UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11396 JLT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
AGA FISHING CORP.                              *
                                               *
v.                                             *
                                               *
FLAGSHIP GROUP LIMITED and                     *
BROWN & BROWN, INC.                            *
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS CLAIM THAT
CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS, IS THE
APPROPRIATE MEASURE OF DAMAGES

Background

The plaintiff, AGA Fishing Corporation (hereafter AGA) at all times material
hereto was the owner of the F/V GEORGIE J. The GEORGIE J, a scalloper out of New
Bedford and its scallop fishing permit were the only assets of AGA Fishing Corp. In or
about November 2003 a seaman working aboard the GEORGIE J was seriously injured
as a consequence of an unseaworthy condition aboard the GEORGIE J. Early on it was
clear that the extent of the injured seaman's damages well exceeded the protection and
indemnity (seaman's liability) policy limits (hereafter "P&I") and, pursuant to this
Court's Order, the GEORGIE J was seized by the United States Marshal Service and the
GEORGIE J (which had been previously appraised at $600,000) and its scallop fishing
permit sold at auction for $1,700,000. The seizure and sale of the GEORGIE J and its
fishing permit put AGA out of business as it simply no longer had any assets.

### AGA and its Principals

The evidence will establish the following.  The principals of AGA Fishing Corporation were Antonette Jones (owner of 100% of the stock of AGA) and her husband, George Jones (who handled the day to day operation of the fishing boat).  Mrs. Jones was neither a fisherman nor directly involved in the affairs of the vessel.

George Jones had been a crewmember aboard the F/V VICTOR in the 1980s which later was renamed the "F/V GEORGIE J" by AGA.  When AGA purchased the vessel the decision was made to carry P&I coverage aboard the vessel.   AGA simply continued the same amount of P&I coverage the previous owner had carried, i.e., $1,000,000 in primary and excess coverage.  This was the same coverage the vessel had through its last policy (May, 2003 thru May, 2004).

George Jones served as the vessel's captain for many years.  From its acquisition until the November, 2003 accident there was never a claim brought by a fisherman who was injured while working aboard the F/V GEORGIE J that exceeded $25,000.     The evidence will establish that neither Mr. nor Mrs. Jones had any idea that a claim resulting from a fisherman injured while working aboard AGA's vessel could result in a judgment exceeding AGA's policy limits or the consequences of such an occurrence, such as the loss of AGA's assets and its business.

### Flagship Group, Ltd.

In the late 1990s Flagship Group Limited (hereafter Flagship), an insurance agency located in Norfolk, VA specializing in maritime (a/k/a marine) insurance, chose

to open a marine insurance brokerage office in New Bedford.[1]  Flagship hired to operate the office Ronald Walsh, a licensed insurance broker/producer with many years experience selling marine insurance in the New Bedford area.  AGA became a client of Mr. Walsh at Flagship's New Bedford office.  Until Flagship decided to close its New Bedford office in or about February, 2001 and terminate Mr. Walsh's employment,  the evidence will establish that Mr. & Mrs. Jones would look to Mr. Walsh to advise them as to appropriate amounts of insurance coverages for the GEORGIE J.

AGA's policy years typically ran from May until May.  The last policy that AGA purchased through Mr. Walsh expired in or about May 2001.  The evidence will establish that until this time Mr. Walsh advised AGA to continue to carry $1,000,000 P&I coverage.   After Mr. Walsh was terminated Flagship assigned broker/producer John Devnew to handle the AGA account.   Devnew admitted at his deposition that he knew "early on" in their relationship that George Jones was a simple man, unsophisticated and inexperienced in legal matters. (Devnew depo., pp. 37-40).

The Scallop Industry in Massachusetts in the Early 2000's

The evidence will establish that there was a substantial change in the scallop fishing industry in the New Bedford area starting in or about 2001.  The scallop fishing industry was significantly on the upswing.  The vessels were doing considerably better financially, each crewmember was earning substantially more money and the value of

---

[1]     Pretrial discovery has established that some Flagship brokers/producers had already been soliciting and selling marine insurance to commercial fishing vessel owners operating out of the New Bedford, MA area without either the agency (Flagship) or its broker/producers being properly licensed to do so.  An investigation by the MA Commissioner of Insurance's office resulted in Flagship, while admitting no responsibility, agreeing to pay a $15,000 fine for alleged licensing violations.

the scallop fishing permits was starting to skyrocket.  The evidence will establish that

this was known to Mr. Walsh who was no longer employed by Flagship and out of the

marine insurance business after February, 2001, when Flagship closed its New Bedford

office.   This significant information knew or should have been known by Flagship and

its producers. [2]

Flagship's Expertise

At all times material to this litigation Flagship held itself out to be a leader in the

field of maritime insurance with significant expertise.   The evidence will establish that

Flagship touted its expertise and its company practices on a website.  (Exh. 1)

The website was created in or about 2000 by Flagship personnel, including

Steven Johnson (founder and former CEO), John Devnew and Christopher Burns.  (Exh.

2, Burns Depo., pp. 41-43).  As testified to by  Flagship producers who sold marine

insurance to Massachusetts vessel owners out of New Bedford after February, 2001 and

its current general manager (Burns) all confirmed that Flagship touted its expertise in

the field of marine insurance.  (Exh. 3, Devnew Depo. pp. 41-42, "unequalled expertise";

Burns Depo.,  p. 85, "unequalled expertise"; Exh. 4, See also Depo. of Steven Johnsen, p.

26,).

Flagship went so far as to define its company practice on its website, which

practice was confirmed by the testimony at deposition of Flagship's producers selling in

Massachusetts:

---

[2]        As stated in <u>Couch on Insurance</u> 3d, Sec. 46.37, "It is the duty of an agent to keep his or her
principal fully and promptly informed of all material knowledge and facts possessed by such agent
relating to the risk . . . and which it is important that the principal should know, which information
should be thorough and accurate, since fidelity, veracity and candor toward the principal are required."

4

> We systematically and comprehensively examine your maritime exposures, recognizing that protecting your corporate business risks is our primary concern.

As noted this company practice during the relevant timeframe, including the policy year at issue (May 2003 – May 2004) was the credo pursuant to which Flagship's producers were supposed to conduct the sale of marine insurance in MA (Devnew Depo. p. 41-43, Depo. of Robert O'Sullivan, pp. 32-33, Exhibit 5).

### Flasghip's Activities in MA after February, 2001

The evidence will establish that after Flagship closed its Massachusetts office and terminated Mr. Walsh's relationship in or about February, 2001, there were three producers/brokers from Flagship selling marine insurance in Massachusetts. These producers were Robert O'Sullivan, Steven Johnson, and John Devnew. O'Sullivan and Johnson had previously been handling Massachusetts fishing vessel accounts for a number of years.

Internal Flagship records generated thru discovery have shown that the scallop fishing vessel owners whose accounts were handled by O'Sullivan and Johnsen after the closure of Flagship's New Bedford office in February, 2001, all had $5,000,000 P&I coverage on each of their vessels. Devnew was assigned to handle the Flagship accounts that had previously been handled by Ron Walsh. The evidence will establish that none of the accounts handled by Mr. Devnew carried P&I coverage in excess of $1,000,000.

Flagship's Producer/Broker, John Devnew

John Devnew had been in charge of Flagship's Norfolk office for a short period of time prior to Flagship being acquired by the defendant, Brown & Brown, Inc. This changed after Chris Burns was hired in 2000. (Burns Depo., pp. 12-14). At Devnew's deposition, when confronted with the above-quoted language in the Flagship website, the creation of which he was a participant in, to wit, "We systematically and comprehensively examine your maritime exposures, recognizing that protecting your corporate business risks is our primary concern", he described this practice as being consistent with the practice of Flagship prior to his discussions with AGA's principals concerning procuring a P&I policy for the policy year of May 2003 through May 2004 (Devnew Depo., pp. 42-43). But Devnew then conceded at his deposition that, while knowing virtually nothing about the financial history or status of AGA or its principals (Devnew depo. p. 41), he also had virtually no idea how a court and/or jury would go about assessing damages in a personal injury lawsuit prosecuted by a Jones Act seaman. (Devnew Depo. pp. 17-18).

The evidence will establish that Devnew never had any training from Flagship or elsewhere on the subject; nor had he ever attended a jury trial involving a Jones Act seaman's personal injury claim. (Devnew Depo. pp. 19-21). In short, Devnew had no clue as to how to "systematically and comprehensively examine . . . [a vessel owner's] maritime exposures" so as to protect its business. As a proximate cause thereof AGA was underinsured and lost its business when a seaman was injured as a result of an unseaworthy condition aboard the F/V GEORGIE J.

*       *       *       *       *

This set of facts creates liability for Flagship for negligence (Count I),

misrepresentation (Count II & III), violations of M.G.L. c. 93A & M.G.L. c 176D Sec. 3(2)

(Count IV & Count V--violations of insurance licensing laws and untrue, deceptive or

misleading insurance practices), creating the right of AGA to recover consequential

damages.

## Issue

The issue to be addressed by this Court is whether, if plaintiff prevails on any or

all of its claims against Flagship, its damages are limited to the $1,700,000 received at

auction[3] or whether plaintiff is entitled to recover not only the loss of its equity in the

GEORGIE J and the value of the fishing permit but also any additional consequential

damages (which, of course, would be subsumed at least in part in the value allocated to

the fishing permit).  It is plaintiff's position that plaintiff should be entitled to recover

by way of consequential damages the higher of whatever is proven at trial, i.e., the

monies generated form the sale at auction or the value of the assets of AGA, including

its fishing vessel and permit, had it been adequately insured and able to continue in

business subsequent to the November 2003 accident.

### Special Duty of Care Creates Right to Recover Consequential Damages

AGA's claims against Flagship are based on Flagship's failure to properly advise

AGA of the need for protection and indemnity insurance coverage over $1,000,000, the

---

[3] Less $120,000 that was negotiated as monies used to pay down the mortgage against the home of the
Jones that was securing the loan for the F/V GEORGIE J.

cost associated therewith and the consequences of being underinsured. The measure of damages available to AGA is, in part, related to the nature of the duty owing AGA by Flagship. It is the position of AGA that Flagship owed to it a "special duty of care".

AGA recognizes that "there is no general duty of care of an insurance agent to insure that an insurance policies procured by him provide coverage that is adequate for the needs of the insured." Martinonis v. Utica Nat. Ins. Group, 65 Mass. App. Ct. 418, 420, 840 N.E. 2d 1994 (2006). "The relationship between an insurer broker and the insured is not normally thought to be fiduciary in nature, absent special circumstances of assertion, representation and reliance." Baldwin Crane & Equipment Corp. v. Riley & Rielly Ins. Agency, Inc., 44 Mass. App. Ct. 29, 31-32, 687 N.E. 2d 1267 (1997). However "an expanded agency agreement arrangement or relationship, sufficient to require a greater duty from the agent than the general duty, generally exists when the agent holds himself out as an insurance specialist, consultant or counselor." Baldwin Crane, at 32 (emphasis added) quoting Sandbulte v. Farm Bureau Mut. Ins. Co., 342 N.W. 2d 457, 464-465, Iowa (1984), Martinonis at 65 Mass. App. Ct. at 422. 840 N.E.2d 994 ("[T]he absence of separate compensation does not mean that special circumstances giving rise to a duty of care did not exist.").

AGA alleges that Flagship represented to it that it was an "insurance specialist" in the field of marine insurance which AGA relied on to its detriment.

Flagship as "Insurance Specialists"

It is beyond dispute that Flagship held itself out as being "insurance specialists" in the field of marine insurance. As noted on the Flagship website (Exh, 1) "Flagship

8

Group, Ltd. was originally established in response to a recognized need for insurance and professional services geared to highly specialized marine and marine-related businesses." Flagship's expertise in the marine insurance field was testified to by each of the brokers who sold in Massachusetts (Devnew, p. 42, "unequalled expertise", Johnsen, Rule 30(b)(6) designee, p. 26 and & Burns, Rule 30(b)(6) designee, p. 85, "unequalled expertise"). As will be shown at trial AGA relied upon the advice of Flagship concerning its maritime insurance needs for the GEORGIE J. (See also, Jones Deposition, pp. 7, 114, 128-129, Exhibit 6).

The evidence in this case will establish that for the policy year May 2003 through May 2004, the cost of increasing the P&I coverage for the GEORGIE J for a 5 to 6 man crew from $1,000,000 P&I coverage to $5,000,000 P&I coverage would probably have cost somewhere in the range of about $600 to $750 per man which extrapolates to a cost of approximately $4,000 per year. The evidence will establish that had AGA been informed by Flagship/Devnew that AGA should carry $5,000,000 P&I coverage on the GEORGIE J it would have done so. [4] As previously noted each scallop fishing vessel insured through the efforts of the only other two brokers of Flagship (O'Sullivan and Johnson) who were selling marine insurance to scallop fishing vessel owners in Massachusetts all carried $5,000,000 P&I coverage. [5]

---

[4]    The evidence will establish that Flagship never had a problem finding an underwriter for excess coverages of up to $5,000,000 (See, e.g., O'Sullivan Depo. p. 59)

[5]    As noted in Couch on Insurance, 3d §46:74, (3d ed.1995):, "The proper measure of damages in an action against an agent for failure to procure insurance is the amount that would agent's breach of duty, and punitive damages where the agent acted fraudulently and with actual malice, reckless disregard."

Flagship as "Insurance Professionals"

In Massachusetts the nature and extent of the duty of care owed by an independent insurance agent/broker to his client depends in part, at least, upon the degree of skill which he represents himself to possess.  <u>Wilson v. James L. Cooney Ins. Agency</u>, 66 Mass.App.Ct. 156, 162, 845 N.E.2d 1187 (2006) and <u>Bicknell, Inc. v. Havlin</u>, 9 Mass.App.Ct. 497, 500-501, 402 N.E.2d 116 (1980).  If he holds himself out to the world as possessing certain skill or if his business is such as to carry with it an implication that he possesses particular skill in effecting insurances, then his principal is justified in relying upon the knowledge which he professes to possess, and he is bound to exercise the skill and to use the knowledge which the business requires.  Id.

Flagship's Rule 30(b)(6) designee, founder, and former CEO testified that Flagship held itself out as "insurance professionals" in the field of maritime/marine insurance. (Johnson Depo.,  pp. 27-28).  Once an insurance broker claims to be an expert in a particular area of insurance he is held to the standard of a professional in that insurance field.  The situation is analogous to professional negligence.  See <u>Fishman v. Brooks</u>, 396 Mass. 643, 487 N.E.2d 1377 (1986) ("An attorney who has not held himself out as a specialist owes his client a duty to exercise the degree of care and skill of the average qualified practitioner"), <u>Edmund & Co. v. Rosen</u>, 412 Mass. 572, 574-75, 591 N.E.2d 179, 180 (1992) (illustrating that standard of care may rise if attorney holds out as specialist in particular area),  <u>Brune v. Belinkoff</u>, 354 Mass. 102, 109, 235 N.E.2d 793 (1968) (general medical practitioner is held to the standard of care and skill of the

average qualified practitioner, whereas a specialist is held to the standard of care of the average practitioner of the specialty.)

Although the general rule in Massachusetts is that "purely economic losses are unrecoverable in tort ... actions in the absence of personal injury or property damage." Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 439 Mass. 387, 413 (2003), there are recognized exceptions to the economic loss doctrine that are present in this action. The economic loss doctrine does not apply to claims arising out of professional malpractice, see generally, Frank Cooke Inc. v. Hurwitz, 10 Mass. App. Ct. 99, 109 (1980) (accounting malpractice losses), Fishman v. Brooks, 396 Mass. 643, 646, 487 N.E.2d 1377 (1986) (the scope of liability for an attorney who commits malpractice is any reasonably foreseeable loss caused by the attorney's negligence), and Clark v. Rowe, 428 Mass. 339, 342, 701 N.E.2d 624 (1998) (refusing to apply the economic loss rule to legal malpractice, the Court stated, "When the economic loss rule has been applied, the parties usually were in a position to bargain freely concerning the allocation of risk, and, more importantly, there was no fiduciary relationship").

AGA's claim for lost profits/consequential damages for breach of a "special duty of care" by an insurance broker/producer is bolstered by the case of Capital Cite Management Assoc. v. Inland Underwriters Ins. Agency Ltd., 61 Mass. App. Ct. 14, 806 N.E. 2d 959 (2004). Therein the agreement between the insured and the agent (who was obtaining a renewal blanket fire insurance policy covering a management company's properties) was treated as a contract for professional services pursuant to which the broker had an obligation to use "that skill and judgment which can be reasonably

expected from similarly situated professionals." 806 N.E. 2d at 961. The Court went on to hold that "accordingly, an insurance broker's failure to perform to this standard in obtaining coverage for its client may support a claim for breach of contract." (Id at 972).

The Court specifically noted that by implying into a contract for professional services an obligation to meet the standards of the applicable profession, said obligation has the effect of overlapping remedies in contract and tort. 806 N.E. 2d at 962, n. 6. Compare, Fall River Savings Bank v. Callahan, 18 Mass.App.Ct. 76, 81-82, 463 N.E.2d 555 (1984), quoting Hendrickson v. Sears, 365 Mass. 83, 86, 310 N.E.2d 131 (1974) ("The gist of an action for damages resulting from the negligence of an attorney, 'regardless of its form, is the attorney's breach of contract.' ")

AGA's Loss of Its Business Was Forseeable

Pursuant to Massachusetts law, an award of consequential damages for prospective lost profits is permitted as the natural, primary and probable consequence of the breach of contract. Hendricks & Associates, Inc. v. Daewoo Corporation, 923 F.2d 209, 217 (1st Cir. 1991) and see Delano Growers' Coop. Winery v. Supreme Wine Co., 393 Mass. 666, 680 (1985) ("Consequential damages are those that cannot be reasonably prevented and arise naturally from the breach, or which are reasonably contemplated by the parties" at the time the parties entered into the agreement.)

In the case sub judice it is beyond dispute that if AGA had inadequate insurance coverage to satisfy any judgment against it the likelihood was that it would lose its vessel and related assets. On this subject, as previously noted, it was Flagship's practice to be executed by its brokers to "systematically and comprehensively evaluate" a

12

potential insured's maritime exposures recognizing that "protecting your corporate business risks is our primary concern."[6]   Therefore the consequential damages that naturally flow from Flagship's breach of its duty are AGA's lost profits, including those attributable to the value of its fishing permit.

Consequential Damages Based on Misrepresentation

The economic loss doctrine also does not apply to claims arising out to claims arising out of misrepresentation, <u>Nota Constr. Corp. v. Keyes Assocs., Inc</u>., 45 Mass.App.Ct. 15, 20, 694 N.E.2d 401 (1998) ("An exception to the doctrine permits recovery for economic losses resulting from negligent misrepresentation").

<u>Consequential Damages for Flagship's Violations of M.G.L. c. 93A §11 & 176D</u>

Per Counts IV and V of its Amended Complaint AGA seeks relief against Flagship resulting from alleged wrongful conduct, including licensing issues after the closing of Flagship's New Bedford office and deceptively holding itself out, through Devnew, as a specialist in marine insurance.

An act is deceptive if it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted.  <u>Purity Supreme, Inc. v. Attorney General,</u> 380 Mass. 762, 777, 407 N.E.2d 297 (1980).  However, a plaintiff need

---

[6]       As noted in Wilson v. James L. Cooney Ins. Agency, 66 Mass.App.Ct. at 163:

"We limit liability in these circumstances, however, to cases where the plaintiff's harm was the foreseeable result of the defendant's negligence in that the plaintiff rightfully relied on the defendant and the defendant knew that the plaintiff would rely on his services or the defendant should have anticipated the plaintiff's reliance and resulting harm." cases cited and citing the Restatement (Second) of Torts §435 comment b (1965) ("if the actor should have realized that his conduct might cause harm to another in substantially the manner in which it is brought about, the harm is universally regarded as the legal consequence of the actor's negligence").

13

not prove actual reliance on a misrepresentation in order to recover under c. 93A, §11. International Fidelity, Inc. Co. v. Wilson, 387 Mass. 841, 850, 443 N.E.2d 1308 (1983). Rather, a plaintiff need only demonstrate a causal connection between the deception and the loss, and that the loss was foreseeable as a result thereof. Id. This is satisfied by a showing that but for the deception, the plaintiff would not have entered into the transaction which caused him damage. Id.

In the case sub judice AGA was deceived by Devnew's lack of knowledge that AGA was underinsured and patent inability to calculate AGA's potential exposure to a seaman injured aboard its vessel. To the contrary the evidence will show that Devnew constantly assured AGA's principals of his and Flagship's expertise, lulling the Jones into a false sense of security.

In deciding unfairness under G.L.c. 93A, §11, the court must focus on the nature of the challenged conduct and the purpose and effect of that conduct. Massachusetts Employers Insurance Exchange v. Propac-Mass, Inc., 420 Mass. 39, 43, 648 N.E.2d 435 (1995). "To be held unfair or deceptive under c. 93A, practices involving even worldly-wise business people do not have to attain the anti-heroic proportions of immoral, unethical, oppressive, or unscrupulous conduct, but need only be within any recognized or established common law or statutory concept of unfairness." VMark Software, Inc. v. EMC Corp., 37 Mass.App.Ct. 610, 620, 642 N.E.2d 587 (1994).

In this action the AGA has asserted Flagship[7] violated G.L. c. 176D, Sec. 3(2) that prohibits the "making, publishing, disseminating, circulating, or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated or placed before the public. . .in any way. . .any assertion, representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business, which is untrue, deceptive or misleading".  Therefore the consequential damages that are foreseeable due to Flagship's unlawful misrepresentations include AGA's lost profits/consequential damages.  See, Standard Register Co. v. Bolton-Emerson, Inc., 38 Mass.App.Ct. 545, 649 N.E.2d 791 (1995) (determination that there was no gap between time of seller's breach of contract for sale of label machine and seller's corporate officers' alleged misrepresentations, in violation of c. 93A, §11 that machine would be ready in time for buyer's relocation, so that total amount of lost profits sustained by buyer were foreseeable damages which flowed from corporate officers' alleged misrepresentations, was supported by evidence that corporate officers made misrepresentations from start of contract.)

The "economic loss rule" does not apply to claims arising out of unfair and deceptive trade practices, G.L.c. 93A, §11, which provides in pertinent part:

> Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two ...

---

[7] General Laws c. 176D, §1(a) defines as insuring entities subject to the act "any individual, corporation, association, partnership, ... and any other legal entity or self insurer which is engaged in the business of insurance, including agents, brokers, and adjusters...."

may ... bring an action ... for damages . . .as the court deems to be necessary and proper.

### Evidence of the Amount of AGA's Lost Profits

"A party may recover for lost profits as long as the value of those profits may be determined, as a practical matter, with a fair degree of certainty ...  The amount of lost profits may be ascertained by reference to some definite standard, either of market value, established experience, or direct inference from known circumstances."  Our Lady of the Sea Corp. v. Borges, 40 Mass.App.Ct. 484, 487-488, 665 N.E.2d 128 (1996). AGA will present evidence at trial showing lost profits by various witnesses who will provide testimony of the revenues generated by the F/V GEORGE J since the time of its sale at auction, earnings that would have been available to AGA if it had been able to continue in business and evidence of the current value of scallop fishing permits in New Bedford, including evidence that AGA's scallop fishing permit for the F/V GEORGIE J is currently valued in excess of $2,000,000.

### Conclusion

Based on the foregoing AGA respectfully submits that it is entitled to recover against Flagship consequential damages and is not limited to the proceeds generated at auction from the sale of the F/V GEORGIE J and its scallop fishing permit.

16

Dated:  March 28, 2007                    Respectfully submitted
                                          The Plaintiff, AGA FISHING CORP.,
                                          By its attorney,
                                          JOSEPH G. ABROMOVITZ, P.C.


                                          s/Joseph G. Abromovitz
                                          _____

                                          Joseph G. Abromovitz
                                          BBO No. 011420
                                          858 Washington Street, Third Floor
                                          Dedham, MA 02026
                                          Phone: (781) 329-1080



                        CERTIFICATE OF SERVICE

       I, Joseph G. Abromovitz, counsel for the plaintiff, hereby certify that on the 28th

day of March, 2007 I served a copy of the within document via postage prepaid mail to

Michael J. Stone
Peabody & Arnold, LLP
30 Rowes Wharf
Boston, MA 02110
                                          s/Joseph G. Abromovitz
                                          _____

                                          Joseph G. Abromovitz



Home | Maritime | Insurance Solutions | Benefit Solutions | Claim Services | About Us | Contact Us | Parent Company

## Maritime Insurance

Companies needing Maritime Insurance are looking for an agent or broker that offers end-to-end service and relationships with insurers that cover all types of liabilities at a reasonable cost.



**Why choose Flagship?**

- We have relationships with many of the more prestigious insurers and brokers throughout the world to give you a wide range of choices for coverage that exactly meets your needs. These insurance markets offer financial stability and a long-term commitment.
- We have the expertise necessary to offer the appropriate insurance services for the maritime industry and cover all types of marine liabilities - From a single vessel to a large fleet of vessels, marine construction, local and worldwide ship repairing projects, terminal operations, cargo coverage, and others.
- We systematically and comprehensively examine your maritime exposures, recognizing that protecting your corporate business risks is our primary concern.
- We are committed to providing our clients with a wide array of insurance products and services at the most reasonable cost.
- We offer our clients in house underlined claims adjusting , including hull, protection and indemnity, and others.





EXHIBIT
Burns 2
KRW 1·23·07

1

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF MASSACHUSETTS

3

4    AGA FISHING CORP.,                    )

5                   Plaintiff,            )    CIVIL ACTION NO.

6        v.                                )        05-11396 JLT

7    FLAGSHIP GROUP LIMITED and            )

8    BROWN & BROWN, INC.,                  )

9                   Defendants.            )

10

11

12    CERTIFIED ORIGINAL

13    DEPOSITION UPON ORAL EXAMINATION

14    OF CHRISTOPHER G. BURNS

15    TAKEN ON BEHALF OF THE PLAINTIFF

16    Norfolk, Virginia

17    January 23, 2007

18

19

20

21    ----------------------------------------

22    TAYLOE ASSOCIATES, INC.

23    Registered Professional Reporters

24    Telephone:   (757) 461-1984

25    Norfolk, Virginia

41

A.      I believe on or around the same time I was transitioning into the office.

Q.      And that would be around 2000?

A.      Yes.

Q.      And what role, if any, did you play in the creation of this -- the content of the web site as reflected in Exhibit Number 2?

A.      Very little.  I think I was asked about some language, but I don't know that I participated in the language.  We had some round-table discussions about what we were going to put in there.  And, essentially, it was because at the time we had a salesperson in the office that was focusing on technology, and we didn't have a web site.  So we needed to have a web site to go after that type of business, and this is where it was -- this is where the Flagship web site came from.

Q.      And who was the salesperson in the office that was focusing on technology?

A.      Fay Carbo was her name.  She's no longer there.

Q.      C-A-R-B-O?

A.      I believe so.

Q.      And was she a producer?

A.      She was.

Q.      And what was -- what type of -- strike
that.

        Did she sell marine insurance?

        A.      She sold more property and casualty.  I
don't believe she did very much marine at all.  She
was into the property/casualty side and then the
technology side.

        It became -- in 2000 it had become sort
of a new niche market with technology, and she tried
to -- very unsuccessfully she tried to go into that
niche.

        Q.      I want to focus on some language in the
web site under the category marine -- Maritime
Insurance, "Why choose Flagship."  And I'll quote the
following language:  "We systematically and
comprehensively examine your maritime exposures,
recognizing that protecting your corporate business
risks is our primary concern," end quote.  Did I read
that correctly?

        A.      Yes, sir.

        Q.      Okay.  How did that language come into
existence?

        A.      I would imagine that, again, the round
tables put it together.

        Q.      And who were participants in this round

43

```
 1    table or round tables?

 2          A.      Probably all the salespeople in the

 3    office.

 4          Q.      And that would have consisted of

 5    yourself?

 6          A.      Myself, Jack Devnew, Steve --

 7          Q.      Steve Johnson?

 8          A.      Steve Johnson.

 9                  -- Eddie Gay, Fay Carbo.

10          Q.      Mr. O'Sullivan?

11          A.      No, he would not have been involved in

12    that.  Probably doesn't know how to get on the web

13    site.

14                  And there may have been a few others.

15          Q.      Do you know a gentleman by the name of

16    Ron Walsh?

17          A.      I know of him.  I don't believe I've ever

18    met him.

19          Q.      Was he a participant in the round tables

20    that you're referring to?

21          A.      Not that I'm aware of.  Again, that was

22    when he was transitioning out as well, as I was coming

23    in.

24          Q.      You mentioned Eddie Gay.  Was he involved

25    in the sale of marine insurance at the --
```

85

probably have zero.  It just depends on home porting.
There may be a boat that packs in New England that's
home ported out of New Jersey, which is how we
delineate who gets to write what.

    Q.      Okay.  Before May of '03 did Flagship
hold itself out as having expertise necessary to offer
the appropriate insurance services for the maritime
industry and cover all types of liability?

    A.      Yes.

            Not cover all, no, not cover all types,
but offer -- hopefully offer all types of cover.

    Q.      Okay.  Before May of '03 did Flagship
portray itself as having unequaled expertise and
experience in the fishing vessel industry?

    A.      I would bet that we did, and should have,
because we certainly had a tremendous amount of
experience.

    Q.      Were you involved at all in the
termination of John Devnew's employment with Brown &
Brown?

    A.      No.

    Q.      I assume at some point you became aware
of it?

    A.      Immediately, yes.

    Q.      And what's your understanding as to why

TAYLOE ASSOCIATES, INC.

1

1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3

4

5   AGA FISHING CORP.,            )

6              Plaintiff,   )   CIVIL ACTION NO.

7     v.                 )     05-11396JLT

8   FLAGSHIP GROUP LIMITED      )

9   and                  )

10  BROWN & BROWN, INC.,       )

11             Defendant.   )

12

13             CERTIFIED ORIGINAL

14      DEPOSITION UPON ORAL EXAMINATION

15         OF JOHN S. DEVNEW

16    TAKEN ON BEHALF OF THE PLAINTIFF

17         Norfolk, Virginia

18          May 5, 2006

19

20

21     - - - - - - - - - - - - - - - - - - - - - - - - - - - -

22         TAYLOE ASSOCIATES, INC.

23     Registered Professional Reporters

24       Telephone:  (757) 461-1984

25         Norfolk, Virginia

1          A.      Oh, yes.

2          Q.      Is it fair to say that some of these

3     people could have been seriously hurt?

4          A.      Yes.

5          Q.      What did you understand about the law --

6     if a fisherman got hurt while fishing aboard a

7     commercial fishing boat, what did you understand his

8     legal remedies to be?

9          A.      Well, there's -- there's the Jones Act

10    and admiralty law provisions.

11         Q.      Okay.  And what did you understand --

12    what remedies did you understand that those -- the

13    Jones Act or admiralty law provisions provided to a

14    seaman who was hurt aboard a vessel under

15    circumstances where the vessel owner was responsible?

16         A.      Can you ask the question again?  I'm

17    not --

18         Q.      Sure.  Is it fair to say you understood

19    that if a commercial fisherman got hurt while working

20    on a commercial fishing boat he could sue his employer

21    under a law called the Jones Act?  Did you know that?

22         A.      Yes.

23         Q.      Okay.  And he could bring that lawsuit in

24    the federal court, correct?

25         A.      Yes.

18

1    Q.    And he could claim a right to a trial by

2  jury, correct?

3    A.    Yes.

4    Q.    And you understood his lawsuit would be

5  for money damages to compensate him for the extent of

6  the injuries that were caused as a result of the

7  accident, correct?

8    A.    Partially, yeah.  There was -- there's

9  issues of maintenance and cure, you know, for injured

10  seamen, and then there's, you know, the -- and then

11  there's potentially damages beyond maintenance and

12  cure.

13    Q.    Okay.  And under those circumstances

14  where a fisherman could recover damages beyond

15  maintenance and cure, what was your understanding of

16  how those damages would be calculated by a jury?

17    A.    I would say that I didn't have -- I --

18  you know, I think they would be very subjective.

19    Q.    Subjective.  What do you mean by that?

20    A.    Take a look at the nature of the injury,

21  the nature of the circumstances surrounding the injury

22  or accident.  I think -- you know, I was never in a

23  courtroom during -- and I've never witnessed any of

24  the -- you know, the P & I claims, bodily injury

25  claims, that went to trial, nor was I involved in --

1     with the adjusters.

2              Typically, our involvement as agents with

3     crew injury claims were only to make sure that the

4     adjusters -- that there was communication and there

5     was an initial response, okay?

6              Typically, beyond that, the -- we would

7     tend to get involved only if there seemed to be an

8     issue, either a communication problem or something

9     like that, so that we would, you know, try to help

10    facilitate if there was some kind of log jam or

11    something.

12             Typically, we did not get very involved,

13    so my answer to your question is, you know, how a jury

14    would actually look at something, I don't know.  You

15    know, I don't -- I've never been involved with it, so

16    I can't say.  I've never been on a jury myself, I've

17    never had a call to jury duty, and never was part of

18    the actual adjustment, you know, of a bodily injury

19    claim.

20       Q.      During the period of time you worked at

21    Flagship did it have a -- in Norfolk -- did it have a

22    division that did some claims adjusting for certain

23    underwriters?

24       A.      Yes.

25       Q.      Okay.  And is it fair to say that you

1   really did not get involved in how they went about

2   doing their work of adjusting a claim?  Is that a fair

3   statement?

4        A.     Well, not on a -- yeah, right.  I mean,

5   what we might -- where we might get involved or

6   something is if a vessel owner calls me and says,

7   Well, can you tell me what's going on with this, you

8   know, claim?  You know, so-and-so has seen this guy

9   working on a roof, okay?

10            So then I would go in to, you know, our

11   adjusters, or if it wasn't them, call the adjuster,

12   perhaps, or have David call the adjuster that was

13   particularly working on it, or check on it and say,

14   well, you know, is anybody following up on this --

15   what's the status of this claim?

16            So it would more -- tend to be -- my

17   involvement on things would tend to be on that level,

18   you know, or when it would come to a renewal and there

19   was a reserve out there, there was an open claim and

20   the -- perhaps the injured crewman was still

21   undergoing -- he had not reached maximum medical

22   improvement and so there was an ongoing medical thing.

23   So I would generally, you know, take the pulse of that

24   and see where we were on a renewal basis.

25        Q.     You mentioned the name David in the

TAYLOE ASSOCIATES, INC.

1    context of somebody you would talk to if it came to

2    your attention, for example, that you got a call from

3    a vessel owner who told you that an injured worker was

4    seen working on a roof.

5                 Who is David that you're talking about?

6        A.      David Husbands.

7        Q.      Okay.  And who was Mr. Husbands?

8        A.      He was the gentleman that you're

9    referring to when you say they -- Flagship had a

10   division that did P & I claims adjusting, crew

11   injuries, and that was the fellow.  His name was David

12   Husbands, and it was Flagship Maritime Adjusters.

13       Q.      And was Mr. Husbands the only person that

14   worked in that department of Flagship?

15       A.      No.  No, we -- depending on the level of

16   activity and the clientele that we used, sometimes he

17   was; sometimes there was other people.

18       Q.      Okay.  Do you know a man by the name of

19   Ron Walsh?

20       A.      Yes.

21       Q.      And Mr. Walsh used to run the

22   Massachusetts office of Flagship up until the time it

23   was closed.  Is that correct?

24       A.      Yes.

25       Q.      During the period of time that Mr. Walsh

TAYLOE ASSOCIATES, INC.

37

1    either George Jones or his wife, Antoinette Jones?

2         A.    I seem to recall a discussion with Ron,

3    and they were -- the relationship between Ron and

4    Flagship went south very quickly after we closed the

5    office, so it was not a particularly -- I had had a

6    good relationship with Ron.  When we closed the office

7    and everything up there, you know, he became very

8    distant.

9              I did -- my recollection is that I talked

10   with him about several boat owners, and -- and I think

11   all -- you know, he just said that, you know, they're

12   nice people; that -- you know, that George could be

13   difficult sometimes to get along with.

14        Q.    I've been provided with some e-mails that

15   you generated in connection with communications with a

16   man by the name of Lev Osman.

17        A.    Uh-huh.

18        Q.    Yes?

19        A.    Yes.

20        Q.    Okay.  And in one of the e-mails you

21   state -- and I'm -- this is an e-mail that you sent to

22   Mr. Osman on April 26, 2004 -- "Jones is a simple man

23   in his 50s who has spent his life fishing, owns the

24   one boat, and very likely has the majority of his net

25   worth in retirement wrapped up in the boat, and permit

TAYLOE ASSOCIATES, INC.

1    now in great jeopardy."

2            Do you remember saying that, sir?

3        A.    Yes.

4        Q.    Okay.  "He is unsophisticated and

5    inexperienced in legal matters, certainly one of this

6    magnitude and gravity.  Do you remember saying that?

7        A.    Yes.

8        Q.    Okay.

9        A.    I remember writing the e-mail.

10        Q.    Okay.  When did you first learn that

11    Mr. Jones was a fairly unsophisticated, simple man?

12        A.    Well, I would say it was, you know,

13    pretty early on in our relationship, whenever that

14    started.

15        Q.    The incident that gave rise to the claim

16    against the AGA Fishing Corporation and the seizure

17    and sale of the GEORGIE J took place in November,

18    2003, correct?

19        A.    Yes, to the best of my recollection.

20        Q.    Is it fair to say that prior to November,

21    2003 you became aware that Mr. Jones was a simple,

22    unsophisticated man?

23        A.    Yes.

24        Q.    Would it also be fair to say that you

25    knew that -- strike that.

1              The policy, the insurance policy in

2    effect at that time, covered the time period of May 1,

3    '03 to May 1, '04, correct?

4         A.    Correct.

5         Q.    Would it be fair to say that prior to

6    that policy being renewed -- and that was a renewal

7    policy, was it not?

8         A.    Yes, it was.

9         Q.    Flagship placed the coverage for the

10   prior year for the GEORGIE J, correct?

11        A.    Yes.

12        Q.    Would it be fair to say that prior to the

13   renewal of the policy in effect at the time of the

14   Capaldi incident in November, 2003, you were aware

15   that Mr. Jones was a simple and unsophisticated man?

16        A.    Yes.  Simple -- I don't know.  I mean,

17   what's simple?  But, yes.

18              My sentiments, as either accurately or

19   inaccurately portrayed in the e-mail regarding Jonesy

20   were, you know, evident to me prior to -- you know,

21   fairly early on when we met.

22        Q.    In the e-mail -- and I'll be happy to

23   show it to you -- you did refer -- you said, quote,

24   "Jones is a simple man in his 50s who has spent his

25   life fishing."

40

1          You used the word "simple," did you not?

2     A.     Yeah.  If it's there, that's what I used.

3     Q.     Well, why don't you just take a look at

4  this to confirm that that in fact is what you said.

5          (There was a pause in the proceedings.)

6          THE WITNESS:  Uh-huh.

7  BY MR. ABROMOVITZ:

8     Q.     You referred to Mr. Jones as "a simple,

9  unsophisticated man," correct?

10    A.     Yes.

11    Q.     Okay.  And that's something that you knew

12 prior to the renewal policy that went into effect on

13 May 1st, 2003.

14    A.     Yes.

15    Q.     Okay.  And you also knew prior to

16 May 1st, 2003 that Mr. Jones's entire financial life

17 was wrapped up in his fishing boat and that fishing

18 permit, correct?

19    A.     No.

20    Q.     Do you remember saying in a later e-mail

21 to Mr. Osman on exactly the same day, "I was right in

22 my estimation that Jones's worth is almost entirely

23 wrapped up in the vessel and that prospects for him

24 are potentially devastating"?

25          Do you remember saying that?

1       A.      Uh-huh.

2       Q.      Yes?

3       A.      Yes.

4       Q.      Okay.  Are you saying that before

5   May 1st, 2003 you did not know that if Mr. Jones lost

6   this vessel -- AGA Corporation lost the vessel and

7   fishing license that the effects would be financially

8   devastating?  You didn't know that?

9       A.      Well, not to the extent that I was to

10  learn it once Jonesy got into this situation.

11              I mean, for all I knew when I was writing

12  Jones's insurance -- I mean, it's possible he had bank

13  accounts in the Cayman Islands.  I mean, he could

14  still do that, and I could be way wrong about it.

15              I don't know Jonesy's history, you know,

16  financial history, that well.

17      Q.      Did Flagship Group, in the time frame

18  that you were servicing the AGA Fishing Corp. account,

19  hold itself out as having expertise necessary to offer

20  the appropriate insurance services for the maritime

21  industry and cover all types of marine liabilities?

22      A.      Generally, yes.

23      Q.      Did Flagship Group, during the time that

24  you were servicing the Jonesy account and prior to

25  selling the last policy in issue, represent that it

1    had unequaled expertise and experience in the fishing

2    vessel industry?

3         A.    I don't recall that particularly, but it

4    would be a reasonable thing to portray.  We had very

5    good experience in it.

6         Q.    And did Flagship Group also represent

7    that it systematically and comprehensively examined

8    the insured's potential maritime exposure, recognizing

9    that "protecting your corporate business risks is our

10   primary concern"?

11        A.    Yes.

12        Q.    Okay.  So, would it be fair to say that

13   when you dealt with the Joneses, prior to the issuance

14   of that last policy on May 1st, 2003, the statements

15   that I just read to you -- which I'll represent came

16   from Flagship's Web site -- were matters of which you

17   were aware?

18        A.    In general, yes.

19        Q.    Okay.  That Flagship held itself out as

20   having a lot of expertise in the field of marine

21   insurance, correct?

22        A.    Yes.

23        Q.    And represented to its insureds that it

24   would undertake the necessary work to find out what

25   was needed to protect those insureds in the event that

TAYLOE ASSOCIATES, INC.

1    something happened to create a loss aboard one of its

2    vessels?

3          A.    Could you ask that again, please?  I'm

4    sorry.

5          Q.    Sure.  What do you understand the

6    statement in the Web site to mean -- and I'll read it

7    verbatim.

8                "We systematically and comprehensively

9    examine your maritime exposures, recognizing that

10   protecting your corporate business risks is our

11   primary concern."

12               What do you understand that statement to

13   mean, sir?

14         A.    I understand that to mean that we would

15   discuss with our clients and prospects the natures of

16   their exposures and offer them a host of insurance

17   products and access products that they would request

18   and discuss their -- their insurance issues in

19   general.

20         Q.    Prior to May 1st, 2003, and in connection

21   with the renewal of that policy, when Flagship would

22   sell insurance on behalf of an underwriter to a vessel

23   owner such as AGA Fishing Corp. is it fair to say that

24   the primary layer of P & I, protection and indemnity

25   coverage, typically was in the range of $250,000?

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3

4

5    AGA FISHING CORP.,                    )

6                        Plaintiff,        )    CIVIL ACTION NO.

7        v.                                )       05-11396JLT

8    FLAGSHIP GROUP LIMITED                )

9    and                                   )

10   BROWN & BROWN, INC.,                  )

11                        Defendants.      )

12

13                   CERTIFIED ORIGINAL

14        DEPOSITION UPON ORAL EXAMINATION

15            OF STEPHEN A. JOHNSEN

16       TAKEN ON BEHALF OF THE PLAINTIFF

17             Norfolk, Virginia

18               May 4, 2006

19

20

21    -------------------------------------

22          TAYLOE ASSOCIATES, INC.

23      Registered Professional Reporters

24        Telephone:  (757) 461-1984

25             Norfolk, Virginia

1    cyclical.  It could have happened at that time.

2         Q.      And would it also be fair to say that --

3    understanding some of these crew members who were

4    making upwards of a hundred thousand dollars a year

5    could be in their 20s or 30s?

6         A.      That's correct.

7         Q.      And have a potential earning capacity

8    going into the millions over the balance of their work

9    life expectancy, if the industry maintains its then

10   level of business?

11        A.      It could.

12        Q.      Okay.  Would it also be fair to say that

13   you would expect producers on behalf of Flagship to

14   have conversations along these lines with its

15   customers when discussing their insurance needs?

16        A.      I think that generally happened.

17        Q.      Okay.  And you would expect Mr. Devnew to

18   have had such conversations with any of his customers?

19        A.      Absolutely.

20        Q.      Okay.  Is it fair to say that in the time

21   frame of 2001 to 2004 that Flagship held itself out to

22   the maritime industry and fishing vessel owners as

23   having expertise in the field of marine insurance?

24        A.      Yes.

25        Q.      And having the ability to properly

1    counsel people on what their insurance needs are or

2    were?

3         A.      There are two different designations in

4    the insurance marketplace.  One is an insurance

5    consultant, and another is an insurance agent or

6    producer.

7         Q.      Uh-huh.

8         A.      And the responsibility to provide

9    specific consulting and/or recommending coverages is

10   not something that Flagship generally would do.

11            We would certainly talk with a client

12   about the nature of their risk -- as an example on the

13   hull side, the age of the vessel, it's current

14   condition, getting information having to do with the

15   survey of the vessel, and then working to place that

16   business with an underwriter on an agreed-value basis,

17   because it's the underwriter and the assured -- not

18   the broker and the assured, or the broker and the

19   underwriter, but it's the assured and the underwriter

20   who agree on what amount needs to be placed.

21            And it effectively is the broker's job to

22   be able to bring to the client information about the

23   markets that are available, and it's our job also to

24   take information from the client and take it to the

25   underwriter and let the two of them make a

28

1    determination about the specifics of the program it's

2    put together of insurance, either in terms of pricing,

3    or in terms of limits, or in terms of the technical

4    exposures.

5              Now, we certainly hold ourselves out as

6    insurance professionals, which means that we know

7    generally what's going on in the market and generally

8    what's happening with the trends within the fishing

9    industry, and it's our job to make sure that both

10   parties understand and recognize those relationships.

11        Q.    When you use the term "client" you're

12   referring to in this context --

13        A.    Our assured.

14        Q.    Your insured or --

15        A.    Or a prospective insured.

16        Q.    Okay.  And in this case AGA Fishing Corp.

17   would be a client of Flagship's, correct?

18        A.    That's correct.

19        Q.    Okay.  Who hired Mr. Devnew?

20        A.    I hired Mr. Devnew.

21        Q.    Okay.  And I haven't had time to go

22   through the whole thing, but he started with your

23   company sometime in the early '90s, I believe, '94 or

24   thereabouts?

25        A.    Approximately eleven years ago.

TAYLOE ASSOCIATES, INC.

1           UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3

4    AGA FISHING CORP.,                    )

5                      Plaintiff,     )   CIVIL ACTION NO.

6       v.                             )      05-11396 JLT

7    FLAGSHIP GROUP LIMITED and          )

8    BROWN & BROWN, INC.,                )

9                      Defendants.    )

10

11

12              CERTIFIED ORIGINAL

13       DEPOSITION UPON ORAL EXAMINATION

14          OF ROBERT W. O'SULLIVAN

15      TAKEN ON BEHALF OF THE PLAINTIFF

16             Norfolk, Virginia

17            January 23, 2007

18

19

20

21       ---------------------------------------

22           TAYLOE ASSOCIATES, INC.

23      Registered Professional Reporters

24        Telephone:   (757) 461-1984

25             Norfolk, Virginia

1    you would say something to them about it?

2         A.    Sure.

3         Q.    Okay.  Let me show you what's been marked

4    Exhibit 2 in Mr. Burns' deposition and also marked as

5    exhibits at other depositions and ask -- and I'll tell

6    you this is something that was printed off of

7    Flagship's web site and ask you to just take a look at

8    that for a minute, please.

9              MR. STONE:  That's a little thing on some

10   people's desks, sort of looks like a television set.

11             THE WITNESS:  Very funny.

12             MR. STONE:  That was actually for Joe's

13   benefit, not yours.

14             THE WITNESS:  Actually, it could be mine

15   just as well.

16             Okay.

17   BY MR. ABROMOVITZ:

18        Q.    With reference to -- first of all, have

19   you seen this document before today or the web site

20   before today?

21        A.    No.

22        Q.    With reference to the paragraph that

23   reads, and it's third from the bottom, quote, "We

24   systematically and comprehensively examine your

25   maritime exposures, recognizing that protecting your

1    corporate business risks is our primary concern," is

2    it fair to say that that's what you viewed your job to

3    be when you were a producer for Flagship before 2000?

4            A.      One of them, certainly, one of them.

5            Q.      And in order to systematically and

6    comprehensively examine a vessel owner's potential

7    maritime exposures, how would you go about doing that?

8            A.      Well, you would start off with a pretty

9    good knowledge, background knowledge, of the maritime

10   industry, the part of the industry that you're

11   potentially insured would be working in, whether it be

12   tugs and barge, fishing vessels, shipyards, whatever

13   that happened to be.  You would -- are we restricting

14   this to fishing vessels?

15           Q.      At the moment, yes.

16                   Actually, yeah, let's restrict right now

17   to fishing vessels.

18           A.      Okay.

19           Q.      Then I'll have ask you to expand it.

20           A.      Sorry I asked the question.

21           Q.      Okay.

22           A.      The fishing vessel, you'd have to

23   document a number of the parameters of the vessel

24   itself, length overall, builder, how old,

25   construction, type of power, where it operated,

1        Q.    No?

2        A.    No.

3        Q.    Okay.  In connection with any of the

4  commercial fishing vessel owners that you were

5  involved with over the years up until the year 2000

6  where the coverages were placed for more than $1

7  million excess, did you have trouble placing coverages

8  for any of those fishing vessel owners?

9             MR. STONE:  Objection to "trouble."

10  BY MR. ABROMOVITZ:

11       Q.    Well, let me ask the question this way:

12  With reference to any of the commercial fishing vessel

13  owners which you were the producer before the year

14  2000, was there ever an instance where you tried to

15  place coverage in excess of $1 million and you

16  couldn't get an underwriter to take the risk?

17       A.    No.

18       Q.    Just give me a minute.  I think we're all

19  done.

20       A.    I do have a comment I'd like to make

21  before we finish, if I may.

22       Q.    Sure.

23       A.    I guess I've worked with Flagship for

24  about 27 years, prior to that five years with another

25  independent agency.  In all the 30-plus years, I have

VOLUME:   I

PAGES:   1 - 176

EXHIBITS: 1 - 16

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


------------------------x

AGA FISHING CORPORATION,

      Plaintiff,

 vs.                         Civil Action No.

FLAGSHIP GROUP LIMITED      05-11396 JLT

and BROWN & BROWN, INC.,

      Defendants.

------------------------x

RULE 30(b)(6)DEPOSITION OF AGA FISHING CORPORATION

(By its Designee, GEORGE E. JONES JR.) and

GEORGE E. JONES JR., Individually

Monday, May 15, 2006

10:13 a.m.

Peabody & Arnold LLP

30 Rowes Wharf

Boston, Massachusetts


Reporter:  Dana Welch, CSR, RPR

7

1    understandable to you.  Okay?

2        A.  Okay.

3        Q.  Now, you've been living in your house for

4    about 30 years, you say?

5        A.  Yeah; '75; that's what, 31.

6        Q.  I seem to recall that there was some

7    problem with correspondence reaching you from

8    Flagship at some point in the -- in the late '90s

9    or early 2000.

10        Did you change addresses at some point

11    perhaps for your business?  Were you getting

12    business mail at one location and then to another

13    location?

14        MR. ABROMOVITZ:  Object to the form of the

15        question.  You may answer.

16        THE WITNESS:  I don't understand.

17        Q.  Okay.  In addition to your home --

18        A.  Yes.

19        Q.  -- do you have any other homes in addition

20    to that home?  Do you own other property?

21        A.  One on Princeton Street.

22        Q.  Is that a residence or a business?

23        A.  Residence.

24        Q.  Who lives there?

114

1    Q.  Do you remember what -- and this was

2    Steve?

3    A.  Steve, yes.

4    Q.  And do you remember what Steve said when

5    you were upgrading?

6    A.  Yes.  He told me I should upgrade because

7    I have a business.

8    Q.  Okay.  Did he suggest a particular amount?

9    A.  Yes.  I guess that amount.

10   Q.  He suggested 100/300?

11   A.  Yes.  I rely on their judgment.

12   Q.  Okay.

13   A.  The agents.

14   Q.  All right.  Now, with respect to your boat

15   insurance, as I understand it, you had a million

16   dollars in coverage -- sorry -- Axel had a million

17   dollars in coverage when you bought the boat from

18   him.

19   A.  Yes.

20   Q.  At any point after that, did you have a

21   discussion with anyone, either Mr. Walsh or

22   Mr. Hart or Mr. Devnew about how much P&I coverage

23   you should have?

24   A.  No.

128

1    A.  I don't remember.

2    Q.  **Do you understand what those two sentences**

3  **mean?**

4    A.  No.  Pollution?  Something goes in the

5  water.

6    Q.  **Do you know what pollution insurance**

7  **coverage is?**

8    A.  Yeah.  In case you have a spill.

9    Q.  **How much were you -- was your limit for**

10  **pollution coverage?**

11    A.  I think it was 20, 20 -- 25,000.

12    Q.  **Do you understand what the phrase "write**

13  **higher limits" means in Exhibit 12?  "Please**

14  **remember we can write higher limits."**

15    A.  What does it mean?

16    Q.  **Yeah.  Do you understand it -- tell me**

17  **what it means to you, sir.**

18    A.  It means if I need more, they can write

19  more.

20    Q.  **So if you want to get a higher -- a higher**

21  **amount of coverage, they can get it for you?**

22    A.  Yes.

23    Q.  **Did you understand that back in 2001?**

24    A.  I thought they were taking care of me,

George E. Jones JR.                                    05/15/2006

129

1    really.  I didn't need it.

2        Q.  What do you mean, you thought they were

3    taking care of you?

4        A.  Well, I thought I had enough.

5        Q.  Okay.  Why is it that you thought you had

6    enough?

7        A.  Because they're an insurance company.

8    It's like my cars.

9        Q.  Did they -- did anyone from the insurance

10   company ever tell you that you had enough insurance

11   coverage?

12       A.  No.

13       Q.  But you were buying the same coverage that

14   you had bought from two other insurance companies?

15       A.  Yes.

16       Q.  Gotcha.  All right.  Let me show you the

17   next one.

18           (Exhibit No. 13, Letter of April 19, 2002,

19           marked for identification.)

20       Q.  The letter of April 19, 2002, Mr. Jones,

21   that contained the renewal proposal for the year

22   '02-'03; is that correct?

23       A.  Yes.

24       Q.  And did you renew with Flagship in