UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **AGA FISHING CORP.,**<br>                    **Plaintiff**<br><br>**v.**<br><br>**FLAGSHIP GROUP LIMITED and**<br>**BROWN & BROWN, INC.,**<br>                    **Defendants** | **CIVIL ACTION NO. 05-11396 JLT** |

**MEMORANDUM OF THE DEFENDANTS, FLAGSHIP GROUP LIMITED AND
BROWN & BROWN, INC., IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT**

The Defendants, Flagship Group Limited ("Flagship") and Brown & Brown, Inc.

("Brown & Brown"), submit this memorandum in support of their motion for summary judgment

on the Plaintiff, AGA Fishing Corp.'s ("AGA") complaint. AGA claims that Flagship, its

marine insurance broker, failed to advise it as to the proper limit of Protection & Indemnity

insurance ("P&I insurance"), and as a result AGA claims that it lost its vessel F/V GEORGIE J.

and fishing permit because it did not have sufficient P&I insurance to cover a personal injury

claim by a crew member.

The United States District Court for the District of Massachusetts has previously

considered a claim for a broker's alleged failure to advise, and granted a broker summary

judgment on virtually the same facts. See RLI Ins. Co. v. Wood Recycling, Inc., 2006 U.S. Dist.

Lexis 30596 (D. Mass. 2006) (Zobel, J.). An insurance broker ordinarily "assumes those duties

normally found in an agency relationship." Id. at *25 (D. Mass. 2006) (Zobel, J.) (quoting

Baldwin Crane & Equip. Corp. v. Riley & Rielly Ins. Agency, Inc. 44 Mass. App. Ct. 29, 31-32

(1997)). "These duties include the duty to deal in good faith and the duty to carry out

instructions, but do not include the duty to advise." RLI Ins. Co., 2006 U.S. Dist. Lexis 30596,

at *25 (citing 16A Appleman, Insurance Law and Practice § 8836, at 64 (1981). As Judge Zobel

found:

> Rather than establishing that "special circumstances of assertion, representation and reliance" existed in this case, much of what [the assured] describes instead amounts to "typical brokerage services," as [the assured] itself describes [the broker's] work. For example, [the assured] states that [the broker] met with [it] to discuss its insurance needs, researched the insurance market, and obtained quotes, all of which are normal broker activities. The fact that [the broker] was familiar with [the assured's] business, that it kept abreast of company changes that could affect insurance coverage, and that it was aware of the need for business interruption coverage likewise do nothing to establish an "expanded relationship" between the parties. Any broker who wishes to procure appropriate coverage for an insured must ascertain the types of risks for which coverage is required.

RLI Ins. Co., 2006 U.S. Dist. Lexis 30596, at *28-29. Likewise, summary judgment should

enter for Flagship and Brown & Brown on AGA's claims. The law is clear: a broker in the

same situation as Flagship is not required to advise an insured how much insurance to purchase.

## I.    INTRODUCTION

AGA purchased the GEORGIE J,[1] a scalloping vessel and its fishing permit in 1987.

There was an unfortunate accident aboard the GEORGIE J. on November 25, 2003 involving a

crew member, Victor P. Capaldi. Capaldi was injured and commenced an in rem action against

the GEORGIE J. shortly after the accident. The United States Marshal ultimately sold the vessel

and its permit for $1.7 million at an auction on November 15, 2004. Capaldi and AGA settled

their dispute with the payment to Capaldi of the remaining P&I insurance proceeds and the

proceeds from the sale of the vessel and its permit after the mortgage of $125,000 was satisfied.

---

[1] When AGA originally purchased the vessel it was named VICTOR. The name was later changed to the GEORGIE J.

AGA contends that it did not have sufficient P&I insurance on the GEORGIE J. to cover Capaldi's claim, and blames Flagship for the loss of the boat and permit. AGA claims that, despite the fact that it never asked Flagship to evaluate its insurance or make a recommendation as to how much P&I insurance it should carry, Flagship should have advised AGA to purchase at least $5 million in P&I coverage.[2] AGA sued Flagship and its parent company, Brown & Brown. AGA's Amended Complaint contains the following counts against Flagship: negligence (Count I); negligent misrepresentation (Count II); intentional misrepresentation (Count III); violations of Massachusetts General Laws Chapter 93A (Count IV); and violations of Massachusetts General Laws Chapter 176D (Count V). The Amended Complaint contains two claims against Brown & Brown: vicarious liability (Count VI) and negligent failure to supervise (Count VII).

Flagship had a sales relationship with AGA. It fulfilled its duty to AGA by purchasing the amount of P&I coverage that AGA requested. AGA never asked Flagship to evaluate the limit of its liability policy or to make recommendations as to the amount of coverage it should purchase. Flagship did not have a duty to make unsolicited recommendations on the "appropriate" amount of P&I insurance for the GEORGIE J.

Flagship and Brown & Brown are entitled to summary judgment on each of AGA's claims. AGA's negligence based claims (Counts I and II) fail because Flagship did not have a duty to provide advice to AGA concerning the limits of its P&I insurance coverage. Additionally, summary judgment should enter on the negligence counts because the damages AGA seeks are barred by the economic loss doctrine and are duplicative. Flagship is entitled to

---

[2] AGA has also claimed that Flagship should have told it to purchase $10 million in P&I insurance.

summary judgment on AGA's claim for misrepresentation (Count III) and alleged violations of Massachusetts General Laws Chapter 93A (Count IV) because Flagship's broker was a licensed producer in Massachusetts during the relevant timeframe and there is no causal connection between the licensing and any harm to AGA. AGA's claim for alleged violations of Chapter 176D (Count V) fails because AGA does not have a private right of action under Chapter 176D. Finally, Brown & Brown is entitled to summary judgment on AGA's claims for vicarious liability and negligent supervision (Count VI and VII) because AGA's underlying claims against Flagship fail.

## II.    UNDISPUTED MATERIAL FACTS[3]

For the purpose of this motion, Flagship and Brown & Brown state the following facts are undisputed. George Jones has been a fisherman and skipper for many years and held an operator's license since sometime in the early 1980's. See George Jones' Deposition Transcript at 12 (Exhibit A). George and Antonette Jones through their corporation, AGA, purchased the GEORGIE J. in 1987 for $500,000, which included a scallop fishing permit. Exhibit A at 11, 15-16. George Jones became captain of the Georgie J.

Upon purchasing the GEORGIE J., George Jones elected to continue the same insurance coverage that the previous owner had on the vessel which was $350,000 in hull insurance and $1 million for P&I coverage. Exhibit A at 42-43. The broker of the insurance was Neptune and George Jones' contact was Ronald Walsh. Exhibit A at 42. Jones testified that he renewed the policy at the end of every year. Exhibit A at 60. He never talked to Walsh about how much P&I

---

[3] For a fuller recitation of the facts not in dispute, Flagship and Brown & Brown respectfully direct the Court's attention to its Local Rule 56.1 Statement, which contains citations to the record. The supporting documents are attached to the Pastori Affidavit submitted herewith.

coverage the GEORGIE J. should carry, instead he just continued the $1 million in coverage unchanged year-to-year.  Exhibit A at 61.

The Joneses purchased a second scalloping vessel, F/V KELLY JEAN, in 1999 or 2000. Exhibit A at 45.  The Joneses incorporated another business entity, Brian Fisheries, Inc., to hold title to that boat, which is a common mechanism for boat owners to minimize their exposure. Exhibit A at 105.  The Jones went through another broker for the marine insurance on the KELLY JEAN.  Exhibit A at 46.  The hull insurance on the Kelly Jean was $50,000 or $60,000 and the P&I was $500,000 ($500,000 less than the P&I on the GEORGIE J.).  See Debra Fernandez Deposition Exhibit 2, at DF 22 (Exhibit B).

George Jones switched brokers on the GEORGIE J. at some point and began utilizing the services of Bill Hart, who was working with Mariner Insurance.  Exhibit A at 44.  George Jones gave Bill Hart a copy of the then current marine policy on the GEORGIE J. and that was the insurance that Bill Hart procured.  Exhibit A at 64.  George Jones never had a discussion with Bill Hart about the amount of P&I insurance he should have on the GEORGIE J.  Exhibit A at 70.  Bill Hart never made any recommendations for insurance limits and George Jones never asked.  Exhibit A at 20.

In 1999, George Jones switched brokers again, this time to Flagship in order to save a few thousand dollars in premium.  Exhibit A at 71.  By that time, Ronald Walsh had become an employee of Flagship.  Exhibit A at 71.  The Joneses did not rely on the Flagship website to select brokers and in fact, the Joneses did not even own a computer at that time.  See Antonette Jones' Deposition Transcript at 66-67 (Exhibit C).

George Jones continued the same P&I insurance coverage and limits at Flagship as he did with Neptune and Mariners.  Exhibit A at 129.  He never sought to change the $1 million in P&I

coverage because that is what the prior owner had on the vessel. Exhibit A at 88. Each year upon renewal, Flagship informed AGA in writing that higher limits were available upon request but AGA never sought higher P&I insurance limits. See, e.g., Jones Deposition Exhibits 6, 10, and 12 (Exhibit D).

In November of 2003, during the relevant policy time period with Flagship, Victor Capaldi, a crew member of the GEORGIE J sustained serious injuries aboard the vessel. Exhibit A at 158 – 63. Purportedly, the value of Capaldi's injuries was in excess of the $1 million P&I policy limit and AGA contends that as a result, its vessel and permit were seized and sold and it suffered other damages. See U.S. Marshal's Bill of Sale (Exhibit E); Approval of Settlement Agreement (Exhibit F).

At no time from 1999 to 2003, did anyone from AGA request higher P&I coverage from Flagship. See Exhibit A at 99. No one from AGA had any discussions with anyone from Flagship about how much liability coverage AGA should have on the vessel. Exhibit A at 114. No one from Flagship ever told George Jones or anyone from AGA that AGA had sufficient coverage. Exhibit A at 129. AGA takes the simple position that Flagship should have advised it to "up" its P&I insurance to $10 million. Exhibit A at 151. Absent what established case law identifies as a "special relationship," which does not exist here, an insurance agent or broker has no obligation to give advice to a client regarding the amount of coverage the client should purchase. See, e.g., Robinson v. Charles A. Flynn Ins. Agency, 39 Mass. App. Ct. 902, 903 (1985) (no broad duty to inform and advise insured of the availability of limits or underinsured motor vehicle coverage); Kourouvacilis v. Travelers Ins. Co., 57 Mass. App. Ct. 1105 (2003) (unpublished opinion) (no special relationship between assured and her automobile insurance agent).

6

Jack Devnew took over for Ron Walsh on the AGA account. He was a licensed insurance broker in Virginia employed by Flagship and held a non-resident Massachusetts producers license during the relevant period of time. See Exhibit G at 11, 58; Devnew's Massachusetts Producers License[4] (Exhibit H). There is no evidence that the Joneses discussed Devnew's license with him or relied on the license in selecting a broker. They came to Flagship based upon the fact that they could reduce their marine insurance premium. There is no causal connection between Devnew's licensing and the alleged injury suffered by AGA.

Based upon the undisputed facts, AGA's claims fail as a matter of law.

## III.  ARGUMENT

### A.  Flagship Satisfied Its Duty Of Care To Act Reasonably And Provide AGA With The Insurance That It Requested.

"It may be stated as a general proposition that an insurance agent is a person expressly or impliedly authorized to represent an insurance company in dealing with third persons in matters relating to insurance. . . . An insurance broker is one who acts as a middleman between the insured and insurer and who solicits insurance from the public under no employment from any special company and who either places an order for insurance with a company selected by the insured, or, in the absence of such selection, with a company the broker selects." Travelers Indem. Co. v. National Indem. Co., 292 F.2d 214, 219-20 (8th Cir. 1961) (internal citations omitted). See also Mass. Gen. Laws ch. 175, § 162 (distinguishing between insurance brokers and insurance agents). Generally speaking the "insurance agent is the representative of the company, and the insurance broker is ordinarily the agent of the insured[.]" Hudson v. Massachusetts Property Ins. Underwriting Assoc., 386 Mass. 450, 455 (1982) (internal citations

---

[4] The license misspelled Devnew's name as "Dernew" rather than "Devnew."

omitted).  "This is true in the context of maritime insurance as well, where, as a general rule, 'a broker acts as agent for the insured.'"  Markel Am. Ins. Co., v. Madonna, 448 F. Supp. 2d 234, 239 (D. Mass. 2006) (quoting Certain Underwriters at Lloyd's London v. Giroire, 27 F. Supp. 2d 1306, 1313 (S.D. Fla.1998).  "Consequently, where, as here, the broker was 'employed to procure insurance, he is the agent of the person for whom the insurance is procured insofar as matters in connection with the procurement are concerned.'"  Markell, 448 F. Supp. 2d at 239 (quoting Travelers Indem. Co., 292 F.2d at 220).

An insurance broker ordinarily "assumes those duties normally found in an agency relationship."  RLI Ins. Co., 2006 U.S. Dist. Lexis 30596, at *25 (quoting Baldwin Crane, 44 Mass. App. Ct. at 31-32).  "These duties include the duty to deal in good faith and the duty to carry out instructions, but does not include the duty to advise."  RLI Ins. Co., 2006 U.S. Dist. Lexis 30596, at *25 (citing 16A Appleman, Insurance Law and Practice § 8836, at 64 (1981).  It is generally agreed that:

> [I]nsurance agents or brokers have no general duty to advise an insurance customer of the amount of insurance necessary to cover the customer's needs … [T]he imposition of liability would remove the burden on the [insured] to "take care of [their] own financial needs and expectations" before entering the marketplace to procure insurance coverage … .  [I]f a duty were imposed on [the agent] it would transform the insurance company into [the insured's] personal financial consultant or guardian … .  [I]t was [the insured's] responsibility to advise [the agent] what kind of policy he desired as well as the coverage limits of any policy … .  [W]ere this court to impose a duty upon [the agent], the floodgates would be open to suits against insurance agents for failing to advise them or inform …  customers about an infinite number of possibilities, including the appropriate amount of insurance coverage.  The duty of an insurance agent … would be nearly unlimited.

Manzella v. Gilbert-Magill Co., 965 S.W. 2d 221, 226-27 (Mo. Ct. App. 1998).

The undisputed facts establish that AGA had carried $1 million in P&I insurance since it purchased the GEORGIE J. and took over the insurance policy from the prior owner. When AGA switched brokers for a third time and applied for marine insurance for the GEORGIE J. through Flagship, it gave Flagship's broker, Ronald Walsh, a copy of its current policy and asked him for a quote to obtain that same coverage. Ronald Walsh provided AGA with a quote that was a few thousand dollars less than what it was paying Mariner Insurance and AGA switched its coverage to Flagship. To that end, AGA signed an application for $1 million in P&I insurance, among other things. AGA renewed its marine insurance annually and elected to maintain $1 million in P&I coverage. There is no dispute that Flagship procured the coverage that AGA requested. The law requires no more. Flagship and AGA had no agreement for anything else. Based on the foregoing, Flagship satisfied its duty to AGA and this matter should end here.

**B.    Flagship Did Not Have A "Special Relationship" With AGA Requiring A Heightened Duty Of Care To Provide Unsolicited Advice On Policy Limits.**

AGA contends that it had a "special relationship" with Flagship, and as a result, Flagship owed it a duty to advise AGA that it should purchase an additional $4 million in P&I insurance so that its total would be $5 million. AGA claims that the special duty was created because on its website Flagship "held itself out as to vessel owners and operators as having the practice to systematically and comprehensively examine. . . a vessel owner/operator's maritime exposures, recognizing that protecting your corporate business risks is our primary concerns." Amended Complaint ¶ 7. Contrary to AGA's claims Flagship had no "special relationship" with AGA.

The well-established law in Massachusetts is that insurance agents and brokers have no broad sweeping duty to advise customers on their insurance needs. See, e.g., Wilson v. James L. Cooney Ins. Agency, 66 Mass. App. Ct. 156, 162 (2006) (no general duty of an insurance agent

9

to ensure that the insurance policies procured by him provide coverage that is adequate for the

needs of the insured); Robinson, 39 Mass. App. Ct. at 903. Insurance brokers "are not personal

financial counselors and risk managers, approaching guarantor status" and "insureds are in a

better position to know their personal assets and abilities to protect themselves . . . unless [their

brokers] are informed and asked to advise and act." Murphy v. Kuhn, 90 N.Y.2d 266, 273 (N.Y.

1997). See also City of Colton v. Schweback, 557 N.W.2d 769, 772 (S.D. 1997) (in suit against

agent for failing to obtain coverage for city finance officer, insurance agent had no duty to

inquire into city's insurance needs where city simply requested coverage identical to that in its

previous policy, which did not cover city finance officer, and did not request a review of its

coverage or sought any recommendation in its clear request). The "special circumstances of

assertion, representation and reliance" giving rise to a heightened duty of care will be found only

in limited circumstances where the agent or broker undertakes to do more than merely respond to

specific insurance requests. Rapp v. Lester L. Burdick, 336 Mass. 438, 442 (1957).[5] "Special

circumstances" may exist where there is evidence of a long-standing relationship between a

broker and a policyholder, the broker undertakes to evaluate the customer's coverage

requirements and provide advice, and the customer justifiably relies on the broker's undertaking.

See McCue v. Prudential Ins. Co., 371 Mass. 659, 662-63 (1976) (28 year relationship between

broker and client during which brokers made monthly visit to the plaintiffs to attend to their

insurance needs in support of finding of "special circumstances"); Bicknell, Inc. v. Havlin, 9

---

[5] It should be noted that a broker's contract for professional services can give rise to liability of its breach in failing to use the skill and judgment reasonably expected from similarly situated professionals. Capital Site Mgmt. Assocs. v. Inland Underwriters Ins. Agency, Ltd., 61 Mass. App. Ct. 14, 18 (2004) (holding broker's failure to investigate conditions it knew would invalidate coverage of property provides basis for liability in contract). AGA has not made such a claim here.

Mass. App. Ct. 497, 499-501 (1980) (recommendation to "slap" $50,000 in coverage on each

building was one of many recommendations made by broker over a considerable time period,

which gave rise to special circumstances of assertion, representation and reliance for which the

broker may be liable). "An expanded agency agreement or relationship, sufficient to require a

greater duty from the agent than the general duty generally exists when the agent holds himself

out as an insurance specialist, consultant or counselor and is receiving compensation for

consultation and advice apart from premiums paid by the insured." Baldwin Crane, 44 Mass.

App. Ct. at 32 (holding no breach of duty to inform assured that replacement policy carried a

minimum premium rather than a refundable premium and no duty to ensure assured understood

full import of the meaning of "minimum premium") (quoting Sandbulte v. Farm Bureau Mut.

Ins. Co., 343 N.W.2d 457, 464-65 (Iowa 1984). "The nature and extent of the duty of care owed

by an independent insurance agent to his client depends in part, at least, upon the degree of skill

which he represents himself to possess." Bicknell Inc., 9 Mass. App. Ct. at 500. "Although an

insured is entitled to rely on [its] broker as his agent, an insured cannot abandon all responsibility

for ascertaining the terms of he coverage [its] broker obtained." Campione v. Wilson, 422 Mass.

185, 196 (1996).

    Here, plaintiff claims that because of a statement on Flagship's website, Flagship owed it

a heightened duty of care.[6] There is not a scintilla of evidence that AGA relied on Flagship's

promotional information on the website. The Joneses did not even have a computer during the

---

[6] The statement on the website concerning Flagship examining maritime exposures means that
Flagship discusses with its clients and potential clients the nature of their exposures and offers
them a host of insurance products and access products and discusses insurance issues in general.
Jack Devnew Deposition Transcript, at 43 (Exhibit G). The website makes no promise to assess
an insured's or potential insured's assets and make recommendations about the limits of
coverage.

relevant period of time and did not rely on Flagship's website to select a broker.  See Exhibit C at 66-67.  AGA was not aware of the website advertisement until after this litigation.  Flagship's website played no part in AGA using Flagship as its broker.  In fact, the driving force for AGA switching brokers and moving its business to Flagship was a lower premium.  AGA, therefore, cannot rely on the website for its claim of a special relationship.

AGA's relationship with Flagship was a sales relationship.  No more, no less.  AGA wanted to purchase marine insurance for the GEORGIE J., and Flagship was in the business of procuring marine insurance for companies like AGA.  AGA gave Flagship a copy of the policy it had with another carrier and asked it to obtain the same coverage.  AGA never consulted Flagship on the question of whether it had "sufficient" P&I insurance, and Flagship never provided any advice to AGA on its P&I coverage.  Compare Martinonis v. Utica Nat. Ins. Group, 65 Mass. App. Ct. 418, 421-22 (2006) (reversing summary judgment for the broker where insureds specifically consulted broker on questions of fair replacement value and broker assured them the limits were proper, there was a long relationship between broker and assured, assured placed policies with broker on variety of other properties, and regularly relied on broker's advice).  AGA never asked for additional coverage, no one from Flagship assured AGA that it had sufficient coverage, and no one from Flagship ever endeavored to, or assured AGA that it would, evaluate whether the $1 million in P&I coverage was "sufficient."  Such a subjective determination was neither requested, made, nor offered.  Furthermore, AGA did not pay Flagship for such advice.

Based on the foregoing, AGA never gave Flagship the responsibility to advise it concerning its insurance coverage.  AGA did not delegate to Flagship the responsibility of

determining the amount of liability coverage which would provide it "adequate" protection.[7]

This fact is confirmed by AGA's failure to provide Flagship financial information concerning its

assets and business earnings.  "Such lack of initiative or personal indifference cannot qualify as

legal recognizable or justifiable reliance."  Peter v. Schumacher Enterprises, Inc., 22 P.3d 481,

486 (Alaska 2001).  "An insurance agent is in no better position than the insured to predict the

extent of damage that the insured might incur at some time in the future."  Sintros v. Hamon, 148

N.H. 478, 481 (2002).  In this case because of the undisputed material facts, this Court can and

should award Flagship and Brown & Brown summary judgment as a matter of law.  See RLI

Insurance Co., 2006 U.S. Dist. Lexis 30596, at *31.

This case is strikingly similar to RLI Insurance Co in which the Court (Zobel, J.)granted

an insurance broker's motion for summary judgment on an assured's third-party complaint for

allegedly failing to procure adequate business interruption coverage.  See id. at *31.  The assured

argued that a special relationship existed between it and its broker because it had a "long-

standing relationship" with its broker and the broker "held itself out to [the assured] as an expert

in insurance matters and risk protection."  Id.  The assured argued, therefore, that its broker had a

duty to "adequately inform it about the business insurance that it obtained and when the

insurance afforded coverage and when it did not."  Id. at *27-28.  The Court disagreed, and

concluded that there was no evidence from which "a reasonable jury could conclude that [the

---

[7] It is Flagship's position that no amount of insurance is ever "sufficient" since one cannot control the amounts of third-party claims and catastrophic accidents, although uncommon, can occur for which a policy of even $5 or $10 million will not be "sufficient" (e.g. a vessel collides with a passenger ferry).  Moreover, decisions regarding the amount of insurance coverage are personal and subjective based upon a trade-off between cost and risk.  See, e.g., Murphy v. Kuhn, 90 N.Y.2d 266, 273 (NY 1997).  See also Lisa's Style Shop v. Hagen Ins. Agency, 511 N.W.2d 849, 853 (Wis. 1994) (explaining advertisements and insurance manuals do not create enforceable standards of contact since no evidence of plaintiff's reliance upon the materials).

broker] owed [it] anything beyond the usual duties of an agent." Id. at *28. In reaching its

decision to grant the broker summary judgment, the Court relied on facts which are strikingly

similar to this case. Like this case, the assured in RLI Insurance paid the broker only

commissions based on its premiums and nothing more. Id. Also like this case, the assured did

not contend that it ever hired the broker to provide consultation and advise on its insurance

needs. Id. As AGA does, the assured in the RLI Insurance case argued that the broker's

advertisements in which "it claimed significant expertise and experience with the insurance

industry, and the skills and products to distribute risk protection at the right price while providing

sophisticated claims management systems" created a "special relationship." Id.

Notwithstanding, the Court found that such statements do not establish that the broker was ever

hired as a consultant or advisor to the assured. Id.

> Rather than establishing that "special circumstances of assertion,
> representation and reliance" existed in this case, much of what [the
> assured] describes instead amounts to "typical brokerage services,"
> as [the assured] itself describes [the broker's] work. For example,
> [the assured] states that [the broker] met with [it] to discuss its
> insurance needs, researched the insurance market, and obtained
> quotes, all of which are normal broker activities. The fact that [the
> broker] was familiar with [the assured's] business, that it kept
> abreast of company changes that could affect insurance coverage,
> and that it was aware of the need for business interruption
> coverage likewise do nothing to establish an "expanded
> relationship" between the parties. Any broker who wishes to
> procure appropriate coverage for an insured must ascertain the
> types of risks for which coverage is required.

Id. at *28-29. Accord Sintros, 148 N.H. at 484 (affirming entry of summary judgment for

broker where broker left decisions about insurance coverage to assured rather than

undertaking responsibility of providing such advise, no evidence that assureds ever

inquired about the sufficiency of their liability limits, and no evidence that broker offered

his expertise or that the assureds relied upon such expertise in making insurance decisions).

Based on the foregoing, Flagship is entitled to summary judgment on AGA's negligence claim in Count I and negligent misrepresentation claim in Count II, which is simply a rehash of AGA's negligence claim.

### C.   The Damages That AGA Seeks Are Barred By The Economic Loss Doctrine And Are Duplicative.

AGA claims that it lost its vessel F/V GEORGIE J. and its fishing permit because it did not have sufficient P&I insurance to cover a personal injury claim by a crew man. AGA seeks both the value of the GEORGIE J. and its permit, and lost profits from Flagship and its parent company, Brown & Brown. As explained in detail in Response of Flagship Group Limited and Brown & Brown, Inc. To Plaintiff's Damage Memorandum, a copy of which is attached and incorporated herein by reference, the damages that AGA seeks are barred by the economic loss doctrine and are duplicative.

It is the well-established rule in Massachusetts, and the majority position among the states, that economic-loss damages not involving injury to person or property are not recoverable as damages for negligence. See, e.g., Barber Lines A/S v. M/V Donau Maru, 764 F.2d 50, 51 (1st Cir. 1985) (no tort action under Massachusetts law for recovery of damages for financial harm arising out of negligently caused fuel spill in Boston Harbor); FMR Corp. v. Boston Edison Co., 415 Mass. 393, 395 (1993) (rejecting claims for economic losses of a business arising out of power outages); Garweth Corp. v. Boston Edison Co., 415 Mass. 303, 305 (1993); Bay State-Spray & Provincetown Steamship, Co. v. Caterpillar Tractor Co., 404 Mass. 103, 107 (1989); Stop & Shop Cos. v. Fisher, 387 Mass. 889, 897-899 (1983). The prohibition is known as the economic loss doctrine. The value of the GEORGIE J., its permits, and the lost profits that AGA

seeks are economic loss damages, and are not recoverable on a negligence claim. <u>See</u>, <u>e.g.</u>, <u>Bay State-Spray</u>, 404 Mass. at 104 (1989). AGA does not contend that it suffered any personal injury or property damage, and therefore cannot make a claim for damages on Counts I, VI, and VII. <u>See</u>, <u>e.g.</u>, <u>Morgan v. Financial Planning Advisors, Inc.</u>, 701 F. Supp. 923, 927-928 (1988) (dismissing claims for negligence and negligent supervision against brokerage firm and its managerial personnel based on economic loss doctrine).

There are very few limited exceptions to the economic loss doctrine. As explained in Flagship and Brown & Brown's brief, AGA has not established that its claims fit into any one of the exceptions to the economic loss doctrine. First, this is not a professional malpractice case. Second, AGA's claim for negligent misrepresentation is simply a rehash of its negligence claim in Count I and does not state a separate claim. <u>See</u> Amended Complaint, Count II. Finally, AGA has not alleged a negligent breach of contractual duties.

Notwithstanding the fact that the damages AGA seeks constitute economic losses and are not recoverable, AGA's claims for damages are duplicative. Tort damages are essentially restitution to an injured party, and as such they are designed to restore the plaintiff to the position in which it found itself immediately prior to the tortfeasor's act. <u>See</u> 37 Joseph R. Nolan, Laurie J. Sartorio, <u>Massachusetts Practice Series</u>, Tort Law § 1.2 (2005); <u>Griffin v. General Motors Corporation</u>, 380 Mass. 362, 370-71 (1980). Tort damages are not designed to create a windfall to a plaintiff.

AGA claims that the seizure and sale of the GEORGIE J. and its permit put it out of business because it no longer had any assets. As damages, AGA seeks the value of its vessel and permit (*i.e.* the value of its business since the assets were the business), which sold at auction for

$1.7 million, and its lost profits as a result of the sale of the vessel and permit. Such damages are duplicative and therefore, inappropriate.

The GEORGIE J. and its permit were sold by the United States Marshal for $1.7 million at a public auction. Fair market value is "that price likely to be arrived at by a willing seller under no compulsion to sell and an informed purchaser." Meyer v. Wagner, 57 Mass. App. Ct. 494, 501-02 (2003). The fair market value of the vessel and permit was established as being $1.7 million. The bids submitted at auction took into account the potential of the vessel and permit to generate a future income stream and profits to the successful bidder. See United States v. Pervaz, 118 F.3d 1, 10 (1st Cir. 1997) ("Profit is an ingredient of the fair market value of goods or services that can be sold and purchased"). AGA should not be allowed to recover the lost profits in addition to the fair market value of the GEORGIE J. and its permit on any one claim or combination thereof. See Szalla v. Locke, 421 Mass. 448, 453-454 (1995) (duplicative damages under multiple counts of a complaint is not permissible). Cf. Protectors Ins. Servs., Inc. v. United States Fidelity & Guar. Co., 132 F.3d 612, 618 (10th Cir. 1998) (reversing damage award in breach of contract case because it permitted double recovery where plaintiff awarded difference in the actual sale price for business and the fair market value of the business had it not been sold under duress and future lost profits from the sale of the business); Albrecht v. The Herald Co., 452 F.2d 124, 131 (8th Cir. 1971) (holding that plaintiff in suit alleging antitrust violations could not recover both value of business as a going concern at the time of damage and future profits of business after the time of damage). In arguing that it is entitled to both the value of the GEORGIE J. and its permit and lost profits, AGA seeks to collect twice for the same alleged injury.

17

**D.    Flagship Is Entitled To Summary Judgment On AGA's Claims Concerning Licensing Issues Because Devnew Held A Valid Massachusetts Producers License During The Relevant Time Period And AGA Cannot Establish A Causal Connection Between The Licensing And Any Alleged Harm.**

Devnew was a licensed insurance broker in Virginia and held a non-resident Massachusetts producers license during the relevant period of time.  He obtained a property and casualty license from Virginia after taking several days of classes and passing the test on the first try.  Exhibit G at 11.  He later applied for and obtained a Massachusetts producers license.[8]  Id. at 58.  AGA cannot prove otherwise.

Even if there was a flaw in Devnew's licensing, there is no evidence and AGA cannot prove that it contributed to AGA's alleged injury.  See McCarthy v. Boston City Hospital, 358 Mass. 639, 645-47 (1971) (trial judge properly excluded evidence that radiologist's license had lapsed because there was no showing that there was any causal connection between the licensing issue and the plaintiff's injuries).  Furthermore, there is no evidence that the Joneses discussed Devnew's license with him or relied on the license in selecting a broker.  They came to Flagship based upon the fact that they could reduce their marine insurance premium.  Based on the foregoing, Flagship is entitled to judgment on Counts III (misrepresentation) and IV (alleged violations of Chapter 93A) of the complaint.

---

[8] Massachusetts and Virginia are reciprocal states.  Thus, once a producer is licensed in Virginia, he only needs to submit an application and pay a fee to obtain a Massachusetts license.  No further testing is required.

**E.    AGA Does Not Have A Claim Against Flagship Or Brown &
Brown For Violations Of Massachusetts General Laws
Chapter 176D.**

Count V in AGA's complaint purports to state a claim for alleged violations of

Massachusetts General Laws Chapter 176D.  Flagship denies such claims.  As a matter of law,

Flagship is entitled to summary judgment on AGA's count for alleged violations of Chapter

176D because the statute does not provide a private cause of action and is only enforceable by

the commissioner of insurance.[9]  See, e.g., Thorpe v. Mutual of Omaha Ins. Co., 984 F.2d 541,

544 n.1 (1st Cir. 1993) ("Thorpe also invoked Chapter 176D prohibiting unfair and deceptive

insurance practices, but the statute provides no private cause of action and is enforceable only by

the commissioner of insurance"); RLI Ins. Co., 2006 U.S. Dist. Lexis * at 13 (assured may not

sue broker directly under Chapter 176D); M. DeMatteo Constr. Co. v. Century Indem. Co., 182

F. Supp. 146, 160 (D. Mass 2001) (concluding that plaintiff's attempt to state an independent

claim for recovery on Chapter 176D must fail); Mahaney v. John Hancock Mut. Life Ins. Co., 6

Mass. App. Ct. 919, 921 (1978) (trial judge correctly ruled that Chapter 176D provides no

remedy for private parties injured by deceptive insurance practices).  Based on the foregoing,

summary judgment should enter for Flagship on AGA's claim under Chapter 176D in Count V.

**IV.    CONCLUSION**

For all the foregoing reasons, Flagship and Brown & Brown are entitled to summary

judgment on AGA's complaint.  AGA's negligence based claims (Counts I and II) fail because

Flagship did not have a duty to provide advice to AGA concerning the limits of its P&I insurance

coverage.  Additionally, summary judgment should enter on the negligence counts because the

---

[9]  Chapter 93A was amended in 1979 to provide a private cause of action for unfair or deceptive
settlement practices as prohibited by Chapter 176D.  AGA is not making such a claim here.

damages AGA seeks are barred by the economic loss doctrine and are duplicative. Flagship is

entitled to summary judgment on AGA's claim for misrepresentation (Count III) and alleged

violations of Massachusetts General Laws Chapter 93A (Count IV) because Flagship's broker

was a licensed producer in Massachusetts during the relevant timeframe and there is no causal

connection between the licensing and any harm to AGA. AGA's claim for alleged violations of

Chapter 176D (Count V) fails because AGA does not have a private right of action under

Chapter 176D. Finally, Brown & Brown is entitled to summary judgment on AGA's claims for

vicarious liability and negligent supervision (Count VI and VII) because AGA's underlying

claims against Flagship fail.

Respectfully submitted,

FLAGSHIP GROUP LIMITED and
BROWN & BROWN, INC.,

By their attorneys,


  /s/ Terri L. Pastori
Michael J. Stone, Esq., BBO # 482060
Terri L. Pastori, Esq., BBO #635323
Peabody & Arnold, LLP
30 Rowes Wharf
Boston, MA 02110
(617) 951-2041

Dated: May 29, 2007

## CERTIFICATE OF SERVICE

I, Terri L. Pastori, hereby certify that on this 29th day of May 2007, the foregoing document was served on counsel for the plaintiff, Joseph E. Abromovitz, Esquire, Law Offices of Joseph G. Abromovitz, P.C., 858 Washington Street, 3rd Floor, Dedham, MA 02026, by electronic mail.


/s/ Terri L. Pastori
Terri L. Pastori

PABOS2:TPASTOR:659031_1
9999-99999