UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **AGA FISHING CORP.,**<br>                **Plaintiff**<br><br>**v.**<br><br>**FLAGSHIP GROUP LIMITED and**<br>**BROWN & BROWN, INC.,**<br>                **Defendants** | **CIVIL ACTION NO. 05-11396 JLT** |

**AFFIDAVIT OF TERRI L. PASTORI IN SUPPORT OF THE MOTION OF THE DEFENDANTS, FLAGSHIP GROUP LIMITED AND BROWN & BROWN, INC., FOR SUMMARY JUDGMENT**

I, Terri L. Pastori, hereby depose under oath and state as follows:

1.      I am an attorney in good standing, and admitted to practice before the Bar of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts, among other courts.

2.      I am partner in the law firm of Peabody & Arnold LLP, and I am an attorney for the Defendants, Flagship Group Limited and Brown & Brown, Inc., in this matter.

3.      Attached hereto as Exhibit A are true and accurate copies of excerpts from George Jones' deposition transcript.

4.      Attached hereto as Exhibit B is a true and accurate copy of Debra Fernandez deposition Exhibit 2, page DF 22.

5.      Attached hereto as Exhibit C is a true and accurate copy of an excerpt from Antonette Jones' deposition transcript.

6.      Attached hereto as Exhibit D are true and accurate copies George Jones' deposition Exhibits 6, 10 and 12.

7.      Attached hereto as Exhibit E is a true and accurate copy of U.S. Marshal's Bill of Sale of the GEORGIE J., which I obtained from Pacer.

8.      Attached hereto as Exhibit F is a true and accurate copy the Approval of Settlement in Victor Capaldi v. AGA Fishing Corp., docketed as Civil Action No. 04-10755-JLT in the United States District Court for the District of Massachusetts, which I obtained from Pacer.

9.      Attached hereto as Exhibit G are true and accurate copies of excerpts from Jack Devnew's deposition transcript.

10.     Attached hereto as Exhibit H are true and accurate copies of Jack Devnew's agent licenses from the Massachusetts Division of Insurance for February 20, 2001 through June 30, 2003, which have been produced in discovery in this case.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 29TH  DAY OF MAY 2007.

/s/ Terri L. Pastori
Terri L. Pastori

## CERTIFICATE OF SERVICE

I, Terri L. Pastori, hereby certify that on this 27th day of May 2007, the foregoing document was served on counsel for the plaintiff, Joseph E. Abromovitz, Esquire, Law Offices of Joseph G. Abromovitz, P.C., 858 Washington Street, 3rd Floor, Dedham, MA 02026, by electronic mail.


  /s/ Terri L. Pastori
Terri L. Pastori

PABOS2:TPASTOR:662103_1
14811-91372

VOLUME:  I

PAGES:  1 - 176

EXHIBITS: 1 - 16

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------x

AGA FISHING CORPORATION,

   Plaintiff,

 vs.       Civil Action No.

FLAGSHIP GROUP LIMITED  05-11396 JLT

and BROWN & BROWN, INC.,

   Defendants.

------------------------x

RULE 30(b)(6)DEPOSITION OF AGA FISHING CORPORATION

 (By its Designee, GEORGE E. JONES JR.) and

  GEORGE E. JONES JR., Individually

   Monday, May 15, 2006

    10:13 a.m.

   Peabody & Arnold LLP

   30 Rowes Wharf

   Boston, Massachusetts

Reporter:  Dana Welch, CSR, RPR

Page 10

1    Q. And after you left school, what did you
2    do?
3    A. I worked -- I worked at a company
4    unloading trucks, loading trucks.
5    Q. When did you first start fishing?
6    A. My very, very first trip, my very, very
7    first trip?
8    Q. Sure. Your very, very first trip.
9    A. I was 15.
10   Q. Where was that?
11   A. The boat was out of Atlantic City. I made
12   one trip.
13   Q. What kind of a boat?
14   A. A lobster boat.
15   Q. Okay. When did you start fishing for a
16   living?
17   A. 21; I think I was 21.
18   Q. Where was that?
19   A. New Bedford.
20   Q. What kind of a boat?
21   A. Scallop.
22   Q. What's your date of birth, sir?
23   A. December 17th, 1946.
24   Q. So that would put it sometime in the late

Page 11

1    1960s that you first started fishing?
2    A. I guess so.
3    Q. Okay. What kind of boats did you fish on?
4    A. Scallop boats.
5    Q. All the time?
6    A. All the time.
7    Q. When did you first become an owner of a
8    scallop boat?
9    A. 1987, I think.
10   Q. What was the name of that boat?
11   A. The Victor.
12   Q. You purchased that boat?
13   A. Yes.
14   Q. Who did you purchase it from?
15   A. Axel -- I don't know how to pronounce his
16   last name. Henders, or -- I don't know.
17   Q. Did you -- were you ever on the boat
18   fishing before you purchased it?
19   A. Yes.
20   Q. For how many years were you fishing on
21   that boat?
22   A. I was on it twice. 1980. I don't know --
23   eight months, a year, I'm not sure. And then I
24   think it was '85 or '86. I don't remember. I took

Page 12

1    the boat, skipper, not in 1980, though.
2    Q. Okay.
3    Was that your first trip, as the skipper
4    of the boat?
5    A. No.
6    Q. When did you first become a captain of a
7    boat?
8    A. '83.
9    Q. Did that require a license of some sort?
10   A. No.
11   Q. Do you hold any licenses as a --
12   A. No.
13   Q. -- in the fishing industry?
14   A. Just an operator's.
15   Q. When did you get an operator's license?
16   A. I don't remember.
17   Q. Give me a ballpark. Before 1980?
18   A. I don't remember. When they said you had
19   to have them, that's when I got them. I don't
20   recall what year.
21   Q. Okay. What's the process for obtaining an
22   operator's license? How do you get it? Is there a
23   test?
24   A. No, just fill out a paper.

Page 13

1    Q. That's it; you just -- anybody can do it?
2    A. Yes.
3    Q. So I could walk down to New Bedford and
4    fill out the paper and become a captain?
5    A. I don't know about now.
6    Q. But back when you did it --
7    A. Yeah.
8    Q. -- all you had to do was fill out a form?
9    A. Yes.
10   Q. Who did you send the form to, what agency
11   was it that did the licensing?
12   A. NOAA, I think it was NOAA.
13   Q. Do you know what NOAA stands for?
14   A. No.
15   Q. That's just the way you refer to it,
16   N-O-A-A?
17   A. Yeah.
18   Q. For how many years prior to 1987 -- strike
19   it in that form.
20   When you bought the Victor in '87, were
21   you the skipper?
22   A. Yes.
23   Q. Prior to that, you had been the skipper on
24   other boats?

Legalink Boston, A Merrill Company
(617) 542-0039

Page 14

```
 1      A.  Yes.
 2      Q.  Scallop boats?
 3      A.  Yes.
 4      Q.  You became the skipper on -- sometime in
 5  '87 when you purchased it.  How many crew did you
 6  generally take out on the boat?
 7      A.  On the Victor?
 8      Q.  Yes.
 9      A.  Ten.
10      Q.  Did that change at some point; did you
11  take out fewer crew at some point?
12      A.  Yes.
13      Q.  Why is that?
14      A.  NOAA said you could only go -- I think the
15  first time was eight men, and then you couldn't go
16  more than seven.
17      Q.  Do you know why that was?
18      A.  To bring back the stock, conservation
19  and --
20      Q.  So it was a regulation to --
21      A.  Regulation, yes.
22      Q.  -- to preserve the fishing industry?
23      A.  Yes.
24      Q.  Did you have a license to do scalloping
```

Page 15

```
 1  back in '87?
 2      A.  What do you mean, a license?
 3      Q.  Did you have to get a permit in order to
 4  do scalloping?
 5      A.  Me?
 6      Q.  Yes.
 7      A.  No.
 8      Q.  At some point as you operated the Victor,
 9  did you have to get a license or a permit in order
10  to do scalloping?
11      A.  With the boat?
12      Q.  Yeah.
13      A.  Yes.
14      Q.  When did you first get that; did you get
15  it in 1987?
16      A.  Yes.
17      Q.  Do you remember how much you paid for the
18  Victor?
19      A.  I think it was 500,000.
20      Q.  Did that include the boat and the license?
21      A.  Yes.
22      Q.  So that was a total price?
23      A.  Yes.
24      Q.  The boat came with a license?
```

Page 16

```
 1      A.  Yes.
 2      Q.  Did you have somebody finance the
 3  purchase; was there a bank involved?
 4      A.  Yes.
 5      Q.  What bank was that?
 6      A.  Shawmut.
 7      Q.  They're not around anymore, you know.
 8      A.  Yeah, I know.
 9      Q.  Did you have a mortgage on the boat?
10      A.  Yes.
11      Q.  How much was the mortgage?
12      A.  I think it was 360-65,000.
13      Q.  Okay.  And the balance came from your
14  savings or money that you had?
15      A.  The owner held 40,000 --
16      Q.  Okay.
17      A.  -- and then we put up the rest.
18      Q.  Where did the balance come from, from your
19  savings?
20      A.  I think it was savings, and I remortgaged
21  my house.
22      Q.  Did the bank that took the mortgage on the
23  boat also own the mortgage on your house?
24      A.  No.
```

Page 17

```
 1      Q.  Two different banks?
 2      A.  Yes.
 3      Q.  Did the bank that you mortgaged your boat,
 4  did they also become a second mortgage holder on
 5  your house; did they also have an interest in your
 6  house?  Do you remember?
 7          MR. ABROMOVITZ:  At any point in time or
 8      right at the beginning?
 9      Q.  At the beginning.
10      A.  I don't think so.
11      Q.  Now, you continued to fish the Victor from
12  '87 to '95 --
13      A.  Yes.
14      Q.  What happened in 1995?
15      A.  I had a heart attack.
16      Q.  Okay.  And were you hospitalized for that,
17  treated for that condition?
18      A.  Yeah.  I went to the hospital.  They took
19  tests.
20      Q.  Okay.  Did they tell you anything, or did
21  they restrict you about your fishing abilities
22  after that?
23      A.  No.
24      Q.  Did you continue to fish after 1995?
```

5 (Pages 14 to 17)

Page 18

1      A. No.
2      Q. Why not?
3      A. I didn't feel good.
4      Q. Did the doctors tell you you couldn't or
5  shouldn't?
6      A. I just kept going to them, and yeah, he
7  said don't go fishing, you know, right now.
8      Q. Did you get a skipper to replace you?
9      A. Yes.
10     Q. Who was that?
11     A. I don't remember.
12     Q. Okay. Do you remember any of the skippers
13 that you've had on the boat?
14     A. Yes.
15     Q. How many have you had since '95?
16     A. Four.
17     Q. Who was the last skipper that was on the
18 boat while you owned it?
19     A. Gary Sylvia.
20     Q. How long had he been a skipper on the
21 boat?
22     A. First trip.
23     Q. Prior to that, who had been the skipper?
24     A. I took it out.

Page 19

1      Q. When did you take it out?
2      A. I don't remember. I don't know if it was
3  May, June.
4      Q. Can you get me a year?
5      Let's back up for a moment, if we could.
6  The accident involving Mr. Capaldi was in November
7  of 2003; do you remember that?
8      A. Yes.
9      Q. Okay. And at that time Gary Sylvia was
10 the skipper?
11     A. Just one trip.
12     Q. And prior to November of '03, you were the
13 skipper?
14     A. For four trips.
15     Q. Okay. And prior to you being the skipper,
16 who was the skipper?
17     A. Tommy Saunders -- Sanders.
18     Q. For how long a period of time was Sanders
19 the skipper?
20     A. Couple of years.
21     Q. Okay. And prior to him?
22     A. Kenny Rogers.
23     Q. Okay. He's not the guy who sings, right?
24     A. No, not that guy.

Page 20

1      Q. Okay. Can you remember any other
2  skippers?
3      A. Peter Barbero.
4      Q. Peter?
5      A. Barbero.
6      Q. Okay.
7      A. And my son.
8      Q. When was your son the skipper?
9      A. Before he died he was a skipper for a few
10 years.
11     Q. How did -- may I ask how your son passed
12 away, from what cause?
13     A. He got beat up. He got killed.
14     Q. Did that happen down in New Bedford area?
15     A. Yes.
16     Q. After he died, did you change the name of
17 the boat?
18     A. Yes.
19     Q. Prior to the time that your son was the
20 skipper, do you remember any other skippers that
21 you had?
22     A. I think Russell took it a trip.
23     Q. Russell --
24     A. Piver, I think his name was. Piver.

Page 21

1      Q. Tell me how you went about getting a
2  skipper for the boat after you stopped.
3      A. They come and ask.
4      Q. Did they come to your house?
5      A. Down at the dock.
6      Q. Take me back, if you would, to say 1994.
7  While you were still fishing actively, how many
8  days a year would you fish?
9      A. I have no idea.
10     Q. More than 100 days?
11     A. Yes.
12     Q. More than 200 days?
13     A. I have no idea.
14     Q. Was there any limit on your license?
15     A. That's what I -- no.
16     Q. At that time there was no limit; you could
17 fish as much as you wanted?
18     A. Yeah.
19     Q. At some point there became a time when
20 there was a limit placed on scallopers?
21     A. Yes.
22     Q. When was that, do you remember?
23     A. I don't remember.
24     Q. What was the limit that was placed on

6 (Pages 18 to 21)

Page 42

1  with Luzo Bank?
2     A.  I have no idea.  I can't remember.
3     Q.  Back in 1987 when you acquired the boat,
4  did you insure it?
5     A.  Yes.
6     Q.  Who did you insure it with?
7     A.  I think it was Neptune.
8     Q.  Was there a person from Neptune that you
9  dealt with?
10    A.  Ronnie Walsh.
11    Q.  Ronnie Walsh?
12    A.  Yes.  It was a carryover.
13    Q.  What does that mean?
14    A.  Axel had Neptune; I just bought the boat
15  and --
16    Q.  Had the same insurance that he did?
17    A.  Yeah.
18    Q.  Okay.  You had hull insurance?
19    A.  Yes.
20    Q.  And you had P&I insurance?
21    A.  Yes.
22    Q.  Do you know what P&I insurance is, what it
23  stands for?
24    A.  It's for the workers.

Page 43

1     Q.  Okay.  Did you have Workers' Compensation
2  insurance?
3     A.  Yes.
4     Q.  Was that in addition to the hull and the
5  P&I insurance?
6     A.  Yes.
7     Q.  Who provided that insurance?  Was it also
8  Neptune or somebody else?
9     A.  I think they used to get it for me.
10    Q.  When you say "they," are you talking
11  about --
12    A.  Neptune.
13    Q.  Okay.
14    A.  That would be a separate bill, though.
15    Q.  Okay.  Can you remember back in 1987 how
16  much hull insurance you were carrying?
17    A.  I think it was 350,000.
18    Q.  And that was the same insurance coverage
19  that Axel had before you did?
20    A.  I'm not sure.
21    Q.  How about P&I, how much P&I insurance did
22  you have back in '87?
23    A.  A million.
24    Q.  Was that the amount that Axel had been

Page 44

1  carrying before then?
2     A.  Yes.
3     Q.  What about pollution coverage, did you
4  have that?
5     A.  Yes.
6     Q.  How much?
7     A.  I have no idea.  That 350,000, I think
8  that's what it was.
9     Q.  Did you have -- how long did you maintain
10  insurance with Neptune?
11    A.  I don't remember.
12    Q.  Who was the next insurance company that
13  you dealt with after Neptune?
14    A.  Bill Hart.
15    Q.  Who is Bill Hart?
16    A.  An insurance agent.
17    Q.  When did you start doing business with
18  him?
19    A.  When I left Neptune.
20    Q.  Can you help me with the time frame?
21    A.  Honest, I don't remember.
22    Q.  Okay.  Do you remember the name of his
23  insurance company, who he wrote for?
24    A.  I think it was Marine something.

Page 45

1     Q.  Could it have been Maritime something?
2     A.  You know -- Marine, I don't know.
3     Q.  Okay.  And after Bill Hart, where did you
4  go?
5     A.  Flagship.
6     Q.  Okay.  At some point, Mr. Jones, you had a
7  second boat; you purchased another boat?
8     A.  Yes.
9     Q.  When was that?
10    A.  I don't know.  2000, I don't know.
11    Q.  Somewhere around 2000?
12    A.  Yeah, '99.  I don't know.
13    Q.  Okay.  What was the name of that boat?
14    A.  Kelly Jean.
15    Q.  That was named for your daughter?
16    A.  Yes.
17    Q.  Did you obtain insurance for that boat?
18    A.  Yes.
19    Q.  From whom?
20    A.  This girl named Debbie.
21    Q.  You don't have a last name for her?
22    A.  I'm trying to think.  It's out of -- she's
23  out of Moniz, I'm sure.
24    Q.  I'm sorry?

12 (Pages 42 to 45)

Page 46

1     A.  She's out of Moniz.
2     Q.  Can you spell that for us?
3     A.  M-O-N-I-Z, Moniz.
4     Q.  Moniz Insurance?
5     A.  Yeah.
6     Q.  Do you remember the name of the insurance
7  company that it was placed with?
8     A.  No.
9     Q.  Moniz Insurance was the broker?
10     A.  Yes.  She worked out of there.  She was
11  like my agent.
12     Q.  The Kelly Jean was a scalloper as well?
13     A.  Yes.
14     Q.  Smaller boat than the Georgie J?
15     A.  Yes.
16     Q.  How much insurance did you get on the
17  Kelly Jean?
18     A.  I think the hull was 50, 60,000.  I forgot
19  what the P&I was.  It was only a day boat.
20     Q.  That means it would just go out for the
21  day and come back at the end of the day?
22     A.  More or less a day, day -- 400-pound.  As
23  soon as you get your 400 pound, you'd come home.
24  They call it a day boat.

Page 47

1     Q.  And the Georgie J could hold up to how
2  much?
3     A.  To fill the hold?
4     Q.  Yeah.
5     A.  I have no idea.
6     Q.  What's the most you ever took in?
7     A.  Since I had her?
8     Q.  Yeah.
9     A.  The biggest trip?  I don't remember.
10     MR. STONE:  Why don't we take a couple of
11  minutes, okay?
12     (Proceedings interrupted at 11:15 a.m.
13  and reconvened at 11:19 a.m.)
14     Q.  All right.  Mr. Jones, who between
15  yourself and your wife was the person who dealt
16  with insurance agents?
17     MR. ABROMOVITZ:  For the boat you're
18  talking about?
19     Q.  For the boat.
20     A.  Both of us.
21     Q.  What about for your car?
22     A.  Both of us.
23     Q.  Okay.  Did you have insurance on your
24  house as well?

Page 48

1     A.  Yes.
2     Q.  And would both of you deal with that as
3  well?
4     A.  Yes.
5     Q.  All right.  Back in 1987, had you ever --
6  prior to 1987, had you ever obtained insurance on a
7  boat?
8     A.  Prior to '87?  No.
9     Q.  Prior to '87, you were working for other
10  people?
11     A.  Yes.
12     Q.  Was '87 the first year when you started
13  working for yourself?
14     A.  Yes.
15     Q.  Okay.  So you had additional
16  responsibility that you had to undertake to manage
17  the boat and manage the business affairs of the
18  boat?
19     A.  Yes.
20     Q.  Okay.  Did you take any courses or
21  anything like that to teach you how to do that?
22  Was there a course that helped fishermen who were
23  purchasing a boat to learn the business of owning a
24  boat?

Page 49

1     A.  Not that I know of.
2     Q.  Okay.  How was it that you learned all of
3  those things?
4     MR. ABROMOVITZ:  Object to the form of the
5  question.  All of what things?
6     Q.  How did you learn how to manage a boat;
7  trial and error?
8     A.  Through years of being in the business.
9     Q.  Watched other people?
10     A.  Yeah.
11     Q.  Talked to other people?
12     A.  Heard other people talk.
13     Q.  Just stuff that you would hear on the
14  docks and with other fishermen when you were out on
15  the boats and so forth?
16     A.  Well, I started when I was 21, I started
17  on deck.  And you make trips over the years.  It's
18  like stepping up a ladder.
19     Q.  So by the time you first bought a boat in
20  '87, did you feel comfortable in owning a boat and
21  all of the responsibilities that went along with
22  owning it?
23     A.  Yeah.
24     Q.  Okay.  Did your bank require you to have

13 (Pages 46 to 49)

Page 58

1  to be an owner and an operator.  Then it became not
2  that way.
3      Q.  In order to get insurance from Neptune,
4  you had to be the owner and the operator?
5      A.  That's the way I understood it.
6      Q.  And you were the owner and the operator of
7  the boat?
8      A.  Victor.
9      Q.  So you could get the insurance through
10  Neptune?
11      A.  Yes.  But that changed.
12      Q.  So did that mean that you could no longer
13  get insurance through Neptune?
14      A.  Who, me?
15      Q.  Yes.
16      A.  No.
17      Q.  But you decided to change?
18      A.  Yes.
19      Q.  Why was that?
20      A.  Because it's supposed to be owner/operator
21  and that changed.  They were letting some owners
22  let somebody else take the boat.  And they're
23  telling -- you know, it was supposed to be
24  owner/operator, so --

Page 59

1      Q.  Why did that --
2      A.  Bill had the insurance on that boat in
3  1980, anyway.
4      Q.  Okay.  You lost me there.
5      A.  Bill Hart, in 1980, had the insurance on
6  the fishing vessel Victor.
7      Q.  So Bill Hart had the insurance before
8  Neptune took it over?
9      A.  Yes.
10      Q.  When did Neptune take it over; do you
11  know?
12      A.  I think Axel did it as a favor to join the
13  club.  It was supposed to be a club or something.
14      Q.  Okay.  And you stuck with them for some
15  years and then you switched over to Bill Hart's
16  company?
17      A.  Yes.
18      Q.  Prior to switching over to Bill Hart's
19  company you renewed with Neptune a few times at
20  least?
21      A.  Yes.
22      Q.  Every year that you renewed did you have a
23  discussion with Mr. Walsh about the insurance?
24      A.  No.

Page 60

1      Q.  What was the process of renewal?
2      A.  The end of the policy, renew it.
3      Q.  At any point did Mr. Walsh ask you if you
4  wanted to change the coverage?
5      A.  No.
6      Q.  At any point during the time that you had
7  insurance with Mr. Walsh, did you ask him about
8  different levels of insurance coverage?
9      A.  No.
10      Q.  Did you ever ask him if you could get more
11  hull coverage?
12      A.  No.
13      Q.  Did you ever ask him if you could get more
14  P&I coverage?
15      A.  No.
16      Q.  Did you ever ask him if you could get more
17  pollution coverage?
18      A.  No.
19      Q.  Why not?
20      A.  I don't know.
21      Q.  Well, how is it that you decided how much
22  hull coverage to get?
23      A.  From the 350?
24      Q.  Yeah.

Page 61

1      A.  I don't know if it was -- I got a survey
2  and I upped it.  The survey went from 350 to 400
3  and I upped it.
4      Q.  Okay.  Did you do that when you were with
5  Mr. Walsh?
6      A.  I can't remember.
7      Q.  Okay.  How is it that you decided that you
8  would get a million dollars of P&I coverage back in
9  1987?
10      A.  That's what the boat had.
11      Q.  Okay.  Did you ever talk to Mr. Walsh
12  about that, about how much P&I coverage you should
13  have?
14      A.  No.
15      Q.  You just followed on with what you had
16  before?
17      A.  Yes.
18      Q.  Okay.  And that just continued from year
19  to year; it just never changed?
20      A.  Yes.
21      Q.  Do you remember ever having a discussion
22  with Mr. Walsh about the amount of P&I coverage?
23      A.  No.
24      Q.  Did you talk to other boat owners around,

16 (Pages 58 to 61)

Page 62

1  ask them how much coverage they were carrying?
2     A. No.
3     Q. Anybody ever tell you how much they were
4  carrying?
5     A. No.
6     Q. More or less?
7     A. No.
8     Q. What about hull coverage? Did you ever
9  talk to other boat owners about hull coverage and
10 how much hull coverage they were carrying?
11    A. No. Just scallop talk.
12    Q. Okay. No discussion around the docks
13 about insurance coverage?
14    A. No.
15    Q. Okay. Back in the -- at the time that you
16 bought the boat in '87, did you know where the
17 other boat owners were insuring their boats?
18    A. Different companies.
19    Q. Did many of them insure with Neptune, just
20 as you?
21    A. Yes.
22    Q. How many scallop boat owners were there in
23 the area back in the mid-'80s?
24    A. I don't know. I don't know.

Page 63

1     Q. More than 100?
2     A. I couldn't say. I never counted them.
3     Q. At some point the scallop industry became
4  a closed industry, is that right, in New Bedford, a
5  closed port? You couldn't get a license to do
6  scallop fishing, they weren't available anymore?
7     A. Yes.
8     Q. When did that happen?
9     A. I have no idea. I don't remember.
10    Q. Do you have any idea how many licenses
11 there were at the time that that happened?
12    A. No.
13    Q. When you switched over from Neptune to
14 Bill Hart's company, I take it that Bill Hart was
15 the one who contacted you, or did you seek him out?
16    A. I don't remember. He insured that boat in
17 1980, I know that.
18    Q. And at some point you decided that you
19 wanted to get out of Neptune, I take it?
20    A. Yes.
21    Q. So did you call him up and say, hey, Bill,
22 can you give me a quote on insurance?
23    A. I don't know if I went by there or I
24 called or --

Page 64

1     Q. Where was --
2     A. -- I bumped into him.
3     Q. Where was Bill Hart located?
4     A. New Bedford.
5     Q. On the docks?
6     A. No.
7     Q. In the neighborhood?
8     A. Yes.
9     Q. He had an office?
10    A. Yes.
11    Q. Do you remember what the name of the
12 office was?
13    A. I think it was the name of the insurance,
14 Marine something.
15    Q. Could it be Mariners?
16    A. Mariners, that's what it is, Mariners
17 Insurance.
18    Q. Did you have a discussion with him about
19 transferring your insurance from Neptune to his
20 company?
21    A. Yes.
22    Q. What do you remember about the discussion?
23    A. I just asked him if he could insure me, he
24 said yes.

Page 65

1     Q. Did you talk to him about coverage
2  amounts?
3     A. No.
4     Q. Did you tell him how much coverage you had
5  with Neptune?
6     A. Yeah. I showed him the policy and that's
7  what I got.
8     Q. Okay. Did you get the exact same amount
9  of coverage with Bill Hart as you had with Neptune?
10    A. Yes.
11    Q. Did you seek to have any changes in the
12 coverage at all?
13    A. No.
14    Q. The same amount of the hull coverage?
15    A. I changed that and I can't honestly
16 remember.
17    Q. We'll get to that because I have some
18 paperwork that can help refresh you on that.
19    A. All right.
20    Q. Other than the change in the hull
21 coverage, do you have any memory of any other
22 changes in the coverages?
23    A. No.
24    Q. Do you remember how much the annual

17 (Pages 62 to 65)

Page 70

1  Q. Yeah.
2  A. I was supposed to go to a wedding.
3  Q. Did you make a claim for that sinking?
4  A. Yes.
5  Q. And the insurance company paid for it?
6  A. Yes.
7  Q. Subject to whatever the deductible was?
8  A. Yes.
9  Q. And the deductible came out of AGA
10 Fishing?
11 A. Yes.
12 Q. Which company were you with at the time,
13 do you remember?
14 A. Bill Hart.
15 Q. At any point did you have a discussion
16 with Bill Hart about the amount of coverage you
17 should be having on the boat?
18 A. No.
19 Q. Did he ever recommend to you and say you
20 ought to have $5 million or $10 million P&I
21 coverage?
22 A. No.
23 Q. Did you ever ask him?
24 A. No.

Page 71

1  Q. Did he ever tell you what the rates were
2  for additional insurance coverage?
3  A. No.
4  Q. At some point you decided that you wanted
5  to switch companies again and leave Bill Hart's
6  company?
7  A. Yes.
8  Q. Why was that?
9  A. The premium was cheaper.
10 Q. At another company?
11 A. Yes.
12 Q. Where was that?
13 A. Flagship.
14 Q. Who did you contact to find out about the
15 premium at Flagship?
16 A. Ronnie.
17 Q. Had he switched companies at that time?
18 A. Yes.
19 Q. So he had gone to work for Flagship?
20 A. Yes.
21 Q. And he told you he could quote a rate
22 lower than what you were paying with Bill Hart's
23 company?
24 A. He did.

Page 72

1  Q. Do you remember what you were paying with
2  Bill Hart's company and what Walsh was offering?
3  A. No. I really don't.
4  Q. It's -- can you remember what the
5  difference was?
6  A. It was a few thousand dollars.
7  Q. A few thousand dollars a year --
8  A. Same coverage.
9  Q. -- for the same coverage?
10 A. Yes.
11 Q. Did you ask Ronnie about whether you could
12 or should get more coverage?
13 A. No.
14 Q. Did he tell you you could or should get
15 more coverage?
16 A. No.
17 Q. Did he ever recommend to you that you
18 ought to consider getting more than the
19 million-dollar P&I coverage?
20 A. No.
21 Q. Do you remember what year that was that
22 you switched over to Flagship?
23 A. If I'm off a year or two, it's --
24 Q. I'm just trying to get your best memory,

Page 73

1  Mr. Jones.
2  A. I --
3  Q. We have some paperwork that can help.
4  A. '98, I think.
5  Q. Okay.
6  A. '98.
7  Q. Did you actually try to -- do you remember
8  trying to shift off of Bill Hart's company in the
9  middle of the renewal year rather than at the end?
10 Do you remember that happening?
11 A. No.
12 Q. Do you remember Walsh telling you that the
13 company didn't want to pick you up in the middle of
14 the year?
15 A. Oh, when I talked to him, yeah.
16 Q. What's your memory about that?
17 A. I'm trying to think what he said. All I
18 remember is him saying we'll try next year.
19 MR. STONE: Let's mark this as Exhibit
20 Number 1, please.
21 (Exhibit No. 1, March 2, 1998 letter,
22 marked for identification.)
23 Q. Mr. Jones, I've shown you a letter from
24 Ron Walsh to you and to Mrs. Jones dated March 2,

19 (Pages 70 to 73)

Page 86

1    A. What?
2    Q. If someone had a catastrophic injury on
3    the boat back in 1999, did you have an
4    understanding of how the insurance would handle
5    such a claim?
6    A. Yes.
7    Q. What was your understanding?
8    A. They would handle the claim.
9    Q. Okay. Suppose it was a claim, suppose you
10   lost some hands on a fishing trip, did you have an
11   understanding of what would happen then?
12   A. They would get paid.
13   Q. Did you have an understanding of how much
14   they would get paid?
15   A. No.
16   Q. Had you ever heard of any claims on the
17   docks that were very large claims by your
18   understanding?
19   A. No.
20   Q. What's the largest claim that you knew of
21   back in 1999?
22   A. That's not to discuss, you know, it's like
23   hey, the guy -- the boat sank, lost three guys and
24   it's not money. We just discuss the boat, the boat

Page 87

1    sunk, three guys or one guy or this guy fell
2    overboard.
3    Q. So you just talked about what happened and
4    not what the insurance companies did?
5    A. No.
6    Q. Were there ever articles in the local
7    paper about those things?
8    A. You know, it would say, boat sank, you
9    know, lost three guys, one guy, or they airlifted
10   somebody off the boat because of a thumb or --
11   Q. Were you ever a party to a lawsuit
12   involving an injured seaman prior to the Capaldi
13   accident; did you ever get sued?
14   A. Did I ever get sued?
15   Q. Yeah. AGA Fishing ever get sued?
16   A. I imagine it did. I don't know.
17   Q. Do you ever remember getting court papers
18   before the Capaldi case?
19   A. For any other case?
20   Q. Yeah.
21   A. No.
22   Q. Did you ever see in the New Bedford papers
23   -- do you -- strike it in that form.
24      Back in the 1990s, were you getting a

Page 88

1    daily newspaper at your home?
2    A. Yes.
3    Q. Which paper?
4    A. Standard Times.
5    Q. New Bedford?
6    A. Yes.
7    Q. Did the Standard Times report on -- did
8    you ever see any reports of lawsuits involving
9    seamen who were injured or lost at sea?
10   A. I seen articles that lost at sea or --
11   Q. Did they ever talk about money in any of
12   the articles?
13   A. Not that I -- I don't remember no money.
14   Just this guy got hurt or a boat got washed up and
15   they wondered, were they ashore or they're looking,
16   and -- just that.
17   Q. Now, as I understand it, you were carrying
18   a million bucks of insurance because that's what
19   Axel had on the boat when you bought it; is that
20   right?
21   A. Yes.
22   Q. And you never thought to change it at any
23   point?
24   A. No.

Page 89

1    Q. Did anybody ever talk to you about
2    changing it at any point?
3    A. No.
4    Q. Did you ever ask anybody about it?
5    A. No.
6    Q. Now, after you first got the policy with
7    Flagship in 1999, did you continue to get insurance
8    policies from Flagship until the time of the
9    Capaldi accident?
10   A. Every year?
11   Q. Yes.
12   A. Yes.
13   Q. And they would always renew on May 1st of
14   the year?
15   A. Yes.
16   Q. During any of those years did you ever
17   think about getting insurance coverage somewhere
18   else?
19   A. No.
20   Q. Did you ever make an application anywhere
21   else?
22   A. No.
23   Q. Did you ever get a quote from anyone else?
24   A. No.

23 (Pages 86 to 89)

Page 98

1  Bedford.
2     Q. And on one of those occasions -- strike it
3  in that form. Did you meet with Mr. Devnew with
4  other people or just you and Mr. Devnew?
5     A. The first time?
6     Q. Either time. Was anyone else present at
7  either of those meetings that you had with Devnew?
8     A. Yeah. Ronnie, Jack Devnew, O'Sullivan, me
9  and my wife.
10    Q. That was the first time?
11    A. First time, Fairhaven.
12    Q. And the second time?
13    A. The second time was in New Bedford.
14    Q. And who was there? Just you and
15 Mr. Devnew?
16    A. I think my wife was there.
17    Q. So it would be you --
18    A. Me, my wife, and he pulled up with his
19 car.
20    Q. And was that on the dock at New Bedford?
21    A. On the dock, in back of American Seafood.
22    Q. Was that an appointment or did he just
23 happen to --
24    A. No. He just -- he said, I think he called

Page 99

1  me up and said, hey, I'm going to be around.
2     Q. Now, by that time you were no longer
3  actively fishing; is that right?
4     A. That's right.
5     Q. But you would come to the docks on a
6  regular basis?
7     A. I got to be excused.
8     MR. STONE: Sure. Why don't we go off the
9  record for a minute.
10    (Proceedings interrupted at 12:36 p.m.
11 and reconvened at 12:38 p.m.)
12    MR. STONE: Can you read me back the last
13 one, please.
14    (Requested testimony read by the
15 reporter.)
16    THE WITNESS: I was, I made a few trips,
17 not steady.
18    Q. Did you tell your doctors about that?
19    A. I was with them so long.
20    Q. Okay. When you made trips, occasional
21 trips, would you go as a deckhand on your own boat?
22    A. Skipper, captain.
23    Q. You'd take -- skipper and captain mean the
24 same thing?

Page 100

1     A. Same thing. Sorry.
2     Q. That's all right.
3     By the time that you were being insured by
4  Flagship, from the documents that I've seen, it
5  looks like you had a crew of 6.5, six and a half.
6  At least that's what you were insured for. How was
7  that determined?
8     A. You'd have to ask Jack.
9     Q. Well, how did you determine how many
10 people would be going out on a fishing trip in the
11 year, say 2000, 2001 time frame?
12    A. We were seven guys; sometimes you'd go
13 with six.
14    Q. So it would vary between six and seven?
15    A. Uh-huh.
16    Q. How did that number get selected; is that
17 because of some industry regulation?
18    A. Yes.
19    Q. What was the regulation?
20    A. You couldn't go more than seven.
21    Q. On a scallop boat?
22    A. Yes.
23    Q. And it also limited the number of days
24 that you could go?

Page 101

1     A. Yes.
2     Q. Do you remember back in the year 2000,
3  2001 how many days you were limited to?
4     A. No. They changed it every so often.
5     Q. How did you find out about those changes?
6     A. They mail the changes to the settlement
7  office.
8     Q. And then the settlement office would
9  notify you?
10    A. Yes.
11    Q. Okay. Did the settlement office -- was
12 there more than one settlement office in New
13 Bedford?
14    A. Yes.
15    Q. How did you select the one that you were
16 with?
17    A. I just went to Edie & Maria.
18    Q. Was there any difference in terms of --
19 strike it in that form. What were your
20 arrangements with the settlement house in terms of
21 how much they would get paid for the work they did
22 for you?
23    A. Edie's?
24    Q. Yes.

26 (Pages 98 to 101)

Page 102

1    A. She'd take so much a settlement.
2    Q. A percentage?
3    A. No. A fee.
4    Q. A flat fee for each fishing trip?
5    A. Yes.
6    Q. Was that the same as other settlement
7  houses would take per fishing trip?
8    A. The same money?
9    Q. The same amount; did they charge the same
10  rates at the other places?
11    A. I don't think so.
12    Q. Did the amount that the settlement house
13  was charging you, did that change depending on how
14  many days you were out, or was it just a flat
15  number for --
16    A. Just a flat number.
17    Q. So it was the same whether you were out
18  for two days or ten days?
19    A. Yeah.
20    Q. Okay. On days when you were not going out
21  on the boat, would you still show up at the docks?
22    A. Yes.
23    Q. Would that be true whether or not your
24  boat was already out fishing or would -- only when

Page 103

1  your boat was in port?
2    A. Only when my boat was in.
3    Q. Okay. Were you in communication with the
4  boat when it was out fishing?
5    A. I could, yes.
6    Q. What kind of communication equipment did
7  the boat have to contact you on the shore?
8    A. BOAT/TRACK.
9    Q. Is that live voice?
10    A. No. It's -- he could send me a fax.
11    Q. Do you have a fax machine in your house?
12    A. Yes.
13    Q. Did you have any other equipment in your
14  house that would allow you to communicate with the
15  boat?
16    A. No.
17    Q. According to records that I have, there
18  was a survey of your boat done in August of 1999.
19  How often were surveys done of the boat?
20    A. Two, three years.
21    Q. What was the reason for doing surveys?
22    A. It was for the insurance. And for me,
23  too.
24    Q. What information did you get from the

Page 104

1  survey? What information did it provide to you?
2    A. The gauging, how thick the steel was, and
3  they check the boat.
4    Q. Based on the survey, did you sometimes
5  have to do repair work or upgrade the boat to meet
6  conditions?
7    A. Yes. And the value of the boat.
8    Q. Now, according to my notes, the survey in
9  August of 1999 valued the boat at 375 to $400,000;
10  is that consistent with your memory?
11    A. I think so, yes.
12    Q. And that was at the point in time when you
13  decided that you wanted to up the hull coverage?
14    A. Yes.
15      MR. STONE: All right. Why don't we take
16    a few minutes and have a bite to eat.
17      (Proceedings interrupted at 12:45 p.m.
18    and reconvened at 1:36 p.m.)
19  BY MR. STONE:
20    Q. Mr. Jones, you're appearing here today in
21  response to a notice of taking deposition of AGA
22  Fishing Corporation; are you aware of that?
23    A. Yes.
24    Q. And you're appearing here both in your

Page 105

1  individual capacity as George Jones, but also as a
2  person who has knowledge of the affairs of AGA
3  Fishing?
4    A. Yes.
5    Q. Okay. Mr. Jones, other than yourself and
6  Mrs. Jones, is there anyone else who is able to
7  testify on behalf of AGA Fishing?
8    A. No.
9    Q. Between the two of you, you know
10  everything that there is to know about AGA Fishing
11  and its business activities?
12    A. Yes.
13    Q. Okay. Mr. Jones, if I may digress for
14  just a moment, you tried to get insurance from
15  Flagship for your boat, the Kelly Jean?
16    A. Yes.
17    Q. And you created a corporation called the
18  -- Brian's Fisheries, Inc.?
19    A. Yes.
20    Q. And I take it that that's named after your
21  other son?
22    A. Yes.
23    Q. Let me show you a document -- let me show
24  you a multipage document, dated December 10, 2001,

27 (Pages 102 to 105)

Page 114

1    Q.  Do you remember what -- and this was
2  Steve?
3    A.  Steve, yes.
4    Q.  And do you remember what Steve said when
5  you were upgrading?
6    A.  Yes.  He told me I should upgrade because
7  I have a business.
8    Q.  Okay.  Did he suggest a particular amount?
9    A.  Yes.  I guess that amount.
10   Q.  He suggested 100/300?
11   A.  Yes.  I rely on their judgment.
12   Q.  Okay.
13   A.  The agents.
14   Q.  All right.  Now, with respect to your boat
15  insurance, as I understand it, you had a million
16  dollars in coverage -- sorry -- Axel had a million
17  dollars in coverage when you bought the boat from
18  him.
19   A.  Yes.
20   Q.  At any point after that, did you have a
21  discussion with anyone, either Mr. Walsh or
22  Mr. Hart or Mr. Devnew about how much P&I coverage
23  you should have?
24   A.  No.

Page 115

1    Q.  So none of them ever talked to you about
2  that?
3    A.  None of them.
4    Q.  You just continued to have the same amount
5  of coverage that you had always had?
6    A.  Yes.
7    Q.  Or that Axel had had before you bought the
8  boat?
9    A.  Yes.
10   Q.  Did any of them ever suggest to you that
11  you ought to consider getting more coverage?
12   A.  No.
13   Q.  Did any of them ever tell you that --
14       (Proceedings briefly interrupted.)
15   Q.  Did Mr. Devnew ever provide you with
16  examples of bad things that could happen which
17  might lead you to have -- think about more
18  insurance coverage?
19   A.  No.
20   Q.  Did he ever give you the example that if
21  your boat hit a passenger ferry, that you could
22  have a catastrophic situation?
23   A.  No.
24   Q.  Never discussed that example?

Page 116

1    A.  Never.
2    Q.  Did you ever hear about claims in which
3  there were settlements or payments in excess of a
4  million dollars?
5    A.  No.
6    Q.  Never heard about that happening?
7    A.  No, never heard.
8    Q.  Okay.  Folks on the dock never talked
9  about anything like that, at least when you were
10  around?
11   A.  No.
12   Q.  When you got stuff from Flagship, did you
13  read it?  When you got paperwork from them, did you
14  read it or did Mrs. Jones read it?
15   A.  Either her or me.
16   Q.  Okay.  One of you would generally read at
17  least the cover letter?
18   A.  Yeah.  Didn't get too much.
19   Q.  I'm sorry?
20   A.  We didn't get too much.
21   Q.  Gotcha.  Okay.  Now, I have a note in my
22  file from Mary Lafleur in April of 2000 that Bill
23  Hart was calling you, seeking to quote insurance to
24  him -- I'm sorry -- calling you, trying to get you

Page 117

1  to buy insurance from him.  Is that consistent with
2  your memory of the timing when he was chasing you?
3    A.  No.  I don't --
4    Q.  Do you have any memory?
5    A.  I remember him coming up the house and I
6  said, hey, it's too late.  I signed.
7    Q.  This one has to do with a conversation
8  that Bill Hart had with Mrs. Jones.
9    A.  Oh --
10   Q.  Did she ever tell you about the
11  conversations that she had with Hart?
12   A.  I don't recall.
13   Q.  Do you have a memory of Mr. Walsh, and
14  this is in the 2000 time frame, offering you the
15  alternative of a 5 and $10,000 deductible on the
16  hull rather than a 10 or $15,000 deductible?  Do
17  you remember him talking to you about that, giving
18  you that choice?
19   A.  I don't know.
20   Q.  Now, in 2001, do you remember asking Lisa
21  Rawles -- strike it in that form.
22       Do you remember ever talking to Lisa
23  Rawles on the telephone?
24   A.  Me?

Page 126

1    Q. She just happened to mention that to you?
2    A. Well, when I had to write out a check, she
3    sees everybody's -- you know, when they do their
4    deductible.
5    Q. So when you had an injury on the boat and
6    you had to write a check for 2,500 and other guys
7    were writing 1,500?
8    A. Or was it Cheryl?
9        So I asked Jack about it.
10   Q. Okay. And so Jack was able to obtain a
11   reduction in the deductible from 2,500 to 1,500?
12   A. Yes.
13   Q. So that would save you a thousand bucks
14   any time there was an accident?
15   A. Yeah.
16   Q. Okay. Gotcha.
17       Let me show you a letter dated April 26,
18   2001.
19       (Exhibit No. 12, Letter dated April 26,
20       2001, marked for identification.)
21   Q. This is a letter to you from Lisa Rawles,
22   dated April 26, 2001, Exhibit Number 12, in which
23   she encloses the 2001-2002 policy; is that correct?
24   A. Yes.

Page 127

1    Q. Okay. And she also enclosed a bill for a
2    portion of the policy, the down payment portion.
3    Do you see where it references that?
4    A. Yes.
5    Q. Am I to understand that you would pay some
6    portion to Flagship and finance the bulk of the
7    annual premium?
8    A. Yes.
9    Q. So that you would make monthly payments on
10   the premium to a finance company?
11   A. Yes.
12   Q. And you did that pretty much every year?
13   A. Yes. Some years I gave a bigger down
14   payment.
15   Q. Okay. Looking at the third paragraph of
16   this letter to you, where it says, "Please
17   remember, we can write higher limits for pollution
18   and protection and indemnity. If you are
19   interested in either of these, please be sure to
20   let us know."
21       Do you see that sentence in there --
22   A. Yes.
23   Q. -- sentences?
24       Did you read that at the time?

Page 128

1    A. I don't remember.
2    Q. Do you understand what those two sentences
3    mean?
4    A. No. Pollution? Something goes in the
5    water.
6    Q. Do you know what pollution insurance
7    coverage is?
8    A. Yeah. In case you have a spill.
9    Q. How much were you -- was your limit for
10   pollution coverage?
11   A. I think it was 20, 20 -- 25,000.
12   Q. Do you understand what the phrase "write
13   higher limits" means in Exhibit 12? "Please
14   remember we can write higher limits."
15   A. What does it mean?
16   Q. Yeah. Do you understand it -- tell me
17   what it means to you, sir.
18   A. It means if I need more, they can write
19   more.
20   Q. So if you want to get a higher -- a higher
21   amount of coverage, they can get it for you?
22   A. Yes.
23   Q. Did you understand that back in 2001?
24   A. I thought they were taking care of me,

Page 129

1    really. I didn't need it.
2    Q. What do you mean, you thought they were
3    taking care of you?
4    A. Well, I thought I had enough.
5    Q. Okay. Why is it that you thought you had
6    enough?
7    A. Because they're an insurance company.
8    It's like my cars.
9    Q. Did they -- did anyone from the insurance
10   company ever tell you that you had enough insurance
11   coverage?
12   A. No.
13   Q. But you were buying the same coverage that
14   you had bought from two other insurance companies?
15   A. Yes.
16   Q. Gotcha. All right. Let me show you the
17   next one.
18       (Exhibit No. 13, Letter of April 19, 2002,
19       marked for identification.)
20   Q. The letter of April 19, 2002, Mr. Jones,
21   that contained the renewal proposal for the year
22   '02-'03; is that correct?
23   A. Yes.
24   Q. And did you renew with Flagship in

33 (Pages 126 to 129)

Page 150

1    A. No.
2    Q. What is the reason that you brought a
3  claim against Flagship?
4       MR. ABROMOVITZ: Object to the form. You
5  may answer. It's okay. You can answer.
6       THE WITNESS: I feel they didn't do their
7  job.
8    Q. Okay. In what way?
9    A. Well, they're an insurance company; they
10 should advise me.
11   Q. What should they have advised you about?
12   A. Upping my insurance.
13   Q. Anything else?
14   A. No.
15   Q. So it's your position that they should
16 have said, hey, George, you really need more
17 insurance coverage, you've got to buy some more?
18   A. Yes. Like my car insurance, when I bought
19 the business, we upgraded.
20   Q. How much insurance should they have told
21 you to buy?
22   A. I have no idea. I'm not insurance.
23   Q. Well, do you know what the right amount
24 would have been? We're two years later now. What

Page 151

1  amount should you have been told?
2    A. Two years later right now, the amount
3  right now today?
4    Q. You've become a bit more educated about
5  insurance in the last couple of years, sir, from
6  your experience?
7    A. Yeah.
8    Q. Based on what you've learned and what you
9  now know, how much should they have advised you to
10 obtain?
11   A. 10 million.
12   Q. Do you know whether any of the other
13 scallop boats in your area had 10 million of
14 insurance coverage?
15   A. Yes.
16   Q. Who is that?
17   A. Should I answer that?
18      MR. ABROMOVITZ: It's okay.
19      THE WITNESS: That's somebody else's
20 business.
21      MR. ABROMOVITZ: Well, it's discoverable.
22      THE WITNESS: Ray Starvish.
23   Q. Anyone else?
24   A. Well, not 10. Ray.

Page 152

1    Q. How much did Ray have?
2    A. He had 10.
3    Q. How is it that you know that, he told you
4  that?
5    A. Yes.
6    Q. When did he tell you that?
7    A. Everybody upped it to 5 million or they
8  had 5 million.
9    Q. How do you know that?
10   A. Because I dock beside Eric.
11   Q. Eric?
12   A. I don't know his last name. Eric, he owns
13 the Endeavor.
14   Q. Uh-huh.
15   A. He told me, geez, how come you ain't got
16 5 million. I said nobody told me. He says, it's
17 only a matter of a few thousand dollars.
18   Q. When did he tell you that?
19   A. I don't remember the day. After the
20 accident.
21   Q. Okay. Prior to the accident, did anybody
22 tell you how much insurance coverage they had?
23   A. No.
24   Q. Didn't talk about it before that?

Page 153

1    A. Talk about scallops. Don't go here. Hey,
2  I found a wreck here. That's --
3    Q. Fishing talk?
4    A. That's it.
5    Q. But they didn't talk --
6    A. I used a longer sweep, seems to be better,
7  higher shoe. No.
8    Q. And did Ray Starvish own the Endeavor at
9  one time?
10   A. Yes.
11   Q. And he owned it in partnership with
12 Hansen?
13   A. That's his name. Hansen. Yes. Eric.
14   Q. And did Starvish tell you that he had
15 10 million on his boats?
16   A. After.
17   Q. Do you know what he had on the boats
18 before the Capaldi accident?
19   A. No.
20   Q. Were there any other boat owners that you
21 talked to after the accident about their coverage?
22   A. I really -- I didn't go around.
23   Q. Did people talk to you and --
24   A. Nobody. It was kind of like nontalkable,

39 (Pages 150 to 153)

Page 158

1    Q. -- that they were all getting more
2 coverage?
3        Tell me a bit about the accident itself.
4    A. I wasn't there.
5    Q. I understand. Your skipper was a new
6 skipper at that time? Mr. Sylvia?
7    A. He was skipper before.
8    Q. How long had he been the skipper on your
9 boat?
10    A. First trip. I only had ten days.
11    Q. Had he -- he had been a skipper on other
12 boats before that?
13    A. Yes.
14    Q. Had he ever been out on your boat before
15 that?
16    A. Yes.
17    Q. He was generally familiar with the boat?
18    A. Yes.
19    Q. What's your understanding of what caused
20 the accident?
21    A. What caused it?
22    Q. Yeah. How it happened.
23    A. I never got really told. The block came
24 down. Nobody really explained.

Page 159

1    Q. The block came down and hit Mr. Capaldi?
2    A. Yes. One of the guys said it bounced off
3 the galley. He was in the middle of the deck.
4 Statements that the surveyor got.
5    Q. Have you read some of the statements and
6 descriptions about the accident and the way it
7 occurred?
8    A. Just two, I think.
9    Q. Did you --
10    A. I wanted to read Gary's, but he never made
11 one.
12    Q. Who's Gary?
13    A. The skipper.
14    Q. He never gave a statement?
15    A. No. And he wouldn't let nobody go next to
16 his stepson; that was his stepson.
17    Q. Who? Capaldi was his stepson?
18    A. Yes.
19    Q. And nobody would talk to Capaldi about how
20 it happened?
21    A. He wouldn't let them, the way I understood
22 it.
23    Q. What was your understanding of what the
24 defect was in the boat, what people thought the

Page 160

1 defect in the boat was that caused the accident?
2    A. The defect?
3    Q. Was there something wrong with the boat or
4 with the equipment or the gear that caused the
5 accident?
6    A. Oh, when the surveyor came?
7    Q. Yeah.
8    A. He really -- he didn't know whether it was
9 a heavy load or if he had the brake on -- because
10 he was asking the gang how much was in the bag.
11 I'm pretty sure they said the bag was full, but
12 leaving it outside, it kind of emptied.
13    Q. Do you remember there being some
14 suggestion that there was some wear and tear that
15 had not been addressed before the trip?
16    A. I wasn't aware until after.
17    Q. I understand that you weren't aware. But
18 was there some discussion or statements about that?
19 Do you remember that?
20    A. I think the mate.
21    Q. I'm sorry?
22    A. The mate.
23    Q. What did the mate say?
24    A. He told the surveyor.

Page 161

1    Q. What was it that he --
2    A. Something about something worn. But he
3 figured he'd get another trip out of it or
4 something. He didn't address it to me.
5    Q. So the mate told the surveyor that there
6 was --
7    A. Yes.
8    Q. -- a worn line?
9    A. I think it was a swivel, shackle, swivel.
10 And he didn't address it to nobody.
11    Q. He saw it, but he thought it could hang in
12 there for another trip?
13    A. Another trip.
14    Q. Was that what caused the block to fall?
15    A. They don't know what caused it really,
16 whether the bag was full, the brake was on and
17 giving it the air. I never got a definite thing.
18    Q. Now, after the accident, when were you
19 notified about the accident? How did you find out
20 about it?
21    A. Gary called, called me, called the house,
22 had a satellite telephone.
23    Q. Okay. Where was he fishing?
24    A. Closed area. Off New York. I don't know

41 (Pages 158 to 161)

Page 162

1  if it's closed area 3, 2.
2     Q.  Where did he go into port?
3     A.  He didn't.
4     Q.  What did he do?
5     A.  They airlifted Victor off the boat.  He
6  fished another day or two; then he came home.
7  Because Victor was going to be operated on and he
8  wanted to be there.
9     Q.  Coast Guard went out and got him?
10    A.  Got who?
11    Q.  Sorry.  The Coast Guard went out to get
12  Victor off the boat?
13    A.  Airlifted him off.
14    Q.  Did anyone go with Victor or did he go by
15  himself?
16    A.  Went by himself.
17    Q.  Where did they take him to?
18    A.  Atlantic City Hospital.
19    Q.  What's your understanding of the injury
20  that he had?
21    A.  What do you mean, what's my understanding?
22    Q.  What were you told that he -- about his
23  injuries?
24    A.  He got hit on the head.

Page 163

1     Q.  And what happened to him because of that?
2  What's your understanding, what were you told
3  happened to him as a result of being hit on the
4  head?
5     A.  What happened to him?
6     Q.  I understand he went to the hospital.
7  What did they find?  What was his -- the diagnosis?
8     A.  Oh, I don't know.  Something -- what did
9  they say?  I don't know.  His neck or something
10  and --
11    Q.  Have you talked to Mr. Capaldi at all
12  since the time of the accident?
13    A.  No.
14    Q.  How about --
15    A.  His lawyer said no talking.
16    Q.  How about to Mr. Sylvia?
17    A.  No talking.
18    Q.  Have you seen either one of them around
19  the docks since then?
20    A.  Yes.
21    Q.  Which one?
22    A.  Both.
23    Q.  Mr. Sylvia is back fishing on the scallop
24  boats?

Page 164

1     A.  Yes.
2     Q.  What about Mr. Capaldi, what's he doing?
3     A.  He's walking around, going to the gym.
4     Q.  So it appears that he's substantially
5  recovered from his injuries?
6     A.  Oh, yes.  It was in the paper.
7     Q.  Prior to your boat being arrested, you
8  were represented by counsel, by an attorney?
9     A.  Yes.
10    Q.  Which attorneys were representing you
11  then?
12    A.  Tom Muzyka.
13    Q.  Anyone else?
14    A.  Pamela Lafreniere.  And before that was
15  Steve Willett, because Jack told me I needed a
16  lawyer.
17    Q.  Needed a lawyer personally?
18    A.  No.  I needed a lawyer.
19    Q.  Okay.  Did you have conversations with
20  Jack after the accident, about the accident itself?
21    A.  Yes.
22    Q.  What did he tell you?
23    A.  He told me, keep me posted.  He said, I'll
24  have somebody there when the boat comes in.  I

Page 165

1  said, okay.  He gave me his home number, his cell
2  number.
3     All right.  Then I said the boat's going
4  to be in Friday night.  I think they left on a
5  Tuesday.  I'm not sure, Tuesday, Friday, you know.
6     The skipper called me, said I'm going to
7  be in 4:00.  I called Jack, it's going to be in at
8  4:00.  He said, okay, don't worry about nothing.  I
9  said, okay, Jack.  Then the skipper said, I don't
10  think I'm going to be 4:00, I'm going to be 5:00.
11  I called Jack back, 5:00.  Jack says, okay.  Don't
12  worry about nothing.
13    I said, okay, Jack.  He said, you got all
14  my numbers?  I said, I got all your numbers.  I
15  went down the dock.  The boat made the 4:00 bridge
16  or whatever.  He docked the boat.  I went down to
17  the dock.  Everybody is on the dock, blah, blah,
18  blah.  I'm looking, looking, looking.  He never
19  sent nobody until Monday.
20    I tried calling him at his home.  I tried
21  calling him on his cell.  No answer.  No answer.
22    Q.  Did you have a discussion with him
23  afterward about what happened?
24    A.  Yes.

# INSURANCE BINDER
## THIS BINDER IS A TEMPORARY INSURANCE CONTRACT.

**NAME AND ADDRESS OF AGENCY**
Seacoast Specialty Administrators, Inc.
3771 Nesconset Hwy., Suite 212
South Setauket, NY 11720
Phone: 631-444-0900, Fax: 631-444-0044

**COMPANY**

A) Indemnity Ins Co Of NA    B) WQIS

Effective: 03/15/2002 Noon
Expires:   03/15/2003 Noon

**NAME AND MAILING ADDRESS OF INSURED**
Brian Fisheries, Inc.

14 Green Dr.
North Dartmouth, MA 02747

**OPERATION/PROPERTY DESCRIPTION**

Inshore C/FV

**TYPE AND DESCRIPTION OF PROPERTY**

1977 58'  N. Dartmouth, MA Built
Detroit 8V-71

Named: KELLY JEAN
Gross Tons:  39
Official # 643019

| COVERAGE/PERILS/FORMS | AMOUNT OF INSURANCE | DEDUCTION |
|---|---|---|
| (A) Hull, Machinery & War FPA Clause Applies | $60,000 | $ 5000 |
| (A) Protection & Indemnity Incl. 2  FT, 0  PT Crew * Excludes All Owners | $500,000 | $ 2500/BI $ 5000/PD |
| (A) Excess Collision | $440,000 | |
| (B) WQIS Pollution | $500,000 | |

**SPECIAL CONDITIONS**

U.S. Coastal Atlantic and Inland Tributary Waters from Eastport, ME to Cape May, NJ - not more than twenty-five (25) miles offshore.  Warranted:  In-port every 36 hours.

**MORTGAGE 1**

**ADD. INSURED 1**

**MORTGAGE 2**

**ADD. INSURED 2**

Signature of authorized representative

3/15/02

Date

DF22

VOLUME:   I

PAGES:  1 - 107

EXHIBITS: None marked

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


------------------------x

AGA FISHING CORPORATION,

      Plaintiff,

 vs.                              Civil Action No.

FLAGSHIP GROUP LIMITED           05-11396 JLT

and BROWN & BROWN, INC.,

      Defendants.

------------------------x


DEPOSITION OF ANTONETTE JONES

Wednesday, May 31, 2006

10:13 a.m.

Peabody & Arnold LLP

30 Rowes Wharf

Boston, Massachusetts


Reporter:  Dana Welch, CSR, RPR



**Page 66**

1    A. Yes.
2    Q. How many occasions?
3    A. Once or twice.
4    Q. Where did you meet him when you did meet
5 him?
6    A. I met him on the dock and probably at the
7 office.
8    Q. What office are you speaking about?
9    A. Ronnie's, when they were taking over.
10    Q. Did they have any promotional material or
11 literature?
12    A. Not that I recall.
13    Q. A brochure of any kind?
14    A. Not that I recall.
15    Q. Did you ever obtain any information about
16 Flagship from anyone?
17    A. Not that I recall.
18    Q. Did you know anything about their company?
19    A. No.
20    Q. Other than meeting Ronnie Walsh and then
21 Jack Devnew did you have any other knowledge about
22 Flagship?
23    A. No.
24    Q. Did you have -- do you have a computer?

**Page 67**

1    A. No.
2    Q. So I take it that you didn't go searching
3 the Web to find out about insurance companies?
4    A. No.
5    Q. Did you ever speak to any of the other
6 fishing people about who they used as insurance
7 companies?
8    A. No.
9    Q. Do you know if your husband did?
10    A. Don't know.
11    Q. Were you aware of accidents that happened
12 in the fishing fleet out of New Bedford and
13 Fairhaven?
14    MR. ABROMOVITZ: Can we fix a time?  This
15 is, I take it before the Capaldi accident?
16    Q. Before the Capaldi accident.
17    A. No.
18    Q. Did you ever read about accidents or
19 deaths that happened within the fishing fleet?
20    A. No.
21    Q. Did your husband ever discuss injuries or
22 accidents that happened on boats?
23    A. Not that I recall, no.
24    Q. Were you aware of any claims that were

**Page 68**

1 made against the Victor or Georgie J for injuries
2 that happened on the boat before Mr. Capaldi's
3 accident?
4    A. Yes.
5    Q. Which ones were you aware of?
6    A. He would tell me to call Lisa and report
7 an accident.
8    Q. Your husband would ask you to call Lisa
9 Rawles?
10    A. Yeah.  Or he would call.  If he was busy,
11 then I would call.
12    Q. Who is Lisa Rawles?
13    A. One of the ladies at Flagship.
14    Q. Have you ever meet her?
15    A. No.
16    Q. Have you spoken to her on the phone?
17    A. Yes.
18    Q. On more than one occasion?
19    A. Yes.
20    Q. Other than speaking to her about claims of
21 injured fishermen, did you ever speak to her about
22 insurance coverage matters?
23    A. No.
24    Q. Do you remember back in 2001 there was a

**Page 69**

1 change in the -- in the bodily injury deductible on
2 the insurance policy?  Do you remember that
3 happening?
4    A. I think my husband mentioned it.
5    Q. Do you have any memory as to why or how
6 that came about?
7    A. No.
8    Q. Do you have a recollection about other
9 boat owners having a better deductible than you
10 did?
11    A. No.
12    Q. Do you understand what it means to reduce
13 the deductible?
14    A. Get a better price.
15    Q. Do you understand that if you reduce the
16 deductible that you're less out of pocket in the
17 event of an injury?
18    A. Yeah.
19    Q. That less comes from you?  On your car
20 insurance, do you know whether you have a
21 deductible for your car insurance?
22    A. Yes.
23    Q. How much is your deductible on that?
24    A. 500.

18 (Pages 66 to 69)

**EXHIBIT D**



# FLAGSHIP
### GROUP INSURANCE AGENCY, LTD.

*To: LISA*

March 15, 2000

AGA Fishing, Inc.
14 Green Drive
North Dartmou MA    02747

RE:  F/V "VICTOR" 1966, 80.6', STEEL
     Policy No. 99-A5441

Dear George:

The above referenced policy will be expiring on May 01, 2000.
Please take a few minutes to assist us in updating our files.  We are
presently covering the vessel under the following conditions and if
you would like to make any changes, we would be glad to implement
them at renewal.

|     |                              | **PRESENT COVERAGE** | |
|-----|------------------------------|----------------------|---|
| 1.  | HULL VALUE:                  | $350,000.00 | |
| 2.  | HULL DEDUCTIBLE:             | $10,000.00 | |
|     | MACHINERY:                   | $15,000.00 | |
| 3.  | 1ST MORTGAGEE:               | LUZO COMMUNITY BANK | |
|     | 2ND MORTGAGEE:               | PREMIUM ASSIGNMENT CORP. | |
| 4.  | 1ST MORTGAGEE AMOUNT:        | $71,429          Please Update: _____ | |
| 5.  | PRIMARY P&I LIMIT:           | $500,000.00 | |
| 6.  | P&I DEDUCTIBLES:             | $1,500 Bodily Injury | |
|     |                              | $2,500 Property Damage | |
| **7. | CREW COMPLEMENT:            | 6.5 CAPTAIN: INCLUDED | |
| 8.  | CAPTAIN'S NAME:              | | |
| **9. | FISHERY:                    | SC | |
| 10. | OTHER PERMITS HELD:          | | |
| 11. | NAVIGATION LIMITS:           | HAGUE LINE TO CAPE HATTERAS, NC - NOT TO EXCEED 200 MILES OFFSHORE | |
| 12. | MAIN ENGINES:                | Caterpillar D-398 | |
| 13. | EXCESS P&I POLICY CARRIED:   | YES          x        NO  _____ | |
| 14. | EXCESS P&I LIMITS:           | 500 XS 500 | |
| 15. | POLLUTION POLICY CARRIED:    | YES          x        NO  _____ | |
| 16. | POLLUTION LIMIT:             | $500,000.00 | |
| 17. | OFFICIAL HULL NO:            | 502064 | |
| 18. | ANY OTHER CHANGES:           | _____ | |

Higher limits are available for Protection and Indemnity.

Please return this letter with the necessary changes in the self-
addressed envelope provided.

Sincerely,

*Ronald Walsh*
Ronald Walsh
Manager

/ml



**AGA 1436**

R'

April 16, 2001

AGA Fishing, Inc.
Mr. George Jones
113 MacArthur Drive
New Bedford, MA 02740



Re:    F/V "GEORGIE J"
       Hull, Primary P&I, and Pollution Insurance Coverage Renewal
       Effective: May 1, 2001 to May 1, 2002

Dear Mr. Jones:

We are pleased to enclose  the 2001/02 Insurance Renewal Proposal for the
"GEORGIE J."

The renewal premium for the period indicated above will be $31,164.00, and we would
like to bring the following items to your attention as they represent a change in coverage
for this year:

1. Hull and Primary P&I coverages to be issued by Centennial Insurance
   Company
2. Primary P&I limit to be $250,000 with deductibles of $2,500 for Bodily Injury
   and $5,000 for Property Damage
3. Excess P&I limit will be $750,000 xs $250,000

As done in the past, we have prepared a Finance Contract for this amount which should
be signed and returned along with the required downpayment at your earliest
convenience.

In order to complete the underwriting process, we are also enclosing an Application and
Captain's Resume which need to be completed and returned, as well.

We look forward to continuing our relationship and providing you with these important
coverages for your benefit and protection.  If you have any questions, please do not
hesitate to contact our office.

Sincerely,

THE FLAGSHIP GROUP, LTD.

Jack S. Devnew

JSD/lar
Enclosures

Post-it® Fax Note    7671    Date 1/20/01  # of pages ▶ 11
To George Jones          From Glse Rhurdes
Co./Dept. AGA Fishing    Co. Flagship
Phone # 508-993-4193     Phone # 800-634-3559
Fax # 508-993-4442       Fax # 757-627-2150

AGA 1677



**INSURANCE RENEWAL PROPOSAL**

**FOR**

**AGASSIZ VILLAGE**

Presented by:

**JACK S. DEVNEW**
**PRODUCER**

**LISA RAWLES**
**ACCOUNT MANAGER**

MAY 1, 2001 TO MAY 1, 2002



**FLAGSHIP GROUP, LTD.**

**NORFOLK, VIRGINIA**



AGA 1683

## HULL & MACHINERY INSURANCE

| | |
|---|---|
| **NAMED ASSURED:** | **AGA FISHING, INC. / GEORGE JONES** |
| **TERM:** | **05/01/01 TO**      **12:00 Noon E.S.T.**<br>**05/01/02**      **12:00 Noon E.S.T.** |
| **VESSEL:** | **F/V "GEORGIE J"**<br>**1966, 80.6', STEEL SCALLOPER** |
| **AGREED VALUE:** | **$400,000** |
| **DEDUCTIBLE:** | **$5,000**      **Per Occurrence - Hull**<br>**$10,000**      **Per Occurrence - Machinery** |
| **LOSS ADJUSTMENT:** | **To Be Advised** |
| **NAVIGATION LIMIT:** | **HAGUE LINE TO CAPE HATTERAS, NC – NOT TO EXCEED 200 MILES OFFSHORE** |

**FORMS:**
- Hull Taylor Form SP39C 1953 (Rev. 70)
- Schedule of Vessels
- BOW Schedule of Vessels
- S.R. & C.C. Endorsement (Hulls) 87B-46 (Sept. 8, 1959)
- A.I. Hull War Risk & Strikes clauses (December 1, 1977)
- Fishing Vessel Clauses Special Terms & Conditions
- A.I. Radioactive Contamination Exclusion Clause
- Electronic Date Recognition Endorsement – C
- CRO Endorsement

| | |
|---|---|
| **LOSS PAYEE:** | **LUZO COMMUNITY BANK**<br>AMOUNT UNKNOWN AT THIS TIME<br>**PREMIUM ASSIGNMENT CORPORATION** |
| **SECURITY:** | **Centennial Insurance Company**<br>**United States** |
| **BEST RATING:** | **A-X**      **Excellent** |
| **PREMIUM:** | **INCL.**      **Hull** |

**FLAGSHIP**
GROUP, LTD.

AGA 1684

## PROTECTION & INDEMNITY

**NAMED ASSURED:** AGA FISHING, INC. / GEORGE JONES

**TERM:** 05/01/01 TO 12:00 Noon E.S.T.
05/01/02 12:00 Noon E.S.T.

**PRIMARY LIMIT OF LIABILITY:** $250,000.00 PER OCCURRENCE

**SECURITY:** Centennial Insurance Company
United States

**BEST RATING:** A-X      Excellent

**LOSS ADJUSTMENT:** TO BE ASSIGNED

**FORMS:**
- A.I.M.U.  P&I Clauses 6/2/83
- Fishing Vessel Clauses (P&I)
- Excess Collision Extention
- Pollution Exclusion Clause
- Occupational Disease Exclusions
- CRO Endorsement

**DEDUCTIBLE:** $2,500      Bodily Injury each occurrence
$5,000      Property Damage each occurrence

**CREW:** 5-7 WA                   Captain / Owner
•X Included           ☐ Excluded
Additional Crew held covered subject to audit at
expiration of policy

**FISHERY:** SCALLOP
**PREMIUM:** INCL.

## HIGHER LIMITS AVAILABLE UPON REQUEST



AGA 1685

### UNDERWRITING CHECKLIST

**APPLICATION RECEIVED?    NO**

CENTENNIAL APPLICATION IS ATTACHED FOR COMPLETION

**CAPTAIN'S RESUME RECEIVED?    NO**

ATTACHED FOR COMPLETION

**CURRENT SURVEY?  YES**

**SURVEY DATE:  5/00**

**SURVEY RECOMMENDATIONS COMPLIED WITH?  NONE LISTED**

**\*\*PLEASE NOTE:  IF SURVEY IS OVER 2 YEARS OLD, A NEW OUT OF WATER SURVEY WILL BE REQUESTED AT NEXT HAUL OUT AT OWNERS EXPENSE**

**CLAIMS HISTORY:  ATTACHED**



AGA 1686

## EXCESS PROTECTION & INDEMNITY

**NAMED ASSURED:**   **AGA FISHING, INC. / GEORGE JONES**

| | | |
|---|---|---|
| **TERM:** | **05/01/01 TO** | **12:00 Noon E.S.T.** |
| | **05/01/02** | **12:00 Noon E.S.T.** |
| **LIMIT OF LIABILITY:** | **$750,000 XS $250,000** | |

**SECURITY:**   **Underwriters At Lloyd's**
**London, England**

**TERMS & CONDITIONS:**
- **Excess of Primary Protection & Indemnity Policy Following Form**
- **AIMU Protection and Indemnity Clauses 6/2/83**
- **Fishing Vessel Clauses (P&I)**
- **Service of Suit Clause**
- **Excess Collision Extention**
- **Institute Radioactive Contamination Exclusion Clause 1/10/90**
- **Brokers Cancellation Clause**
- **Osprey Electronic Date Recognition Conformity Endorsement Clause**
- **Cancelling Returns Only**

**CREW:**   5-7 WA, CAPTAIN INCLUDED

**TOTAL EXCESS P&I PREMIUM:**   INCL.

## HIGHER LIMITS AVAILABLE UPON REQUEST



AGA 1687

## POLLUTION

| | |
|---|---|
| **NAMED ASSURED:** | **AGA FISHING, INC. / GEORGE JONES** |

| | | |
|---|---|---|
| **TERM:** | **05/01/01 TO** | **12:00 Noon E.S.T.** |
| | **05/01/02** | **12:00 Noon E.S.T.** |

**LIMITS OF LIABILITY:**

| | |
|---|---|
| **$500,000** | **OIL POLLUTION ACT OF 1990, THIRD PARTY LIABILITY** |
| **$5,000,000** | **CERCLA** |
| **$5,000,000** | **NON OPA/NON CERCLA ENDORSEMENT** |
| **$1,000,000** | **CERTAIN FINES/PENALTIES/DEFENSE COSTS** |
| **$5,000,000** | **SALVAGE/FIREFIGHTING/CLEANING** |
| **$100,000** | **PUBLIC RELATIONS (PAYS 60% OF PRE-APPROVED EXPENSE)** |

| | |
|---|---|
| **GRT:** | **164** |
| **SECURITY:** | **AMERICAN NATIONAL FIRE INSURANCE COMPANY** |
| **BEST RATING:** | **A X11** |
| **CLAIMS ADJUSTMENT:** | **AT UNDERWRITER'S DISCRETION** |
| **ANNUAL PREMIUM:** | **INCL.**    **SUBJECT TO CHANGE** |

## HIGHER LIMITS AVAILABLE UPON REQUEST



## PREMIUM BREAKDOWN & COMPARISON

| | 2000/01 | | 2001/02 |
|---|---|---|---|
| **HULL and P&I** | | | |
| HULL PREMIUM | $10,166.60 | | $10,289.00 USING LAST YEAR'S BOW CHARGE ; |
| DEDUCTIBLES | $5,000/$10,000 | | $5,000/$10,000 |
| PRIMARY P&I PREMIUM | $15,000.00 FOR $500,000 LIMIT | | $13,375.00 FOR $250,000 LIMIT |
| DEDUCTIBLES | $1,500/$2,500 | | $2,500/$5,000 |
| **TOTAL PREMIUM** | **$25,166.60** | | **$23,664** |

| | 2000/01 | | 2001/02 |
|---|---|---|---|
| **EXCESS P&I** | | | |
| $500,000 XS $500,000 | $2700.00 | | |
| $750,000 XS $250,000 | | | $6600.00 |
| **EXCESS TOTAL** | **$2700.00** | | **$6600.00** |

| | 2000/01 | | 2001/02 |
|---|---|---|---|
| **POLLUTION** | | | |
| OPA and CERCLA | | | |
| LIMITED FINES & PENALTIES | | | |
| POLLUTION TOTAL | $857.00 | | $900.00 |

| | 2000/01 | | 2001/02 |
|---|---|---|---|
| **GRAND TOTAL** | **$28,723.60** | | **$31,164.00** |



FLAGSHIP GROUP, LTD.

AGA 1689



**FLAGSHIP**
GROUP, LTD.

April 26, 2001

George Jones
AGA Fishing, Inc.
14 Green Drive
North Dartmouth, MA 02747

RE:  F/V "GEORGIE J", 1966, 80.6', Steel
     Policy No. 121801009, Excess Cover Note PL007160Z-03
       and Pollution Policy No. H 349-06-58
     Effective May 1, 2001 to May 1, 2002

Dear Mr. Jones:

We are pleased to enclose your 2001-2002 Hull/Primary P&I, Excess P&I,
and Pollution policy(s) for the above referenced fishing vessel.

Also enclosed please find Invoice No. 78598 in the amount of $2,336.40
which represents the down payment for the Hull/Primary P&I coverage;
Invoice No. 78601 in the amount of $660.00 which represents the down
payment for the Excess P&I coverage; and Invoice No. 78602 in the
amount of $90.00 which represents the down payment for the Pollution
coverage.  All policies are being financed through Premium Assignment
Corporation.

Please remember we can write higher limits for Pollution and
Protection & Indemnity.  If you are interested in either of these,
please be sure to let us know.

Just a reminder, we still need the completed application and captain's
resume returned as soon as possible.

Thank you for giving us the privilege of writing your coverage again
this year.  If you have any questions after reviewing the enclosed
items, please do not hesitate to contact our office.

Sincerely,

FLAGSHIP GROUP, LTD.



Lisa Rawles
Account Manager

/spk

Enclosures



cc:  Luzo Community Bank
     160 County Street
     New Bedford, MA  02740

**AGA 1649**

---

5000 WORLD TRADE CENTER    NORFOLK, VA 23510-1624    757-625-0938    FAX 757-624-1361

**EXHIBIT E**

OMB APPROVED
2115-0110

| DEPARTMENT OF TRANSPORTATION U.S. COAST GUARD CG-1356 (REV. 9-92) | BILL OF SALE BY GOVERNMENT ENTITY PURSUANT TO COURT ORDER OR ADMINISTRATIVE DECREE OF FORFEITURE | THIS SECTION FOR COAST GUARD USE ONLY |
|---|---|---|

| 1. VESSEL NAME<br><br>F/V GEORGIE J. | 2. OFFICIAL NUMBER OR OTHER UNIQUE IDENTIFIER<br><br>502064 | |
|---|---|---|

**3. PERSON EXECUTING INSTRUMENT**

NAME:  ANTHONY DICHIO          TITLE:  UNITED STATES MARSHAL

NAME AND ADDRESS OF AGENCY REPRESENTED (AND DISTRICT, IF APPLICABLE)

UNITED STATES MARSHALS SERVICE, DISTRICT OF MASSACHUSETTS
ONE COURTHOUSE WAY, SUITE 1-500 BOSTON, MA 02210

**4. COURT OR FORFEITURE INFORMATION:**

[ ] VESSEL SOLD PURSUANT TO ADMINISTRATIVE FORFEITURE (COPY OF DECREE ATTACHED)

[X] VESSEL SOLD PURSUANT TO COURT ORDER
NAME OF COURT
**UNITED STATES DISTRICT COURT**          TITLE OF ORDER
                                          **ORDER OF SALE**

RECORDING DATA:

BOOK:                    PAGE:

PORT (IF DIFFERENT FROM FILING PORT):

**5. NAME (S) AND ADDRESS (ES) OF BUYER (S) AND INTEREST TRANSFERRED TO EACH:**

Carlos Rafael
77 Tucker Lane
North Dartmouth, MA  02747

5A.  TOTAL INTEREST TRANSFERRED (100% UNLESS OTHERWISE SPECIFIED.)  **100**       %

5B.  MANNER OF OWNERSHIP.  (CHECK ONLY ONE, IF APPLICABLE).  UNLESS OTHERWISE STATED HEREIN, THIS BILL OF SALE CREATES A TENANCY IN COMMON, WITH EACH TENANT OWNING AN EQUAL UNDIVIDED INTEREST.

[ ] JOINT TENANCY WITH RIGHT OF SURVIVORSHIP      [ ] TENANCY BY THE ENTIRETIES      [ ] COMMUNITY PROPERTY

[ ] OTHER (DESCRIBE)

6.    CONSIDERATION RECEIVED:  One Million Seven Hundred Thousand Dollars
                               **$1,700,000.00**
(ONE DOLLAR AND OTHER VALUABLE CONSIDERATION UNLESS OTHERWISE STATED)

7. BY VIRTUE OF THE AFORESAID COURT ORDER, A COPY OF WHICH IS ATTACHED HERETO, OR DECREE OF ADMINISTRATIVE FORFEITURE ATTACHED HERETO, I DO HEREBY GRANT, BARGAIN, AND SELL THE VESSEL DESCRIBED HEREIN, TOGETHER WITH ITS TACKLE, APPAREL, AND FURNITURE, TO THE BUYER (S) NAMED ABOVE.  FURTHERMORE, OWNERSHIP OF SAID VESSEL IS TRANSFERRED TO  **CARLOS RAFAEL** FREE AND CLEAR OF ANY AND ALL LIENS OR ENCUMBREANCES OF ANY KIND.

**8. SIGNATURE AND ACKNOWLEDGMENT:**          *[signature]* CDUSM

ON    **November 15, 2004**          THE
            (DATE)
PERSON (S) NAMED ABOVE ACKNOWLEDGED EXECUTION
OF THE FOREGOING INSTRUMENT IN THEIR STATED
CAPACITY (IES) FOR THE PURPOSE THEREIN CONTAINED.

STATE: **MASSACHUSETTS**

COUNTY: **SUFFOLK**

NOTARY PUBLIC.

*[signature]*
William J. Ryan

MY COMMISSION EXPIRES: May 20, 2005
                              (DATE)

PREVIOUS EDITION OBSOLETE                    SN 7530-00-F01-1070

REVERSE OF CG-1356 (REV. 9-92)

(COMPLETE THIS SECTION ONLY IF VESSEL HAS NEVER BEEN DOCUMENTED AND DOES NOT HAVE A HULL IDENTIFICATION NUMBER.)

**VESSEL DATA**

A. BUILDER                                                    B. BUILDER'S HULL NUMBER

C. FORMER NAME                                           D. FORMER MOTORBOAT NUMBERS

E. FORMER ALIEN REGISTRATIONS

F. DIMENSIONS: L=                        B=                                              D=

G. PERSON FROM WHOM SELLER OBTAINED VESSEL

SIGNATURE OF SELLER

# INSTRUCTIONS

1. INDICATE CURRENT DOCUMENTED NAME. (IF VESSEL HAS NEVER BEEN DOCUMENTED SELLER MUST COMPLETE AND SIGN DATA SECTION ABOVE.)

2. INDICATE OFFICIAL NUMBER AWARDED TO VESSEL OR HULL IDENTIFICATION NUMBER ASSIGNED BY MANUFACTURER. (IF THE VESSEL HAS NO HULL IDENTIFICATION NUMBER AND HAS NEVER BEEN DOCUMENTED, SELLER MUST COMPLETE AND SIGN THE VESSEL DATA SECTION ABOVE.)

3. INSERT NAMES AND ADDRESSES OF ALL PERSONS EXECUTING INSTRUMENT AND THEIR CAPACITY. LIST THE NAME AND ADDRESS OF THE AGENCY IF APPLICABLE.

4. SELF-EXPLANATORY.

5. LIST THE NAME(S) AND ADDRESS(ES) OF THE BUYERS.

5A. LIST THE INTEREST TRANSFERRED TO THE BUYER(S) NAMED ABOVE.

5B. CHECK THE MANNER OF OWNERSHIP. UNLESS OTHERWISE STATED, THIS BILL OF SALE CREATES A TENANCY IN COMMON WITH EACH TENANT OWNING AN UNDIVIDED INTEREST.

6. SELF-EXPLANATORY. USE "REMARKS" SECTION ABOVE IF VESSEL IS NOT SOLD FREE AND CLEAR, OR TO LIST VESSEL APPURTENANCES WHICH ARE NOT SOLD WITH THE VESSEL.

7. SELF-EXPLANATORY.

8. THIS SECTION MUST BE COMPLETED BY A NOTARY PUBLIC OR OTHER PERSON AUTHORIZED TO TAKE ACKNOWLEDGMENTS OF DEEDS UNDER THE LAWS OF A STATE OR THE UNITED STATES. IF THERE ARE MULTIPLE SIGNATORIES TO THIS BILL OF SALE, EACH MUST MAKE AN ACKNOWLEDGMENT BEFORE A NOTARY. ATTACHMENTS SHOWING THOSE APPEARANCES ARE PERMITTED.

NOTE: THIS INSTRUMENT WILL BE INELIGIBLE FOR FILING AND RECORDING IF ALTERED AFTER EXECUTION AND ACKNOWLEDGMENT. ANY ALTERATIONS MADE PRIOR TO EXECUTION MUST BE ATTESTED BY THE PERSON TAKING THE ACKNOWLEDGMENT.

# PRIVACY ACT STATEMENT

IN ACCORDANCE WITH 5 USC 552(A), THE FOLLOWING INFORMATION IS PROVIDED TO YOU WHEN SUPPLYING PERSONAL INFORMATION TO THE U.S. COAST GUARD.

1. AUTHORITY. SOLICITATION OF THIS INFORMATION IS AUTHORIZED BY 46 USC, CHAPTER 313 AND 46 CFR, PART 67.

2. THE PRINCIPAL PURPOSES FOR WHICH THIS INSTRUMENT IS TO BE USED ARE:

   (A) TO PROVIDE A RECORD, AVAILABLE FOR PUBLIC INSPECTION AND COPYING, OF THE SALE OR OTHER CHANGE IN OWNERSHIP OF A VESSEL WHICH IS DOCUMENTED, WILL BE DOCUMENTED, OR HAS BEEN DOCUMENTED PURSUANT TO 46 USC, CHAPTER 121.
   (B) PLACEMENT OF THIS INSTRUMENT IN A BOOK FOR EXAMINATION BY GOVERNMENTAL AUTHORITIES AND MEMBERS OF THE GENERAL PUBLIC.

3. THE ROUTINE USE WHICH MAY BE MADE OF THIS INFORMATION INCLUDES DEVELOPMENT OF STATISTICAL DATA CONCERNING DOCUMENTED VESSELS.

4. DISCLOSURE OF THE INFORMATION REQUESTED ON THIS FORM IS VOLUNTARY. HOWEVER, FAILURE TO PROVIDE THE INFORMATION COULD PRECLUDE FILING OF A BILL OF SALE AND DOCUMENTATION OF THE VESSEL NAMED HEREIN PURSUANT TO 46 USC, CHAPTER 121. MOREOVER, BILLS OF SALE WHICH ARE NOT FILED ARE NOT DEEMED TO BE VALID EXCEPT AGAINST ANY PERSON EXCEPT THE GRANTOR OR A PERSON HAVING ACTUAL KNOWLEDGE OF THE SALE. (46 USC 31321(A)).

THE COAST GUARD ESTIMATES THAT THE AVERAGE BURDEN FOR THIS FORM IS 20 MINUTES. YOU MAY SUBMIT ANY COMMENTS CONCERNING THE ACCURACY OF THIS BURDEN ESTIMATE OR MAKE SUGGESTIONS FOR REDUCING THE BURDEN TO: COMMANDANT (G-MVI), U.S. COAST GUARD, WASHINGTON, DC 20593-0001 OR OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF INFORMATION AND REGULATORY AFFAIRS, ATTENTION: DESK OFFICER FOR DOT/USCG, OLD EXECUTIVE OFFICE BUILDING, WASHINGTON, DC 20503.

*U.S. Government Printing Office 1992-312-673/62945

**EXHIBIT F**

## UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF MASSACHUSETTS



| | |
|---|---|
| VICTOR P. CAPALDI )<br>    **Plaintiff** )<br>)<br>**V.** )<br>)<br>**AGA FISHING CORPORATION** )<br>    **Defendant** )<br>) | **Civil Action**<br><br>**No. 04-10755-JLT** |

## MOTION FOR APPROVAL OF SETTLEMENT

Now comes the Plaintiff in the above-entitled action and by and through his attorneys respectfully requests that this Honorable Court approve the Plaintiff's settlement.

On November 25, 2003, the Plaintiff, a seaman and member of the crew of the F/V GEORGIE J, was injured when a block fell and hit him on the head. As a result of the accident, the Plaintiff was rendered a quadriplegic and sustained brain damage. Currently, the Plaintiff lives with his mother and step father in Rochester, Massachusetts where round the clock care is provided to the Plaintiff.

The Plaintiff and Defendant settled the above-entitled case Victor Capaldi v. F/V GEORGIE J, Civil Action No: 04-10843-JLT and Victor Capaldi v. AGA Fishing Corporation, Civil Action No: 04-10755-JLT.

The settlement is funded from the remainder of the insurance policy on the F/V GEORGIE J and from the money held in the Registry of the Court from the auction F/V GEORGIE J.

Allowed
Tam JL
1/11/05

The Plaintiff will receive the remainder of the insurance policy and the net proceeds from the auction of the F/V GEORGIE J currently held by the Registry of the Court. Out of the available proceeds, the Plaintiff has agreed to pay the attorney fees of Clinton & Muzyka's, the fees of Walters Nixon, the adjusting company, the attorneys fees of Pamela LaFreniere and the mortgage of the F/V GEORGIE J which was $125,885.69.

After payment of the aforementioned items, plus the payment of Plaintiff's attorney fees and expenses, the Plaintiff will receive the remainder. The net remainder will be deposited into a special needs trust. Due to the Plaintiff's physical condition, a special needs trust is in the best interest of the Plaintiff in order to preserve his assets and ability to obtain benefits.

Additionally, as part of the settlement, a structured settlement has been set up for Suzy Marie Capaldi. Suzy Capaldi is the Plaintiff's daughter whose is currently 12 years old. Ms. Capaldi lives with her mother in New Bedford, Massachusetts Since Ms. Capaldi was born, the Plaintiff has provided monetary support for her. However, due to the Plaintiff accident, the Plaintiff can not work and will not be able to work in the future. As a result, the Plaintiff has not been able to support his daughter and will be unable to in the future. Under the terms of the structured settlement, Suzy Capaldi receives a guaranteed payment of $500.00 monthly from March 15, 2005 until June 15, 2014; $25,000.00 guaranteed payment on 8/01/2010, 8/01/2011/, 8/01/20012, 8/01/20013; and a guaranteed payment of $50,000.00 on 3/30/2020 for a cost of $148,682.00 and total expected benefits of $206,000.00. *Exhibit A*.   The structure settlement is in lieu of child support payments and for future educational costs.

The settlement agreement is in the best interests of all parties.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court approve the Plaintiff's settlement as set forth above.

2

Respectfully submitted for the
the Plaintiff, Victor P. Capaldi,
by his attorney,

Carolyn M. Latti
BBO #567-394
David F. Anderson
BBO#560-994
LATTI & ANDERSON LLP
30-31 Union Wharf
Boston, MA 02109
(617) 523-1000

Dated: January 11, 2005

3

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS          **EXHIBIT G**

3

4

5   AGA FISHING CORP.,                    )

6                     Plaintiff,          )    CIVIL ACTION NO.

7      v.                                 )      05-11396JLT

8   FLAGSHIP GROUP LIMITED                )

9   and                                   )

10  BROWN & BROWN, INC.,                  )

11                  Defendant.            )

12

13              CERTIFIED COPY

14          DEPOSITION UPON ORAL EXAMINATION

15               OF JOHN S. DEVNEW

16        TAKEN ON BEHALF OF THE PLAINTIFF

17               Norfolk, Virginia

18                May 5, 2006

19

20

21     -------------------------------------

22            TAYLOE ASSOCIATES, INC.

23       Registered Professional Reporters

24         Telephone:  (757) 461-1984

25               Norfolk, Virginia

Page 10

1  partnership. They built a 220-foot freezer trawler to
2  freeze squid -- calamari, actually -- so he hired me
3  as a port captain.
4        Flagship Group had the builders risk
5  insurance at the shipyard in Mississippi, where it was
6  constructed, and then had the hull and P & I
7  insurances. It was a very lean management team, it
8  was the owner and myself, and, so, I had some
9  interface with Johnsen and O'Sullivan and got to know
10 them then.
11       So I had known them, you know, for ten
12 years at that point off and on, and really a chance
13 meeting at the Boston Seafood Show in March of '94 led
14 to a job offer.
15    Q.    Okay. When you worked for that -- just
16 you and the owner were involved with that -- the large
17 vessel that actually did fish processing --
18    A.    Uh-huh.
19    Q.    -- did you actually work aboard the boat?
20    A.    No. I mean, I took periodic parts of
21 trips. The trips on the freezer trawler were
22 typically -- they could run anywhere for a month, or
23 you know, plus or minus.
24       Sometimes we'd have some technicians for
25 buyers -- we were exporting all the seafood that came

Page 12

1  coverages of hull, P & I, and pollution, no.
2    Q.    When you first started with Flagship in
3  or about 1994 -- let's take it up until the time that
4  Flagship closed its Massachusetts office. What
5  level -- strike that.
6        What amount of your time was spent in
7  connection with the marine insurance side of
8  Flagship's business?
9    A.    90 to 95 percent.
10   Q.    Were you hired by Mr. Johnsen to
11 primarily work in the area of marine insurance?
12   A.    Yes.
13   Q.    And were you trained by Mr. Johnsen or
14 anybody else at Flagship concerning how to go about
15 doing your job as a producer for Flagship, selling and
16 servicing marine insurance?
17   A.    Yes.
18   Q.    Can you tell me briefly what that
19 training consisted of?
20   A.    Well, I guess it would not be considered
21 a formal training program as such. I would travel
22 with either Johnsen or O'Sullivan or another producer
23 at the time, Bobbie Daily, that was doing some marine
24 work.
25   Q.    "O'Sullivan" was Bob O'Sullivan?

Page 11

1  in -- and we'd take them out. Sometimes I'd go out
2  for a few days to just see how everything was running,
3  and, you know, then grab a ride back in.
4    Q.    When you were hired by Flagship in what
5  capacity were you hired? What were you hired to do?
6    A.    I was hired to, you know, get my agent --
7  my license, you know, to be an agent, and -- they call
8  them producers in insurance parlance -- and produce
9  new business and service existing business.
10   Q.    When you were hired as an agent and you
11 needed to get a license, what type of license did you
12 need to get?
13   A.    Property and casualty license.
14   Q.    And how did you go about getting that?
15   A.    I went to a class, I think it was a
16 three-day class, perhaps, three- or four-day class,
17 maybe, and then took the exam afterwards.
18   Q.    Okay. Did you pass it on the first try?
19   A.    Yeah.
20   Q.    And did that three- or four-day exam
21 include any instruction regarding marine insurance?
22   A.    I don't believe so. They touched on
23 inland marine insurance, some, you know, equipment
24 floaters, that type of thing.
25       In terms of ocean marine insurance and

Page 13

1    A.    Yes. So I would travel with them as they
2  visited clients and sit through, you know, proposals
3  and the discourse that went on between the agent and
4  the vessel owner or client.
5        Excuse me.
6        In addition to that, I read some books on
7  marine insurance, in particular, would have
8  discussions with them. There was another gentleman
9  that was kind of an old master at the business, a
10 fellow named Ozzie Ingvaldsen, and Ozzie was there a
11 couple of years before he retired, and I spent some
12 time with Ozzie and others, and I would ask questions.
13       And, you know, as I began to have some
14 accounts transferred to me, as issues would come up
15 I'd ask questions, and -- so it was really kind of
16 on-the-job training type things. I would talk with
17 underwriters. And I was encouraged to talk to
18 underwriters. If there was any questions of coverage
19 or how something was applied I was -- you know,
20 clauses or terms were applied -- I was encouraged to
21 just sit there and say, "Well, how do you look at
22 this; how would you interpret this policy provision,"
23 et cetera.
24       So it was -- I think, you know, besides
25 the fact that it was a very informalized training, it

4 (Pages 10 to 13)

TAYLOE ASSOCIATES, INC.

1   Massachusetts to sell insurance in Massachusetts?
2       A.    Yes, we applied for licenses that did not
3   require a separate test.
4       Q.    Okay.
5       A.    But I was licensed in quite a few states.
6       Q.    Okay.  Did you actually make an
7   application to some government agency in Massachusetts
8   in order to be permitted to sell insurance in
9   Massachusetts?
10      A.    Excuse me.  Yeah, it was -- we -- we had
11  a woman in the office that looked after all that
12  licensing aspects, but typically my involvement in it
13  would be to sign the application.
14      Q.    Okay.  And you recall doing that?
15      A.    Yes.
16      Q.    Okay.  Was it your understanding that
17  once you were licensed or authorized by some form to
18  sell insurance in Massachusetts that it was good for
19  whatever period of time you were involved in
20  activities there?
21      A.    Yeah.
22      Q.    Okay.  In looking over the documentation
23  concerning the renewal application on behalf of AGA
24  Fishing Corp. for the policy that issued on
25  February 1st -- I'm sorry -- on May 1st, 2003 through

1   time, you know, that I would usually revisit, "Would
2   you like to take a look at some additional P & I?"
3       Q.    Okay.  Let's just stay with the change in
4   the quote for the hull coverage.
5            You said -- you testified what your usual
6   practice was, and I understand what your usual
7   practice was.
8            Do you have a specific memory in this
9   particular case for the AGA Fishing Corporation what
10  you were told by Mr. Jones as the reason why he wanted
11  a quote for 500,000 in hull coverage rather than
12  400,000 in hull coverage?
13      A.    I don't.
14      Q.    Okay.  I just have a couple of questions
15  about permits.
16           What was your understanding during the
17  period of time that you were servicing the AGA Fishing
18  Corp. account, which was after Ron Walsh was no longer
19  with Flagship and up until the -- is it fair to say
20  the last renewal was the policy on May 1st, 2003?
21      A.    I believe it was.
22      Q.    Okay.  At that point in time the
23  GEORGIE J had a scallop fishing permit, did it not?
24      A.    Yes.
25      Q.    What was your understanding as to how

1   May 1st, 2004, it appears that there was a quote
2   provided to increase the hull coverage from 400,000 to
3   500,000.  Do you recall that?
4       A.    Vaguely.  I do recall that, you know, he
5   wanted to -- he wanted to take a look at increasing
6   the value of the hull.
7       Q.    Okay.  That was -- I was going to ask you
8   how did that come about?  How did it come about that
9   you were quoting not only a renewal but a change in
10  the amount of coverage for at least the hull?
11      A.    Well, typically, my -- the renewal
12  process that I would go through would be in the course
13  of conversation, either on the phone or in person on
14  the dock, would be to ascertain if there was any
15  change in their operations.  You know, did they pick
16  up another permit and also start flounder fishing, you
17  know?  Did -- was the crew -- the number of crew the
18  same?  Did they re-power the vessel?  You know, was
19  there anything done structurally?  Did they, you know,
20  send it in to the yard and do something else with it?
21  Did they mount the winches up higher?  You know, did --
22  did --
23           So we talked, generally speaking, about
24  the aspect of, you know, any changes and how to
25  approach the renewal.  And it would also be at that

1   easy or difficult it was for a vessel owner to obtain
2   a scallop fishing permit?
3       A.    Well, it was a closed fishery, there were
4   no new permits, so you had to buy an existing permit.
5       Q.    And when did that fishery become closed?
6       A.    I would expect back in the mid '90s.
7       Q.    Okay.  And insofar as -- strike that.
8            Was the fish -- did the fishery go with
9   the vessel, or was it issued to the owner of the
10  vessel?
11      A.    The -- I think with respect to
12  scallops -- and you have different scenarios in
13  different fisheries.  My understanding about the way
14  it went in scallops, it was -- it -- I'm not sure best
15  how to press this -- or at least my understanding of
16  it.
17           It was not issued to individuals.  It was
18  tied to a refusal in terms of horsepower, length and
19  tonnage, but it could be taken -- it could be bought
20  and sold independent of a particular vessel, so it
21  had -- it had tied to it a history.
22      Q.    Uh-huh.
23      A.    Okay?  And it was -- and in terms of --
24  for instance, you could -- you could -- you could buy
25  a permit and a vessel, if you wanted to, put the




THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF CONSUMER AFFAIRS
DIVISION OF INSURANCE

## INDIVIDUAL AGENT LICENSE

License to: John Starr Dernew
313 Pike Circle
Va Beach, VA 23454

| License Number | Lines of Insurance |
|---|---|
| 1608063 | F |
| Effective Date | Expiration Date |
| 02/20/2001 | See NOTE Below |
| Serial No. 000113767000 ||

As Agent For: Executive Risk Indemnity Inc.
15 Mountain View Rd.
Warren, NJ 07059

*Diane Silverman Black*

NOTE: LIFE, ACCIDENT/HEALTH LICENSE SHALL REMAIN IN EFFECT FOR THE PERIOD BETWEEN THE EFFECTIVE DATE OF THIS LICENSE AND MIDNIGHT OF JUNE 30 NEXT, UNLESS SUCH LICENSE IS SOONER REVOKED AS PROVIDED BY LAW. PROPERTY/CASUALTY, TRAVEL, ACCIDENT AND BAGGAGE LICENSE SHALL REMAIN IN EFFECT FOR THE PERIOD BETWEEN THE EFFECTIVE DATE OF THIS LICENSE AND MIDNIGHT OF JUNE 30, 2003 UNLESS SUCH LICENSE IS SOONER REVOKED AS PROVIDED BY LAW. THE INSURER NAMED ABOVE, HOWEVER, MAY RENEW THIS LICENSE BEYOND ITS EXPIRATION DATE BY SUBMITTING WRITTEN REQUEST FOR RENEWAL TO THE COMMISSIONER.

Diane Silverman Black
Director of Agent & Broker Licensing

---




THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF CONSUMER AFFAIRS
DIVISION OF INSURANCE

## INDIVIDUAL AGENT LICENSE

License to: John Starr Dernew
313 Pike Circle
Va Beach, VA 23454

| License Number | Lines of Insurance |
|---|---|
| 1608066 | F |
| Effective Date | Expiration Date |
| 02/20/2001 | See NOTE Below |
| Serial No. 000113770000 ||

As Agent For: Pacific Indemnity Company
15 Mountain View Road
P.O. Box 1615
Warren, NJ 07061-1615

*Diane Silverman Black*

NOTE: LIFE, ACCIDENT/HEALTH LICENSE SHALL REMAIN IN EFFECT FOR THE PERIOD BETWEEN THE EFFECTIVE DATE OF THIS LICENSE AND MIDNIGHT OF JUNE 30 NEXT, UNLESS SUCH LICENSE IS SOONER REVOKED AS PROVIDED BY LAW. PROPERTY/CASUALTY, TRAVEL, ACCIDENT AND BAGGAGE LICENSE SHALL REMAIN IN EFFECT FOR THE PERIOD BETWEEN THE EFFECTIVE DATE OF THIS LICENSE AND MIDNIGHT OF JUNE 30, 2003 UNLESS SUCH LICENSE IS SOONER REVOKED AS PROVIDED BY LAW. THE INSURER NAMED ABOVE, HOWEVER, MAY RENEW THIS LICENSE BEYOND ITS EXPIRATION DATE BY SUBMITTING WRITTEN REQUEST FOR RENEWAL TO THE COMMISSIONER.

Diane Silverman Black
Director of Agent & Broker Licensing

---



THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF CONSUMER AFFAIRS
DIVISION OF INSURANCE

## INDIVIDUAL AGENT LICENSE

License to: John Starr Dernew
313 Pike Circle
Va Beach, VA 23454

| License Number | Lines of Insurance |
|---|---|
| 1608065 | F |
| Effective Date | Expiration Date |
| 02/20/2001 | See NOTE Below 6/30/03 |
| Serial No. 000113769000 ||

As Agent For: Great Northern Insurance Company
15 Mountain View Road
P.O. Box 1615
Warren, NJ 07061-1615

*Diane Silverman Black*

NOTE: LIFE, ACCIDENT/HEALTH LICENSE SHALL REMAIN IN EFFECT FOR THE PERIOD BETWEEN THE EFFECTIVE DATE OF THIS LICENSE AND MIDNIGHT OF JUNE 30 NEXT, UNLESS SUCH LICENSE IS SOONER REVOKED AS PROVIDED BY LAW. PROPERTY/CASUALTY, TRAVEL, ACCIDENT AND BAGGAGE LICENSE SHALL REMAIN IN EFFECT FOR THE PERIOD BETWEEN THE EFFECTIVE DATE OF THIS LICENSE AND MIDNIGHT OF JUNE 30, 2003 UNLESS SUCH LICENSE IS SOONER REVOKED AS PROVIDED BY LAW. THE INSURER NAMED ABOVE, HOWEVER, MAY RENEW THIS

Diane Silverman Black
Director of Agent & Broker Licensing




## THE COMMONWEALTH OF MASSACHUSETTS
### OFFICE OF CONSUMER AFFAIR
### DIVISION OF INSURANCE

### INDIVIDUAL AGENT LICENSE

License to:  John Starr Dernew
313 Pike Circle
Va Beach, VA 23454

| License Number 1608067 | Lines of Insurance F |
|---|---|
| Effective Date 02/20/2001 | Expiration Date See NOTE Below |

| Serial No.  000113771000 | |

As Agent For:  Vigilant Insurance Company
15 Mountain View Road
Warren, NJ 07059

*Diane Silverman Black*

Diane Silverman Black
Director of Agent & Broker Licensing

NOTE: LIFE, ACCIDENT/HEALTH LICENSE SHALL REMAIN IN EFFECT FOR THE PERIOD BETWEEN THE EFFECTIVE DATE OF THIS LICENSE AND MIDNIGHT OF JUNE 30 NEXT, UNLESS SUCH LICENSE IS SOONER REVOKED AS PROVIDED BY LAW.  PROPERTY/CASUALTY, TRAVEL, ACCIDENT AND BAGGAGE LICENSE SHALL REMAIN IN EFFECT FOR THE PERIOD BETWEEN THE EFFECTIVE DATE OF THIS LICENSE AND MIDNIGHT OF JUNE 30, 2003 UNLESS SUCH LICENSE IS SOONER REVOKED AS PROVIDED BY LAW.  THE INSURER NAMED ABOVE, HOWEVER, MAY RENEW THIS LICENSE BEYOND ITS EXPIRATION DATE BY SUBMITTING WRITTEN REQUEST FOR RENEWAL TO THE COMMISSIONER.

---




## THE COMMONWEALTH OF MASSACHUSETTS
### DEPARTMENT OF BANKING AND INSURANCE
#### DIVISION OF INSURANCE
### AGENT'S LICENSE

THE PERSON, PARTNERSHIP OR CORPORATION NAMED BELOW HAVING DULY QUALIFIED UNDER THE LAWS OF THIS COMMONWEALTH IS HEREBY LICENSED TO ACT WITHIN THIS COMMONWEALTH AS AN INSURANCE AGENT, IN RESPECT TO THE KINDS OF INSURANCE INDICATED BELOW, FOR THE INSURER NAMED HEREIN WHO IS AUTHORIZED TO TRANSACT THE BUSINESS OF INSURANCE IN THIS COMMONWEALTH.

LICENSE TO:
DERNEW JOHN STARR
313 PIKE CIRCLE
VA BEACH                    VA   23454

| SERIAL NUMBER 165510 | DATE ISSUED 02/23/98 |
|---|---|
| KIND OF INSURANCE (SEE REVERSE SIDE) F | FEE PAID |

AS AGENT FOR:

UNITED STATES FIDELITY AND GUARANTY COMPANY
P.O. BOX 1138
MAIL STOP: MC0401
BALTIMORE                    MD   21203

*Jim Wickwit*

COMMISSIONER OF INSURANCE

LIFE/ACCIDENT HEALTH, TRAVEL ACCIDENT & BAGGAGE LICENSE SHALL REMAIN IN EFFECT FOR THE PERIOD BETWEEN THE DATE OF THIS LICENSE AND MIDNIGHT OF JUNE 30 NEXT UNLESS SUCH LICENSE IS SOONER REVOKED AS PROVIDED BY LAW. PROPERTY/CASUALTY LICENSE SHALL REMAIN IN EFFECT FOR THE PERIOD BETWEEN THE DATE OF THIS LICENSE AND MIDNIGHT OF JUNE 30, 2000 UNLESS SUCH LICENSE IS SOONER REVOKED AS PROVIDED BY LAW. THE INSURER NAMED ABOVE, HOWEVER, MAY RENEW THIS LICENSE BEYOND ITS EXPIRATION DATE BY SUBMITTING WRITTEN REQUEST FOR RENEWAL TO THE COMMISSIONER.

---



## THE COMMONWEALTH OF MASSACHUSETTS
### OFFICE OF CONSUMER AFFAIR
### DIVISION OF INSURANCE

### INDIVIDUAL AGENT LICENSE

License to:  John Starr Dernew
313 Pike Circle
Va Beach, VA 23454

| License Number 1608064 | Lines of Insurance F |
|---|---|
| Effective Date 02/20/2001 | Expiration Date See NOTE Below |

| Serial No.  000113768000 | |

As Agent For:  Federal Insurance Company
15 Mountain View Road
Warren, NJ 07061

*Diane Silverman Black*

Diane Silverman Black
Director of Agent & Broker Licensing

NOTE: LIFE, ACCIDENT/HEALTH LICENSE SHALL REMAIN IN EFFECT FOR THE PERIOD BETWEEN THE EFFECTIVE DATE OF THIS LICENSE AND MIDNIGHT OF JUNE 30 NEXT, UNLESS SUCH LICENSE IS SOONER REVOKED AS PROVIDED BY LAW.  PROPERTY/CASUALTY, TRAVEL, ACCIDENT AND BAGGAGE LICENSE SHALL REMAIN IN EFFECT FOR THE PERIOD BETWEEN THE EFFECTIVE DATE OF THIS LICENSE AND MIDNIGHT OF JUNE 30, 2003 UNLESS SUCH LICENSE IS SOONER REVOKED AS PROVIDED BY LAW.  THE INSURER NAMED ABOVE, HOWEVER, MAY RENEW THIS LICENSE BEYOND ITS EXPIRATION DATE BY SUBMITTING WRITTEN REQUEST FOR RENEWAL TO THE COMMISSIONER.