**EXHIBIT 1**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **AGA FISHING CORP.,**<br>**Plaintiff**<br><br>**v.**<br><br>**FLAGSHIP GROUP LIMITED and**<br>**BROWN & BROWN, INC.,**<br>**Defendants** | **CIVIL ACTION NO. 05-11396 JLT** |

### RESPONSE OF THE DEFENDANTS, FLAGSHIP GROUP LIMITED AND BROWN & BROWN, INC., TO PLAINTIFF'S DAMAGE MEMORANDUM AND HEARING REQUESTED

The Defendants, Flagship Group Limited ("Flagship") and Brown & Brown, Inc. ("Brown & Brown"), submit this response to the memorandum of the Plaintiff, AGA Fishing Corp. ("AGA") concerning the appropriate measure of damages in this case. In sum, AGA claims that its broker, Flagship failed to advise it as to the proper limit of Protection & Indemnity insurance ("P&I insurance"). AGA claims that it lost its vessel F/V GEORGIE J. and its fishing permit because it did not have sufficient P&I insurance to cover a personal injury claim by a crew man. AGA seeks both the value of the GEORGIE J. and its permit, and lost profits from Flagship and its parent company, Brown & Brown. As explained below, the damages that AGA seeks are barred by the economic loss doctrine and are duplicative.

I.    **INTRODUCTION**

AGA purchased GEORGIE J,[1] a scalloping vessel and its fishing permit in 1987. AGA

was a family owned and operated business of Antonette and George Jones. George Jones was

the captain of the GEORGIE J.

There was an unfortunate accident aboard the GEORGIE J. on November 25, 2003

involving a crew member, Victor P. Capaldi. Capaldi was injured and commenced an in rem

action against the GEORGIE J. shortly after the accident. The United States Marshall ultimately

sold the vessel and its permit for $1.7 million at an auction on November 15, 2004. Capaldi and

AGA settled their dispute with the payment to Calpaldi of the remaining P&I insurance proceeds

and the proceeds from the sale of the vessel and its permit after the mortgage of $125,000 was

satisfied. See Approval of Settlement Agreement (Exhibit A).

AGA contends that it did not have sufficient P&I insurance on the GEORGIE J. to cover

Calpaldi's claim, and blames Flagship for the loss of the boat and permit. AGA went out of

business after the auction because it did not have any other assets with which to carry on. See

AGA's damage memorandum at 1.

AGA claims that, despite the fact that it never asked Flagship to evaluate its insurance or

make a recommendation as to how much P&I insurance it should carry, Flagship should have

advised AGA to purchase at least $10 million in P&I coverage.[2] AGA's Amended Complaint

---

[1] When AGA originally purchased the vessel it was named THE VICTOR. After the Jones' son
died, the name was changed to the GEORGIE J.

[2] AGA has also argued that it should have been told to purchase $5 million in P&I insurance.
See AGA's damage memorandum.

contains the following counts against Flagship: negligence (Count I); negligent

misrepresentation (Count II); intentional misrepresentation (Count III); violations of

Massachusetts General Laws Chapter 93A (Count IV); and violations of Massachusetts General

Laws Chapter 176D (Count V). The Amended Complaint contains two claims against Brown &

Brown: vicarious liability (Count VI) and negligent failure to supervise (Count VII).

The evidence will establish that Flagship had a sales relationship with AGA. It fulfilled

any duty it had to AGA by purchasing the amount of P&I coverage that AGA requested. AGA

never asked Flagship to evaluate the limits of its liability policy or to make recommendations as

to the amount of coverage it should purchase. Each year upon renewal, Flagship informed AGA

that higher limits were available upon request and AGA never asked for higher P&I insurance

limits. <u>See</u>, <u>e.g.</u>, Jones Deposition Exhibits 6, 10, and 12 (Exhibit B). Flagship did not have a

duty to make unsolicited recommendations on the "appropriate" amount of P&I insurance for the

GEORGIE J.

Through this lawsuit, AGA seeks not only the value of the GEORGIE J. and its permit

but additional damages in the form of lost profits. As explained below, the damages that AGA

seeks are barred by the economic loss doctrine. In addition, AGA's alleged lost profit damages

are not recoverable because they constitute duplicative damages.

## II.    FACTS

George Jones has been a fisherman and skipper for many years and held an operator's

license since some time in the early 1980's. <u>See</u> George Jones' Deposition Transcript (Exhibit C

at 12). Mr. And Mrs. Jones through their corporation, AGA, purchased the GEORGIE J. in 1987

for $500,000, which included a scallop fishing permit. Exhibit C at 11, 15-16. George Jones

elected to continue the same insurance coverage that the previous owner had on the GEORGIE J., which was $350,000 in hull insurance and $1 million for P&I coverage. Exhibit C at 42-43. The broker of the insurance was Neptune and George Jones' contact was Ronald Walsh. Exhibit C at 42. Jones testified that he renewed the policy at the end of every year. Exhibit C at 60. He never talked to Walsh about how much P&I coverage the GEORGIE J. should carry, instead he just continued the $1,000,000 in coverage unchanged year to year. Exhibit C at 61.

The Jones purchased a second scalloping vessel, F/V KELLY JEAN, in 1999 or 2000. Exhibit C at 45. The Jones incorporated another business entity, Brian Fisheries, Inc., to hold title to that boat, which is not an uncommon mechanism for boat owners to minimize their exposure. Exhibit C at 105. The Jones went through another broker for the marine insurance on the KELLY JEAN. Exhibit C at 46. The hull insurance on the Kelly Jean was $50,000 or $60,000 and the P&I was $250,000. Exhibit C at 46, 100.

George Jones switched brokers at some point on the GEORGIE J. and went to Bill Hart, who was working with Mariner's Insurance. Exhibit C at 44. George Jones gave Bill Hart a copy of the then current marine policy on the GEORGIE J. and that was the insurance that Bill Hart procured for the boat. Exhibit C at 64. George Jones never had a discussion with Bill Hart about the amount of P&I insurance he should have on the GEORGIE J. Exhibit C at 70. Bill Hart never made any recommendations for insurance limits and George Jones never asked. Exhibit C at 20.

George Jones switched brokers again in 1999 to save a few thousand dollars in premiums for the same coverage, and moved his business to Flagship. Exhibit C at 71. By that time, Ronald Walsh had become an employee of Flagship. George Jones never asked Ronald Walsh

4

whether he should or could get more P&I insurance and Walsh did not recommend that he purchase more coverage. Exhibit C at 72. George Jones never had a discussion with anyone from Flagship concerning how much P&I insurance he should have on the GEORGIE J. Exhibit C at 114.

George Jones continued the same insurance coverage and limits at Flagship as he did with Neptune and Mariner's. Exhibit C at 129. He continued to carry $1 million in P&I insurance because that is what the prior owner had and he never thought to change it. Exhibit C at 88.

Unfortunately, in November of 2003, during the relevant policy time period with Flagship, Victor Capaldi, a crew member of the GEORGIE J sustained serious injuries aboard the vessel. Exhibit C at 158–163. Purportedly, the value of Capaldi's injuries was in excess of the $1,000,000 P&I policy limit and AGA contends that as a result, its vessel and permit were seized and sold and it suffered other damages. See U.S. Marshall's Bill of Sale (Exhibit D). AGA closed its doors because without the boat and permit, it had no other assets.

This case is ripe for summary judgment, and the defendants intend to file a motion for summary judgment on AGA's negligence as well as other claims. Flagship did not have a duty to advise AGA on its insurance needs. The well-established law in Massachusetts is that insurance agents and brokers have no broad sweeping duty to advise customers as to their insurance needs. See, e.g., Robinson v. Charles A. Flynn Ins. Agency, 39 Mass. App. Ct. 902, 903 (1995) (Rescript Opinion). The evidence establishes that at no time did anyone from AGA request higher coverage. No one from AGA had any discussions with anyone from Flagship about how much liability coverage AGA should have on the vessel. Exhibit C at 114. No one

from Flagship ever told George Jones or anyone from AGA that AGA had sufficient coverage. Exhibit C at 129. AGA takes the simple position that Flagship should have advised it to "up" its P&I insurance to $10,000,000. Exhibit C at 151.

Absent what established case law identifies as a "special relationship," which does not exist here, an insurance agent or broker has no obligation to give advice to a client regarding the amount of coverage the client should purchase. Robinson, 39 Mass. App. Ct. at 903 (no broad duty to inform and advise insured of the availability of limits or underinsured motor vehicle coverage); Kourouvacilis v. Travelers Insurance Co., 57 Mass.App.Ct. 1105 (2003) (unpublished opinion). The "special circumstances" giving rise to a heightened duty of care will be found only in limited circumstances where the agent or broker undertakes to do more than merely respond to specific insurance requests. Rapp v. Lester L. Burdick, 336 Mass. 438, 442 (1957). "Special circumstances" may exist where there is evidence of a long-standing relationship between a broker and a policyholder, the broker undertakes to evaluate the customer's coverage requirements and provide advice, and the customer justifiably relies on the broker's undertaking. See Bicknell, Inc. v. Havlin, 9 Mass. App. Ct. 497, 499-501 (1980). See also McCue v. Prudential Co. of America, 371 Mass. 659, 662-663 (1976) (28 year relationship between broker and client during which brokers made monthly visit to the plaintiffs to attend to their insurance needs in support of finding of "special circumstances"). Here, there is no such special relationship. AGA's relationship with Flagship was a sales relationship. No more, no less. AGA wanted to purchase marine insurance for the GEORGIE J., and Flagship was in the business of procuring marine insurance for companies like AGA. AGA never asked for additional coverage, no one from Flagship assured AGA that it had sufficient coverage, and no

one from Flagship ever endeavored to, or assured AGA that it would, evaluate whether the $1 million in P&I coverage was "sufficient." Such a subjective determination was neither requested, made nor offered. Furthermore, AGA paid Flagship a standard commission and never paid it any extra compensation for insurance advice.

As will be explained in a motion for summary judgment, all of AGA's claims fail as a matter of law based upon the undisputed facts. Furthermore, as argued below, the damages AGA seeks for the value of its vessel, permit, and lost profits are not recoverable in this action.

## III.    ARGUMENT

### A.    AGA Cannot Recover Economic Losses On Its Negligence Claims.

The damages that AGA seeks for the loss of its boat, permit and profits are barred by the economic loss doctrine. AGA claims that it is entitled to recover the value of its boat, permit, and lost profits as a result of Flagship's alleged negligence in selling it what was later determined to be insufficient P&I insurance to cover a catastrophic claim. AGA's complaint contains three counts that are for simple negligence: a claim against Flagship for negligence (Count I), a claim against Brown & Brown for vicarious liability (to the extent it is based on Flagship's negligence) (Count VI), and negligent failure to supervise against Brown & Brown (Count VII). AGA cannot recover the economic damages it seeks on its negligence claims, and therefore they should be dismissed.

It is the well-established rule in Massachusetts, and the majority position among the states, that economic-loss damages not involving injury to person or property are not recoverable as damages for negligence. See, e.g., Barber Lines A/S v. M/V Donau Maru, 764 F.2d 50, 51 (1st Cir. 1985) (no tort action under Massachusetts law for recovery of damages for financial

harm arising out of negligently caused fuel spill in Boston Harbor); <u>FMR Corp. v. Boston Edison Co.</u>, 415 Mass. 393, 395 (1993) (rejecting claims for economic losses of a business arising out of power outages); <u>Garweth Corp. v. Boston Edison Co.</u>, 415 Mass. 303, 305 (1993); <u>Bay State-Spray & Provincetown Steamship, Co. v. Caterpillar Tractor Co.</u>, 404 Mass. 103, 107 (1989); <u>Stop & Shop Cos. v. Fisher</u>, 387 Mass. 889, 897-899 (1983). The prohibition is known as the economic loss doctrine. The value of the GEORGIE J., its permits, and the lost profits that AGA seeks are economic loss damages, and are not recoverable on a negligence claim. <u>See</u>, <u>e.g.</u>, <u>Bay State-Spray</u>, 404 Mass. at 104 (1989). AGA does not contend that it suffered any personal injury or property damage, and therefore cannot make a claim for damages on Counts I, VI, and VII. <u>See</u>, <u>e.g.</u>, <u>Morgan v. Financial Planning Advisors, Inc.</u>, 701 F. Supp. 923, 927-928 (1988) (dismissing claims for negligence and negligent supervision against brokerage firm and its managerial personnel based on economic loss doctrine).

**B.      AGA Has Failed To Establish That Any One Of The Limited Exceptions To The Economic Loss Doctrine Applies.**

There are very few limited exceptions to the economic loss doctrine. As explained below, AGA has not established that its claims fit into any one of the exceptions to the economic loss doctrine.

**i.   This Is Not A Professional Malpractice Case.**

Massachusetts courts have carved out a limited exception to the economic loss doctrine for professional malpractice claims against fiduciaries. <u>See</u> <u>Clark v. Rowe</u>, 428 Mass. 339, 342 (1998). As an initial matter, AGA does not allege that Flagship stands in a fiduciary relationship to it, and therefore cannot now claim that this exception applies. <u>See</u> Amended Complaint.

8

The Massachusetts Supreme Judicial Court has only applied this exception to one class of fiduciaries: attorneys. The reasoning behind allowing clients to recover economic losses from their attorneys in malpractice cases stems from the recognition that "[w]hen the economic loss rule has been applied, the parties usually were in a position to bargain freely concerning the allocation of risk, and, more importantly, there was no fiduciary relationship." Id. The public policy behind exempting attorney malpractice cases from the application of the economic loss doctrine reflects the courts conclusion that the "attorney and client do not deal with each other at arms' length. The client often is in many respects powerless to resist the influence of his attorney." Clark, 428 Mass. at 342 (citing Berman v. Coakley, 243 Mass. 348, 354-55 (1923). This is not a legal malpractice case, and therefore this exception to the economic loss doctrine does not apply.

AGA would have this Court expand the limited exception and apply it to its claims against its former insurance broker. AGA's argument that the economic loss doctrine should not apply in any "professional malpractice" case is contrary to the law in Massachusetts and would cause the exception to swallow the rule.

Even if this Court were to conclude that the economic loss doctrine does not apply in professional malpractices cases, under Massachusetts law, AGA's claims against its broker do not constitute professional malpractice claims. In setting out rules for accrual and limitations periods for contract and tort actions for "professional malpractice" -- negligence actions against professionals -- Massachusetts law refers to attorneys, public accountants, hairdressers, physicians, surgeons, dentists, optometrists, hospitals, and sanitoria. See Mass. Gen. Laws ch. 260, § 4 (2003). The legislature did not include brokers in the definition of professionals. As

such, a claim against a broker is not a "professional malpractice" claim. See Santiago v. 1370 Broadway Assocs., L.P., 695 N.Y.S.2d 326, 326-27 (N.Y. App. Div. 1st Dep't 1999).

Courts have been reticent to freely carve out exceptions to the economic loss doctrine for any and all negligence claims against service providers even if they are "professionals." The courts have applied the doctrine to claims against engineers, architects, and consultants. See, e.g., Arthur D. Little Intern, Inc. v. Dooyang Corp., 928 F. Supp. 1189, 1202-03 (D. Mass. 1996) (declining to expand exception concerning professional malpractice case to business consultants under Massachusetts law); Aldrich v. ADD, Inc., 437 Mass. 213, 223-223 (2002) ( holding that the plaintiff's pleadings and affidavits alleged physical property damage sufficient to state a cause of action for negligence against an architect); 695 Atlantic Avenue Company LLC v. Commercial Construction Consulting, Inc., 64 Mass. App. 1109 (2005) (unpublished opinion) (engineers). See also Columbus McKinnon Corp. v. China Semiconductor Co., LTD., 867 F. Supp. 1173, 1182-83 (W.D.N.Y. 1994) ("There is no basis in law for extending the doctrine of professional malpractice to cover independent computer consultants"). The Massachusetts Appeals Court opinion in Frank Cooke, Inc. v. Hurwitz, 10 Mass. App. Ct. 99 (1980), does not assist AGA. In Frank Cooke, Inc., the Massachusetts Appeals Court did not specifically consider the economic loss doctrine. The issue in the case was whether some or all of the plaintiff's claims for professional malpractice, breach of fiduciary duty, breach of contract, and Massachusetts Generals Laws Chapter 93A violations against the plaintiff's former accountant were barred by the applicable statute of limitations. Id. at 106. Although the court considered when losses the plaintiff alleged were sustained, the court did not consider whether those losses were barred by the economic loss doctrine. Id. at 110-11.

AGA has failed to cite any cases creating an exception to the economic loss doctrine for a negligence claim against a broker. Even assuming arguendo that a "special relationship" between a broker and an assured could trigger the exception to the economic loss doctrine, which the Defendants dispute, AGA has not and cannot establish such a relationship with Flagship. Based on the foregoing, Count I against Flagship for negligence, Count IV against Brown & Brown for vicarious liability based upon Flagship's alleged negligence, and Count VII against Brown & Brown for negligent failure to supervise do not provide a basis for an award of economic damages.

### ii. AGA Negligent Misrepresentation Claim Is A Rehash Of Its Negligence Claims And Does Not Provide A Separate Basis For Recovery.

AGA's claim for negligent misrepresentation is simply a rehash of it negligence claim in Count I and does not state a separate claim. See Amended Complaint, Count II. "In order to recover for negligent misrepresentation a plaintiff must prove that the defendant (1) in the course of his business, (2) supplies false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information." Nota Constr. Corp. v. Keyes Assocs., Inc., 45 Mass. App. Ct. 15, 19-20 (1998). Here, in its purported negligent misrepresentation claim, AGA alleges that when Flagship closed its New Bedford office, it was assured by Flagship that it would remain available to take care of all of AGA maritime insurance needs. Amended Complaint ¶ 15. The Amended Complaint alleges that "Flagship negligently and/or incompetently supplied false information for the guidance of AGA in its insurance business

transactions." Amended Complaint ¶ 16.  In essence, AGA contends that Flagship failed to advise it to obtain $5 million (or $10 million) in P&I insurance.  AGA has not identified any additional alleged "misrepresentations."  The claim is, therefore, a rehash of its negligence claim but cast as negligent misrepresentation to circumvent the economic loss doctrine.  As such, AGA should not be allowed to recover economic losses on this claim.

Even if this Court were to conclude that AGA has stated a separate claim for negligent misrepresentation, AGA is not entitled to all the damages that it seeks.  While there is an exception to the economic loss doctrine that permits recovery for economic loss resulting from negligent misrepresentation, see Nota Constr. Corp., 45 Mass. App. Ct. at 20, the lost profits that AGA seeks are not recoverable on a negligent misrepresentation claim.  See Cambridge Planting Co., Inc. v. Napco, Inc., 85 F.3d 752, 774 (1st Cir. 1996).  Based on the foregoing, AGA is not entitled to lost profits if it were to prevail on its negligent misrepresentation claim.

### iii. AGA Has Not Alleged A Negligent Breach Of Contractual Duties.

The third exception to the economic loss doctrine relates to claims for negligent breach of contractual duties.  See Abrams v. Factory Mutual Liab. Ins. Co., 298 Mass. 141, 144 (1937).  AGA's complaint contains a claims for negligence, negligent misrepresentation, intentional misrepresentation, violations of Massachusetts General Laws Chapter 93A, violations of Massachusetts General Laws Chapter 176D, vicarious liability, and negligent failure to supervise.  It does not contain a claim for negligent breach of a contractual duty.  AGA does not allege that there was a contract between it and Flagship, that a contract supplied Flagship's

12

alleged duties to AGA, or that the contract has been breached. AGA, therefore, has not made such a claim in this case. As a result, the exception is not applicable here.[3]

**C.    The Damages That AGA Seeks Are Duplicative And Therefore Not Recoverable.**

Notwithstanding the fact that the damages AGA seeks constitute economic losses and are not recoverable, AGA's claims for damages are duplicative. Tort damages are essentially restitution to an injured party, and as such they are designed to restore the plaintiff to the position in which it found itself immediately prior to the tortfeasor's act. See 37 Joseph R. Nolan, Laurie J. Sartorio, Massachusetts Practice Series, Tort Law § 1.2 (2005); Griffin v. General Motors Corporation, 380 Mass. 362, 370-71 (1980). Tort damages are not designed to create a windfall to a plaintiff.

AGA claims that the seizure and sale of the GEORGIE J. and its permit put it out of business because it no longer had any assets. As damages, AGA seeks the value of its vessel and permit (*i.e.* the value of its business since the assets were the business), which sold at auction for $1.7 million, and its lost profits as a result of the sale of the vessel and permit. Such damages are duplicative and therefore, inappropriate.

The GEORGIE J. and its permit were sold by the United States Marshall for $1.7 million at a public auction. Fair market value is "that price likely to be arrived at by a willing seller

---

[3] It should be noted, however, that a plaintiff may not avoid the applicable negligence doctrines by characterizing a claim for negligence as one for breach of contract. Anthony's Pier Four, Inc. v. Crandall Dry Dock Eng'rs, Inc., 396 Mass. 818, 823 (1986); Sullivan v. First Mass. Fin. Corp., 409 Mass. 783, 798-99 (1991). In determining whether a claim is properly characterized as tort or contract, the reviewing court must look at the "gist of the action." Anthony's Pier Four, Inc., 396 Mass. at 823 (citing Hendrick v. Sears, 365 Mass. 83, 85 (1974)).

under no compulsion to sell and an informed purchaser." Meyer v. Wagner, 57 Mass. App. Ct. 494, 501-02 (2003). The fair market value of the vessel and permit was established as being $1.7 million. The bids submitted at auction took into account the potential of the vessel and permit to generate a future income stream and profits to the successful bidder. See United States v. Pervaz, 118 F.3d 1, 10 (1st Cir. 1997) ("Profit is an ingredient of the fair market value of goods or services that can be sold and purchased").

AGA should not be allowed to recover the lost profits in addition to the fair market value of the GEORGIE J. and its permit on any one claim or combination thereof. See Szalla v. Locke, 421 Mass. 448, 453-454 (1995) (duplicative damages under multiple counts of a complaint is not permissible). Cf. Protectors Ins. Servs., Inc. v. United States Fidelity & Guar. Co., 132 F.3d 612, 618 (10th Cir. 1998) (reversing damage award in breach of contract case because it permitted double recovery where plaintiff awarded difference in the actual sale price for business and the fair market value of the business had it not been sold under duress and future lost profits from the sale of the business); Albrecht v. The Herald Co., 452 F.2d 124, 131 (8th Cir. 1971) (holding that plaintiff in suit alleging antitrust violations could not recover both value of business as a going concern at the time of damage and future profits of business after the time of damage). In arguing that it is entitled to both the value of the GEORGIE J. and its permit and lost profits, AGA seeks to collect twice for the same alleged injury. "A plaintiff is not entitled to duplicative damages: it may recover only the amount of damages it actually suffered." Garshman Co., Ltd. v. Gen. Elec. Co., 176 F.3d 1, 5 (1st Cir. 1999). See also Flag Fables, Inc. v. Jean Ann's Country Flags & Crafts, Inc., 753 F. Supp. 1007, 1019-20 (D. Mass. 1990) (denying motion to recover

against bond because allowing such recovery would essentially allow the defendants to collect twice for the same injury).

"A person obtains restitution when he is restored to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its equivalent in money." Restatement (First) of Restitution § 1, cmt. a (1988 Supp. 2007). In this case, AGA will be fully compensated (assuming liability) if it recovers the fair market value of the GEORGIE J. and its permit as of the date of the sale. The fair market value of the vessel and its permit was $1.7 million. The $1.7 million would then need to be reduced by $125,000, which AGA received to satisfy an outstanding mortgage of the vessel.

## IV.   CONCLUSION

AGA should be barred from introducing any evidence of its alleged economic damages and should be barred from introducing duplicative evidence of lost profits.

### THE DEFENDANTS RESPECTFULLY REQUEST A HEARING.

Respectfully submitted,

FLAGSHIP GROUP LIMITED and

BROWN & BROWN, INC.,

By their attorneys,

/s/ Terri L. Pastori
Michael J. Stone, Esq., BBO # 482060
Terri L. Pastori, Esq., BBO #635323
Peabody & Arnold, LLP
30 Rowes Wharf
Boston, MA 02110
(617) 951-2041

Dated:  April 11, 2007

## CERTIFICATE OF SERVICE

I, Terri L. Pastori, hereby certify that on this 11th day of April 2007, the foregoing document was served on counsel for the plaintiff, Joseph E. Abromovitz, Esquire, Law Offices of Joseph G. Abromovitz, P.C., 858 Washington Street, 3rd Floor, Dedham, MA 02026, by electronic mail.


/s/ Terri L. Pastori
Terri L. Pastori


PABOS2:TPASTOR:658896_1
14811-91372

16

# UNITED STATES DISTRICT COURT
### for the
## DISTRICT OF MASSACHUSETTS



| | |
|---|---|
| **VICTOR P. CAPALDI**<br>    **Plaintiff** | ) |
| | ) |
| | ) |
| **V.** | ) |
| | ) |
| **AGA FISHING CORPORATION**<br>    **Defendant** | ) |
| | ) |

**Civil Action**

**No. 04-10755-JLT**

## MOTION FOR APPROVAL OF SETTLEMENT

Now comes the Plaintiff in the above-entitled action and by and through his attorneys respectfully requests that this Honorable Court approve the Plaintiff's settlement.

On November 25, 2003, the Plaintiff, a seaman and member of the crew of the F/V GEORGIE J, was injured when a block fell and hit him on the head. As a result of the accident, the Plaintiff was rendered a quadriplegic and sustained brain damage. Currently, the Plaintiff lives with his mother and step father in Rochester, Massachusetts where round the clock care is provided to the Plaintiff.

The Plaintiff and Defendant settled the above-entitled case Victor Capaldi v. F/V GEORGIE J, Civil Action No: 04-10843-JLT and Victor Capaldi v. AGA Fishing Corporation, Civil Action No: 04-10755-JLT.

The settlement is funded from the remainder of the insurance policy on the F/V GEORGIE J and from the money held in the Registry of the Court from the auction F/V GEORGIE J.

Allowed
Tauro J
1/11/05

The Plaintiff will receive the remainder of the insurance policy and the net proceeds from the auction of the F/V GEORGIE J currently held by the Registry of the Court. Out of the available proceeds, the Plaintiff has agreed to pay the attorney fees of Clinton & Muzyka's, the fees of Walters Nixon, the adjusting company, the attorneys fees of Pamela LaFreniere and the mortgage of the F/V GEORGIE J which was $125,885.69.

After payment of the aforementioned items, plus the payment of Plaintiff's attorney fees and expenses, the Plaintiff will receive the remainder. The net remainder will be deposited into a special needs trust. Due to the Plaintiff's physical condition, a special needs trust is in the best interest of the Plaintiff in order to preserve his assets and ability to obtain benefits.

Additionally, as part of the settlement, a structured settlement has been set up for Suzy Marie Capaldi. Suzy Capaldi is the Plaintiff's daughter whose is currently 12 years old. Ms. Capaldi lives with her mother in New Bedford, Massachusetts Since Ms. Capaldi was born, the Plaintiff has provided monetary support for her. However, due to the Plaintiff accident, the Plaintiff can not work and will not be able to work in the future. As a result, the Plaintiff has not been able to support his daughter and will be unable to in the future. Under the terms of the structured settlement, Suzy Capaldi receives a guaranteed payment of $500.00 monthly from March 15, 2005 until June 15, 2014; $25,000.00 guaranteed payment on 8/01/2010, 8/01/2011/, 8/01/20012, 8/01/20013; and a guaranteed payment of $50,000.00 on 3/30/2020 for a cost of $148,682.00 and total expected benefits of $206,000.00. *Exhibit A.* The structure settlement is in lieu of child support payments and for future educational costs.

The settlement agreement is in the best interests of all parties.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court approve the Plaintiff's settlement as set forth above.

2

Respectfully submitted for the
the Plaintiff, Victor P. Capaldi,
by his attorney,

Carolyn M. Latti
BBO #567-394
David F. Anderson
BBO#560-994
LATTI & ANDERSON LLP
30-31 Union Wharf
Boston, MA 02109
(617) 523-1000

Dated: January 11, 2005

3



# FLAGSHIP
## GROUP INSURANCE AGENCY, LTD.



To: LISA

March 15, 2000

AGA Fishing, Inc.
14 Green Drive
North Dartmou MA    02747

RE:  F/V "VICTOR" 1966, 80.6', STEEL
     Policy No. 99-A5441

Dear George:

The above referenced policy will be expiring on May 01, 2000.
Please take a few minutes to assist us in updating our files.  We are
presently covering the vessel under the following conditions and if
you would like to make any changes, we would be glad to implement
them at renewal.

|  |  | PRESENT COVERAGE |
|---|---|---|
| 1. | HULL VALUE: | $350,000.00 |
| 2. | HULL DEDUCTIBLE: | $10,000.00 |
|  | MACHINERY: | $15,000.00 |
| 3. | 1ST MORTGAGEE: | LUZO COMMUNITY BANK |
|  | 2ND MORTGAGEE: | PREMIUM ASSIGNMENT CORP. |
| 4. | 1ST MORTGAGEE AMOUNT: | $71,429      Please Update: _____ |
| 5. | PRIMARY P&I LIMIT: | $500,000.00 |
| 6. | P&I DEDUCTIBLES: | $1,500 Bodily Injury |
|  |  | $2,500 Property Damage |
| **7. | CREW COMPLEMENT: | 6.5 CAPTAIN: INCLUDED |
| 8. | CAPTAIN'S NAME: |  |
| **9. | FISHERY: | SC |
| 10. | OTHER PERMITS HELD: |  |
| 11. | NAVIGATION LIMITS: | HAGUE LINE TO CAPE HATTERAS, NC – |
|  |  | NOT TO EXCEED 200 MILES OFFSHORE |
| 12. | MAIN ENGINES: | Caterpillar D-398 |
| 13. | EXCESS P&I POLICY CARRIED: | YES      x      NO _____ |
| 14. | EXCESS P&I LIMITS: | 500 XS 500 |
| 15. | POLLUTION POLICY CARRIED: | YES      x      NO _____ |
| 16. | POLLUTION LIMIT: | $500,000.00 |
| 17. | OFFICIAL HULL NO: | 502064 |
| 18. | ANY OTHER CHANGES: | _____ |

Higher limits are available for Protection and Indemnity.

Please return this letter with the necessary changes in the self-
addressed envelope provided.

Sincerely,

Ronald Walsh
Manager



/ml

AGA 1436

78 MIDDLE STREET    FAIRHAVEN, MA 02719    508-994-2217    FAX 508-994-6803

R'

April 16, 2001

AGA Fishing, Inc.
Mr. George Jones
113 MacArthur Drive
New Bedford, MA 02740

Re:     F/V "GEORGIE J"
        Hull, Primary P&I, and Pollution Insurance Coverage Renewal
        Effective: May 1, 2001 to May 1, 2002

Dear Mr. Jones:

We are pleased to enclose the 2001/02 Insurance Renewal Proposal for the
"GEORGIE J."

The renewal premium for the period indicated above will be $31,164.00, and we would
like to bring the following items to your attention as they represent a change in coverage
for this year:

1.  Hull and Primary P&I coverages to be issued by Centennial Insurance
    Company
2.  Primary P&I limit to be $250,000 with deductibles of $2,500 for Bodily Injury
    and $5,000 for Property Damage
3.  Excess P&I limit will be $750,000 xs $250,000

As done in the past, we have prepared a Finance Contract for this amount which should
be signed and returned along with the required downpayment at your earliest
convenience.

In order to complete the underwriting process, we are also enclosing an Application and
Captain's Resume which need to be completed and returned, as well.

We look forward to continuing our relationship and providing you with these important
coverages for your benefit and protection. If you have any questions, please do not
hesitate to contact our office.

Sincerely,

THE FLAGSHIP GROUP, LTD.

Jack S. Devnew

JSD/lar
Enclosures

EXHIBIT
10
Jones   1-5-06

Post-it® Fax Note    7671   Date 4/20/01   # of pages ► 11
To George Jones              From Jack Rhodes
Co. AGA Fishing              Co. Flagship
Phone # 508-993-4193         Phone # 800-634-3599
Fax # 508-993-4442           Fax # 757-627-2130

AGA 1677



# INSURANCE RENEWAL PROPOSAL
## FOR
### AGASSING, INC. / GEORGE JONES
### F/V "GEORGE H." D/B/A STEEL SCALLOPER

Presented by:

## JACK S. DEVNEW
## PRODUCER

## LISA RAWLES
## ACCOUNT MANAGER



### MAY 1, 2001 TO MAY 1, 2002



## FLAGSHIP GROUP, LTD.

### NORFOLK, VIRGINIA

AGA 1683

## HULL & MACHINERY INSURANCE

| | |
|---|---|
| **NAMED ASSURED:** | **AGA FISHING, INC. / GEORGE JONES** |

| | | |
|---|---|---|
| **TERM:** | **05/01/01 TO** | **12:00 Noon E.S.T.** |
| | **05/01/02** | **12:00 Noon E.S.T.** |
| **VESSEL:** | **F/V "GEORGIE J"** | |
| | **1966, 80.6', STEEL SCALLOPER** | |
| **AGREED VALUE:** | **$400,000** | |

| | | |
|---|---|---|
| **DEDUCTIBLE:** | **$5,000** | **Per Occurrence - Hull** |
| | **$10,000** | **Per Occurrence - Machinery** |
| **LOSS ADJUSTMENT:** | **To Be Advised** | |
| **NAVIGATION LIMIT:** | **HAGUE LINE TO CAPE HATTERAS, NC – NOT TO EXCEED 200 MILES OFFSHORE** | |
| **FORMS:** | ♦ **Hull Taylor Form SP39C 1953 (Rev. 70)** | |
| | ♦ **Schedule of Vessels** | |
| | ♦ **BOW Schedule of Vessels** | |
| | ♦ **S.R. & C.C. Endorsement (Hulls) 87B-46 (Sept. 8, 1959)** | |
| | ♦ **A.I. Hull War Risk & Strikes clauses (December 1, 1977)** | |
| | ♦ **Fishing Vessel Clauses Special Terms & Conditions** | |
| | ♦ **A.I. Radioactive Contamination Exclusion Clause** | |
| | ♦ **Electronic Date Recognition Endorsement – C** | |
| | ♦ **CRO Endorsement** | |

| | |
|---|---|
| **LOSS PAYEE:** | **LUZO COMMUNITY BANK** |
| | AMOUNT UNKNOWN AT THIS TIME |
| | **PREMIUM ASSIGNMENT CORPORATION** |
| **SECURITY:** | **Centennial Insurance Company** |
| | **United States** |

| | | |
|---|---|---|
| **BEST RATING:** | **A-X** | **Excellent** |

| | | |
|---|---|---|
| **PREMIUM:** | **INCL.** | **Hull** |

**FLAGSHIP**
GROUP, LTD.

**AGA 1684**

## PROTECTION & INDEMNITY

**NAMED ASSURED:**    AGA FISHING, INC. / GEORGE JONES

**TERM:**    05/01/01 TO          12:00 Noon E.S.T.
05/01/02          12:00 Noon E.S.T.

**PRIMARY LIMIT OF LIABILITY:**    $250,000.00 PER OCCURRENCE

**SECURITY:**    Centennial Insurance Company
United States

**BEST RATING:**    A-X          Excellent

**LOSS ADJUSTMENT:**    TO BE ASSIGNED

**FORMS:**
- ♦ A.I.M.U.  P&I Clauses 6/2/83
- ♦ Fishing Vessel Clauses (P&I)
- ♦ Excess Collision Extention
- ♦ Pollution Exclusion Clause
- ♦ Occupational Disease Exclusions
- ♦ CRO Endorsement

**DEDUCTIBLE:**    $2,500          Bodily Injury each occurrence
$5,000          Property Damage each occurrence

**CREW:**    5-7 WA                          Captain / Owner
•X Included          ☐ Excluded
Additional Crew held covered subject to audit at expiration of policy

**FISHERY:**    SCALLOP
**PREMIUM:**    INCL.

## HIGHER LIMITS AVAILABLE UPON REQUEST



AGA 1685

## UNDERWRITING CHECKLIST

APPLICATION RECEIVED?    NO

CENTENNIAL APPLICATION IS ATTACHED FOR COMPLETION

CAPTAIN'S RESUME RECEIVED?    NO

ATTACHED FOR COMPLETION

CURRENT SURVEY?  YES

SURVEY DATE:  5/00

SURVEY RECOMMENDATIONS COMPLIED WITH?  NONE LISTED


**\*\*PLEASE NOTE:  IF SURVEY IS OVER 2 YEARS OLD, A NEW OUT OF WATER SURVEY WILL BE REQUESTED AT NEXT HAUL OUT AT OWNERS EXPENSE**


CLAIMS HISTORY:  ATTACHED



AGA 1686

## EXCESS PROTECTION & INDEMNITY

| | |
|---|---|
| **NAMED ASSURED:** | AGA FISHING, INC. / GEORGE JONES |

| | | |
|---|---|---|
| **TERM:** | 05/01/01 TO | 12:00 Noon E.S.T. |
| | 05/01/02 | 12:00 Noon E.S.T. |
| **LIMIT OF LIABILITY:** | $750,000 XS $250,000 | |

**SECURITY:**     **Underwriters At Lloyd's**
**London, England**

**TERMS & CONDITIONS:**

- ♦ **Excess of Primary Protection & Indemnity Policy Following Form**
- ♦ **AIMU Protection and Indemnity Clauses 6/2/83**
- ♦ **Fishing Vessel Clauses (P&I)**
- ♦ **Service of Suit Clause**
- ♦ **Excess Collision Extention**
- ♦ **Institute Radioactive Contamination Exclusion Clause 1/10/90**
- ♦ **Brokers Cancellation Clause**
- ♦ **Osprey Electronic Date Recognition Conformity Endorsement Clause**
- ♦ **Cancelling Returns Only**

**CREW:**     5-7 WA, CAPTAIN INCLUDED

**TOTAL EXCESS P&I PREMIUM:**     INCL.

## HIGHER LIMITS AVAILABLE UPON REQUEST



AGA 1687

## POLLUTION

**NAMED ASSURED:**    **AGA FISHING, INC. / GEORGE JONES**

**TERM:**    **05/01/01 TO**                **12:00 Noon E.S.T.**
            **05/01/02**                **12:00 Noon E.S.T.**

**LIMITS OF LIABILITY:**

|  |  |
|---|---|
| **$500,000** | **OIL POLLUTION ACT OF 1990, THIRD PARTY LIABILITY** |
| **$5,000,000** | **CERCLA** |
| **$5,000,000** | **NON OPA/NON CERCLA ENDORSEMENT** |
| **$1,000,000** | **CERTAIN FINES/PENALTIES/DEFENSE COSTS** |
| **$5,000,000** | **SALVAGE/FIREFIGHTING/CLEANING** |
| **$100,000** | **PUBLIC RELATIONS (PAYS 60% OF PRE-APPROVED EXPENSE)** |

**GRT:**    **164**

**SECURITY:**    **AMERICAN NATIONAL FIRE INSURANCE COMPANY**

**BEST RATING:**    **A X11**

**CLAIMS ADJUSTMENT:**    **AT UNDERWRITER'S DISCRETION**

**ANNUAL PREMIUM:**    **INCL.**                **SUBJECT TO CHANGE**

## HIGHER LIMITS AVAILABLE UPON REQUEST



**FLAGSHIP**
GROUP, LTD.

AGA 1688

## PREMIUM BREAKDOWN & COMPARISON

|  | 2000/01 |  | 2001/02 |
|---|---|---|---|
| **HULL and P&I** |  |  |  |
| **HULL PREMIUM** | $10,166.60 |  | $10,289.00 USING LAST YEAR'S BOW CHARGE ; $5,000/$10,000 |
| **DEDUCTIBLES** | $5,000/$10,000 |  |  |
| **PRIMARY P&I PREMIUM** | $15,000.00 FOR $500,000 LIMIT |  | $13,375.00 FOR $250,000 LIMIT |
| **DEDUCTIBLES** | $1,500/$2,500 |  | $2,500/$5,000 |
| **TOTAL PREMIUM** | $25,166.60 |  | $23,664 |

| **EXCESS P&I** |  |  |  |
|---|---|---|---|
| **$500,000 XS $500,000** **$750,000 XS $250,000** | $2700.00 |  | $6600.00 |
| **EXCESS TOTAL** | $2700.00 |  | $6600.00 |

| **POLLUTION** |  |  |  |
|---|---|---|---|
| **OPA and CERCLA** **LIMITED FINES & PENALTIES** **POLLUTION TOTAL** | $857.00 |  | $900.00 |

| **GRAND TOTAL** | $28,723.60 |  | $31,164.00 |
|---|---|---|---|



AGA 1689



# FLAGSHIP
## GROUP, LTD.

April 26, 2001

George Jones
AGA Fishing, Inc.
14 Green Drive
North Dartmouth, MA 02747

RE:   F/V "GEORGIE J", 1966, 80.6', Steel
      Policy No. 121801009, Excess Cover Note PL007160Z-03
        and Pollution Policy No. H 349-06-58
      Effective May 1, 2001 to May 1, 2002

Dear Mr. Jones:

We are pleased to enclose your 2001-2002 Hull/Primary P&I, Excess P&I, and Pollution policy(s) for the above referenced fishing vessel.

Also enclosed please find Invoice No. 78598 in the amount of $2,336.40 which represents the down payment for the Hull/Primary P&I coverage; Invoice No. 78601 in the amount of $660.00 which represents the down payment for the Excess P&I coverage; and Invoice No. 78602 in the amount of $90.00 which represents the down payment for the Pollution coverage. All policies are being financed through Premium Assignment Corporation.

Please remember we can write higher limits for Pollution and Protection & Indemnity. If you are interested in either of these, please be sure to let us know.

Just a reminder, we still need the completed application and captain's resume returned as soon as possible.

Thank you for giving us the privilege of writing your coverage again this year. If you have any questions after reviewing the enclosed items, please do not hesitate to contact our office.

Sincerely,

FLAGSHIP GROUP, LTD.



Lisa Rawles
Account Manager

/spk

Enclosures

cc:   Luzo Community Bank
      160 County Street
      New Bedford, MA  02740



**AGA 1649**

VOLUME:  I

PAGES:  1 - 176

EXHIBITS: 1 - 16

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


------------------------x

AGA FISHING CORPORATION,

      Plaintiff,

 vs.                  Civil Action No.

FLAGSHIP GROUP LIMITED    05-11396 JLT

and BROWN & BROWN, INC.,

      Defendants.

------------------------x

RULE 30(b)(6)DEPOSITION OF AGA FISHING CORPORATION

(By its Designee, GEORGE E. JONES JR.) and

GEORGE E. JONES JR., Individually

Monday, May 15, 2006

10:13 a.m.

Peabody & Arnold LLP

30 Rowes Wharf

Boston, Massachusetts


Reporter:  Dana Welch, CSR, RPR

Page 10

1  Q. And after you left school, what did you
2  do?
3  A. I worked -- I worked at a company
4  unloading trucks, loading trucks.
5  Q. When did you first start fishing?
6  A. My very, very first trip, my very, very
7  first trip?
8  Q. Sure. Your very, very first trip.
9  A. I was 15.
10  Q. Where was that?
11  A. The boat was out of Atlantic City. I made
12  one trip.
13  Q. What kind of a boat?
14  A. A lobster boat.
15  Q. Okay. When did you start fishing for a
16  living?
17  A. 21; I think I was 21.
18  Q. Where was that?
19  A. New Bedford.
20  Q. What kind of a boat?
21  A. Scallop.
22  Q. What's your date of birth, sir?
23  A. December 17th, 1946.
24  Q. So that would put it sometime in the late

Page 11

1  1960s that you first started fishing?
2  A. I guess so.
3  Q. Okay. What kind of boats did you fish on?
4  A. Scallop boats.
5  Q. All the time?
6  A. All the time.
7  Q. When did you first become an owner of a
8  scallop boat?
9  A. 1987, I think.
10  Q. What was the name of that boat?
11  A. The Victor.
12  Q. You purchased that boat?
13  A. Yes.
14  Q. Who did you purchase it from?
15  A. Axel -- I don't know how to pronounce his
16  last name. Henders, or -- I don't know.
17  Q. Did you -- were you ever on the boat
18  fishing before you purchased it?
19  A. Yes.
20  Q. For how many years were you fishing on
21  that boat?
22  A. I was on it twice. 1980. I don't know --
23  eight months, a year, I'm not sure. And then I
24  think it was '85 or '86. I don't remember. I took

Page 12

1  the boat, skipper, not in 1980, though.
2  Q. Okay.
3  Was that your first trip, as the skipper
4  of the boat?
5  A. No.
6  Q. When did you first become a captain of a
7  boat?
8  A. '83.
9  Q. Did that require a license of some sort?
10  A. No.
11  Q. Do you hold any licenses as a --
12  A. No.
13  Q. -- in the fishing industry?
14  A. Just an operator's.
15  Q. When did you get an operator's license?
16  A. I don't remember.
17  Q. Give me a ballpark. Before 1980?
18  A. I don't remember. When they said you had
19  to have them, that's when I got them. I don't
20  recall what year.
21  Q. Okay. What's the process for obtaining an
22  operator's license? How do you get it? Is there a
23  test?
24  A. No, just fill out a paper.

Page 13

1  Q. That's it; you just -- anybody can do it?
2  A. Yes.
3  Q. So I could walk down to New Bedford and
4  fill out the paper and become a captain?
5  A. I don't know about now.
6  Q. But back when you did it --
7  A. Yeah.
8  Q. -- all you had to do was fill out a form?
9  A. Yes.
10  Q. Who did you send the form to, what agency
11  was it that did the licensing?
12  A. NOAA, I think it was NOAA.
13  Q. Do you know what NOAA stands for?
14  A. No.
15  Q. That's just the way you refer to it,
16  N-O-A-A?
17  A. Yeah.
18  Q. For how many years prior to 1987 -- strike
19  it in that form.
20  When you bought the Victor in '87, were
21  you the skipper?
22  A. Yes.
23  Q. Prior to that, you had been the skipper on
24  other boats?

4 (Pages 10 to 13)

Page 14

1    A.  Yes.
2    Q.  Scallop boats?
3    A.  Yes.
4    Q.  You became the skipper on -- sometime in
5  '87 when you purchased it.  How many crew did you
6  generally take out on the boat?
7    A.  On the Victor?
8    Q.  Yes.
9    A.  Ten.
10   Q.  Did that change at some point; did you
11 take out fewer crew at some point?
12   A.  Yes.
13   Q.  Why is that?
14   A.  NOAA said you could only go -- I think the
15 first time was eight men, and then you couldn't go
16 more than seven.
17   Q.  Do you know why that was?
18   A.  To bring back the stock, conservation
19 and --
20   Q.  So it was a regulation to --
21   A.  Regulation, yes.
22   Q.  -- to preserve the fishing industry?
23   A.  Yes.
24   Q.  Did you have a license to do scalloping

Page 15

1  back in '87?
2    A.  What do you mean, a license?
3    Q.  Did you have to get a permit in order to
4  do scalloping?
5    A.  Me?
6    Q.  Yes.
7    A.  No.
8    Q.  At some point as you operated the Victor,
9  did you have to get a license or a permit in order
10 to do scalloping?
11   A.  With the boat?
12   Q.  Yeah.
13   A.  Yes.
14   Q.  When did you first get that; did you get
15 it in 1987?
16   A.  Yes.
17   Q.  Do you remember how much you paid for the
18 Victor?
19   A.  I think it was 500,000.
20   Q.  Did that include the boat and the license?
21   A.  Yes.
22   Q.  So that was a total price?
23   A.  Yes.
24   Q.  The boat came with a license?

Page 16

1    A.  Yes.
2    Q.  Did you have somebody finance the
3  purchase; was there a bank involved?
4    A.  Yes.
5    Q.  What bank was that?
6    A.  Shawmut.
7    Q.  They're not around anymore, you know.
8    A.  Yeah, I know.
9    Q.  Did you have a mortgage on the boat?
10   A.  Yes.
11   Q.  How much was the mortgage?
12   A.  I think it was 360-65,000.
13   Q.  Okay.  And the balance came from your
14 savings or money that you had?
15   A.  The owner held 40,000 --
16   Q.  Okay.
17   A.  -- and then we put up the rest.
18   Q.  Where did the balance come from, from your
19 savings?
20   A.  I think it was savings, and I remortgaged
21 my house.
22   Q.  Did the bank that took the mortgage on the
23 boat also own the mortgage on your house?
24   A.  No.

Page 17

1    Q.  Two different banks?
2    A.  Yes.
3    Q.  Did the bank that you mortgaged your boat,
4  did they also become a second mortgage holder on
5  your house; did they also have an interest in your
6  house?  Do you remember?
7        MR. ABROMOVITZ:  At any point in time or
8  right at the beginning?
9    Q.  At the beginning.
10   A.  I don't think so.
11   Q.  Now, you continued to fish the Victor from
12 '87 to '95 --
13   A.  Yes.
14   Q.  What happened in 1995?
15   A.  I had a heart attack.
16   Q.  Okay.  And were you hospitalized for that,
17 treated for that condition?
18   A.  Yeah.  I went to the hospital.  They took
19 tests.
20   Q.  Okay.  Did they tell you anything, or did
21 they restrict you about your fishing abilities
22 after that?
23   A.  No.
24   Q.  Did you continue to fish after 1995?

5 (Pages 14 to 17)

Page 18

1  A. No.
2  Q. Why not?
3  A. I didn't feel good.
4  Q. Did the doctors tell you you couldn't or
5  shouldn't?
6  A. I just kept going to them, and yeah, he
7  said don't go fishing, you know, right now.
8  Q. Did you get a skipper to replace you?
9  A. Yes.
10  Q. Who was that?
11  A. I don't remember.
12  Q. Okay. Do you remember any of the skippers
13  that you've had on the boat?
14  A. Yes.
15  Q. How many have you had since '95?
16  A. Four.
17  Q. Who was the last skipper that was on the
18  boat while you owned it?
19  A. Gary Sylvia.
20  Q. How long had he been a skipper on the
21  boat?
22  A. First trip.
23  Q. Prior to that, who had been the skipper?
24  A. I took it out.

Page 19

1  Q. When did you take it out?
2  A. I don't remember. I don't know if it was
3  May, June.
4  Q. Can you get me a year?
5  Let's back up for a moment, if we could.
6  The accident involving Mr. Capaldi was in November
7  of 2003; do you remember that?
8  A. Yes.
9  Q. Okay. And at that time Gary Sylvia was
10  the skipper?
11  A. Just one trip.
12  Q. And prior to November of '03, you were the
13  skipper?
14  A. For four trips.
15  Q. Okay. And prior to you being the skipper,
16  who was the skipper?
17  A. Tommy Saunders -- Sanders.
18  Q. For how long a period of time was Sanders
19  the skipper?
20  A. Couple of years.
21  Q. Okay. And prior to him?
22  A. Kenny Rogers.
23  Q. Okay. He's not the guy who sings, right?
24  A. No, not that guy.

Page 20

1  Q. Okay. Can you remember any other
2  skippers?
3  A. Peter Barbero.
4  Q. Peter?
5  A. Barbero.
6  Q. Okay.
7  A. And my son.
8  Q. When was your son the skipper?
9  A. Before he died he was a skipper for a few
10  years.
11  Q. How did -- may I ask how your son passed
12  away, from what cause?
13  A. He got beat up. He got killed.
14  Q. Did that happen down in New Bedford area?
15  A. Yes.
16  Q. After he died, did you change the name of
17  the boat?
18  A. Yes.
19  Q. Prior to the time that your son was the
20  skipper, do you remember any other skippers that
21  you had?
22  A. I think Russell took it a trip.
23  Q. Russell --
24  A. Piver, I think his name was. Piver.

Page 21

1  Q. Tell me how you went about getting a
2  skipper for the boat after you stopped.
3  A. They come and ask.
4  Q. Did they come to your house?
5  A. Down at the dock.
6  Q. Take me back, if you would, to say 1994,
7  While you were still fishing actively, how many
8  days a year would you fish?
9  A. I have no idea.
10  Q. More than 100 days?
11  A. Yes.
12  Q. More than 200 days?
13  A. I have no idea.
14  Q. Was there any limit on your license?
15  A. That's what I -- no.
16  Q. At that time there was no limit; you could
17  fish as much as you wanted?
18  A. Yeah.
19  Q. At some point there became a time when
20  there was a limit placed on scallopers?
21  A. Yes.
22  Q. When was that, do you remember?
23  A. I don't remember.
24  Q. What was the limit that was placed on

6 (Pages 18 to 21)

Page 42

```
 1   with Luzo Bank?
 2       A.  I have no idea.  I can't remember.
 3       Q.  Back in 1987 when you acquired the boat,
 4   did you insure it?
 5       A.  Yes.
 6       Q.  Who did you insure it with?
 7       A.  I think it was Neptune.
 8       Q.  Was there a person from Neptune that you
 9   dealt with?
10       A.  Ronnie Walsh.
11       Q.  Ronnie Walsh?
12       A.  Yes.  It was a carryover.
13       Q.  What does that mean?
14       A.  Axel had Neptune; I just bought the boat
15   and --
16       Q.  Had the same insurance that he did?
17       A.  Yeah.
18       Q.  Okay.  You had hull insurance?
19       A.  Yes.
20       Q.  And you had P&I insurance?
21       A.  Yes.
22       Q.  Do you know what P&I insurance is, what it
23   stands for?
24       A.  It's for the workers.
```

Page 43

```
 1       Q.  Okay.  Did you have Workers' Compensation
 2   insurance?
 3       A.  Yes.
 4       Q.  Was that in addition to the hull and the
 5   P&I insurance?
 6       A.  Yes.
 7       Q.  Who provided that insurance?  Was it also
 8   Neptune or somebody else?
 9       A.  I think they used to get it for me.
10       Q.  When you say "they," are you talking
11   about --
12       A.  Neptune.
13       Q.  Okay.
14       A.  That would be a separate bill, though.
15       Q.  Okay.  Can you remember back in 1987 how
16   much hull insurance you were carrying?
17       A.  I think it was 350,000.
18       Q.  And that was the same insurance coverage
19   that Axel had before you did?
20       A.  I'm not sure.
21       Q.  How about P&I, how much P&I insurance did
22   you have back in '87?
23       A.  A million.
24       Q.  Was that the amount that Axel had been
```

Page 44

```
 1   carrying before then?
 2       A.  Yes.
 3       Q.  What about pollution coverage, did you
 4   have that?
 5       A.  Yes.
 6       Q.  How much?
 7       A.  I have no idea.  That 350,000, I think
 8   that's what it was.
 9       Q.  Did you have -- how long did you maintain
10   insurance with Neptune?
11       A.  I don't remember.
12       Q.  Who was the next insurance company that
13   you dealt with after Neptune?
14       A.  Bill Hart.
15       Q.  Who is Bill Hart?
16       A.  An insurance agent.
17       Q.  When did you start doing business with
18   him?
19       A.  When I left Neptune.
20       Q.  Can you help me with the time frame?
21       A.  Honest, I don't remember.
22       Q.  Okay.  Do you remember the name of his
23   insurance company, who he wrote for?
24       A.  I think it was Marine something.
```

Page 45

```
 1       Q.  Could it have been Maritime something?
 2       A.  You know -- Marine, I don't know.
 3       Q.  Okay.  And after Bill Hart, where did you
 4   go?
 5       A.  Flagship.
 6       Q.  Okay.  At some point, Mr. Jones, you had a
 7   second boat; you purchased another boat?
 8       A.  Yes.
 9       Q.  When was that?
10       A.  I don't know.  2000, I don't know.
11       Q.  Somewhere around 2000?
12       A.  Yeah, '99.  I don't know.
13       Q.  Okay.  What was the name of that boat?
14       A.  Kelly Jean.
15       Q.  That was named for your daughter?
16       A.  Yes.
17       Q.  Did you obtain insurance for that boat?
18       A.  Yes.
19       Q.  From whom?
20       A.  This girl named Debbie.
21       Q.  You don't have a last name for her?
22       A.  I'm trying to think.  It's out of -- she's
23   out of Moniz, I'm sure.
24       Q.  I'm sorry?
```

12 (Pages 42 to 45)

Page 46

1    A. She's out of Moniz.
2    Q. Can you spell that for us?
3    A. M-O-N-I-Z, Moniz.
4    Q. Moniz Insurance?
5    A. Yeah.
6    Q. Do you remember the name of the insurance
7    company that it was placed with?
8    A. No.
9    Q. Moniz Insurance was the broker?
10    A. Yes. She worked out of there. She was
11    like my agent.
12    Q. The Kelly Jean was a scalloper as well?
13    A. Yes.
14    Q. Smaller boat than the Georgie J?
15    A. Yes.
16    Q. How much insurance did you get on the
17    Kelly Jean?
18    A. I think the hull was 50, 60,000. I forgot
19    what the P&I was. It was only a day boat.
20    Q. That means it would just go out for the
21    day and come back at the end of the day?
22    A. More or less a day, day -- 400-pound. As
23    soon as you get your 400 pound, you'd come home.
24    They call it a day boat.

Page 47

1    Q. And the Georgie J could hold up to how
2    much?
3    A. To fill the hold?
4    Q. Yeah.
5    A. I have no idea.
6    Q. What's the most you ever took in?
7    A. Since I had her?
8    Q. Yeah.
9    A. The biggest trip? I don't remember.
10    MR. STONE: Why don't we take a couple of
11    minutes, okay?
12    (Proceedings interrupted at 11:15 a.m.
13    and reconvened at 11:19 a.m.)
14    Q. All right. Mr. Jones, who between
15    yourself and your wife was the person who dealt
16    with insurance agents?
17    MR. ABROMOVITZ: For the boat you're
18    talking about?
19    Q. For the boat.
20    A. Both of us.
21    Q. What about for your car?
22    A. Both of us.
23    Q. Okay. Did you have insurance on your
24    house as well?

Page 48

1    A. Yes.
2    Q. And would both of you deal with that as
3    well?
4    A. Yes.
5    Q. All right. Back in 1987, had you ever --
6    prior to 1987, had you ever obtained insurance on a
7    boat?
8    A. Prior to '87? No.
9    Q. Prior to '87, you were working for other
10    people?
11    A. Yes.
12    Q. Was '87 the first year when you started
13    working for yourself?
14    A. Yes.
15    Q. Okay. So you had additional
16    responsibility that you had to undertake to manage
17    the boat and manage the business affairs of the
18    boat?
19    A. Yes.
20    Q. Okay. Did you take any courses or
21    anything like that to teach you how to do that?
22    Was there a course that helped fishermen who were
23    purchasing a boat to learn the business of owning a
24    boat?

Page 49

1    A. Not that I know of.
2    Q. Okay. How was it that you learned all of
3    those things?
4    MR. ABROMOVITZ: Object to the form of the
5    question. All of what things?
6    Q. How did you learn how to manage a boat;
7    trial and error?
8    A. Through years of being in the business.
9    Q. Watched other people?
10    A. Yeah.
11    Q. Talked to other people?
12    A. Heard other people talk.
13    Q. Just stuff that you would hear on the
14    docks and with other fishermen when you were out on
15    the boats and so forth?
16    A. Well, I started when I was 21, I started
17    on deck. And you make trips over the years. It's
18    like stepping up a ladder.
19    Q. So by the time you first bought a boat in
20    '87, did you feel comfortable in owning a boat and
21    all of the responsibilities that went along with
22    owning it?
23    A. Yeah.
24    Q. Okay. Did your bank require you to have

13 (Pages 46 to 49)

Page 58

1  to be an owner and an operator.  Then it became not
2  that way.
3     Q.  In order to get insurance from Neptune,
4  you had to be the owner and the operator?
5     A.  That's the way I understood it.
6     Q.  And you were the owner and the operator of
7  the boat?
8     A.  Victor.
9     Q.  So you could get the insurance through
10  Neptune?
11     A.  Yes.  But that changed.
12     Q.  So did that mean that you could no longer
13  get insurance through Neptune?
14     A.  Who, me?
15     Q.  Yes.
16     A.  No.
17     Q.  But you decided to change?
18     A.  Yes.
19     Q.  Why was that?
20     A.  Because it's supposed to be owner/operator
21  and that changed.  They were letting some owners
22  let somebody else take the boat.  And they're
23  telling -- you know, it was supposed to be
24  owner/operator, so --

Page 59

1     Q.  Why did that --
2     A.  Bill had the insurance on that boat in
3  1980, anyway.
4     Q.  Okay.  You lost me there.
5     A.  Bill Hart, in 1980, had the insurance on
6  the fishing vessel Victor.
7     Q.  So Bill Hart had the insurance before
8  Neptune took it over?
9     A.  Yes.
10     Q.  When did Neptune take it over; do you
11  know?
12     A.  I think Axel did it as a favor to join the
13  club.  It was supposed to be a club or something.
14     Q.  Okay.  And you stuck with them for some
15  years and then you switched over to Bill Hart's
16  company?
17     A.  Yes.
18     Q.  Prior to switching over to Bill Hart's
19  company you renewed with Neptune a few times at
20  least?
21     A.  Yes.
22     Q.  Every year that you renewed did you have a
23  discussion with Mr. Walsh about the insurance?
24     A.  No.

Page 60

1     Q.  What was the process of renewal?
2     A.  The end of the policy, renew it.
3     Q.  At any point did Mr. Walsh ask you if you
4  wanted to change the coverage?
5     A.  No.
6     Q.  At any point during the time that you had
7  insurance with Mr. Walsh, did you ask him about
8  different levels of insurance coverage?
9     A.  No.
10     Q.  Did you ever ask him if you could get more
11  hull coverage?
12     A.  No.
13     Q.  Did you ever ask him if you could get more
14  P&I coverage?
15     A.  No.
16     Q.  Did you ever ask him if you could get more
17  pollution coverage?
18     A.  No.
19     Q.  Why not?
20     A.  I don't know.
21     Q.  Well, how is it that you decided how much
22  hull coverage to get?
23     A.  From the 350?
24     Q.  Yeah.

Page 61

1     A.  I don't know if it was -- I got a survey
2  and I upped it.  The survey went from 350 to 400
3  and I upped it.
4     Q.  Okay.  Did you do that when you were with
5  Mr. Walsh?
6     A.  I can't remember.
7     Q.  Okay.  How is it that you decided that you
8  would get a million dollars of P&I coverage back in
9  1987?
10     A.  That's what the boat had.
11     Q.  Okay.  Did you ever talk to Mr. Walsh
12  about that, about how much P&I coverage you should
13  have?
14     A.  No.
15     Q.  You just followed on with what you had
16  before?
17     A.  Yes.
18     Q.  Okay.  And that just continued from year
19  to year; it just never changed?
20     A.  Yes.
21     Q.  Do you remember ever having a discussion
22  with Mr. Walsh about the amount of P&I coverage?
23     A.  No.
24     Q.  Did you talk to other boat owners around,

16 (Pages 58 to 61)

Page 62

1   ask them how much coverage they were carrying?
2       A. No.
3       Q. Anybody ever tell you how much they were
4   carrying?
5       A. No.
6       Q. More or less?
7       A. No.
8       Q. What about hull coverage? Did you ever
9   talk to other boat owners about hull coverage and
10  how much hull coverage they were carrying?
11      A. No. Just scallop talk.
12      Q. Okay. No discussion around the docks
13  about insurance coverage?
14      A. No.
15      Q. Okay. Back in the -- at the time that you
16  bought the boat in '87, did you know where the
17  other boat owners were insuring their boats?
18      A. Different companies.
19      Q. Did many of them insure with Neptune, just
20  as you?
21      A. Yes.
22      Q. How many scallop boat owners were there in
23  the area back in the mid-'80s?
24      A. I don't know. I don't know.

Page 63

1       Q. More than 100?
2       A. I couldn't say. I never counted them.
3       Q. At some point the scallop industry became
4   a closed industry, is that right, in New Bedford, a
5   closed port? You couldn't get a license to do
6   scallop fishing, they weren't available anymore?
7       A. Yes.
8       Q. When did that happen?
9       A. I have no idea. I don't remember.
10      Q. Do you have any idea how many licenses
11  there were at the time that that happened?
12      A. No.
13      Q. When you switched over from Neptune to
14  Bill Hart's company, I take it that Bill Hart was
15  the one who contacted you, or did you seek him out?
16      A. I don't remember. He insured that boat in
17  1980, I know that.
18      Q. And at some point you decided that you
19  wanted to get out of Neptune, I take it?
20      A. Yes.
21      Q. So did you call him up and say, hey, Bill,
22  can you give him a quote on insurance?
23      A. I don't know if I went by there or I
24  called or --

Page 64

1       Q. Where was --
2       A. -- I bumped into him.
3       Q. Where was Bill Hart located?
4       A. New Bedford.
5       Q. On the docks?
6       A. No.
7       Q. In the neighborhood?
8       A. Yes.
9       Q. He had an office?
10      A. Yes.
11      Q. Do you remember what the name of the
12  office was?
13      A. I think it was the name of the insurance,
14  Marine something.
15      Q. Could it be Mariners?
16      A. Mariners, that's what it is, Mariners
17  Insurance.
18      Q. Did you have a discussion with him about
19  transferring your insurance from Neptune to his
20  company?
21      A. Yes.
22      Q. What do you remember about the discussion?
23      A. I just asked him if he could insure me, he
24  said yes.

Page 65

1       Q. Did you talk to him about coverage
2   amounts?
3       A. No.
4       Q. Did you tell him how much coverage you had
5   with Neptune?
6       A. Yeah. I showed him the policy and that's
7   what I got.
8       Q. Okay. Did you get the exact same amount
9   of coverage with Bill Hart as you had with Neptune?
10      A. Yes.
11      Q. Did you seek to have any changes in the
12  coverage at all?
13      A. No.
14      Q. The same amount of the hull coverage?
15      A. I changed that and I can't honestly
16  remember.
17      Q. We'll get to that because I have some
18  paperwork that can help refresh you on that.
19      A. All right.
20      Q. Other than the change in the hull
21  coverage, do you have any memory of any other
22  changes in the coverages?
23      A. No.
24      Q. Do you remember how much the annual

17 (Pages 62 to 65)

Page 70

1  Q. Yeah.
2  A. I was supposed to go to a wedding.
3  Q. Did you make a claim for that sinking?
4  A. Yes.
5  Q. And the insurance company paid for it?
6  A. Yes.
7  Q. Subject to whatever the deductible was?
8  A. Yes.
9  Q. And the deductible came out of AGA
10 Fishing?
11 A. Yes.
12 Q. Which company were you with at the time,
13 do you remember?
14 A. Bill Hart.
15 Q. At any point did you have a discussion
16 with Bill Hart about the amount of coverage you
17 should be having on the boat?
18 A. No.
19 Q. Did he ever recommend to you and say you
20 ought to have $5 million or $10 million P&I
21 coverage?
22 A. No.
23 Q. Did you ever ask him?
24 A. No.

Page 71

1  Q. Did he ever tell you what the rates were
2  for additional insurance coverage?
3  A. No.
4  Q. At some point you decided that you wanted
5  to switch companies again and leave Bill Hart's
6  company?
7  A. Yes.
8  Q. Why was that?
9  A. The premium was cheaper.
10 Q. At another company?
11 A. Yes.
12 Q. Where was that?
13 A. Flagship.
14 Q. Who did you contact to find out about the
15 premium at Flagship?
16 A. Ronnie.
17 Q. Had he switched companies at that time?
18 A. Yes.
19 Q. So he had gone to work for Flagship?
20 A. Yes.
21 Q. And he told you he could quote a rate
22 lower than what you were paying with Bill Hart's
23 company?
24 A. He did.

Page 72

1  Q. Do you remember what you were paying with
2  Bill Hart's company and what Walsh was offering?
3  A. No. I really don't.
4  Q. It's -- can you remember what the
5  difference was?
6  A. It was a few thousand dollars.
7  Q. A few thousand dollars a year --
8  A. Same coverage.
9  Q. -- for the same coverage?
10 A. Yes.
11 Q. Did you ask Ronnie about whether you could
12 or should get more coverage?
13 A. No.
14 Q. Did he tell you you could or should get
15 more coverage?
16 A. No.
17 Q. Did he ever recommend to you that you
18 ought to consider getting more than the
19 million-dollar P&I coverage?
20 A. No.
21 Q. Do you remember what year that was that
22 you switched over to Flagship?
23 A. If I'm off a year or two, it's --
24 Q. I'm just trying to get your best memory,

Page 73

1  Mr. Jones.
2  A. I --
3  Q. We have some paperwork that can help.
4  A. '98, I think.
5  Q. Okay.
6  A. '98.
7  Q. Did you actually try to -- do you remember
8  trying to shift off of Bill Hart's company in the
9  middle of the renewal year rather than at the end?
10 Do you remember that happening?
11 A. No.
12 Q. Do you remember Walsh telling you that the
13 company didn't want to pick you up in the middle of
14 the year?
15 A. Oh, when I talked to him, yeah.
16 Q. What's your memory about that?
17 A. I'm trying to think what he said. All I
18 remember is him saying we'll try next year.
19 MR. STONE: Let's mark this as Exhibit
20 Number 1, please.
21 (Exhibit No. 1, March 2, 1998 letter,
22 marked for identification.)
23 Q. Mr. Jones, I've shown you a letter from
24 Ron Walsh to you and to Mrs. Jones dated March 2,

19 (Pages 70 to 73)

Page 86

1    A. What?
2    Q. If someone had a catastrophic injury on
3  the boat back in 1999, did you have an
4  understanding of how the insurance would handle
5  such a claim?
6    A. Yes.
7    Q. What was your understanding?
8    A. They would handle the claim.
9    Q. Okay. Suppose it was a claim, suppose you
10  lost some hands on a fishing trip, did you have an
11  understanding of what would happen then?
12    A. They would get paid.
13    Q. Did you have an understanding of how much
14  they would get paid?
15    A. No.
16    Q. Had you ever heard of any claims on the
17  docks that were very large claims by your
18  understanding?
19    A. No.
20    Q. What's the largest claim that you knew of
21  back in 1999?
22    A. That's not to discuss, you know, it's like
23  hey, the guy -- the boat sank, lost three guys and
24  it's not money. We just discuss the boat, the boat

Page 87

1  sunk, three guys or one guy or this guy fell
2  overboard.
3    Q. So you just talked about what happened and
4  not what the insurance companies did?
5    A. No.
6    Q. Were there ever articles in the local
7  paper about those things?
8    A. You know, it would say, boat sank, you
9  know, lost three guys, one guy, or they airlifted
10  somebody off the boat because of a thumb or --
11    Q. Were you ever a party to a lawsuit
12  involving an injured seaman prior to the Capaldi
13  accident; did you ever get sued?
14    A. Did I ever get sued?
15    Q. Yeah. AGA Fishing ever get sued?
16    A. I imagine it did. I don't know.
17    Q. Do you ever remember getting court papers
18  before the Capaldi case?
19    A. For any other case?
20    Q. Yeah.
21    A. No.
22    Q. Did you ever see in the New Bedford papers
23  -- do you -- strike it in that form.
24      Back in the 1990s, were you getting a

Page 88

1  daily newspaper at your home?
2    A. Yes.
3    Q. Which paper?
4    A. Standard Times.
5    Q. New Bedford?
6    A. Yes.
7    Q. Did the Standard Times report on -- did
8  you ever see any reports of lawsuits involving
9  seamen who were injured or lost at sea?
10    A. I seen articles that lost at sea or --
11    Q. Did they ever talk about money in any of
12  the articles?
13    A. Not that I -- I don't remember no money.
14  Just this guy got hurt or a boat got washed up and
15  they wondered, were they ashore or they're looking,
16  and -- just that.
17    Q. Now, as I understand it, you were carrying
18  a million bucks of insurance because that's what
19  Axel had on the boat when you bought it; is that
20  right?
21    A. Yes.
22    Q. And you never thought to change it at any
23  point?
24    A. No.

Page 89

1    Q. Did anybody ever talk to you about
2  changing it at any point?
3    A. No.
4    Q. Did you ever ask anybody about it?
5    A. No.
6    Q. Now, after you first got the policy with
7  Flagship in 1999, did you continue to get insurance
8  policies from Flagship until the time of the
9  Capaldi accident?
10    A. Every year?
11    Q. Yes.
12    A. Yes.
13    Q. And they would always renew on May 1st of
14  the year?
15    A. Yes.
16    Q. During any of those years did you ever
17  think about getting insurance coverage somewhere
18  else?
19    A. No.
20    Q. Did you ever make an application anywhere
21  else?
22    A. No.
23    Q. Did you ever get a quote from anyone else?
24    A. No.

23 (Pages 86 to 89)

Page 98

1 Bedford.
2    Q. And on one of those occasions -- strike it
3 in that form. Did you meet with Mr. Devnew with
4 other people or just you and Mr. Devnew?
5    A. The first time?
6    Q. Either time. Was anyone else present at
7 either of those meetings that you had with Devnew?
8    A. Yeah. Ronnie, Jack Devnew, O'Sullivan, me
9 and my wife.
10    Q. That was the first time?
11    A. First time, Fairhaven.
12    Q. And the second time?
13    A. The second time was in New Bedford.
14    Q. And who was there? Just you and
15 Mr. Devnew?
16    A. I think my wife was there.
17    Q. So it would be you --
18    A. Me, my wife, and he pulled up with his
19 car.
20    Q. And was that on the dock at New Bedford?
21    A. On the dock, in back of American Seafood.
22    Q. Was that an appointment or did he just
23 happen to --
24    A. No. He just -- he said, I think he called

Page 99

1 me up and said, hey, I'm going to be around.
2    Q. Now, by that time you were no longer
3 actively fishing; is that right?
4    A. That's right.
5    Q. But you would come to the docks on a
6 regular basis?
7    A. I got to be excused.
8    MR. STONE: Sure. Why don't we go off the
9 record for a minute.
10    (Proceedings interrupted at 12:36 p.m.
11 and reconvened at 12:38 p.m.)
12    MR. STONE: Can you read me back the last
13 one, please.
14    (Requested testimony read by the
15 reporter.)
16    THE WITNESS: I was, I made a few trips,
17 not steady.
18    Q. Did you tell your doctors about that?
19    A. I was with them so long.
20    Q. Okay. When you made trips, occasional
21 trips, would you go as a deckhand on your own boat?
22    A. Skipper, captain.
23    Q. You'd take -- skipper and captain mean the
24 same thing?

Page 100

1    A. Same thing. Sorry.
2    Q. That's all right.
3    By the time that you were being insured by
4 Flagship, from the documents that I've seen, it
5 looks like you had a crew of 6.5, six and a half.
6 At least that's what you were insured for. How was
7 that determined?
8    A. You'd have to ask Jack.
9    Q. Well, how did you determine how many
10 people would be going out on a fishing trip in the
11 year, say 2000, 2001 time frame?
12    A. We were seven guys; sometimes you'd go
13 with six.
14    Q. So it would vary between six and seven?
15    A. Uh-huh.
16    Q. How did that number get selected; is that
17 because of some industry regulation?
18    A. Yes.
19    Q. What was the regulation?
20    A. You couldn't go more than seven.
21    Q. On a scallop boat?
22    A. Yes.
23    Q. And it also limited the number of days
24 that you could go?

Page 101

1    A. Yes.
2    Q. Do you remember back in the year 2000,
3 2001 how many days you were limited to?
4    A. No. They changed it every so often.
5    Q. How did you find out about those changes?
6    A. They mail the changes to the settlement
7 office.
8    Q. And then the settlement office would
9 notify you?
10    A. Yes.
11    Q. Okay. Did the settlement office -- was
12 there more than one settlement office in New
13 Bedford?
14    A. Yes.
15    Q. How did you select the one that you were
16 with?
17    A. I just went to Edie & Maria.
18    Q. Was there any difference in terms of --
19 strike it in that form. What were your
20 arrangements with the settlement house in terms of
21 how much they would get paid for the work they did
22 for you?
23    A. Edie's?
24    Q. Yes.

26 (Pages 98 to 101)

Page 102

1    A. She'd take so much a settlement.
2    Q. A percentage?
3    A. No. A fee.
4    Q. A flat fee for each fishing trip?
5    A. Yes.
6    Q. Was that the same as other settlement
7  houses would take per fishing trip?
8    A. The same money?
9    Q. The same amount; did they charge the same
10  rates at the other places?
11    A. I don't think so.
12    Q. Did the amount that the settlement house
13  was charging you, did that change depending on how
14  many days you were out, or was it just a flat
15  number for --
16    A. Just a flat number.
17    Q. So it was the same whether you were out
18  for two days or ten days?
19    A. Yeah.
20    Q. Okay. On days when you were not going out
21  on the boat, would you still show up at the docks?
22    A. Yes.
23    Q. Would that be true whether or not your
24  boat was already out fishing or would -- only when

Page 103

1  your boat was in port?
2    A. Only when my boat was in.
3    Q. Okay. Were you in communication with the
4  boat when it was out fishing?
5    A. I could, yes.
6    Q. What kind of communication equipment did
7  the boat have to contact you on the shore?
8    A. BOAT/TRACK.
9    Q. Is that live voice?
10    A. No. It's -- he could send me a fax.
11    Q. Do you have a fax machine in your house?
12    A. Yes.
13    Q. Did you have any other equipment in your
14  house that would allow you to communicate with the
15  boat?
16    A. No.
17    Q. According to records that I have, there
18  was a survey of your boat done in August of 1999.
19  How often were surveys done of the boat?
20    A. Two, three years.
21    Q. What was the reason for doing surveys?
22    A. It was for the insurance. And for me,
23  too.
24    Q. What information did you get from the

Page 104

1  survey? What information did it provide to you?
2    A. The gauging, how thick the steel was, and
3  they check the boat.
4    Q. Based on the survey, did you sometimes
5  have to do repair work or upgrade the boat to meet
6  conditions?
7    A. Yes. And the value of the boat.
8    Q. Now, according to my notes, the survey in
9  August of 1999 valued the boat at 375 to $400,000;
10  is that consistent with your memory?
11    A. I think so, yes.
12    Q. And that was at the point in time when you
13  decided that you wanted to up the hull coverage?
14    A. Yes.
15    MR. STONE: All right. Why don't we take
16  a few minutes and have a bite to eat.
17    (Proceedings interrupted at 12:45 p.m.
18  and reconvened at 1:36 p.m.)
19  BY MR. STONE:
20    Q. Mr. Jones, you're appearing here today in
21  response to a notice of taking deposition of AGA
22  Fishing Corporation; are you aware of that?
23    A. Yes.
24    Q. And you're appearing here both in your

Page 105

1  individual capacity as George Jones, but also as a
2  person who has knowledge of the affairs of AGA
3  Fishing?
4    A. Yes.
5    Q. Okay. Mr. Jones, other than yourself and
6  Mrs. Jones, is there anyone else who is able to
7  testify on behalf of AGA Fishing?
8    A. No.
9    Q. Between the two of you, you know
10  everything that there is to know about AGA Fishing
11  and its business activities?
12    A. Yes.
13    Q. Okay. Mr. Jones, if I may digress for
14  just a moment, you tried to get insurance from
15  Flagship for your boat, the Kelly Jean?
16    A. Yes.
17    Q. And you created a corporation called the
18  -- Brian's Fisheries, Inc.?
19    A. Yes.
20    Q. And I take it that that's named after your
21  other son?
22    A. Yes.
23    Q. Let me show you a document -- let me show
24  you a multipage document, dated December 10, 2001,

27 (Pages 102 to 105)

Page 114

1     Q. Do you remember what -- and this was
2 Steve?
3     A. Steve, yes.
4     Q. And do you remember what Steve said when
5 you were upgrading?
6     A. Yes. He told me I should upgrade because
7 I have a business.
8     Q. Okay. Did he suggest a particular amount?
9     A. Yes. I guess that amount.
10    Q. He suggested 100/300?
11    A. Yes. I rely on their judgment.
12    Q. Okay.
13    A. The agents.
14    Q. All right. Now, with respect to your boat
15 insurance, as I understand it, you had a million
16 dollars in coverage -- sorry -- Axel had a million
17 dollars in coverage when you bought the boat from
18 him.
19    A. Yes.
20    Q. At any point after that, did you have a
21 discussion with anyone, either Mr. Walsh or
22 Mr. Hart or Mr. Devnew about how much P&I coverage
23 you should have?
24    A. No.

Page 115

1     Q. So none of them ever talked to you about
2 that?
3     A. None of them.
4     Q. You just continued to have the same amount
5 of coverage that you had always had?
6     A. Yes.
7     Q. Or that Axel had had before you bought the
8 boat?
9     A. Yes.
10    Q. Did any of them ever suggest to you that
11 you ought to consider getting more coverage?
12    A. No.
13    Q. Did any of them ever tell you that --
14      (Proceedings briefly interrupted.)
15    Q. Did Mr. Devnew ever provide you with
16 examples of bad things that could happen which
17 might lead you to have -- think about more
18 insurance coverage?
19    A. No.
20    Q. Did he ever give you the example that if
21 your boat hit a passenger ferry, that you could
22 have a catastrophic situation?
23    A. No.
24    Q. Never discussed that example?

Page 116

1     A. Never.
2     Q. Did you ever hear about claims in which
3 there were settlements or payments in excess of a
4 million dollars?
5     A. No.
6     Q. Never heard about that happening?
7     A. No, never heard.
8     Q. Okay. Folks on the dock never talked
9 about anything like that, at least when you were
10 around?
11    A. No.
12    Q. When you got stuff from Flagship, did you
13 read it? When you got paperwork from them, did you
14 read it or did Mrs. Jones read it?
15    A. Either her or me.
16    Q. Okay. One of you would generally read at
17 least the cover letter?
18    A. Yeah. Didn't get too much.
19    Q. I'm sorry?
20    A. We didn't get too much.
21    Q. Gotcha. Okay. Now, I have a note in my
22 file from Mary Lafleur in April of 2000 that Bill
23 Hart was calling you, seeking to quote insurance to
24 him -- I'm sorry -- calling you, trying to get you

Page 117

1 to buy insurance from him. Is that consistent with
2 your memory of the timing when he was chasing you?
3     A. No. I don't --
4     Q. Do you have any memory?
5     A. I remember him coming up the house and I
6 said, hey, it's too late. I signed.
7     Q. This one has to do with a conversation
8 that Bill Hart had with Mrs. Jones.
9     A. Oh --
10    Q. Did she ever tell you about the
11 conversations that she had with Hart?
12    A. I don't recall.
13    Q. Do you have a memory of Mr. Walsh, and
14 this is in the 2000 time frame, offering you the
15 alternative of a 5 and $10,000 deductible on the
16 hull rather than a 10 or $15,000 deductible? Do
17 you remember him talking to you about that, giving
18 you that choice?
19    A. I don't know.
20    Q. Now, in 2001, do you remember asking Lisa
21 Rawles -- strike it in that form.
22     Do you remember ever talking to Lisa
23 Rawles on the telephone?
24    A. Me?

30 (Pages 114 to 117)

1  Q.  She just happened to mention that to you?
2  A.  Well, when I had to write out a check, she
3  sees everybody's -- you know, when they do their
4  deductible.
5  Q.  So when you had an injury on the boat and
6  you had to write a check for 2,500 and other guys
7  were writing 1,500?
8  A.  Or was it Cheryl?
9  So I asked Jack about it.
10  Q.  Okay.  And so Jack was able to obtain a
11  reduction in the deductible from 2,500 to 1,500?
12  A.  Yes.
13  Q.  So that would save you a thousand bucks
14  any time there was an accident?
15  A.  Yeah.
16  Q.  Okay.  Gotcha.
17  Let me show you a letter dated April 26,
18  2001.
19  (Exhibit No. 12, Letter dated April 26,
20  2001, marked for identification.)
21  Q.  This is a letter to you from Lisa Rawles,
22  dated April 26, 2001, Exhibit Number 12, in which
23  she encloses the 2001-2002 policy; is that correct?
24  A.  Yes.

1  Q.  Okay.  And she also enclosed a bill for a
2  portion of the policy, the down payment portion.
3  Do you see where it references that?
4  A.  Yes.
5  Q.  Am I to understand that you would pay some
6  portion to Flagship and finance the bulk of the
7  annual premium?
8  A.  Yes.
9  Q.  So that you would make monthly payments on
10  the premium to a finance company?
11  A.  Yes.
12  Q.  And you did that pretty much every year?
13  A.  Yes.  Some years I gave a bigger down
14  payment.
15  Q.  Okay.  Looking at the third paragraph of
16  this letter to you, where it says, "Please
17  remember, we can write higher limits for pollution
18  and protection and indemnity.  If you are
19  interested in either of these, please be sure to
20  let us know."
21  Do you see that sentence in there --
22  A.  Yes.
23  Q.  -- sentences?
24  Did you read that at the time?

1  A.  I don't remember.
2  Q.  Do you understand what those two sentences
3  mean?
4  A.  No.  Pollution?  Something goes in the
5  water.
6  Q.  Do you know what pollution insurance
7  coverage is?
8  A.  Yeah.  In case you have a spill.
9  Q.  How much were you -- was your limit for
10  pollution coverage?
11  A.  I think it was 20, 20 -- 25,000.
12  Q.  Do you understand what the phrase "write
13  higher limits" means in Exhibit 12?  "Please
14  remember we can write higher limits."
15  A.  What does it mean?
16  Q.  Yeah.  Do you understand it -- tell me
17  what it means to you, sir.
18  A.  It means if I need more, they can write
19  more.
20  Q.  So if you want to get a higher -- a higher
21  amount of coverage, they can get it for you?
22  A.  Yes.
23  Q.  Did you understand that back in 2001?
24  A.  I thought they were taking care of me,

1  really.  I didn't need it.
2  Q.  What do you mean, you thought they were
3  taking care of you?
4  A.  Well, I thought I had enough.
5  Q.  Okay.  Why is it that you thought you had
6  enough?
7  A.  Because they're an insurance company.
8  It's like my cars.
9  Q.  Did they -- did anyone from the insurance
10  company ever tell you that you had enough insurance
11  coverage?
12  A.  No.
13  Q.  But you were buying the same coverage that
14  you had bought from two other insurance companies?
15  A.  Yes.
16  Q.  Gotcha.  All right.  Let me show you the
17  next one.
18  (Exhibit No. 13, Letter of April 19, 2002,
19  marked for identification.)
20  Q.  The letter of April 19, 2002, Mr. Jones,
21  that contained the renewal proposal for the year
22  '02-'03; is that correct?
23  A.  Yes.
24  Q.  And did you renew with Flagship in

Page 150

1    A.  No.
2    Q.  What is the reason that you brought a
3  claim against Flagship?
4         MR. ABROMOVITZ:  Object to the form.  You
5    may answer.  It's okay.  You can answer.
6         THE WITNESS:  I feel they didn't do their
7    job.
8    Q.  Okay.  In what way?
9    A.  Well, they're an insurance company; they
10  should advise me.
11    Q.  What should they have advised you about?
12    A.  Upping my insurance.
13    Q.  Anything else?
14    A.  No.
15    Q.  So it's your position that they should
16  have said, hey, George, you really need more
17  insurance coverage, you've got to buy some more?
18    A.  Yes.  Like my car insurance, when I bought
19  the business, we upgraded.
20    Q.  How much insurance should they have told
21  you to buy?
22    A.  I have no idea.  I'm not insurance.
23    Q.  Well, do you know what the right amount
24  would have been?  We're two years later now.  What

Page 151

1  amount should you have been told?
2    A.  Two years later right now, the amount
3  right now today?
4    Q.  You've become a bit more educated about
5  insurance in the last couple of years, sir, from
6  your experience?
7    A.  Yeah.
8    Q.  Based on what you've learned and what you
9  now know, how much should they have advised you to
10  obtain?
11    A.  10 million.
12    Q.  Do you know whether any of the other
13  scallop boats in your area had 10 million of
14  insurance coverage?
15    A.  Yes.
16    Q.  Who is that?
17    A.  Should I answer that?
18         MR. ABROMOVITZ:  It's okay.
19         THE WITNESS:  That's somebody else's
20    business.
21         MR. ABROMOVITZ:  Well, it's discoverable.
22         THE WITNESS:  Ray Starvish.
23    Q.  Anyone else?
24    A.  Well, not 10.  Ray.

Page 152

1    Q.  How much did Ray have?
2    A.  He had 10.
3    Q.  How is it that you know that, he told you
4  that?
5    A.  Yes.
6    Q.  When did he tell you that?
7    A.  Everybody upped it to 5 million or they
8  had 5 million.
9    Q.  How do you know that?
10    A.  Because I dock beside Eric.
11    Q.  Eric?
12    A.  I don't know his last name.  Eric, he owns
13  the Endeavor.
14    Q.  Uh-huh.
15    A.  He told me, geez, how come you ain't got
16  5 million.  I said nobody told me.  He says, it's
17  only a matter of a few thousand dollars.
18    Q.  When did he tell you that?
19    A.  I don't remember the day.  After the
20  accident.
21    Q.  Okay.  Prior to the accident, did anybody
22  tell you how much insurance coverage they had?
23    A.  No.
24    Q.  Didn't talk about it before that?

Page 153

1    A.  Talk about scallops.  Don't go here.  Hey,
2  I found a wreck here.  That's --
3    Q.  Fishing talk?
4    A.  That's it.
5    Q.  But they didn't talk --
6    A.  I used a longer sweep, seems to be better,
7  higher shoe.  No.
8    Q.  And did Ray Starvish own the Endeavor at
9  one time?
10    A.  Yes.
11    Q.  And he owned it in partnership with
12  Hansen?
13    A.  That's his name.  Hansen.  Yes.  Eric.
14    Q.  And did Starvish tell you that he had
15  10 million on his boats?
16    A.  After.
17    Q.  Do you know what he had on the boats
18  before the Capaldi accident?
19    A.  No.
20    Q.  Were there any other boat owners that you
21  talked to after the accident about their coverage?
22    A.  I really -- I didn't go around.
23    Q.  Did people talk to you and --
24    A.  Nobody.  It was kind of like nontalkable,

39 (Pages 150 to 153)

Page 158

1    Q. -- that they were all getting more
2  coverage?
3       Tell me a bit about the accident itself.
4    A. I wasn't there.
5    Q. I understand. Your skipper was a new
6  skipper at that time? Mr. Sylvia?
7    A. He was skipper before.
8    Q. How long had he been the skipper on your
9  boat?
10   A. First trip. I only had ten days.
11   Q. Had he -- he had been a skipper on other
12 boats before that?
13   A. Yes.
14   Q. Had he ever been out on your boat before
15 that?
16   A. Yes.
17   Q. He was generally familiar with the boat?
18   A. Yes.
19   Q. What's your understanding of what caused
20 the accident?
21   A. What caused it?
22   Q. Yeah. How it happened.
23   A. I never got really told. The block came
24 down. Nobody really explained.

Page 159

1    Q. The block came down and hit Mr. Capaldi?
2    A. Yes. One of the guys said it bounced off
3  the galley. He was in the middle of the deck.
4  Statements that the surveyor got.
5    Q. Have you read some of the statements and
6  descriptions about the accident and the way it
7  occurred?
8    A. Just two, I think.
9    Q. Did you --
10   A. I wanted to read Gary's, but he never made
11 one.
12   Q. Who's Gary?
13   A. The skipper.
14   Q. He never gave a statement?
15   A. No. And he wouldn't let nobody go next to
16 his stepson; that was his stepson.
17   Q. Who? Capaldi was his stepson?
18   A. Yes.
19   Q. And nobody would talk to Capaldi about how
20 it happened?
21   A. He wouldn't let them, the way I understood
22 it.
23   Q. What was your understanding of what the
24 defect was in the boat, what people thought the

Page 160

1  defect in the boat was that caused the accident?
2    A. The defect?
3    Q. Was there something wrong with the boat or
4  with the equipment or the gear that caused the
5  accident?
6    A. Oh, when the surveyor came?
7    Q. Yeah.
8    A. He really -- he didn't know whether it was
9  a heavy load or if he had the brake on -- because
10 he was asking the gang how much was in the bag.
11 I'm pretty sure they said the bag was full, but
12 leaving it outside, it kind of emptied.
13   Q. Do you remember there being some
14 suggestion that there was some wear and tear that
15 had not been addressed before the trip?
16   A. I wasn't aware until after.
17   Q. I understand that you weren't aware. But
18 was there some discussion or statements about that?
19 Do you remember that?
20   A. I think the mate.
21   Q. I'm sorry?
22   A. The mate.
23   Q. What did the mate say?
24   A. He told the surveyor.

Page 161

1    Q. What was it that he --
2    A. Something about something worn. But he
3  figured he'd get another trip out of it or
4  something. He didn't address it to me.
5    Q. So the mate told the surveyor that there
6  was --
7    A. Yes.
8    Q. -- a worn line?
9    A. I think it was a swivel, shackle, swivel.
10 And he didn't address it to nobody.
11   Q. He saw it, but he thought it could hang in
12 there for another trip?
13   A. Another trip.
14   Q. Was that what caused the block to fall?
15   A. They don't know what caused it really,
16 whether the bag was full, the brake was on and
17 giving it the air. I never got a definite thing.
18   Q. Now, after the accident, when were you
19 notified about the accident? How did you find out
20 about it?
21   A. Gary called, called me, called the house,
22 had a satellite telephone.
23   Q. Okay. Where was he fishing?
24   A. Closed area. Off New York. I don't know

41 (Pages 158 to 161)

Page 162

1    if it's closed area 3, 2.
2        Q. Where did he go into port?
3        A. He didn't.
4        Q. What did he do?
5        A. They airlifted Victor off the boat.  He
6    fished another day or two; then he came home.
7    Because Victor was going to be operated on and he
8    wanted to be there.
9        Q. Coast Guard went out and got him?
10       A. Got who?
11       Q. Sorry.  The Coast Guard went out to get
12   Victor off the boat?
13       A. Airlifted him off.
14       Q. Did anyone go with Victor or did he go by
15   himself?
16       A. Went by himself.
17       Q. Where did they take him to?
18       A. Atlantic City Hospital.
19       Q. What's your understanding of the injury
20   that he had?
21       A. What do you mean, what's my understanding?
22       Q. What were you told that he -- about his
23   injuries?
24       A. He got hit on the head.

Page 163

1        Q. And what happened to him because of that?
2    What's your understanding, what were you told
3    happened to him as a result of being hit on the
4    head?
5        A. What happened to him?
6        Q. I understand he went to the hospital.
7    What did they find?  What was his -- the diagnosis?
8        A. Oh, I don't know.  Something -- what did
9    they say?  I don't know.  His neck or something
10   and --
11       Q. Have you talked to Mr. Capaldi at all
12   since the time of the accident?
13       A. No.
14       Q. How about --
15       A. His lawyer said no talking.
16       Q. How about to Mr. Sylvia?
17       A. No talking.
18       Q. Have you seen either one of them around
19   the docks since then?
20       A. Yes.
21       Q. Which one?
22       A. Both.
23       Q. Mr. Sylvia is back fishing on the scallop
24   boats?

Page 164

1        A. Yes.
2        Q. What about Mr. Capaldi, what's he doing?
3        A. He's walking around, going to the gym.
4        Q. So it appears that he's substantially
5    recovered from his injuries?
6        A. Oh, yes.  It was in the paper.
7        Q. Prior to your boat being arrested, you
8    were represented by counsel, by an attorney?
9        A. Yes.
10       Q. Which attorneys were representing you
11   then?
12       A. Tom Muzyka.
13       Q. Anyone else?
14       A. Pamela Lafreniere.  And before that was
15   Steve Willett, because Jack told me I needed a
16   lawyer.
17       Q. Needed a lawyer personally?
18       A. No.  I needed a lawyer.
19       Q. Okay.  Did you have conversations with
20   Jack after the accident, about the accident itself?
21       A. Yes.
22       Q. What did he tell you?
23       A. He told me, keep me posted.  He said, I'll
24   have somebody there when the boat comes in.  I

Page 165

1    said, okay.  He gave me his home number, his cell
2    number.
3        All right.  Then I said the boat's going
4    to be in Friday night.  I think they left on a
5    Tuesday.  I'm not sure, Tuesday, Friday, you know.
6        The skipper called me, said I'm going to
7    be in 4:00.  I called Jack, it's going to be in at
8    4:00.  He said, okay, don't worry about nothing.  I
9    said, okay, Jack.  Then the skipper said, I don't
10   think I'm going to be 4:00, I'm going to be 5:00.
11   I called Jack back, 5:00.  Jack says, okay.  Don't
12   worry about nothing.
13       I said, okay, Jack.  He said, you got all
14   my numbers?  I said, I got all your numbers.  I
15   went down the dock.  The boat made the 4:00 bridge
16   or whatever.  He docked the boat.  I went down to
17   the dock.  Everybody is on the dock, blah, blah,
18   blah.  I'm looking, looking, looking.  He never
19   sent nobody until Monday.
20       I tried calling him at his home.  I tried
21   calling him on his cell.  No answer.  No answer.
22       Q. Did you have a discussion with him
23   afterward about what happened?
24       A. Yes.

42 (Pages 162 to 165)

OMB APPROVED
2115-0110

| DEPARTMENT OF TRANSPORTATION U.S. COAST GUARD CG-1356 (REV. 9-92) | BILL OF SALE BY GOVERNMENT ENTITY PURSUANT TO COURT ORDER OR ADMINISTRATIVE DECREE OF FORFEITURE | THIS SECTION FOR COAST GUARD USE ONLY |
|---|---|---|

| 1. VESSEL NAME<br><br>F/V GEORGIE J. | 2. OFFICIAL NUMBER OR OTHER UNIQUE IDENTIFIER<br><br>502064 | |

**3. PERSON EXECUTING INSTRUMENT**

NAME: ANTHONY DICHIO                    TITLE: UNITED STATES MARSHAL

NAME AND ADDRESS OF AGENCY REPRESENTED (AND DISTRICT, IF APPLICABLE)

UNITED STATES MARSHALS SERVICE, DISTRICT OF MASSACHUSETTS
ONE COURTHOUSE WAY, SUITE 1-500 BOSTON, MA 02210

**4. COURT OR FORFEITURE INFORMATION:**

[ ] VESSEL SOLD PURSUANT TO ADMINISTRATIVE FORFEITURE (COPY OF DECREE ATTACHED)

[X] VESSEL SOLD PURSUANT TO COURT ORDER
NAME OF COURT
UNITED STATES DISTRICT COURT                    TITLE OF ORDER
                                               ORDER OF SALE

RECORDING DATA:

BOOK:                    PAGE:

PORT (IF DIFFERENT FROM FILING PORT)

**5. NAME (S) AND ADDRESS (ES) OF BUYER (S) AND INTEREST TRANSFERRED TO EACH:**

Carlos Rafael
77 Tucker Lane
North Dartmouth, MA  02747

5A.  TOTAL INTEREST TRANSFERRED (100% UNLESS OTHERWISE SPECIFIED.)  100          %

5B. MANNER OF OWNERSHIP. (CHECK ONLY ONE, IF APPLICABLE). UNLESS OTHERWISE STATED HEREIN, THIS BILL OF SALE CREATES A TENANCY IN COMMON, WITH EACH TENANT OWNING AN EQUAL UNDIVIDED INTEREST.

[ ] JOINT TENANCY WITH RIGHT OF SURVIVORSHIP          [ ] TENANCY BY THE ENTIRETIES          [ ] COMMUNITY PROPERTY

[ ] OTHER (DESCRIBE)

6.    CONSIDERATION RECEIVED: One Million Seven Hundred Thousand Dollars
$1,700,000.00
(ONE DOLLAR AND OTHER VALUABLE CONSIDERATION UNLESS OTHERWISE STATED)

7. BY VIRTUE OF THE AFORESAID COURT ORDER, A COPY OF WHICH IS ATTACHED HERETO, OR DECREE OF ADMINISTRATIVE FORFEITURE ATTACHED HERETO, I DO HEREBY GRANT, BARGAIN, AND SELL THE VESSEL DESCRIBED HEREIN, TOGETHER WITH ITS TACKLE, APPAREL, AND FURNITURE, TO THE BUYER (S) NAMED ABOVE. FURTHERMORE, OWNERSHIP OF SAID VESSEL IS TRANSFERRED TO CARLOS RAFAEL FREE AND CLEAR OF ANY AND ALL LIENS OR ENCUMBREANCES OF ANY KIND.

**8. SIGNATURE AND ACKNOWLEDGMENT:**                    *[signature]* CDUSM

ON    November 15, 2004    THE
                    (DATE)
PERSON (S) NAMED ABOVE ACKNOWLEDGED EXECUTION
OF THE FOREGOING INSTRUMENT IN THEIR STATED
CAPACITY (IES) FOR THE PURPOSE THEREIN CONTAINED.

STATE: MASSACHUSETTS

COUNTY: SUFFOLK

NOTARY PUBLIC,

*[signature]*
William J. Ryan

MY COMMISSION EXPIRES: May 20, 2005
                              (DATE)

PREVIOUS EDITION OBSOLETE                    SN 7530-00-F01-1070

REVERSE OF CG-1356 (REV. 9-92)

(COMPLETE THIS SECTION ONLY IF VESSEL HAS NEVER BEEN DOCUMENTED AND DOES NOT HAVE A HULL IDENTIFICATION NUMBER.)

**VESSEL DATA**

A. BUILDER _____    B. BUILDER'S HULL NUMBER _____

C. FORMER NAME _____    D. FORMER MOTORBOAT NUMBERS _____

E. FORMER ALIEN REGISTRATIONS _____

F. DIMENSIONS: L= _____    B= _____    D= _____

G. PERSON FROM WHOM SELLER OBTAINED VESSEL _____

SIGNATURE OF SELLER

# INSTRUCTIONS

1. INDICATE CURRENT DOCUMENTED NAME. (IF VESSEL HAS NEVER BEEN DOCUMENTED SELLER MUST COMPLETE AND SIGN DATA SECTION ABOVE.)

2. INDICATE OFFICIAL NUMBER AWARDED TO VESSEL OR HULL IDENTIFICATION NUMBER ASSIGNED BY MANUFACTURER. (IF THE VESSEL HAS NO HULL IDENTIFICATION NUMBER AND HAS NEVER BEEN DOCUMENTED, SELLER MUST COMPLETE AND SIGN THE VESSEL DATA SECTION ABOVE.)

3. INSERT NAMES AND ADDRESSES OF ALL PERSONS EXECUTING INSTRUMENT AND THEIR CAPACITY. LIST THE NAME AND ADDRESS OF THE AGENCY IF APPLICABLE.

4. SELF-EXPLANATORY.

5. LIST THE NAME(S) AND ADDRESS(ES) OF THE BUYERS.

5A. LIST THE INTEREST TRANSFERRED TO THE BUYER(S) NAMED ABOVE.

5B. CHECK THE MANNER OF OWNERSHIP. UNLESS OTHERWISE STATED, THIS BILL OF SALE CREATES A TENANCY IN COMMON WITH EACH TENANT OWNING AN UNDIVIDED INTEREST.

6. SELF-EXPLANATORY. USE "REMARKS" SECTION ABOVE IF VESSEL IS NOT SOLD FREE AND CLEAR, OR TO LIST VESSEL APPURTENANCES WHICH ARE NOT SOLD WITH THE VESSEL.

7. SELF-EXPLANATORY.

8. THIS SECTION MUST BE COMPLETED BY A NOTARY PUBLIC OR OTHER PERSON AUTHORIZED TO TAKE ACKNOWLEDGMENTS OF DEEDS UNDER THE LAWS OF A STATE OR THE UNITED STATES. IF THERE ARE MULTIPLE SIGNATORIES TO THIS BILL OF SALE, EACH MUST MAKE AN ACKNOWLEDGMENT BEFORE A NOTARY. ATTACHMENTS SHOWING THOSE APPEARANCES ARE PERMITTED.

NOTE: THIS INSTRUMENT WILL BE INELIGIBLE FOR FILING AND RECORDING IF ALTERED AFTER EXECUTION AND ACKNOWLEDGMENT. ANY ALTERATIONS MADE PRIOR TO EXECUTION MUST BE ATTESTED BY THE PERSON TAKING THE ACKNOWLEDGMENT.

# PRIVACY ACT STATEMENT

IN ACCORDANCE WITH 5 USC 552(A), THE FOLLOWING INFORMATION IS PROVIDED TO YOU WHEN SUPPLYING PERSONAL INFORMATION TO THE U.S. COAST GUARD.

1. AUTHORITY. SOLICITATION OF THIS INFORMATION IS AUTHORIZED BY 46 USC, CHAPTER 313 AND 46 CFR, PART 67.

2. THE PRINCIPAL PURPOSES FOR WHICH THIS INSTRUMENT IS TO BE USED ARE:

(A) TO PROVIDE A RECORD, AVAILABLE FOR PUBLIC INSPECTION AND COPYING, OF THE SALE OR OTHER CHANGE IN OWNERSHIP OF A VESSEL WHICH IS DOCUMENTED, WILL BE DOCUMENTED, OR HAS BEEN DOCUMENTED PURSUANT TO 46 USC, CHAPTER 121.
(B) PLACEMENT OF THIS INSTRUMENT IN A BOOK FOR EXAMINATION BY GOVERNMENTAL AUTHORITIES AND MEMBERS OF THE GENERAL PUBLIC.

3. THE ROUTINE USE WHICH MAY BE MADE OF THIS INFORMATION INCLUDES DEVELOPMENT OF STATISTICAL DATA CONCERNING DOCUMENTED VESSELS.

4. DISCLOSURE OF THE INFORMATION REQUESTED ON THIS FORM IS VOLUNTARY, HOWEVER, FAILURE TO PROVIDE THE INFORMATION COULD PRECLUDE FILING OF A BILL OF SALE AND DOCUMENTATION OF THE VESSEL NAMED HEREIN PURSUANT TO 46 USC, CHAPTER 121. MOREOVER, BILLS OF SALE WHICH ARE NOT FILED ARE NOT DEEMED TO BE VALID EXCEPT AGAINST ANY PERSON EXCEPT THE GRANTOR OR A PERSON HAVING ACTUAL KNOWLEDGE OF THE SALE. (46 USC 31321(A)).

THE COAST GUARD ESTIMATES THAT THE AVERAGE BURDEN FOR THIS FORM IS 20 MINUTES. YOU MAY SUBMIT ANY COMMENTS CONCERNING THE ACCURACY OF THIS BURDEN ESTIMATE OR MAKE SUGGESTIONS FOR REDUCING THE BURDEN TO: COMMANDANT (G-MVI), U.S. COAST GUARD, WASHINGTON, DC 20593-0001 OR OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF INFORMATION AND REGULATORY AFFAIRS, ATTENTION: DESK OFFICER FOR DOT/USCG, OLD EXECUTIVE OFFICE BUILDING, WASHINGTON, DC 20503.

*U.S. Government Printing Office 1992-312-673/62945