UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11396 JLT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
AGA FISHING CORP.                        \*
                                         \*
v.                                       \*
                                         \*
FLAGSHIP GROUP LIMITED and               \*
BROWN & BROWN, INC.                      \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS AND REPONSE TO
STATEMENT OF UNDISPUTED MATERIAL FACTS OF THE DEFENDANTS
PURSUANT TO LOCAL RULE 56.1

PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS.

1.  At all times material hereto Flagship Group, Limited (hereafter Flagship) of Norfolk, VA held itself out as specializing in the field of marine/maritime insurance. (Exh. 1, Depo. of John Devnew, pp. 41-42; Exh. 2, Depo. of Christopher Burns, p. 85; Exh. 3, Depo. of Stephen A. Johnsen, p. 26).

2.  At all times material hereto Flagship held itself out as having "**unequaled expertise and experience in the fishing vessel industry.**" (Exh. 1, Devnew Depo. pp. 41-42).

3.  Flagship's founder, Stephen A. Johnsen, made a decision in the late 1990's to open a New Bedford, MA office to service the local commercial fishing fleet. Ronald Walsh, an experienced marine insurance broker was hired to run the office and generate

new business for Flagship. (Exh. 3, Johnson, Depo., pp. 9-10).

4.     Starting with the policy year commencing May 1, 1999, one of the new accounts that Walsh sold and serviced for Flagship was the Plaintiff, AGA Fishing Corp..(Exh 4, Depo. of George Jones, p. 83). From his earlier years in the marine insurance business Walsh knew AGA's principals, George and Antonette Jones. Walsh recognized that the Jones were "very unsophisticated" in the field of marine insurance, had little understanding of marine insurance and relied upon him for advice and guidance. (Exh. 5, Affidavit of Ronald Walsh). He was not paid extra by AGA for his advice/guidance. (Exh. 6, Depo. of Ron Walsh, p. 73).

5.     At all times material hereto Flagship had a business practice relative to its sales and servicing of marine insurance to commercial fishing vessel owners that Flagship described as follows:  "We systematically and comprehensively examine your potential maritime exposure, recognizing that protecting your corporate business risks is out primary concern." This language appears on Flagship's website (Exh. 7). Its primary broker/producers in Massachusetts between 2001 and 2004, including the broker/producer servicing the AGA account, confirmed the website as describing Flagship's business practice at all times material hereto. (Exh. 1, Devnew Depo., pp. 42-43; Exh. 8, Depo. of Robert O'Sullivan, pp. 32-33).

6.     Flagship provided no formal instruction or training to its brokers/producers as to how they should carry out the practice of "systematically and comprehensively

examine . . .[a vessel owner's] potential maritime exposure." (Exh. 1, Devnew Depo. pp. 18-19; Exh. 2, Rule 30(b)(6) Depo. of Christopher Burns, pp. 48-49)

7. After being acquired by Brown & Brown, Inc. in late 2000 the decision was made by Brown & Brown, Inc. and Flagship to close the New Bedford office and terminate Ron Walsh' employment. This was done in early 2001. (Exh. 3, Johnsen Depo., pp 6, 10)

8. Following the closure of its New Bedford office in early 2001 thru and including the policy year at issue (May 1, 2003 thru May 1, 2004) the AGA account was assigned to John Devnew, a Flagship broker/producer. (Exh.1, Devnew Depo. p. 25; 60).

9. Devnew dealt primarily with George Jones. Early on in his relationship with George Jones, John Devnew learned that George Jones was a **simple man, unsophisticated and inexperienced in legal matters.** (Ex. 1, Devnew Depo, pp. 37, 38, 40).

10. At no time material hereto did Devnew know how to assess potential damages to an injured seaman in a Jones Act case (Exh. 1, Devnew Depo. pp. 17-19) or have any understanding of the law relative to the Limitation of Liability Act. (Exh. 1, Devnew Depo, pp. 112-113).

11. At no time did Devnew have any understanding of the financial history or financial status of AGA or its principals. (Exh. 1, Devnew Depo., p. 41).

12. Starting in or about 2001 there was a major change in the profitability of the scallop fishing industry in New Bedford. The landings were higher in poundage, the price per pound was higher, the profits to the owners were higher and the earnings of crewmembers working aboard scallopers were higher than ever. (Exh. 9, Affidavit of Edie Mikina). Starting in the early 2000's a crewmember aboard a scallop fishing vessel out of New Bedford could earn in excess of $100,000/year. (Id.)

12. The potential earnings of a crewmember aboard a New Bedford scallop fishing vessel in the timeframe of 2001-2003 was virtually unknown to Devnew. (Exh. 1, Devnew Depo, p.p. 34-35).

13. When Flagship first acquired AGA as a client starting with policy year May, 1999 thru the last policy year wherein Ron Walsh was the Flagship New Bedford-based broker/producer handling the AGA account, $1,000,000 was an adequate amount of protection and indemnity insurance for a scallop fishing vessel of the size and type of the F/V GEORGIE J to carry. (Exh. 5, Affidavit of Ronald Walsh).

14. If a Flagship broker/producer was of the opinion that a vessel owner was asking for P&I coverage that he thought to be inadequate he should so inform the vessel owner. (Exh 8, Depo. O'Sullivan, pp. 31-32).

15. When servicing the AGA account for Flagship Walsh considered it his responsibility to evaluate the sufficiency of the coverage sought by a commercial fishing vessel owner, including AGA. (Exh. 6, Depo. of Ronald Walsh, p. 73). He received no

additional compensation from AGA for this service. (Id.).

16.    Starting in or about the 2001-2002 timeframe a vessel of the size and type of the F/V GEORGIE J should have carried $5,000,000 P&I coverage. (Exh.5, Walsh Affidavit; Exh. 10, Affidavit of Paul Amoruso).

17.    That in the timeframe of 2001 thru 2004, other than John Devnew, the only Flagship brokers/producers selling marine insurance to scallop fishing vessel owners in Massachusetts were Steve Johnson and Robert O'Sullivan. (Exh. 11, Depo. of Lisa Rawles, pp. 18-20).

18.    In the timeframe of 2003 thru 2004 every New Bedford area commercial scallop fishing vessel insured thru Flagship broker/producers Johnson and O'Sullivan carried $5,000,000 P&I coverage. (Exh. 3, Johnsen Depo., p. 16; Exh. 8, O'Sullivan Depo., p. 46). This fact was unknown to John Devnew, the Flagship broker/producer servicing the AGA account. (Exh. 1, Devnew Depo. pp 24-25). It was also unknown to AGA's principals. (Exh. 13, Affidavit of George Jones; Exh. 14, Affidavit of Antonette Jones).

19.    Devnew did not know that the cost to AGA to have increased the P&I coverage for the F/V GEORGIE J to $5,000,000 from $1,000,000 was between $600-$750 per man per year for a 6-7 man crew. (Exh. 15— (Exh. 4— pricing analysis from the Rawles Depo).; Exh. 1, Devnew Depo., pp. 50-51). Nor did AGA's principals. (Exh. 13 &14, Affidavits of George Jones and Antonette Jones).

20.     At no time did Devnew recommend to AGA that it increase its P&I for the F/V GEORGIE J to $5,000,000. (Exh. 13, Affidavit of George Jones; Exh. 14, Affidavit of Antonette Jones).  That had he done so AGA would have increased its P&I limits to $5,000,000. (Id.).

20.     That if AGA had purchased through Flagship $5,000,000 P&I coverage for the F/V GEORGIE J it would not have lost its vessel, appurtenances and/or fishing permit as a result of the accident to Victor Capaldi in November, 2003.

PLAINTIFF'S RESPONSE TO DEFENDANTS STATMENT OF UNDISPUTED FACTS

The following "undisputed material facts" are not challenged by the Plaintiff: 1, 2, 3, 4, 5, 6, 12, 13, 14, 15, 16, 17, 19, 21, and 22.

Plaintiff does challenge and contests the remaining facts for the reasons set forth after each alleged "undisputed material fact."

Alleged Undisputed Material Fact No. 7: "He [Jones] never talked to Walsh about how much P&I coverage the GEORGIE J should carry, instead he just continued the $1,000,000 in coverage unchanged year to year."

This alleged undisputed material fact is misleading.  As testified to by Ronald Walsh at his deposition Mr. Walsh, when working for Flagship, viewed it as part of his duty to assess the adequacy of coverage; if he did not believe the P&I coverage limits were adequate he would not have signed AGA's application for insurance.  (Exhibit 6, Walsh Depo., p 73).  Walsh recognized that the Jones were unsophisticated, knew little about insurance and relied upon him for advice.  (Exh. 5, Walsh Affidavit).  If he made a

6

recommendation to AGA to increase the P&I coverage for its vessel he expected that they would follow his recommendation. (Walsh Depo. Exh. 6, p. 133).

Moreover, as set forth in the Affidavit of Ronald Walsh, Exh. 5, starting in the early 2000s (shortly before his relationship with Flagship terminated) there had been a significant change in the scallop fishing industry in New Bedford. The resulting exposure to a vessel owner in the event of a serious injury to a crewmember occurring aboard a scallop fishing vessel was such that $1,000,000 was no longer an adequate P&I limit for a scallop fishing vessel of the size of the F/V GEORGIE J engaging in multi-day offshore fishing trips. (Exhibit 5, Affidavit of Ronald Walsh; see also Affidavit of Edie Mikina of Edie and Marie's Boat Settlements, Exh. 9).

As testified to by Flagship's primary broker/producers in MA following Flagship's closure of its New Bedford office in early 2001, it was their obligation to vessel owners to "systematically and comprehensively examine . . .[a vessel owner's] maritime exposures, recognizing that protecting your corporate business risks is our primary concern." (Exh. 1, Devnew Depo., pp. 42-43; Exh. 8, O'Sullivan Depo., pp. 32-33). Devnew did not know how to assess the potential exposure of a commercial vessel owner because he did not understand Jones Act damages. (Exh. 1, Devnew Depo., pp. 17-19).

The cost to increase the P&I coverage to $5,000,000 was less than $5,000/year for a crew of 6-7 men. (Exh. 15— Exh. 4 (pricing analysis) from Depo. of Lisa Rawles). Per the Affidavit of Ronald Walsh, Exhibit 5, once the scallop fishing industry started its significant surge Walsh would have recommended to AGA to increase its P&I limits to

7

$5,000,000. Had Flagship advised Jones to increase AGA's P&I coverage to $5,000,000 AGA would have done so. (Exh. 13, George Jones Affidavit and Exh. 5, Ronald Walsh Affidavit). Flagship never did. (Id.).

Alleged Undisputed Material Fact No. 8: The Jones purchased a second scallop fishing vessel, F/V KELLY JEAN, in 1999 or 2000.

Alleged Undisputed Material Fact No. 9: The Jones incorporated another business entity, Brian Fisheries, Inc., to hold title to that boat, which is a common mechanism for boat owners to minimize their exposure.

Alleged Undisputed Material Fact No. 10: The Jones went thru another broker for the marine insurance on the KELLY JEAN.

Alleged Undisputed Material Fact No. 11: The hull insurance on the Kelly Jean was $50,000 or $60,000 and the P&I was $500,000 ($500,000 less than the P&I on the GEORGIE J.

These alleged undisputed facts all related to a small vessel purchased by the Jones in 2002. The F/V KELLY JEAN was very different than the F/V GEORGIE J. The KELLY JEAN was an inshore, day tripper that carried a crew of one to two men with fishing limits of 400 pounds. (Exh. 4, Deposition of George Jones, p. 46).

The Jones went thru another broker (Debra Fernandes) **in connection with the insurance for the KELLY JEAN (named after their daughter) owned by Brian's Fisheries (named after their handicapped son) because Flagship never got back to the Jones in a timely manner with competitive quotes** (Exh. 4, George Jones Depo., pp. 105-107). As testified to by Debra Fernandes, the broker who placed the marine insurance coverages for this vessel, the application form for the underwriter that she used to seek coverage for the F/V KELLY JEAN (Exh. 16, p. 62) only had available limits of $250,000 and as the Jones requested more coverage than $250,000 P&I for this vessel Fernandes had to

8

handwrite in a request for $500,000 of coverage that she was able to place. (Exhibit 17, Hand-written entry by Debra Fernandes on page from insurance application for F/V KELLY JEAN,--See Exh. 16, Dep. Of Fernandes, p. 62). More coverage for the KELLY JEAN was unavailable. (Exh. 16, Fernandes Depo. p. 95-96).

Alleged Undisputed Fact No. 18: "The Jones did not rely on the Flagship website to select brokers and in fact, the Jones did not even own a computer at the time."

While this undisputed material fact is accurate it does not fully set forth the most relevant and material facts that relate to this issue. The Flagship website (Exh. 7) contains the following language:

> "We systematically and comprehensively examine your maritime exposures, recognizing that protecting your corporate business risks is our primary concern."

As testified to by the General Manager of Flagship who was also its Rule 30(b)(6) designee on the subject (Exh. 2, Burns Depo. pp. 5-6), the language and content of the website resulted from "roundtable discussion" in early 2000 by several Flagship personnel, including Steve Johnson (founder of Flagship) and John Devnew (the broker who serviced AGA following the closing of AGA's MA office. (Exh. 2, Burns Depo. pp. 41-43).

The two primary brokers [1] who were selling marine insurance on behalf of Flagship in Massachusetts after Ronald Walsh ceased working for Flagship, John Devnew and William O'Sullivan, testified that the Flagship website simply described the business practice of Flagship as it existed prior to and during the period of time that

---

[1] Steve Johnson serviced one Massachusetts account during this timeframe. That account carried $5,000,000 P&I coverage on its vessel. (Exh. 3, Johnsen,Depo, p. 16)

Devnew was the Flagship producer selling marine insurance to and servicing AGA Fishing Corporation. (Exh.8, O'Sullivan Depo., pp. 32-33; Exh. 1, Devnew Depo. , pp. 41-43). Devnew confirmed at his deposition that the Flagship website (Exh. 7) set forth the practices of Flagship during the period of time that he was the producer working with AGA Fishing Corp. (Exhibit 1, Devnew Depo. Id.).

Every Massachusetts commercial scallop fishing vessel insured by Flagship via O'Sullivan during the relevant timeframe carried, $5,000,000 P&I coverage. (Exhibit 8, O'Sullivan Depo. p. 46)

Devnew knew from the onset of his dealings with George Jones that Mr. Jones was a simple, unsophisticated man. (Exh. 1, Devnew Depo., pp. 37, 38, 40). Neither George nor Antonette Jones understood insurance. (Exh. 5, Walsh Affidavit; Exh. 13, George Jones affidavit; Exh. 14, Antonette Jones Affidavit). This was clear to Ron Walsh during the time he worked as their marine insurance broker. (Exh. 5, Walsh Affidavit; Exh. 6, Walsh depo., pp123-124). Devnew never recommended to AGA to increase its P&I limits for the F/V GEORGIE J. (Exh. 13, George Jones Affidavit). Had he done so AGA would have followed his recommendation. (Id.).

Alleged Undisputed Material Fact No. 20: "Each year upon renewal Flagship informed AGA in writing that higher limits were available upon request and AGA never asked for higher P&I insurance limits."

Neither George nor Antonette Jones understood insurance. (Exh. 5, Walsh Affidavitl; Exh. 13, George Jones affidavit; Exh. 14, Antonette Jones Affidavit). This was clear to Ron Walsh during the time he worked as their insurance broker. (Exh. 5, Walsh Affidavit). When asked at his deposition what he understood to be meant by the

10

language "higher limits were available upon request" George Jones testified that he believed that this language meant that the insurer could raise the premiums at any time that it wanted during any particular policy year. (Exhibit 4, Deposition of George Jones, p. 124).

Alleged Undisputed Fact No. 23: At no time from 1999 to 2003, did anyone from AGA request higher P&I coverage from Flagship.

Alleged Undisputed Fact No. 24: No one from AGA had any discussions with anyone from Flagship about how much liability coverage AGA should have on its vessel.

Alleged Undisputed Material Fact No. 25: No one from Flagship ever told George Jones or anyone from AGA that AGA had sufficient coverage.

Alleged Undisputed Material Fact No. 26: AGA takes the simple position that Flagship should have advised it to "up" its P&I insurance to $10 million.

As testified to by Ronald Walsh at his deposition (Exhibit 6, p. 73) and via his affidavit (Exhibit 5) he viewed his duty on behalf of Flagship during the period of time that he was the broker/producer for AGA as including an obligation to evaluate the coverage limits to AGA Fishing and advise if they were adequate. In fact, the primary broker/producer in MA following the closing of Flagship's MA office in New Bedford, Robert O'Sullivan, testified that it would be fair to say that part of his job would be that if customers suggested to him that they wanted coverages that he thought were too low, he would say something to them about it. (Exh. 8, O'Sullivan Depo, pp. 31-32). Each scallop fishing vessel insured thru Flagship for which O'Sullivan was the broker/producer carried $5,000,000 P&I limits. (Exh. 8, O'Sullivan Depo., p. 46).

As testified to by Ron Walsh at his deposition, when he was servicing the AGA

11

account before the scallop fishing industry in MA started escalating in or about 2001 had he been of the opinion that the vessels insured thru him did not have enough P&I coverage he would not sign the application. (Walsh Depo., p. 73) The cost of increasing P&I coverage from $1,000,000 to $5,000,000 was negligible. (Exh. 15) Had Walsh been of the opinion that the coverage was inadequate he would have advised George Jones to increase the coverage. Exh.5, Walsh Affidavit, Exh. 6, Walsh Depo., p. 73). Had such a recommendation been made to George Jones he would have gone along with the recommendation and paid for the increased coverage. (Exhibit 13, Affidavit of George Jones).

The scallop fishing industry in New Bedford starting changing significantly in or about 2001 (Exh. 9, Mikina affidavit). Vessel owners were achieving record profits. Crewmembers of scallop fishing vessels in New Bedford area were making in excess of $100,000/year. Because of the change in the industry starting in 2001 the exposure to a vessel owner to an injured crewmember increased significantly over what it had been prior to the escalation of the industry. Unfortunately because John Devnew had no clue as to how damages were measured in a Jones Act seaman's case he was not equipped to advise AGA's principals of their insurance needs.

At all times material hereto the Jones' automobile and home insurances were placed through Steve Bastoni with Crowley & Weaver Insurance Agency in New Bedford. (Exh. 13 & 14, Affidavits of George and Antonette Jones). When Steve Bastoni made a recommendation for increased coverages either for the home or the auto coverages the Jones always followed his recommendations. (Id.). In fact when Steve

Bastoni recommended to the Jones that they add earthquake insurance for their properties the Jones accepted the recommendation, without question, and paid the additional premiums.  (Id.).

Neither George nor Antonette Jones knew they could lose their business if their vessel was underinsured (Exh. 13 & 14, Affidavits of George & Antonette Jones). They both believed that the claim would be limited to the insurance coverage. (Id.).  They relied upon their Flagship broker to advise them accordingly. (Id.).

There is no claim in this case that the coverage should have been up to $10,000,000 as alleged in "Undisputed Material Fact No. 26."  What is claimed is that the coverage should have been the same for the AGA vessel as it was for every other vessel handled by the other two Flagship producers (William O'Sullivan and Steve Johnsen), to wit, $5,000,000 coverage.

Alleged Undisputed Fact No. 28:  AGA cannot establish that (sic) contributed to its alleged injury.

Assuming this causation argument relates to the licensing issue than the fact is undisputed.  However it is the gravamen of AGA's claims that it was because it was underinsured due to Flagship's breach of its duty to aGA that aGA lost its vessel, fishing permit and business.

## PLAINTIFF'S REQUEST FOR ORAL ARGUMENT

Pursuant to Rule 7.1 (D) of the Local Rules of The United States District Court for the District of Massachusetts, the plaintiff hereby requests oral argument.

Dated: June 19, 2007                The Plaintiff, AGA FISHING CORP.
                                    By its attorney,
                                    JOSEPH G. ABROMOVITZ, P.C.


                                    s/Joseph G. Abromovitz
                                    _____
                                    Joseph G. Abromovitz
                                    BBO No. 011420
                                    858 Washington Street
                                    Third Floor
                                    Dedham, MA 02026
                                    Phone: (781) 329-1080

## CERTIFICATE OF SERVICE

I, Joseph G. Abromovitz, counsel for the plaintiff, hereby certify that on the 19th day of June, 2007 I served a copy of the within document via postage prepaid mail to:

Michael J. Stone
Peabody & Arnold, LLP
30 Rowes Wharf
Boston, MA 02110

                                    s/Joseph G. Abromovitz
                                    _____
                                    Joseph G. Abromovitz