UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11396 JLT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

AGA FISHING CORP.                     \*
                                      \*
v.                                    \*
                                      \*
FLAGSHIP GROUP LIMITED and            \*
BROWN & BROWN, INC.                   \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

History of Proceedings

In November, 2003 a serious accident occurred aboard plaintiff's offshore

scallop fishing vessel, the F/V GEORGIE J.  In the accident, caused by an

unseaworthy condition, a crewmember, Victor Capaldi, was seriously injured.

Because the vessel carried inadequate protection and indemnity (hereafter P&I)

insurance coverage, per Court order, the vessel, its appurtenances and fishing

permit were seized and sold at auction for the sum of $1,700,000.  As AGA's sole

assets were its vessel, appurtenances and fishing permit AGA was effectively put

out of business.

AGA brought suit against Flagship, its insurance broker, and

Brown & Brown, the parent company of Flagship, on a number of grounds.  As

AGA's claims against Brown & Brown are based on theories of vicarious liability,

this opposition is directed to the liability issues against Flagship raised by its

summary judgment motion.

### Defendant's Summary Judgment Motion

The primary thrust of Counts I thru III of AGA's Amended Complaint relate to the nature and scope of the duty owed by Flagship to AGA in connection with the solicitation and sale of the P&I policy for the policy year May 1, 2003 thru May 1, 2004, whether any duty was breached by Flagship, and whether any breach resulted in the losses sustained by AGA when its vessel and permit were seized and sold at auction. [1]  Counts IV and V of Plaintiff's Amended Complaint relate to G.L. c. 93A/176D and will be addressed infra.[2]

### FACTUAL BACKGROUND

### Flagship in Massachusetts

At all times material hereto AGA owned, operated and controlled the F/V GEORGIE J, an offshore scallop fishing vessel operating out of New Bedford, Massachusetts.   At all times material hereto the protection and indemnity insurance for said vessel was brokered through the defendant, Flagship Group. Ltd.

Prior to its acquisition by Brown & Brown in November, 2000, Flagship had an office in New Bedford, MA that was run by an experienced marine

---

[1]     To the extent that Defendants' motion challenges the claimed damages of AGA, Plaintiff relies on its memorandum of law entitled "Plaintiff's Memorandum in Support of its Claim That Consequential Damages, Including Lost Profits, is the Appropriate Measure of Damages".  The scope of damages was fully briefed by all parties and is awaiting decision.

[2]     As it appears that Flagship's broker/producer, John Devnew, did have the necessary Massachusetts licensure to work in Massachusetts during the relevant timeframe claims related to liability for his being unlicensed are waived.  Similarly, the fact that Flagship ceased being a licensed Massachusetts insurance agency after the closure of it Massachusetts office and the relevance of issues related thereto are also moot.

insurance broker, Ronald Walsh.  (Exh. 3, Depo. of Steven Johnsen,  pp. 9-10).

Mr. Walsh handled the AGA account for Flagship starting in or about 1999 until

Flagship closed its New Bedford office in early, 2001, several months before the

current insurances for the F/V GEORGIE J would expire on May 1, 2001.  (Exh. 5,

Affidavit of Ronald Walsh.   Following Brown & Brown's acquisition of Flagship,

the decision was made to close the New Bedford office and terminate Walsh'

employment. (Exh.  3, Depo. of Steven Johnson,  pp. 6, 10).

AGA's Principals, George and Antonette Jones

The evidence will establish that AGA's principals, George and Antonette

Jones, two life-long New Bedford residents with little education and little

understanding of insurance, relied upon their insurance agents for advice as to

their insurance needs.  (Exh. 4, George Jones Depo., pp. 110-114; Exh. 6, Walsh

Depo., pp. 123-124); Exh. 13 , Affidavit of George Jones,  Exh. 14 , Affidavit of

Antonette Jones).   This was true for their homeowner's insurance, auto

insurance and marine insurance thru Flagship for the F/V GEORGIE J.  (Id. ).

Their reliance upon him for guidance for their insurance needs for their vessel

was known to Walsh.  (Exh. 5, Affidavit of Ronald Walsh). [3]

When Flagship's New Bedford office was closing in early 2001 George

Jones spoke with Ron Walsh as to what AGA should do for its marine insurance

---

[3]        Some examples of AGA's actual reliance on Flagship for advice related to Walsh'
advising AGA to wait until the current policy period expired before switching to Flagship as
AGA's broker (Exh. 4, Geo. Jones Depo., p.p. 73-74)..  AGA relied on his advice.  Also when the
issue of terrorism coverage first arose during the period of time that Devnew serviced AGA he
advised AGA that it did not need this type of coverage.  AGA relied on his advice.  (Exh. 4,
George Jones depo., pp, 132-134)..

needs. Walsh encouraged AGA to stay with Flagship.  (Exh. 6, Walsh Depo., p.
125; Exh. 5, Walsh Affidavit).  Jones also spoke with John Devnew who assured
him that AGA's insurance needs for its vessel would continue to be taken care of
by Flagship.  (Depo. of George Jones, pp. 95-96).

The Scallop Fishing Industry in Massachusetts After 2000

Starting in or about 2001 there was a major change in the profitability of
the scallop fishing industry in New Bedford.  The landings were higher in
volume, the price per pound was higher, the profits to the owners were higher
and the earnings of crewmembers working aboard scallopers were higher than
ever.  (Exh.9, Affidavit of Edie Mikina).  Starting in the early 2000's a
crewmember aboard a scallop fishing vessel out of New Bedford could earn in
excess of $100,000/year.  (Id.) [4]  This fact has great significance to the exposure of
an owner of a scalloper employing seamen working upon its vessels.   In the
event of an injury to a seaman part of the Jones Act remedy compensates for
diminished earning capacity.  Thus a serious injury to a young seaman could
quickly create exposure to a vessel owner into the millions of dollars, as
demonstrated by the Capaldi accident.

Flagship in Massachusetts After Closing its New Bedford Office

Once Flagship closed its New Bedford office three Norfolk-based Flagship
broker/producers continued to service commercial fishing vessel owners in MA.

---

[4]        Although he was no longer in the insurance business after his termination by Flagship
this information was also known to Ron Walsh.  (Exh. 5).

These were Steve Johnson, founder of Flagship (who serviced one account);
Robert O'Sullivan and John Devnew. (Exh. 11, Depo. of Lisa Rawles, pp. 18-20).
After the closure of Flagship's New Bedford office the AGA account was handled
by John Devnew. (Exh. 1, Depo. of John Devnew, pp. 25, 60).

Every commercial scallop fishing vessel working out of New Bedford
whose marine insurance was handled by Flagship thru the efforts of either
Johnson or O'Sullivan carried $5,000,000 P&I coverage. (Exh. 12— Exh. 3 from
Rawles Depo; Exh.3, Johnson Depo., p16; Exh.8, Depo. of Robert O'Sullivan, p.
46). The cost to increase coverage from $1,000,000 to $5,000,000 was between
$600-$750 per crewmember per year. (Exh. 14— Exh. 4 from the Rawles Depo.).
For the policy year May, 2003-May, 2004 the projected annual cost to AGA for
increased coverage for its 6-7 man crew for the F/V GEORGIE J was less than
$5,000/year. (Id.). John Devnew was unaware of this. (Exh. 1, Devnew Depo.
pp. 50-51). So was George Jones. (Exh. 13, George Jones Affidavit).

The evidence will establish that, because of what was known to be
happening in the industry in the early 2000's relative to the earnings of scallop
fishing vessels and their crewmembers, along with the increasing value of
scallop fishing permits[5], that had he still been handling the AGA account for
Flagship, Ron Walsh would have advised AGA to increase its P&I coverage to

---

[5] The value of AGA's fishing permit for its vessel is best proven by the fact that the vessel and its
appurtenances had been appraised for $600,000. With its fishing permit the F/V GEORGIE J
generated $1,700,000 at auction.

$5,000,000.  (Exh. 5, Walsh Affidavit).  And he would have expected AGA to
follow his recommendation.  (Exh. 6, Walsh Depo., p. 133).

Flagship's Broker/Producer, John Devnew

Starting in early 2001 John Devnew, on behalf of Flagship, commenced
servicing AGA in connnection with the marine insurance needs for the F/V
GEORGIE J.  (Exh. 1, Devnew Depo., pp. 25; 60).  He knew well before the policy
year of May 1, 2003 thru May 1, 2004, the year of the Capaldi accident, that
George Jones was a simple, unsophisticated man who knew little of legal
matters.  (Id.  At pp. 37, 38, 40).  The evidence will establish that AGA's
principals, the Jones, had no idea that they could lose their vessel and business in
the event of a serious injury occurring aboard the F/V GEORGIE J.  (Exhs. 13, 14,
Affidavits of George and Antonette Jones).  Devnew never advised or even
suggested to AGA to increase the P&I coverage for the F/V GEORGIE J to
$5,000,000.  (Id.).   Had he done so AGA would have agreed to the increased
coverage and cost thereof.  (Id.).

That prior to the issuance of the first P&I policy obtained by Devnew for
AGA , through both its advertising and via its agents, servants and employees,
Flagship held itself out as to vessel owners as specializing in marine insurance
(Exh. 2, Rule 30(b)(6) Deponent, Christopher Burns, Depo., p85); and "unequaled
expertise and experience in the fishing vessel industry." (Exh. 1, Devnew Depo,
pp. 41-42;).  Its brokers (including Devnew) also confirmed at deposition that the
company practice at all times material hereto was to  ". . . systematically and

6

comprehensively examine . . . [a vessel owner's] maritime exposures, recognizing that protecting your corporate business risks is our primary concern". (Devnew Depo., pp. 42-43; Exh. 6, O'Sullivan Depo., pp. 32-33).

Flagship provided neither formal instruction nor training to its brokers/producers as to how they should carry out the practice of "systematically and comprehensively examine . . .[a vessel owner's] potential maritime exposure." (Exh. 1, Devnew Depo. pp. 18-19; Exh. 2, Rule 30(b)(6) Depo. of Christopher Burns, pp. 48-49). Unfortunately, because he did not understand the remedies available to a Jones seaman injured in the service of his vessel Devnew had no clue as to how to carry out Flagship's defined practice and duty to its clients.

Devnew had no idea how damages were measured or assessed in a Jones Act seaman's case for personal injuries or wrongful death. At his deposition, with reference to damages in a Jones Act case and how a jury would go about calculating damages, Devnew testified "I think they would be very subjective." (Exh. 1, p. 18). When asked what he means by "subjective" he testified, "take a look at the nature of the injury, the nature of the circumstances surrounding the injury or accident. I think - - you know, I was never in a courtroom during - - and I never witnessed any of the - - you know, the P&I claims, bodily injury claims, that went to trial nor was I involved in - - with the adjusters...I had never been on a jury myself…and never was part of the actual adjustment, you know, of a bodily injury claim." (Exh. 1, pp. 18-19).

This remarkable admission of incompetence is completely contrary to Flagship's representations and practices.[6]  As stated by Paul Amoruso, AGA's liability expert,

> A marine insurance broker/producer who claims special knowledge about marine insurance and who holds himself out to possess particular skill and expertise in this type of insurance must be well-versed in the types of remedies available to a seaman and what is happening in the industry insofar as the potential earning capacity of a seaman. Only then can an insurance broker be in a position to ascertain whether a fishing vessel owner has adequate insurance coverage and therefore properly assist and advise a vessel owner accordingly, so as to fully protect the owner's business and livelihood.

## ARGUMENT

The primary thrust of the Defendants' motion for summary judgment centers upon the "duty" issue, i.e, what duty was owed by Flagship to AGA in connection with obtaining for AGA P&I insurance for its commercial scallop fishing vessel, the F/V GEORGIE J.  Flagship argues that it was nothing more than a marine insurance sales office processing requests by vessel owners for the purchase of marine insurance with various marine underwriters; that if AGA was underinsured and lost its business because of being underinsured it's not Flagship's responsibility.

---

[6]      In an April, 2005, publication entitled "Maritime Bulletin", sponsored by Flagship, Flagship describes its company's practice as follows:  "As professional brokers the objective is to assist clients with an understanding of their exposures, and to evaluate the proper way to transfer risk at a fair price.  This is accomplished through experience, technical knowledge, risk evaluation and relationships in the insurance market.  A comprehensive review of insurance exposures is performed and coverage recommendations are made.  The employees of Flagship Group average in excess of 15 years in the industry.  Several of the staff have spent time as underwriters." (Exh. 18).

The Defendants argue that Plaintiff's claims are doomed based on the reasoning of Judge Zobel in granting a summary judgment motion in favor of the insurance broker in the case of RLI Insurance Company v. Wood Recycling, Inc., et al, 2006 U.S. Dist. LEXIS 30596. This argument and reliance on Judge Zobel's decision in RLI misses the mark for several reasons.

### Flagship as a Marine Insurance Specialist

Unlike the broker in the RLI case whose boasting of its qualifications Judge Zobel dismissed as, in essence, "puffing", Flagship held itself out to the maritime world as having "unqualified experience in the field of marine insurance".[7] (Exh. 1, Devnew Affidavit, pp. 41-42). Flagship touted its expertise in the field of marine insurance. (Exh.1, Devnew Depo. pp. 41-42, "unequalled expertise"; Exh. 2 Burns Depo., p. 85, "unequalled expertise"; See also Exh. 3, Johnson Depo., p. 26).

---

[7]     As described in the Affidavit of Paul Amoruso, Plaintiff's liability expert, marine insurance, because of the unique liability issues presented by laws such as the Jones Act, is a very different type of insurance that virtually any other type of liability insurance.
As described in Amoruso's Affidavit, Exh . 10)

"Marine Insurance, particularly protection and indemnity coverage, is complex and very different from virtually any other liability insurance available in the United States. This Is because, unlike commercial liability insurance or, more traditionally workers compensation insurance for land-based employers, a seaman working aboard a vessel has the right to sue his employer in tort for a full measure of damages while working in one of the most hazardous occupations in the modern era. The level of proof necessary in order to hold a vessel owner legally responsible in the event of an injury to a seaman is remarkably low, while, at the same time, the potential exposure to the vessel owner is exceptionally large in the event of a serious, disabling injury to a young commercial fisherman. Accordingly, it is imperative that a vessel owner carry adequate coverage so that the vessel owner doesn't lose its vessel and perhaps its business in the event of a serious injury to a seaman working aboard its vessel."

AGA recognizes that "there is no general duty of care of an insurance agent to insure that an insurance policies procured by him provide coverage that is adequate for the needs of the insured." Martinonis v. Utica Nat. Ins. Group, 65 Mass. App. Ct. 418, 420, 840 N.E. 2d 994 (2006). "The relationship between an insurer broker and the insured is not normally thought to be fiduciary in nature, absent special circumstances of assertion, representation and reliance." Baldwin Crane & Equipment Corp. v. Riley & Rielly Ins. Agency, Inc., 44 Mass. App. Ct. 29, 31-32, 687 N.E. 2d 1267 (1997). However "an expanded agency agreement arrangement or relationship, sufficient to require a greater duty from the agent than the general duty, generally exists when the agent holds himself out as an insurance specialist, consultant or counselor." Baldwin Crane, 44 Mass.App.Ct. at 32 (emphasis added) quoting Sandbulte v. Farm Bureau Mut. Ins. Co., 342 N.E. 2d 457, 464-465, Iowa (1984), Martinonis at 65 Mass. App. Ct. at 422.

As testified to by Flagship's broker/producer, John Devnew, who serviced AGA after Flagship closed its Massachusetts office, Flagship held itself out as having the expertise necessary to offer the appropriate insurance services for the maritime industry and cover all types of marine liabilities. (Exh. 1, Devnew Depo. p. 41). Flagship portrayed itself as having "unequaled expertise and experience in the fishing vessel industry." (Id. at pp. 41-42).

These claims of expertise, unlike the broker in the RLI case relied upon by Defendants, per Massachusetts law, increased the scope of the duty owing AGA by Flagship. (Martinonis, supra).  By holding itself out as a specialist in the field

of marine insurance Flagship is held by the law to a "greater duty" to its clients than that of the typical insurance broker.

While AGA recognizes that in many cases the increased duty is measured by extra compensation being paid to the broker for advice "[T]he absence of separate compensation does not mean that special circumstances giving rise to a duty of care did not exist." (<u>Martinonis</u>, 840 N.E.2d at 997).  Moreover, the first Flagship broker, Walsh, recognized that the AGA's principals were relying on him for advice for their insurance needs for AGA's vessel. (Exh. 5, Walsh, Affidavit).  As he testified at his deposition Walsh was not paid extra for this service.  (Exh. 6, Walsh Depo. p. 73).

Defining Flagship's Duty to AGA

While defendants argue that Flagship should not be held to representations of its expertise and practices that are on its website because AGA did not rely upon the website in choosing Flagship as its insurance broker such an argument is misleading.  As testified by the two (2) primary Flagship brokers who sold marine insurance in Massachusetts after Flagship closed its New Bedford office in early 2001, the website simply restated Flagship's practices in existence at the time that AGA's insurance needs were being handled by John Devnew, Flagship's agent/employee.

Quite significantly, and bearing directly on the duty issue, Flagship acknowledged its duty to its clients, including fishing vessel owners operating as small business like AGA.  On its website, that its brokers/producers testified

11

simply "restated" Flagship's business practices during the relevant time periods

at issue herein, Flagship states that its broker/producers

> "systematically and comprehensively examine your [the insured's]
> potential maritime exposure, recognizing that "protecting your
> corporate business risks is our primary concern."

Devnew testified that these business practices of Flagship existed prior to the

issuance of the last P&I policy on May 1, 2003.  (Exh. 1, Devnew Depo, pp. 42-43;

Exh. 8, O'Sullivan Depo., pp. 32-33).   Via this practice, in essence, Flagship

defined the scope of its duty of care in essentially the same way the defendant

contractor did in <u>Corsetti v. Stone,</u>  396 Mass.1, 483 N.E. 2d 793, 799, n. 8 by

agreeing to comply with federal and state safety regulations.  [8]  Compare,

<u>Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co</u>., 439 Mass. 387, 403, 788 N.E.2d 522

(2003) (testimony by liability insurer's claims examiners were admissions as to

the duty of care in defending insured, and the admissions were the functional

equivalent of expert testimony, from which a jury could infer the elements of

negligence and causation).

In fact the language on the Flagship website came about in early 2000

during a meeting in Norfolk, VA between a number of Flagship

broker/producers, including Chris Burns (who at that time ran the Norfolk

---

[8]      See also, <u>Bicknell v. Havlin</u>, 402 N.E. 2d, 116, 9 Mass.App. Ct. 497 (1980).  In action by
insured, which had only $50,000 in insurance coverage on commercial stock within a warehouse and which
sustained a $103,275.91 fire loss to such stock, to recover against its independent insurance agent and
insurance agency for breach of contract, issue of agent's failure to use due care did not require introduction
of expert testimony; **agent's admission of "a technical error of judgment" was sufficient to raise an
inference of negligence.**  In the case *sub judice*, in addition to proving Flagship's duty to AGA and its
breach, AGA has also preferred expert testimony to establish a *prima facie* case.

office), John Devnew and Steve Johnson, founder of Flagship.  (Exh. 2, Burns

Depo.,  pp. 41-43).  While Bob O'Sullivan, the primary Flagship broker/producer

in Massachusetts was not in attendance and did not assist in creating the website,

Bob O'Sullivan testified that it was part of his job as a Flagship broker to

"systematically and comprehensively " examine a vessel owner's maritime

exposures, recognizing that "protecting your corporate business risks is our

primary concern. "  (Exh. 8, O'Sullivan depo.  pp. 32-33).

   O'Sullivan, testified that part of his job as a Flagship broker/producer

included the responsibility, if customers suggested to him that they wanted

coverages that he thought were too low, to say something to the customer about

it. (Exh   pp. 31-32).  This is consistent with the practice of Ron Walsh, the

Flagship broker/producer who preceded Devnew in servicing AGA.  Walsh

testified that if a vessel owner requested P&I coverage that he thought to be

inadequate he would not put his name on the insurance application.  (Exh. 6,

Walsh Depo.  p. 73).  [9]

   In response to questioning by Flagship's counsel Ron Walsh provided the

following testimony concerning the scope of his job duties and responsibilities to

---

[9]     In his dealings with AGA's principals Ron Walsh described their level of sophistication
as follows:  When asked whether his relationship with the Jones was "pretty standard, pretty
typical of what you had with all your other clients" his answer was "No.  More so with them, I
spent more time with them…They didn't understand insurance.  They relied upon everyone,
their bookkeepers, their insurance men, their oil men to put in oil, what should I do…they just
didn't understand, and they needed more guidance than anyone - - the hundreds of people that I
have ever dealt with, they stick out in my mind as probably being the most naïve."  (Walsh depo.,
Exh. 6, pp. 123-124).

AGA when working for Flagship in its New Bedford office and serviced the

AGA account:

Q.    Did the Jones ever ask you to evaluate the sufficiency of their insurance
      coverage?

      A.  I would believe that - - I always did that.  I always looked to see what
was sufficient at the time we placed the insurance, and certainly I would not
have put my name down on any policy application unless I felt it was sufficient
at the time.

Q.    Therefore, for the policies that you procured for the Jones' boat through
      Flagship, you would have - - you put your name on them; you thought
      they were sufficient coverages, correct?

      A.  At that particular time it was written, yes.

Q.    Did the Jones ever pay you anything extra in connection with any
      evaluation of their policies and their coverage?

      A.  No, nothing ever.  (Exh. 6, Walsh Depo, p. 73-74).

                *      *      *      *      *      *      *      *      *

      Other than John Devnew the other Flagship brokers servicing commercial

fishing vessel owners in MA after closure of Flagship's MA office were Robert

O'Sullivan and Steven Johnson.  Notably every scallop vessel in MA insured thru

O'Sullivan and Johnson had, at a minimum, $5,000,000 of P&I coverage. (Exh. 11,

18-20;  Exh. 12, Rawles Depo. Exh.3). Clearly Flagship's other broker/producers

in Massachusetts recognized the potential exposure to a Jones Act employer and

scope of P&I coverage needed to protect Flagship's insured's "corporate business

risks".[10]  Unfortunately, as he admitted at his deposition, Devnew was unaware

as to the elements of damages available to an injured Jones Act seaman and how

they were assessed by the law.  (Exh. 1, Devnew Depo., pp. 17-19).

   John Devnew knew his responsibility to vessel owners while employed at

Flagship.  He testified that during the time he was servicing the AGA account

(after the closing of Flagship's New Bedford office) he was aware of the Flagship

website wherein Flagship represented that it "systematically and

comprehensively examined the insured's potential maritime exposure,

recognizing that "protecting your corporate business risks is our primary

concern." (Exh. 1, Devnew Depo.p. 42).  In fact he was one of the Flagship

employees who participated in the "roundtable discussions" that resulted in the

website and its language. (Exh. 2, Burns Depo., pp. 41-43).  And he agreed at his

deposition that all of these matters (referred to on Flagship's website) were

matters of which he was aware prior to the issuance of the last policy on May 1,

2003.  (Id at pp. 42-43).  Unfortunately, Devnew was not qualified to advise any

vessel owner concerning its exposures to seamen working aboard ocean-going

vessels because he did not know the nature or extent of available remedies to an

injured seaman.

   The issue therefore is whether Flagship, through Devnew, carried out the

duties above-described during his servicing of AGA.  Without doubt, he did not,

---

[10]     So did Flagship's former broker/producer in Massachusetts, Ron Walsh.  As he testified at his deposition, if a crewmember was making a lot of money it would influence the value of the case.  (Exh. 6, Walsh Depo. p. 132).

thereby breaching Flagship's duty to AGA.  At a minimum this is a triable issue
and not ripe for summary judgment.

Flagship Did Have a "Special Relationship" with AGA and its Principals

Devnew acknowledged that he knew the principal of AGA, George Jones,
to be a simple man who was unsophisticated and inexperienced in legal matters.
Devnew testified that he learned "pretty early on in the relationship" that Jones
was an unsophisticated, simple man.  (Exh. 1, Devnew Depo.  pp. 37-38; 40).  He
agrees that he had this knowledge prior to the renewal of the subject insurance
policy in May 1 2003.   Yet prior to May 1, 2003 Devnew knew nothing about
George Jones' financial history or status.  (Id. At p. 41).

Notwithstanding the significant changes in the New Bedford scallop
fishing industry, changes of which he knew or should have known, Devnew
never advised AGA to increase the P&I coverage above $1,000,000 (Exh.13, Aff.
of George Jones); the same coverage the vessel carried since 1987.  Had he
advised AGA to increase its coverage to $5,000,000 AGA would have done so.
(Id.).

Not having a clue as to how a jury would assess damages in a Jones Act
personal injury case Devnew was in no position to carry out Flagship's practices
and fulfill the duty of care that Flagship owed to AGA.

The F/V KELLY JEAN

Flagship's arguments concerning the Jones' insurance needs for a second
vessel, a small, two-man "day tripper" named the "Kelly Jean" are misleading.

16

When they sought to insure this small "day tripper" the Jones went to Debra

Fernandes in order to insure the F/V KELLY JEAN because they could not get a

timely quote from Flagship. (Exh. 4, George Jones Depo, pp. 105-107).

The F/V KELLY JEAN was very different than the F/V GEORGIE J. The

KELLY JEAN was an inshore, day tripper that carried a crew of one to two men

with fishing limits of 400 pounds. (Exhibit 4, Deposition of George Jones, p. 46).

As testified to by Debra Fernandes the application form that she used to seek

coverage for the F/V KELLY JEAN only had available limits of $250,000 and, at

the request of the Jones she had to handwrite in a request for $500,000 of

coverage that she was able to place. (Exhibit 16, Deposition of Debra Fernandes,

p. 62; Exh. 17— insurance app.). More coverage for the KELLY JEAN was

unavailable. (Exhibit 5, Deposition of Debra Fernandes, pp. 95-96).

The M.G.L. c. 93A Claims

AGA's Claims based on John Devnew not being licensed in Massachusetts.

AGA agrees that the Massachusetts producer license issued to "John Starr

Dervew" is in fact John Devnew, and therefore AGA agrees to withdraw any of

the chapter 93A/176D claims based upon the allegation that John Devnew not

properly licensed in Massachusetts.

AGA's Claims based on Flagship's violations of 176D.

AGA's claims based on Flagship's violations of G.L.c. 176D, §3 (Unfair

methods of competition and unfair or deceptive acts or practices) are actionable

because a violation of chapter 176D is evidence of an unfair business practice

17

under G.L.c. 93A, §2 which would give rise to a cause of action under chapter 93A, §11.[11]  See, <u>Fed. Ins. Co.</u> v. <u>HPSC, Inc.</u>, 480 F.3d 26, __ (1st Cir. 2007) and <u>RLI Ins. v. Wood Recycling</u>, Inc. 2006 U.S. Dist. Lexis 30596 (D. Mass) (Zobel. J) (holding that a business plaintiff's G.L.c. 176D claim is treated as a claim made pursuant to G.L.c. 93A §11.)

The evidence will show that Flagship attempted to increase its client base in Massachusetts by making itself known to be more than just a simple service order insurance broker.  Flagship drew upon Ronald Walsh's goodwill with the New Bedford fishing community and Flagship held itself out to be a leader in the field of maritime insurance with significant expertise.  The fact that John Devnew was not qualified to provide the professional services that Flagship's clients came to expect is not merely evidence of Flagship's negligence.  It is also evidence that Flagship had used deceptive trade practices in order to attract and retain Massachusetts vessel owners, like AGA.

In this action the AGA has asserted Flagship[12] violated G.L. c. 176D, Sec. 3(2) that prohibits the "making, publishing, disseminating, circulating, or placing before the public, or causing, directly or indirectly, to be made, published,

---

[11] Chapter 93A, §11 provides: "If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two." *** "If the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action."

[12] General Laws c. 176D, § 1(a) defines as insuring entities subject to the act "any individual, corporation, association, partnership, ... and any other legal entity or self insurer which is engaged in the business of insurance, **including agents, brokers**, and adjusters...."

18

disseminated, circulated or placed before the public. . .in any way. . .any assertion, representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business, which is untrue, deceptive or misleading". "To be held unfair or deceptive under c. 93A, practices involving even worldly-wise business people do not have to attain the anti-heroic proportions of immoral, unethical, oppressive, or unscrupulous conduct, but need only be within any recognized or established common law or statutory concept of unfairness." VMark Software, Inc. v. EMC Corp., 37 Mass.App.Ct. 610, 620, 642 N.E.2d 587 (1994).

Conclusion

For all the reasons addressed herein there are multiple triable issues relative to Flagship's liability to AGA based on a variety of theories of liability. Summary judgment is inappropriate and Defendants' motion should be denied in all respects.

Dated:  June 19, 2007                    The Plaintiff, AGA FISHING CORP.
                                         By its attorney,
                                         JOSEPH G. ABROMOVITZ, P.C.


                                         s/Joseph G. Abromovitz
                                         _____
                                         Joseph G. Abromovitz
                                         BBO No. 011420
                                         858 Washington Street
                                         Third Floor
                                         Dedham, MA 02026
                                         Phone: (781) 329-1080

## CERTIFICATE OF SERVICE

I, Joseph G. Abromovitz, counsel for the plaintiff, hereby certify that on

the 19th day of June, 2007 I served a copy of the within document via postage

prepaid mail to:

Michael J. Stone
Peabody & Arnold, LLP
30 Rowes Wharf
Boston, MA 02110

                                         s/Joseph G. Abromovitz
                                         _____
                                         Joseph G. Abromovitz

1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF MASSACHUSETTS

3

4

5   AGA FISHING CORP.,                    )

6                    Plaintiff,           )     CIVIL ACTION NO.

7        v.                               )        05-11396JLT

8   FLAGSHIP GROUP LIMITED                )

9   and                                   )

10  BROWN & BROWN, INC.,                  )

11                   Defendant.           )

12

13                 CERTIFIED ORIGINAL

14          DEPOSITION UPON ORAL EXAMINATION

15               OF JOHN S. DEVNEW

16          TAKEN ON BEHALF OF THE PLAINTIFF

17               Norfolk, Virginia

18                 May 5, 2006

19

20

21       ---------------------------------------

22              TAYLOE ASSOCIATES, INC.

23          Registered Professional Reporters

24           Telephone:  (757) 461-1984

25               Norfolk, Virginia

17

```
 1          A.     Oh, yes.

 2          Q.     Is it fair to say that some of these

 3   people could have been seriously hurt?

 4          A.     Yes.

 5          Q.     What did you understand about the law --

 6   if a fisherman got hurt while fishing aboard a

 7   commercial fishing boat, what did you understand his

 8   legal remedies to be?

 9          A.     Well, there's -- there's the Jones Act

10   and admiralty law provisions.

11          Q.     Okay.  And what did you understand --

12   what remedies did you understand that those -- the

13   Jones Act or admiralty law provisions provided to a

14   seaman who was hurt aboard a vessel under

15   circumstances where the vessel owner was responsible?

16          A.     Can you ask the question again?  I'm

17   not --

18          Q.     Sure.  Is it fair to say you understood

19   that if a commercial fisherman got hurt while working

20   on a commercial fishing boat he could sue his employer

21   under a law called the Jones Act?  Did you know that?

22          A.     Yes.

23          Q.     Okay.  And he could bring that lawsuit in

24   the federal court, correct?

25          A.     Yes.
```

TAYLOE ASSOCIATES, INC.

1          Q.      And he could claim a right to a trial by

2    jury, correct?

3          A.      Yes.

4          Q.      And you understood his lawsuit would be

5    for money damages to compensate him for the extent of

6    the injuries that were caused as a result of the

7    accident, correct?

8          A.      Partially, yeah.  There was -- there's

9    issues of maintenance and cure, you know, for injured

10   seamen, and then there's, you know, the -- and then

11   there's potentially damages beyond maintenance and

12   cure.

13         Q.      Okay.  And under those circumstances

14   where a fisherman could recover damages beyond

15   maintenance and cure, what was your understanding of

16   how those damages would be calculated by a jury?

17         A.      I would say that I didn't have -- I --

18   you know, I think they would be very subjective.

19         Q.      Subjective.  What do you mean by that?

20         A.      Take a look at the nature of the injury,

21   the nature of the circumstances surrounding the injury

22   or accident.  I think -- you know, I was never in a

23   courtroom during -- and I've never witnessed any of

24   the -- you know, the P & I claims, bodily injury

25   claims, that went to trial, nor was I involved in --

19

1    with the adjusters.

2              Typically, our involvement as agents with

3    crew injury claims were only to make sure that the

4    adjusters -- that there was communication and there

5    was an initial response, okay?

6              Typically, beyond that, the -- we would

7    tend to get involved only if there seemed to be an

8    issue, either a communication problem or something

9    like that, so that we would, you know, try to help

10   facilitate if there was some kind of log jam or

11   something.

12             Typically, we did not get very involved,

13   so my answer to your question is, you know, how a jury

14   would actually look at something, I don't know.  You

15   know, I don't -- I've never been involved with it, so

16   I can't say.  I've never been on a jury myself, I've

17   never had a call to jury duty, and never was part of

18   the actual adjustment, you know, of a bodily injury

19   claim.

20        Q.    During the period of time you worked at

21   Flagship did it have a -- in Norfolk -- did it have a

22   division that did some claims adjusting for certain

23   underwriters?

24        A.    Yes.

25        Q.    Okay.  And is it fair to say that you

TAYLOE ASSOCIATES, INC.

1    account that involved Ray Starvish's vessels?

2         A.    I think Bob O'Sullivan did.

3         Q.    Okay.  And do you know how Mr. O'Sullivan

4    got that account?

5         A.    I don't.  I guess I assume it was part of

6    Ron's business with Neptune that we -- you know, my

7    understanding -- I was not involved in any of the

8    aspect of the purchase and sale and creating a

9    presence up in New Bedford with Ron.

10        Q.    At any point in time prior to the

11   Massachusetts office of Flagship being closed, were

12   you aware that for each of the vessels that Ray

13   Starvish was involved in he carried $5 million of

14   P & I coverage?

15        A.    I can't recall whether I was aware or

16   unaware of it.

17        Q.    Did you ever have any discussions with

18   Bob O'Sullivan concerning the scope of coverage that a

19   vessel owner in New Bedford operating a scalloper

20   should own?

21        A.    No, not that I recall.

22        Q.    How about with Mr. Johnsen, Steve

23   Johnsen?  Did you ever have any discussion with

24   Mr. Johnsen concerning the scope of P & I coverage

25   that a vessel owner operating a scalloper in

1    Massachusetts should have?

2         A.    Not -- no.

3         Q.    Okay.  Once the Massachusetts office of

4    Flagship closed, did your responsibilities concerning

5    Flagship's insureds in Massachusetts change at all?

6         A.    Did my what change?

7         Q.    Let me ask the question differently.

8              Once Flagship closed its Massachusetts

9    office, did your job on behalf of Flagship change at

10   all?

11        A.    I mean, not generally, no, but I -- you

12   know, I did -- some of the accounts that Ron had had,

13   were transferred over to me for, you know, primary

14   responsibility.

15        Q.    Okay.  And did one of those accounts

16   include the AGA Fishing Corp.?

17        A.    Yes.

18        Q.    Now, did you have any discussions with

19   Ron -- strike that.

20             Other than AGA Fishing Corp. being

21   transferred over from Ron Walsh to you, what other

22   vessel owners or the names of vessels were transferred

23   to you, once Ron was no longer working with Flagship?

24        A.    Well, it's been some time, because we

25   didn't hang on to much of that business after a while,

```
 1    was on its knees, probably, I would say, by 2000,
 2    actually, and you had vessel owners that were in dire
 3    straits, a blown engine away from being out of
 4    business.
 5         Q.    Is it your testimony --
 6         A.    And then it turned around.
 7         Q.    Okay.  When did it turn around?
 8         A.    I can't remember, but I would say
 9    probably somewhere around 2000.
10         Q.    The --
11         A.    But it could be plus or minus, you know,
12    a year.
13               But the fishery had been in very
14    substantial decline for some time, and boats were
15    hanging on, and then things turned around.
16         Q.    So tell me --
17         A.    And they've kept going ever since.
18         Q.    Tell me how much the average deckhand was
19    making in the year 2001, 2002, or 2003, while working
20    on a scallop boat the size of the GEORGIE J, if you
21    know.  If you don't know, say "I don't know"?
22         A.    I don't know.  I would tend not to track
23    crew earnings as much because there was so -- there
24    was turnover, a lot of turnover on crew.  What we
25    would tend to talk about is the general overall health
```

1       of the industry; you know, did the vessel owners have

2       money to put back into their boats.

3              Q.     When you would sell --

4              A.     You know, were they paying attention to

5       safety issues.  You know, that was the -- more the

6       barometer of how we looked at the overall economic

7       health of the fishery.

8              Q.     When you would have discussion with a

9       boat owner concerning the amount of P & I coverage

10      that the boat owner wanted or should have aboard his

11      vessel, did you take into consideration the earnings

12      of crew members in connection with your discussion

13      with any particular boat owner?

14             A.     To the extent that it was part of an

15      overall discussion.

16             Q.     What do you mean?

17             A.     We didn't -- well, when a boat -- a

18      vessel owner -- you know, we would often get a

19      question:  Well, you know, how much P & I, you know,

20      should we take?  And it was one that is more a

21      question of, you know, legality and, you know, working

22      with an accountant than it is, you know, an insurance

23      agency in very many respects.

24             Q.     Why do you say that?

25             A.     Well, because it has to do with the cost

1    either George Jones or his wife, Antoinette Jones?

2          A.    I seem to recall a discussion with Ron,

3    and they were -- the relationship between Ron and

4    Flagship went south very quickly after we closed the

5    office, so it was not a particularly -- I had had a

6    good relationship with Ron.  When we closed the office

7    and everything up there, you know, he became very

8    distant.

9          I did -- my recollection is that I talked

10   with him about several boat owners, and -- and I think

11   all -- you know, he just said that, you know, they're

12   nice people; that -- you know, that George could be

13   difficult sometimes to get along with.

14         Q.    I've been provided with some e-mails that

15   you generated in connection with communications with a

16   man by the name of Lev Osman.

17         A.    Uh-huh.

18         Q.    Yes?

19         A.    Yes.

20         Q.    Okay.  And in one of the e-mails you

21   state -- and I'm -- this is an e-mail that you sent to

22   Mr. Osman on April 26, 2004 -- "Jones is a simple man

23   in his 50s who has spent his life fishing, owns the

24   one boat, and very likely has the majority of his net

25   worth in retirement wrapped up in the boat, and permit

1  now in great jeopardy."

2            Do you remember saying that, sir?

3       A.    Yes.

4       Q.    Okay.  "He is unsophisticated and

5  inexperienced in legal matters, certainly one of this

6  magnitude and gravity.  Do you remember saying that?

7       A.    Yes.

8       Q.    Okay.

9       A.    I remember writing the e-mail.

10      Q.    Okay.  When did you first learn that

11 Mr. Jones was a fairly unsophisticated, simple man?

12      A.    Well, I would say it was, you know,

13 pretty early on in our relationship, whenever that

14 started.

15      Q.    The incident that gave rise to the claim

16 against the AGA Fishing Corporation and the seizure

17 and sale of the GEORGIE J took place in November,

18 2003, correct?

19      A.    Yes, to the best of my recollection.

20      Q.    Is it fair to say that prior to November,

21 2003 you became aware that Mr. Jones was a simple,

22 unsophisticated man?

23      A.    Yes.

24      Q.    Would it also be fair to say that you

25 knew that -- strike that.

40

```
 1              You used the word "simple," did you not?

 2       A.     Yeah.  If it's there, that's what I used.

 3       Q.     Well, why don't you just take a look at

 4  this to confirm that that in fact is what you said.

 5              (There was a pause in the proceedings.)

 6              THE WITNESS:  Uh-huh.

 7  BY MR. ABROMOVITZ:

 8       Q.     You referred to Mr. Jones as "a simple,

 9  unsophisticated man," correct?

10       A.     Yes.

11       Q.     Okay.  And that's something that you knew

12  prior to the renewal policy that went into effect on

13  May 1st, 2003.

14       A.     Yes.

15       Q.     Okay.  And you also knew prior to

16  May 1st, 2003 that Mr. Jones's entire financial life

17  was wrapped up in his fishing boat and that fishing

18  permit, correct?

19       A.     No.

20       Q.     Do you remember saying in a later e-mail

21  to Mr. Osman on exactly the same day, "I was right in

22  my estimation that Jones's worth is almost entirely

23  wrapped up in the vessel and that prospects for him

24  are potentially devastating"?

25              Do you remember saying that?
```

1          A.      Uh-huh.

2          Q.      Yes?

3          A.      Yes.

4          Q.      Okay.  Are you saying that before

5    May 1st, 2003 you did not know that if Mr. Jones lost

6    this vessel -- AGA Corporation lost the vessel and

7    fishing license that the effects would be financially

8    devastating?  You didn't know that?

9          A.      Well, not to the extent that I was to

10   learn it once Jonesy got into this situation.

11                 I mean, for all I knew when I was writing

12   Jones's insurance -- I mean, it's possible he had bank

13   accounts in the Cayman Islands.  I mean, he could

14   still do that, and I could be way wrong about it.

15                 I don't know Jonesy's history, you know,

16   financial history, that well.

17         Q.      Did Flagship Group, in the time frame

18   that you were servicing the AGA Fishing Corp. account,

19   hold itself out as having expertise necessary to offer

20   the appropriate insurance services for the maritime

21   industry and cover all types of marine liabilities?

22         A.      Generally, yes.

23         Q.      Did Flagship Group, during the time that

24   you were servicing the Jonesy account and prior to

25   selling the last policy in issue, represent that it

TAYLOE ASSOCIATES, INC.

1    had unequaled expertise and experience in the fishing

2    vessel industry?

3         A.    I don't recall that particularly, but it

4    would be a reasonable thing to portray.  We had very

5    good experience in it.

6         Q.    And did Flagship Group also represent

7    that it systematically and comprehensively examined

8    the insured's potential maritime exposure, recognizing

9    that "protecting your corporate business risks is our

10   primary concern"?

11        A.    Yes.

12        Q.    Okay.  So, would it be fair to say that

13   when you dealt with the Joneses, prior to the issuance

14   of that last policy on May 1st, 2003, the statements

15   that I just read to you -- which I'll represent came

16   from Flagship's Web site -- were matters of which you

17   were aware?

18        A.    In general, yes.

19        Q.    Okay.  That Flagship held itself out as

20   having a lot of expertise in the field of marine

21   insurance, correct?

22        A.    Yes.

23        Q.    And represented to its insureds that it

24   would undertake the necessary work to find out what

25   was needed to protect those insureds in the event that

```
 1    something happened to create a loss aboard one of its

 2    vessels?

 3         A.     Could you ask that again, please?   I'm

 4    sorry.

 5         Q.     Sure.   What do you understand the

 6    statement in the Web site to mean -- and I'll read it

 7    verbatim.

 8                "We systematically and comprehensively

 9    examine your maritime exposures, recognizing that

10    protecting your corporate business risks is our

11    primary concern."

12                What do you understand that statement to

13    mean, sir?

14         A.     I understand that to mean that we would

15    discuss with our clients and prospects the natures of

16    their exposures and offer them a host of insurance

17    products and access products that they would request

18    and discuss their -- their insurance issues in

19    general.

20         Q.     Prior to May 1st, 2003, and in connection

21    with the renewal of that policy, when Flagship would

22    sell insurance on behalf of an underwriter to a vessel

23    owner such as AGA Fishing Corp. is it fair to say that

24    the primary layer of P & I, protection and indemnity

25    coverage, typically was in the range of $250,000?
```

50

1          Q.      Yes.

2          A.      At the time it may have been somewhere

3    around $1500, $2,000 a man, I imagine.

4          Q.      Okay.  And you're basing that on what?

5          A.      Just my own recollection here at the

6    moment.

7          Q.      Let me show you a document marked Exhibit

8    Number 4 at Lisa Rawles' deposition yesterday, the

9    first page, and see if that refreshes your memory as

10   to the cost per man of increasing P & I coverage above

11   excess of $1 million.

12                 (There was a pause in the proceedings.)

13                 THE WITNESS:   It seems that I

14   overestimated them, then.

15   BY MR. ABROMOVITZ:

16         Q.      Okay.  So taking a look at this document

17   from Ms. Rawles, you want to revise your prior answer

18   as to how much you believe it would have cost per man

19   to insure the GEORGIE J for up to, let's say,

20   $5 million in P & I coverage?

21         A.      Can I see it again?

22         Q.      Sure, of course.

23         A.      Does it have it -- was that per million?

24         Q.      Why don't you...

25                 (There was a pause in the proceedings.)

1              THE WITNESS:  Well, it's a pretty wide

2      range here.

3      BY MR. ABROMOVITZ:

4              Q.    Why don't you tell us what that range is.

5              A.    Well, according to this here, it shows

6      two million, excess of one million, at $375 to $1100

7      per man, and four million, excess of one million, for

8      $500 to $750.

9                   So the bottom range is a little bit more

10     per man for an extra $2 million, and the top range is

11     less expensive.  Perhaps that's because of renewal

12     versus new business going into the slip and how long

13     somebody might have had it, you know, the duration in

14     terms of years.  So it seems to be a fair amount of

15     range there.

16             Q.    Keeping in mind that this is -- I'm

17     sorry.  I didn't mean to interrupt you.

18             A.    No, that's all right.

19             Q.    Keeping in mind that this was renewal

20     business, is it fair to say that for the Joneses to

21     have taken the coverage up to $5 million for that last

22     policy year would have cost between $500 and $750 a

23     man?

24             A.    Well, according to that, yeah.  I would

25     have thought it would have been more.

60

1    time, you know, that I would usually revisit, "Would

2    you like to take a look at some additional P & I?"

3         Q.    Okay.  Let's just stay with the change in

4    the quote for the hull coverage.

5              You said -- you testified what your usual

6    practice was, and I understand what your usual

7    practice was.

8              Do you have a specific memory in this

9    particular case for the AGA Fishing Corporation what

10   you were told by Mr. Jones as the reason why he wanted

11   a quote for 500,000 in hull coverage rather than

12   400,000 in hull coverage?

13        A.    I don't.

14        Q.    Okay.  I just have a couple of questions

15   about permits.

16             What was your understanding during the

17   period of time that you were servicing the AGA Fishing

18   Corp. account, which was after Ron Walsh was no longer

19   with Flagship and up until the -- is it fair to say

20   the last renewal was the policy on May 1st, 2003?

21        A.    I believe it was.

22        Q.    Okay.  At that point in time the

23   GEORGIE J had a scallop fishing permit, did it not?

24        A.    Yes.

25        Q.    What was your understanding as to how

1          A.      But did we discuss P & I limits and

2     exposures?  Yes.

3          Q.      All right.  So, if I understand your

4     testimony correct when you say you believe you

5     probably did discuss with them -- excuse me -- whether

6     they had sufficient P & I coverage -- strike that.

7               Are you saying they did or did not most

8     likely ask you if you thought they had enough

9     coverage?

10          A.      I think they probably did.

11          Q.      And your response --

12          A.      Was probably, "You tell me.  We've just

13     discussed the aspects of your exposures.  You have to

14     make a business decision as to what you think is the

15     level you need to insure at."

16          Q.      And in your discussion of their exposures

17     did you discuss things like the limitation of

18     liability laws that come into play in maritime

19     personal injury and wrongful death cases?

20          A.      I may have.  I'm certainly aware of it,

21     and I've had that conversation before, you know, with

22     insureds.

23          Q.      Okay.  What is your understanding as to

24     the circumstances under which a vessel owner can limit

25     its liability?

1          A.     Well, I think it's -- to be honest with

2     you, I mean, I don't have a real good grip on how a

3     judge ascertains whether he's going to allow

4     limitation or not.

5               Very often the decision is actually

6     deferred.  So let's say a vessel owner has an

7     accident, especially something like the CAPE FEAR

8     where you have multiple injuries.  A vessel owner

9     would file a limitation act.  The judge would

10    typically not rule on the limitation other than to see

11    if it actually applied to limiting the -- any award to

12    the value of the vessel, okay?  However, it would

13    allow the limitation to the extent that it would pull

14    it out of state courts and various venues into a

15    federal courtroom, and all actions would be defended

16    at once.

17              You know, how the judge then subsequently

18    applies a limitation, I don't have a really good

19    handle, I would say, on the thought process that goes

20    through a judge's mind as to whether or not to

21    provide, institute, limit liability.

22         Q.     In the marine insurance books that you

23    testified that you read in connection with learning

24    something about marine insurance did they touch upon

25    the issues of the statutory scheme of limitation of

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF MASSACHUSETTS

3

4    AGA FISHING CORP.,                    )

5                        Plaintiff,    )    CIVIL ACTION NO.

6        v.                             )        05-11396 JLT

7    FLAGSHIP GROUP LIMITED and         )

8    BROWN & BROWN, INC.,               )

9                        Defendants.    )

10

11

12    CERTIFIED ORIGINAL

13    DEPOSITION UPON ORAL EXAMINATION

14    OF CHRISTOPHER G. BURNS

15    TAKEN ON BEHALF OF THE PLAINTIFF

16    Norfolk, Virginia

17    January 23, 2007

18

19

20

21    ---------------------------------------

22    TAYLOE ASSOCIATES, INC.

23    Registered Professional Reporters

24    Telephone:  (757) 461-1984

25    Norfolk, Virginia

```
 1     will reiterate are please let me get the question all

 2     the way out before you start to give your answer.

 3                  If in order to answer a question you

 4     would have to guess, just tell me that you would have

 5     to guess and I'll move on to something else.  If, in

 6     fact, you can answer a question based upon a

 7     reasonably good memory, I will ask you to give that

 8     memory of the events in question.

 9                  And if you don't understand any question

10     that I ask, because sometimes the words come out of my

11     mouth different than my brain forms them, that happens

12     when you get a little older, like Mike, just tell me

13     you don't understand and I'll be happy to try to

14     rephrase it.  Okay?

15          A.     Okay.  Not a problem.

16          Q.     Please state your full name.

17          A.     Christopher G. Burns.

18          Q.     Where do you live, Mr. Burns?

19          A.     328 Tuna Lane, Virginia Beach, Virginia.

20          Q.     And are you presently employed?

21          A.     I am.

22          Q.     In what capacity?

23          A.     I am the profit center leader, general

24     manager of Flagship/Brown & Brown.

25          Q.     And when you say you're profit center
```

1    leader and general manager of Brown & Brown, what does

2    that mean?

3        A.    I run the office.

4        Q.    Of Brown & Brown?

5        A.    I run a Brown & Brown office in Norfolk.

6              MR. ABROMOVITZ:  Okay.  Am I going too

7    fast?

8              THE COURT REPORTER:  You're okay.  Thank

9    you.

10   BY MR. ABROMOVITZ:

11       Q.    What is your affiliation with Flagship

12   Group, Limited?

13       A.    They are the limited that Brown & Brown

14   purchased in 2000.  So we are essentially the same.

15       Q.    Okay.

16       A.    We use that as a trading name.

17       Q.    Okay.  And on a day-to-day basis when you

18   go to work, where do you go?

19       A.    I go to 500 East Main Street.

20       Q.    In?

21       A.    In Norfolk.

22       Q.    Okay.  That's the office of Flagship?

23       A.    Correct.

24       Q.    Tell me a little bit about your

25   educational background and training.  How far did you

1          A.       I believe on or around the same time I

2    was transitioning into the office.

3          Q.       And that would be around 2000?

4          A.       Yes.

5          Q.       And what role, if any, did you play in

6    the creation of this -- the content of the web site as

7    reflected in Exhibit Number 2?

8          A.       Very little.  I think I was asked about

9    some language, but I don't know that I participated in

10   the language.  We had some round-table discussions

11   about what we were going to put in there.  And,

12   essentially, it was because at the time we had a

13   salesperson in the office that was focusing on

14   technology, and we didn't have a web site.  So we

15   needed to have a web site to go after that type of

16   business, and this is where it was -- this is where

17   the Flagship web site came from.

18         Q.       And who was the salesperson in the office

19   that was focusing on technology?

20         A.       Fay Carbo was her name.  She's no longer

21   there.

22         Q.       C-A-R-B-O?

23         A.       I believe so.

24         Q.       And was she a producer?

25         A.       She was.

42

1    Q.    And what was -- what type of -- strike

2    that.

3         Did she sell marine insurance?

4    A.    She sold more property and casualty.  I

5    don't believe she did very much marine at all.  She

6    was into the property/casualty side and then the

7    technology side.

8         It became -- in 2000 it had become sort

9    of a new niche market with technology, and she tried

10   to -- very unsuccessfully she tried to go into that

11   niche.

12   Q.    I want to focus on some language in the

13   web site under the category marine -- Maritime

14   Insurance, "Why choose Flagship."  And I'll quote the

15   following language:  "We systematically and

16   comprehensively examine your maritime exposures,

17   recognizing that protecting your corporate business

18   risks is our primary concern," end quote.  Did I read

19   that correctly?

20   A.    Yes, sir.

21   Q.    Okay.  How did that language come into

22   existence?

23   A.    I would imagine that, again, the round

24   tables put it together.

25   Q.    And who were participants in this round

1    table or round tables?

2         A.    Probably all the salespeople in the

3    office.

4         Q.    And that would have consisted of

5    yourself?

6         A.    Myself, Jack Devnew, Steve --

7         Q.    Steve Johnson?

8         A.    Steve Johnson.

9               -- Eddie Gay, Fay Carbo.

10        Q.    Mr. O'Sullivan?

11        A.    No, he would not have been involved in

12   that.  Probably doesn't know how to get on the web

13   site.

14              And there may have been a few others.

15        Q.    Do you know a gentleman by the name of

16   Ron Walsh?

17        A.    I know of him.  I don't believe I've ever

18   met him.

19        Q.    Was he a participant in the round tables

20   that you're referring to?

21        A.    Not that I'm aware of.  Again, that was

22   when he was transitioning out as well, as I was coming

23   in.

24        Q.    You mentioned Eddie Gay.  Was he involved

25   in the sale of marine insurance at the --

1    would come in and talk to the producers about the type

2    of -- or the ways that juries or fact finders would go

3    about assessing damages if a seaman got injured aboard

4    a vessel.

5          A.       Okay.

6          Q.       Along those lines did anybody ever

7    provide you or any of the other producers at Brown &

8    Brown or Flagship with information that described the

9    manner by which a jury or a fact finder would go about

10   assessing maritime exposures in the event of a seaman

11   getting hurt aboard a vessel?

12         A.       There may have been documentation to that

13   effect.  I do not recall that it was sort of

14   officially presented.  I know that there had been many

15   conversations about limits and what would happen in a

16   claim and -- I mean, that could be talking to an

17   attorney, that could be talking to ourselves, that

18   could be talking to one of the marine conferences,

19   that kind of thing.

20               Certainly not provided by Brown & Brown,

21   because it's a decentralized sort of operation.  Our

22   niche is our niche, so that's sort of how they

23   operate.  You know what you're doing in your office;

24   therefore, you go out and do it.

25               So just formalized, I really just don't

1       recall that there was anything super formal about

2       that.  We had the hull forms.  We had the applications

3       that the companies required.  We had our knowledge

4       base either from backgrounds or from, you know,

5       on-the-job training.

6                   Yeah, that's -- I don't know if that

7       answers your question or not, but --

8          Q.      It does.  Are you familiar with something

9       called the Limitation of Liability Act?

10         A.      Yes.

11         Q.      And what do you understand that to be in

12      a maritime context?

13         A.      Again, not being an attorney, my

14      understanding is that you can limit the liability to

15      the value of the vessel or appurtenances of the

16      vessel.

17         Q.      What are the circumstances of which a

18      vessel owner can limit its liability?

19         A.      My understanding is they try in every

20      case.  Whether or not it's successful or not depends

21      on a lot of things that I may not be aware of.

22         Q.      Well, what I'm trying to find out is what

23      you are aware of.

24         A.      Okay.

25         Q.      Under what circumstances can a vessel

1    probably have zero.  It just depends on home porting.

2    There may be a boat that packs in New England that's

3    home ported out of New Jersey, which is how we

4    delineate who gets to write what.

5         Q.    Okay.  Before May of '03 did Flagship

6    hold itself out as having expertise necessary to offer

7    the appropriate insurance services for the maritime

8    industry and cover all types of liability?

9         A.    Yes.

10              Not cover all, no, not cover all types,

11   but offer -- hopefully offer all types of cover.

12        Q.    Okay.  Before May of '03 did Flagship

13   portray itself as having unequaled expertise and

14   experience in the fishing vessel industry?

15        A.    I would bet that we did, and should have,

16   because we certainly had a tremendous amount of

17   experience.

18        Q.    Were you involved at all in the

19   termination of John Devnew's employment with Brown &

20   Brown?

21        A.    No.

22        Q.    I assume at some point you became aware

23   of it?

24        A.    Immediately, yes.

25        Q.    And what's your understanding as to why

1

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF MASSACHUSETTS

3

4

5    AGA FISHING CORP.,                    )

6                    Plaintiff,            )      CIVIL ACTION NO.

7         v.                               )         05-11396JLT

8    FLAGSHIP GROUP LIMITED                )

9    and                                   )

10   BROWN & BROWN, INC.,                  )

11                    Defendants.          )

12

13                    CERTIFIED ORIGINAL

14          DEPOSITION UPON ORAL EXAMINATION

15              OF STEPHEN A. JOHNSEN

16        TAKEN ON BEHALF OF THE PLAINTIFF

17                Norfolk, Virginia

18                  May 4, 2006

19

20

21    -------------------------------------

22              TAYLOE ASSOCIATES, INC.

23         Registered Professional Reporters

24           Telephone:  (757) 461-1984

25                Norfolk, Virginia

1    take a break during the course of the deposition, just

2    tell me, and we will do so.

3            A.      Fine.

4            Q.      And your answers have to be audible, as

5    you are doing so far, okay?

6            A.      Okay.

7            Q.      Please state your full name, sir?

8            A.      Stephen, S-T-E-P-H-E-N, A. Johnsen,

9    J-O-H-N-S-E-N.

10           Q.      And where do you live, Mr. Johnsen?

11           A.      I live at 29368 Harborton,

12   H-A-R-B-O-R-T-O-N, Road, Pungoteague,

13   P-U-N-G-O-T-E-A-G-U-E, Virginia, 23422.

14           Q.      What is the nature of your business or

15   occupation, sir?

16           A.      I'm an insurance broker.

17           Q.      And by whom are you employed?

18           A.      Flagship Group, Ltd., which is part of

19   Brown & Brown, Inc.

20           Q.      And what is your present position with

21   Flagship Group, Ltd.?

22           A.      Executive vice president.

23           Q.      And at some point in time were you its

24   principal shareholder?

25           A.      I owned 50 percent of the stock of

1       of the business?

2              A.     Yes.

3              Q.     And whatever the percentage was, how much

4       of it came from Massachusetts vessels, vessels

5       operating out of ports in Massachusetts?

6              A.     The majority of it would have come from

7       Massachusetts vessels.

8              Q.     Okay.  At some point in time -- strike

9       that.

10             At the time that Flagship merged with

11      Brown & Brown did it have more than one office?

12             A.     Two offices.

13             Q.     And where was this?

14             A.     Norfolk, Virginia and Fairhaven,

15      Massachusetts.

16             Q.     Okay.  When was the Fairhaven, Mass.

17      office opened?

18             A.     In the spring, I believe, of 1986.

19             Q.     And why was there -- strike that.

20             Were you involved in the decision to open

21      the office in Fairhaven?

22             A.     Yes.

23             Q.     And what was the purpose of opening that

24      office?

25             A.     Expand our horizons in terms of providing

10

1    commercial insurance brokerage services to fishermen

2    in New England.

3        Q.    And starting in '96 -- strike that.  How

4    long was that office in Fairhaven open?

5        A.    Until sometime in early 2001.

6        Q.    And why was it closed?

7        A.    Lack of volume.

8        Q.    Okay.  Was that a decision made by Brown

9    & Brown or by Flagship?

10       A.    Both.

11       Q.    From '96 until the time the office was

12   closed who was in charge of the Massachusetts office

13   of Flagship?

14       A.    Ron Walsh.

15       Q.    And can you tell me what Mr. Walsh's

16   background was prior to -- or strike that -- when he

17   first came to Flagship?  Let me strike the question.

18            Did Mr. Walsh have any relationship with

19   Flagship before the Fairhaven office was opened?

20       A.    No.

21       Q.    And who hired Mr. Walsh?

22       A.    I did.

23       Q.    And what inquiry did you make about

24   Mr. Walsh's background?

25       A.    Fairly extensive from the standpoint of

TAYLOE ASSOCIATES, INC.

1        Q.    Were you familiar with an entity by the

2  name of V & G Seafood?

3        A.    I don't recall specifically.  That may be

4  the name for -- I don't recall specifically how --

5  other than the fact that they were a client of

6  Flagship's, who handled it specifically, I just don't

7  recall.

8        Q.    Let me give you the name of the vessel

9  and see if that helps.

10         The vessel was FIRST LIGHT.  Do you know

11  the vessel?

12        A.    Other than recognizing the name, I don't

13  know who handled it and how it was handled.

14        Q.    Owner, Greg Huba, H-U-B-A?

15        A.    (The witness nodded head.)

16        Q.    Do you know Mr. Huba?

17        A.    I do know Huba, and, yes, I was the

18  producer on the Greg Huba account.

19        Q.    Okay.  And, according to Exhibit 3 at

20  Ms. Rawles' deposition, Mr. Huba carried $5 million of

21  P & I coverage on his vessel, did he not, sir?

22        A.    Do you know which number we're looking

23  at?

24        Q.    Right there (indicating).

25        A.    FIRST LIGHT.  Correct.

1    cyclical.  It could have happened at that time.

2           Q.     And would it also be fair to say that --

3    understanding some of these crew members who were

4    making upwards of a hundred thousand dollars a year

5    could be in their 20s or 30s?

6           A.     That's correct.

7           Q.     And have a potential earning capacity

8    going into the millions over the balance of their work

9    life expectancy, if the industry maintains its then

10   level of business?

11          A.     It could.

12          Q.     Okay.  Would it also be fair to say that

13   you would expect producers on behalf of Flagship to

14   have conversations along these lines with its

15   customers when discussing their insurance needs?

16          A.     I think that generally happened.

17          Q.     Okay.  And you would expect Mr. Devnew to

18   have had such conversations with any of his customers?

19          A.     Absolutely.

20          Q.     Okay.  Is it fair to say that in the time

21   frame of 2001 to 2004 that Flagship held itself out to

22   the maritime industry and fishing vessel owners as

23   having expertise in the field of marine insurance?

24          A.     Yes.

25          Q.     And having the ability to properly

VOLUME:  I

PAGES:  1 - 176

EXHIBITS: 1 - 16

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


------------------------x

AGA FISHING CORPORATION,

      Plaintiff,

 vs.                 Civil Action No.

FLAGSHIP GROUP LIMITED    05-11396 JLT

and BROWN & BROWN, INC.,

      Defendants.

------------------------x

RULE 30(b)(6)DEPOSITION OF AGA FISHING CORPORATION

(By its Designee, GEORGE E. JONES JR.) and

GEORGE E. JONES JR., Individually

Monday, May 15, 2006

10:13 a.m.

Peabody & Arnold LLP

30 Rowes Wharf

Boston, Massachusetts


Reporter:  Dana Welch, CSR, RPR

George E. Jones JR.                                    05/15/2006

46

1        A.   She's out of Moniz.

2        Q.   **Can you spell that for us?**

3        A.   M-O-N-I-Z, Moniz.

4        Q.   **Moniz Insurance?**

5        A.   Yeah.

6        Q.   **Do you remember the name of the insurance**

7   **company that it was placed with?**

8        A.   No.

9        Q.   **Moniz Insurance was the broker?**

10       A.   Yes.  She worked out of there.  She was

11   like my agent.

12       Q.   **The Kelly Jean was a scalloper as well?**

13       A.   Yes.

14       Q.   **Smaller boat than the Georgie J?**

15       A.   Yes.

16       Q.   **How much insurance did you get on the**

17   **Kelly Jean?**

18       A.   I think the hull was 50, 60,000.  I forgot

19   what the P&I was.  It was only a day boat.

20       Q.   **That means it would just go out for the**

21   **day and come back at the end of the day?**

22       A.   More or less a day, day -- 400-pound.  As

23   soon as you get your 400 pound, you'd come home.

24   They call it a day boat.

George E. Jones JR.                                    05/15/2006

73

1     Mr. Jones.

2          A.   I --

3          Q.   We have some paperwork that can help.

4          A.   '98, I think.

5          Q.   Okay.

6          A.   '98.

7          Q.   Did you actually try to -- do you remember

8     trying to shift off of Bill Hart's company in the

9     middle of the renewal year rather than at the end?

10    Do you remember that happening?

11         A.   No.

12         Q.   Do you remember Walsh telling you that the

13    company didn't want to pick you up in the middle of

14    the year?

15         A.   Oh, when I talked to him, yeah.

16         Q.   What's your memory about that?

17         A.   I'm trying to think what he said.  All I

18    remember is him saying we'll try next year.

19              MR. STONE:  Let's mark this as Exhibit

20         Number 1, please.

21              (Exhibit No. 1, March 2, 1998 letter,

22         marked for identification.)

23         Q.   Mr. Jones, I've shown you a letter from

24    Ron Walsh to you and to Mrs. Jones dated March 2,

George E. Jones JR.                                    05/15/2006

74

1    1998.  Do you see that?

2        A.  Yes.

3        Q.  Is that consistent with your memory

4    that --

5            MR. ABROMOVITZ:  Want to give him a minute

6        to look it over?

7            THE WITNESS:  I'm trying to read it.

8        Q.  Oh, okay, I'm sorry.

9            Now, does that refresh your recollection

10   or does that help you in remembering that back in

11   the spring of 1998, you were looking to switch over

12   to Ron Walsh's insurer and he suggested that it

13   wasn't good to switch in midstream?

14       A.  I don't -- I don't remember.  Honest.

15       Q.  Okay.

16       A.  I must have got in a fight with Bill, like

17   the fish houses.

18       Q.  Okay.  So you were looking to switch

19   insurance back in the spring of 1998.  Do you

20   remember whether you actually got a policy from

21   Flagship back in '98, '99, that first year?

22       A.  Did I get a policy?

23       Q.  Yeah.

24       A.  When I went back with them?

George E. Jones JR.                              05/15/2006

83

1        Q.   Mr. Jones, have you had a chance to take a

2    quick look at Exhibit Number 5?

3        A.   Yes.

4        Q.   This is a three-page document called

5    Highlands Insurance Company Commercial Vessel

6    Application -- yes?  At the top?

7        A.   Yes.

8        Q.   And at the bottom there's a signature by

9    Antonette Jones?

10        A.   Yes.

11        Q.   Dated April 23, 1999?

12        A.   Yes.

13        Q.   And you see where it has present insurance

14    program and the agency is Mariners down at the

15    bottom?

16        A.   Yes.

17        Q.   So at least as of April 23, 1999 you were

18    still insured with Mariners and that was Mr. Hart's

19    company?

20        A.   Yes.

21        Q.   Okay.  On the second page there's some --

22    there's a P&I limit about midway through on the

23    right.  Do you see that?

24        A.   Yes.

George E. Jones JR.                                05/15/2006

95

1          Q.   Whether you had a $5,000 deductible on the

2    hull or a $7,500 deductible?

3          A.   No.

4          Q.   You don't remember him discussing that

5    either?

6               Okay.   Now, at some point the business of

7    Flagship was switched from New Bedford down to

8    Virginia; do you remember that?

9          A.   Yes.

10         Q.   Do you remember what happened?

11         A.   Ronnie Walsh left.

12         Q.   Where did he go?

13         A.   I don't know.

14         Q.   Did Flagship close its office in New

15    Bedford?

16         A.   Yes.

17         Q.   Did you decide that you wanted to stay

18    with Flagship as your insurance company?

19         A.   Yes.

20         Q.   How did you decide that?

21         A.   After I talked to Jack.

22         Q.   Okay.   That would be Jack Devnew?

23         A.   Jack Devnew.

24         Q.   Where was it that you talked to him, where

George E. Jones JR.                                    05/15/2006

96

1     were you?

2         A.  I think I was in my house.  He was in

3     Virginia.

4         Q.  He called you on the phone?

5         A.  I called him.

6         Q.  What prompted you to call him?

7         A.  I wanted to make sure that I was going to

8     be taken care of.

9         Q.  Do you remember what time of year it was?

10        A.  No.

11        Q.  Was it close to the time when the

12    insurance would be expiring?

13        A.  No.  I -- I don't remember.

14        Q.  Were you satisfied with your conversation

15    with Mr. Devnew that Flagship would continue to

16    take care of your insurance interests?

17        A.  Yes.

18        Q.  Did you and Mr. Devnew discuss what your

19    insurance coverage was?

20        A.  No.

21        Q.  What was it you talked about?

22        A.  He guaranteed me he was going to take care

23    of me, no problems, call him or call Lisa.

24        Q.  Okay.

George E. Jones JR.                                    05/15/2006

                                                              105

1    individual capacity as George Jones, but also as a

2    person who has knowledge of the affairs of AGA

3    Fishing?

4        A.  Yes.

5        Q.  Okay.  Mr. Jones, other than yourself and

6    Mrs. Jones, is there anyone else who is able to

7    testify on behalf of AGA Fishing?

8        A.  No.

9        Q.  Between the two of you, you know

10   everything that there is to know about AGA Fishing

11   and its business activities?

12       A.  Yes.

13       Q.  Okay.  Mr. Jones, if I may digress for

14   just a moment, you tried to get insurance from

15   Flagship for your boat, the Kelly Jean?

16       A.  Yes.

17       Q.  And you created a corporation called the

18   -- Brian's Fisheries, Inc.?

19       A.  Yes.

20       Q.  And I take it that that's named after your

21   other son?

22       A.  Yes.

23       Q.  Let me show you a document -- let me show

24   you a multipage document, dated December 10, 2001,

George E. Jones JR.                                    05/15/2006

106

1    and ask you if you remember seeing that?

2            (Exhibit No. 7, Letter dated December 5,

3        2001, marked for identification.)

4            THE WITNESS:  Just read the first page?

5        Q.  Just read the first page for now, if you

6    would, please.

7        A.  Okay.

8        Q.  This is -- Exhibit Number 7 is a letter to

9    you dated December 5, 2001 from Lisa Rawles,

10   R-A-W-L-E-S, at Flagship, regarding an insurance

11   proposal for Kelly Jean; is that right?

12       A.  Yes.

13       Q.  Do you remember receiving that?

14       A.  Yes.

15       Q.  Do you remember reviewing the insurance

16   proposal?

17       A.  This paper, this front paper?

18       Q.  The attachments to the December 10 letter,

19   which if you take a look at page number 2, you see

20   that it's an insurance proposal, dated December 10,

21   2001, just the second page.

22       A.  This page (indicating)?

23       Q.  Yeah.

24       A.  Oh.  Yes.

George E. Jones JR.                              05/15/2006

107

1       Q.   And it was an insurance proposal from

2   Flagship to insure the Kelly Jean?

3       A.   Yes.

4       Q.   And it was provided to you by Mr. Devnew

5   and Ms. Rawles?

6       A.   Yes.

7       Q.   Do you have a memory of reviewing the

8   proposal?

9       A.   I'm trying to think here.

10           I think the boat was already insured with

11  somebody else.  I'm not sure.  I think --

12      Q.   And were you trying to shop coverage to

13  see if you could get a better --

14      A.   No.  I -- when I asked for it, they said

15  they were going to get back to me.  They never got

16  back to me and she said -- I'm not sure, it might

17  be 15,000 or whatever.  I went somewhere else.

18  Then they gave me this.  I'm pretty sure I went and

19  got it somewhere else.

20      Q.   Did you ever get coverage for the Kelly

21  Jean from Flagship?

22      A.   No.

23      Q.   Did you ask -- strike it in that form.

24           Do you know a boat called the Seldom Home?

George E. Jones JR.                                    05/15/2006

110

1       A.   I see it, yeah.

2       Q.   Okay.  How was that number selected?

3       A.   I have no idea.

4       Q.   Well, did you ask them to quote $250,000?

5       A.   (Indicating.)

6       Q.   Don't know?

7       A.   Don't know.

8       Q.   Did Mr. Walsh or Mr. Devnew suggest that

9   amount?

10      A.   I don't know.

11      Q.   Okay.

12           Where did you get your automobile

13  insurance coverage from, from what company?

14      A.   Crowley and Weaver.

15      Q.   Do you know what company they wrote it

16  with, what insurer?

17      A.   Premier.

18      Q.   I'm sorry?

19      A.   Premier.

20      Q.   How many cars did you have, say in 2003?

21      A.   Three.

22      Q.   You had a Corvette?

23      A.   Yeah.  That was my son's.

24      Q.   Okay.  And an '89 Sunbird?

George E. Jones JR.                                    05/15/2006

111

1          A.   I just got that.

2          Q.   Do you know how much insurance coverage

3      you have on the Sunbird, what liability coverage

4      you have?

5          A.   I think he did the same --

6          Q.   Who's "he"?

7          A.   -- as the others.

8          Q.   Who's "he"?

9          A.   Steve, my agent.

10         Q.   Okay.

11              Do you know what insurance coverage it

12     was; do you know how much?

13         A.   I think it was 100/300.

14         Q.   Do you know what that means?

15         A.   Yeah.  That means I got 100,000/300,000.

16         Q.   Do you know what it means to have

17     100,000/300,000 coverage?  Do you know what

18     protection that provides to you?

19         A.   Yeah.  They can get up to 300,000.

20         Q.   From your insurance company?

21         A.   Yeah.

22         Q.   And what happens in the event that there

23     is a serious injury with damages that are more than

24     that; do you know what happens then?

George E. Jones JR.                                    05/15/2006

112

1       A.   No.

2       Q.   If you're driving your car and you injure

3   someone severely and they bring a lawsuit against

4   you, you understand that your insurance coverage

5   has certain limits?

6       A.   Yes.

7       Q.   If the person who sues you for the

8   injuries that they sustained have injuries that are

9   in excess of those limits, do you know what happens

10  then?

11      A.   Yeah.   What happened to me.

12      Q.   Essentially, what happened with your boat?

13      A.   Yes.

14      Q.   Has your insurance, your automobile

15  insurance person, was he the one that suggested

16  100,000/300,000 dollar limits?

17      A.   Yes.

18      Q.   He suggested that that be the right number

19  for you?

20      A.   Yes.

21      Q.   Did you ask him about getting more

22  coverage than that?

23      A.   No.

24      Q.   Since the time of the Capaldi situation,

George E. Jones JR.                                    05/15/2006

113

1    have you asked him about getting more insurance

2    coverage?

3        A.   No.

4        Q.   Tell me what he said about what your

5    insurance -- your automobile insurance agent said

6    to you about the amount of coverage you should

7    have?

8        A.   When?  Now?

9        Q.   The first time you got automobile

10   insurance coverage from him?

11       A.   I have no idea.

12       Q.   Do you have any memory of --

13       A.   That was in 1975.

14       Q.   Okay.  Do you remember the first time that

15   you got $100,000/$300,000 coverage?

16       A.   I don't remember when I got it, but we

17   upgraded when I bought the boat.

18       Q.   You upgraded your automobile insurance?

19       A.   Yes.

20       Q.   Why was that?

21       A.   To protect me or --

22       Q.   Did you have a discussion with your

23   insurance broker when you upgraded it?

24       A.   I think so.

George E. Jones JR.                                    05/15/2006

114

```
 1          Q.   Do you remember what -- and this was

 2     Steve?

 3          A.   Steve, yes.

 4          Q.   And do you remember what Steve said when

 5     you were upgrading?

 6          A.   Yes.  He told me I should upgrade because

 7     I have a business.

 8          Q.   Okay.  Did he suggest a particular amount?

 9          A.   Yes.  I guess that amount.

10          Q.   He suggested 100/300?

11          A.   Yes.  I rely on their judgment.

12          Q.   Okay.

13          A.   The agents.

14          Q.   All right.  Now, with respect to your boat

15     insurance, as I understand it, you had a million

16     dollars in coverage -- sorry -- Axel had a million

17     dollars in coverage when you bought the boat from

18     him.

19          A.   Yes.

20          Q.   At any point after that, did you have a

21     discussion with anyone, either Mr. Walsh or

22     Mr. Hart or Mr. Devnew about how much P&I coverage

23     you should have?

24          A.   No.
```

George E. Jones JR.                                        05/15/2006

124

1    Q.  Did you ever ask for higher limits, other

2    than on the hull?

3        A.  I thought it was that they could raise the

4    policy.

5        Q.  That they could --

6        A.  In other words, I pay X amount of dollars,

7    and then they could raise it if the policy went up;

8    that's what I thought that was.

9        Q.  You mean if you got more insurance

10   coverage they would charge you more?

11       A.  No.  I thought that the policy could go up

12   at any time.

13       Q.  You mean that they could charge you more

14   for the same policy?

15       A.  Yeah, like three, four months, it could go

16   up, the policy.

17       Q.  Okay.  Let me show you another document,

18   dated April 20, 2001.

19           (Exhibit No. 11, Fax dated April 20, 2001,

20           marked for identification.)

21       Q.  This is a fax from Lisa Rawles to you, Mr.

22   Jones, dated April 20th.  The fax number is

23   508-993-4442.  Is that your fax?

24       A.  Yes.

George E. Jones JR.                                    05/15/2006

134

1      A.  No.

2      Q.  Was this the first time he told you that

3  you didn't need some coverage?

4      A.  Yes.

5      Q.  Okay.  Now, some time shortly after

6  January of 2003, in the next few months, you asked

7  for a quote on a $500,000 hull coverage; do you

8  remember that?

9      A.  Yes.

10      Q.  Did Flagship provide you with an

11  alternative quote for $500,000 hull coverage?

12      A.  Yes.

13      Q.  Do you remember receiving that?

14      A.  Yes.

15      Q.  Do you remember whether you chose to get

16  $500,000 hull coverage or not?

17      A.  Yes.

18      Q.  What was your choice?

19      A.  My choice was when I got the survey, it

20  said 6-and-a-quarter.  And Lisa said, I'll send you

21  one for 5 and I'll send you one for 6.  I got one

22  for 5.  I called her back.  She says I'll send you

23  one for 6.  I said okay.  I never got it.

24      Q.  So did you choose to -- strike it in that

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11396 JLT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

AGA FISHING CORP.                    \*
                                     \*
v.                                   \*
                                     \*
FLAGSHIP GROUP LIMITED and           \*
BROWN & BROWN, INC.                  \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**AFFIDAVIT OF RONALD J. WALSH**

I, Ronald J. Walsh, do attest and swear that the following is true and correct to the best of my knowledge, information and belief.

(1)     That when I first met George and Antoinette Jones in a professional capacity as a broker of marine insurance in the 1980's it became clear to me that they were very unso phisticated in the field of marine insurance. As I testified at my deposition they just did not understand insurance coverage. This was true up to and including my last dealings with them prior to the termination of my employment with Flagship Group, Limited.

(2)     When I testified at my deposition that I didn't remember whether the Jones' relied upon me for advice concerning insurance coverage that was inaccurate. The question was asked of me several hours into the course of my deposition and I was tired. I do remember that, in fact, they did rely upon me for advice, more-so than most if not all of the other clients that I serviced. I did not make this change to my deposition transcript for the simple reason that when the transcript was received by me to review I

was in Florida and more than thirty days passed and I understood that I could not correct the transcript more than 30 days after I received it.

(3)    During the period of time that I was placing marine insurance coverage for AGA both with Neptune Mutual and later with Flagship, because of the factors addressed in my deposition, it was my opinion, certainly up to and including the last policy that I placed for them thru Flagship, that $1,000,000 P&I coverage was adequate. If I had not believed $1,000,000 P&I coverage to have been adequate I would have advised the Jones (and all of my other clients) to increase their coverages. I thought that to have been part of my job as a marine insurance broker/producer.

(4)    When I testified at my deposition that went forward on or about November 29, 2006, that I had not spoken with Attorney Abromovitz, the attorney for AGA Fishing Corporation, prior to the deposition I had forgotten that he and I did speak at length in early 2005. We spoke at length concerning my relationship with the Mr. & Mrs. Jones, and the factors that I would consider when seeking to place coverage for them and the other vessel owners that I serviced. I told Attorney Abromovitz the same things to which I testified at my deposition concerning the Jones', their knowledge of insurance, and the factors that were considered by me and other competent marine insurance brokers/producers when a broker/producer of marine insurance was assessing the adequacy of insurance coverage and advising clients, all about which I testified at my deposition.

(5)    Having lived in New Bedford most of my life, worked in the fishing industry and knowledgeable about what was happening with the scallop fishing industry over

the years it was clear to me that by 2001 there had been a major upswing in the profitability to a commercial scallop fishing vessel owner, and the captains and crews working those boats. While I was no longer in the marine insurance industry I was aware that starting in or about 2001 there had been a major increase in the revenues being generated by commercial scallop fishing vessels out of New Bedford and the value of fishing permits. Had I still been in the industry selling marine insurance I would have advised commercial scallop fishing vessel owners, such as AGA Fishing Corporation, of the need to increase their P&I coverage to at least $5,000,000 because of their potential exposure in the event of a serious injury occurring aboard a vessel, much of which is impacted by the earnings of crewmembers aboard the vessels.

(6)    I was well aware during the period of time that I was selling marine insurance that the cost of increasing P&I coverage from $1,000,000 to $5,000,000 was relatively minimal. There is no doubt in my mind, based upon my relationship with George and Antoinette Jones, that had I informed AGA Fishing Corporation that they should carry at least $5,000,000 P&I coverage for their fishing vessel the GEORGIE J that they would have followed my recommendation.

Dated: June 7, 2007

Ronald Walsh

Ronald J. Walsh

1

1                                        Volume: I

2                                        Pages:  1-138

3                                        Exhibits: 1-17

4              UNITED STATES DISTRICT COURT

5                 DISTRICT OF MASSACHUSETTS

6                              C.A. No. 05-11396 JLT

7

8       -----------------------------------

9    AGA FISHING CORP.,

10                    Plaintiff,

11       v.

12   FLAGSHIP GROUP LIMITED and

13   BROWN & BROWN, INC.,

14                    Defendants.

15       -----------------------------------

16

17            DEPOSITION of RONALD J. WALSH

18    Wednesday, November 29, 2006, 10 a.m. to 1:52 p.m.

19              PEABODY & ARNOLD, LLP

20                 30 Rowes Wharf

21              Boston, Massachusetts

22

23       Court Reporter:  Paulette Cook, RPR/RMR

24

Ronald J. Walsh

73

1    Joneses made their own insurance coverage decisions?

2         MR. ABROMOVITZ:  Objection.

3    Q.  Well, let me rephrase that.  Did you have

4    the authority to place insurance for the Joneses and

5    pick the coverage limits without their authority?

6    A.  No, I could not.

7    Q.  Okay.  So it was -- they had the ultimate

8    decision as to what insurance was placed and what

9    limits were placed?

10    A.  I can answer by saying that, yes, along with

11    their -- their mortgagee.

12    Q.  The bank?

13    A.  Right.

14    Q.  Did the Joneses ever ask you to evaluate the

15    sufficiency of their insurance coverage?

16    A.  I would believe that -- I always did that.

17    I always looked to see what was sufficient at the

18    time we placed the insurance, and certainly I would

19    not have put my name down on any policy application

20    unless I felt it was sufficient at the time.

21    Q.  Therefore, for the policies that you

22    procured for the Joneses' boat through Flagship, you

23    would have -- you put your name on them; you felt

24    they were sufficient coverages, correct?

Ronald J. Walsh

74

1        A.  At the particular time it was written, yes.

2        Q.  Did the Joneses ever pay you anything extra

3   in connection with any evaluation of their policies

4   and their coverage?

5        A.  No, nothing ever.

6            MS. PASTORI:  Could we have that packet

7   marked as the next exhibit?

8            (Exhibit No. 4 marked

9            for identification.)

10       Q.  Mr. Walsh, I'm handing you what's been

11  marked as Exhibit 4.  It's a packet of notes that

12  were produced by --

13           MS. PASTORI:  Were these produced by the

14  defendant Flagship?  But Bates numbered AGA 1506,

15  and they have various Bates numbers in the packet.

16       Q.  What I'd like you to do is take a look at

17  this packet and just tell me if any of these

18  handwritten pages are yours.

19       A.  Yes.

20       Q.  Okay.

21       A.  Looking on page 1 of Exhibit 4 is my entire

22  handwriting with the exception of some writing down

23  at the bottom below AGA 1506.  That looks like

24  Ms. LaFleur's handwriting where it might have been

Ronald J. Walsh

123

1    over the phone, I may have seen Mrs. Jones at a

2    cocktail party for the sheriff on reelection but,

3    heck, that was well over a year ago.

4              MS. PASTORI:  Why don't we go off the

5    record for a minute?

6              (Off the record.)

7    BY MS. PASTORI:

8      Q.  I just have a few followup questions that

9    I'd like to ask you, and then I'll turn you over.

10             In terms of your relationship as a

11   broker with the Joneses, was your relationship with

12   them pretty standard, pretty typical of what you had

13   with all your other clients?

14     A.  No.  More so with them, I spent more time

15   with them, and how I know it is because even the

16   paperwork here -- and an extraordinary amount of

17   paperwork was back and forth, back and forth, and

18   the Joneses were good fishermen, but, without

19   insulting them, they just didn't understand the

20   fishing industry, the intricate part.  They didn't

21   understand insurance.

22             They relied upon everyone, their

23   bookkeepers, their insurance man, their oil men to

24   put in the oil, what should I do.  I found whenever

Ronald J. Walsh

124

1    they conceived there was a big problem, they'd be at

2    my office together.  More often than no, I'd have to

3    hold their hand, and they just didn't understand,

4    and they needed more guidance than anyone -- the

5    hundreds of people that I ever dealt with, they

6    stick out in my mind as probably being the most

7    naive.

8         Q.  Give me some examples.  You mentioned they'd

9    show up at your office if there was a problem or

10    something.  So could you give me some examples of

11    what you're talking about?

12         A.  You asked me specifically about the hull

13    insurance.  They may have come to me, you know, I'm

14    underinsured, or they may say my insurance should be

15    higher.  I don't know.  If there was a minor claim,

16    which they did have a crew member that may have been

17    on -- you know, on their boat when they insured with

18    us, and they would panic.  You know, are we supposed

19    to get involved.  I'm only surmising this now --

20         Q.  You don't have any memory?

21         A.  I don't have any great memory of it.  I can

22    remember she had a terrible time when she lost her

23    son, and she was looking for, you know, consolation

24    and -- I mean if I happened to be on the waterfront,

Ronald J. Walsh

125

1   I'd see her, and she'd be crying and so forth.

2   She'd say, wait, I'm just talking business.  But at

3   times of renewal they were in there getting quotes

4   and spent the time to the best of my knowledge.

5       Q.  So other than the conversation that you had

6   with Mrs. Jones about her losing her son, do you

7   have any specific other recollections of when the

8   Joneses were looking to you for some guidance?

9       A.  Subsequent to my leaving, I had informed

10  them as far as I was concerned the Flagship Group

11  was a couple to stay with -- a company to stay with.

12  Short of that, (Shakes head.)

13              I praised Steve Johnson specifically

14  saying that he was a good person and there was no

15  need to change.

16      Q.  Did you advise them at that time that they

17  should increase their limits?

18      A.  I don't recall that.  I wouldn't even have

19  known what their limit was.

20      Q.  You also mentioned that you believe the

21  Joneses came in to see you at times of renewal.

22      A.  (Nods head.)

23      Q.  And what would those interactions entail?

24      A.  I don't recall specific other than that they

Ronald J. Walsh

132

1   away from his work, and ultimately you had to pay

2   him his lost wages as part of his special damages.

3       Q.   And was it your experience that the amount

4   of earnings that the boats affected how much an

5   individual crew member would make?

6       A.   Oh, absolutely, and it would affect the

7   amount of reserves that we would put on it.  If they

8   weren't making any money, the case was going to get

9   relatively cheap.

10      Q.   If the crew member's making a lot of money,

11  that's going to influence the value of the case?

12      A.   Absolutely.  If a captain got hurt, you

13  know, it's going to make a big difference.

14      Q.   So the last policy that you were involved in

15  in writing when you were with Flagship was the

16  policy that expired on May 1st, 2001?

17      A.   For whom?

18      Q.   Good point.  The last policy -- strike that.

19           Once you left Flagship which I think you

20  said was around early 2002?

21      A.   Yes.

22      Q.   Were you involved in writing anymore

23  insurance coverages for the Joneses or any vessel

24  that they were involved with?

Ronald J. Walsh

133

 1    A.  No, no one.

 2    Q.  So the last policy that you wrote if -- that

 3  went into effect May 1st, 2000, that would have

 4  expired -- strike that -- May 1st, 2001, that would

 5  have expired May 1st, 2002?

 6    A.  Yes.

 7    Q.  I may be off on a year, and I'm not trying

 8  to trick you.

 9    A.  It's close.

10    Q.  The last policy -- were you involved in any

11  policies that issued from Flagship after the policy

12  that expired on May 1st, 2001?  Do you remember?

13    A.  No, I was not.

14    Q.  Based upon your relationship with Mr. and

15  Mrs. Jones, if you had made a recommendation for

16  them to increase the amount of P & I coverage, would

17  you have expected them to go along with it?

18          MS. PASTORI:  Objection the.

19    A.  Yes.

20    Q.  In your experience once the P & I limits

21  reached a million dollars until the time you got out

22  of the industry, to increase that coverage by

23  another million or even up to five million dollars,

24  was it comparatively expensive?

# Flagship Group, Ltd.

Home  |  Maritime  |  Insurance Solutions  |  Benefit Solutions  |  Claim Services  |  About Us  |  Contact Us  |  Parent Company

## Maritime Insurance



Companies needing Maritime Insurance are looking for an agent or broker that offers end-to-end service and relationships with insurers that cover all types of liabilities at a reasonable cost.

**Why choose Flagship?**

- We have relationships with many of the more prestigious insurers and brokers throughout the world to give you a wide range of choices for coverage that exactly meets your needs. These insurance markets offer financial stability and a long-term commitment.
- We have the expertise necessary to offer the appropriate insurance services for the maritime industry and cover all types of marine liabilities - From a single vessel to a large fleet of vessels, marine construction, local and worldwide ship repairing projects, terminal operations, cargo coverage, and others.
- We systematically and comprehensively examine your maritime exposures, recognizing that protecting your corporate business risks is our primary concern.
- We are committed to providing our clients with a wide array of insurance products and services at the most reasonable cost.
- We offer our clients in house claims adjusting , including hull, protection and indemnity, and others.



1

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3

4     AGA FISHING CORP.,                    )

5                    Plaintiff,     )   CIVIL ACTION NO.

6         v.                        )        05-11396 JLT

7     FLAGSHIP GROUP LIMITED and           )

8     BROWN & BROWN, INC.,                 )

9                    Defendants.     )

10

11

12                  CERTIFIED ORIGINAL

13          DEPOSITION UPON ORAL EXAMINATION

14             OF ROBERT W. O'SULLIVAN

15          TAKEN ON BEHALF OF THE PLAINTIFF

16                Norfolk, Virginia

17                January 23, 2007

18

19

20

21     ---------------------------------------

22             TAYLOE ASSOCIATES, INC.

23         Registered Professional Reporters

24           Telephone:  (757) 461-1984

25                Norfolk, Virginia

1    trying to sell.  They're not trying to undersell.  If

2    anything, they would sell more than -- a higher limit

3    than you would actually think might be what is

4    standard in the industry.

5            I mean, if the standard was a million,

6    there's no reason for them not to want to sell more,

7    because they make more money.  The only reason they

8    don't is because certain people just are reluctant to

9    do that.  I mean, they've been in the business a long

10   time.  They know what's going on.  They're not going

11   to spend any more, that's it, I'm not buying more.

12           There are people out of North Carolina

13   that today are with $250,000 P&I insurance.  There are

14   people when I was doing this business five years ago,

15   fleet owners in North Carolina that operated with no

16   insurance, no insurance.  I mean, but that's -- you

17   know, the area, I mean, that's the way it was in North

18   Carolina.  And then you move up the coast not 150

19   miles, totally different tenure, I mean.

20   BY MR. ABROMOVITZ:

21       Q.      When you were servicing the needs of --

22   the insurance needs of people like Mr. Alexander and

23   Mr. Starvish, would it be fair to say that you viewed

24   part of your job to be that if they suggested to you

25   they wanted coverages that you thought were too low,

1  you would say something to them about it?

2      A.      Sure.

3      Q.      Okay.  Let me show you what's been marked

4  Exhibit 2 in Mr. Burns' deposition and also marked as

5  exhibits at other depositions and ask -- and I'll tell

6  you this is something that was printed off of

7  Flagship's web site and ask you to just take a look at

8  that for a minute, please.

9              MR. STONE:  That's a little thing on some

10 people's desks, sort of looks like a television set.

11             THE WITNESS:  Very funny.

12             MR. STONE:  That was actually for Joe's

13 benefit, not yours.

14             THE WITNESS:  Actually, it could be mine

15 just as well.

16             Okay.

17 BY MR. ABROMOVITZ:

18     Q.      With reference to -- first of all, have

19 you seen this document before today or the web site

20 before today?

21     A.      No.

22     Q.      With reference to the paragraph that

23 reads, and it's third from the bottom, quote, "We

24 systematically and comprehensively examine your

25 maritime exposures, recognizing that protecting your

1    corporate business risks is our primary concern," is

2    it fair to say that that's what you viewed your job to

3    be when you were a producer for Flagship before 2000?

4         A.     One of them, certainly, one of them.

5         Q.     And in order to systematically and

6    comprehensively examine a vessel owner's potential

7    maritime exposures, how would you go about doing that?

8         A.     Well, you would start off with a pretty

9    good knowledge, background knowledge, of the maritime

10   industry, the part of the industry that you're

11   potentially insured would be working in, whether it be

12   tugs and barge, fishing vessels, shipyards, whatever

13   that happened to be.  You would -- are we restricting

14   this to fishing vessels?

15        Q.     At the moment, yes.

16               Actually, yeah, let's restrict right now

17   to fishing vessels.

18        A.     Okay.

19        Q.     Then I'll have ask you to expand it.

20        A.     Sorry I asked the question.

21        Q.     Okay.

22        A.     The fishing vessel, you'd have to

23   document a number of the parameters of the vessel

24   itself, length overall, builder, how old,

25   construction, type of power, where it operated,

1        A.      Right.

2        Q.      Do you know how it was that Mr. Johnson

3    was the producer for that particular insurance?

4        A.      Had to do with -- Greg Huba was on the

5    board of directors for the Pt. Judith Co-op, I

6    believe, and he had a falling out with the board.  He

7    didn't like the way their insurance program was

8    handled, and he called down to talk to somebody from

9    our office.  And Steve talked with him, and Steve

10   ended up just handling it.

11       Q.      Okay.  Looking at this list, there were

12   four vessels that were insured through Flagship

13   handled by either you or Mr. Johnson, and that would

14   be the FIRST LIGHT, which was owned by Greg Huba; the

15   COURAGEOUS, which was owned by Ray Starvish; the

16   ENDEAVOR, which was owned by Ray Starvish and Eric

17   Hansen; and the ALPHA & OMEGA, which was owned by Ray

18   Starvish, correct?

19       A.      Right.

20       Q.      All of those vessels carried $5 million

21   P&I coverage?

22       A.      Right.

23       Q.      And is it fair to say that the cost of

24   the premium to jump the coverage in that time frame

25   from $1 million to $5 million was less than $1,000 per

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11396 JLT

```
************************************************
AGA FISHING CORP.                      *
                                       *
v.                                     *
                                       *
FLAGSHIP GROUP LIMITED and             *
BROWN & BROWN, INC.                    *
************************************************
```

**AFFIDAVIT OF EDIE MIKINA**

I, Edie Mikina, do attest and swear that the following is true and correct to the best of my knowledge, information and belief.

(1)     That I am part owner of Edie & Marie Boat Settlements, 113 McArthur Drive, New Bedford, MA 02740 and have been since 1985.

(2)     Edie & Marie's is a boat settlement house.  What this means is that when a commercial fishing vessel that we worked with landed and offloaded its stock at a commercial fish enterprise, typically what would happen is that the revenues generated from the boat's catch would be reported to Edie & Marie's.  We would then pay the vessel's bills associated with the fishing trip, pay the crew, and distribute the remaining funds to the vessel owner.  As part of this process I became familiar with the volume of the gross landings, the monies generated and the earnings of crewmembers from 1985 thru the present.

(3)     In the timeframe of roughly 2001 through 2003 Edie & Marie's did the boat

settlements for roughly 40 scallop commercial fishing vessels fishing out of the ports of New Bedford and Fairhaven. It was quite evident that during this timeframe the gross landings and dollars generated from the landings were increasing significantly over prior years. This meant that the earnings of the crewmembers on these commercial scallop vessels were increasing tremendously over the prior years; also the profits of the scallop fishing vessel owners were too, increasingly over this period of time.

(4)     Starting in the early 2000's a crewmember working steady aboard a scallop fishing vessel could earn annually in excess of $100,000.

Dated: June  , 2007

Edie Mikina

**Exhibit 10**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11396 JLT

```
*************************************************
```
AGA FISHING CORP.                          *
                                           *
v.                                         *
                                           *
FLAGSHIP GROUP LIMITED and                 *
BROWN & BROWN, INC.                        *
```
*************************************************
```

### AFFIDAVIT OF PAUL AMORUSO, CPCU

I, Paul Amoruso, CPCU, do attest and swear that the following is true and correct to the best of my knowledge, information and belief.

I live in Mattapoisett, MA and I am currently self-employed as an insurance and business consultant and I have thirty-seven years of experience working in the insurance industry for several major insurance companies.

From 1969 to 1989 I was employed by Liberty Mutual Insurance Company (Liberty). I began my association with Liberty as a casualty claims adjuster handling personal and commercial automobile, commercial business, workers compensation and first party claims. I was a property specialist and graduated from Vale Technical In Blairsville, Pennsylvania. Thereafter. I was promoted to Liberty's home office as a commercial claims examiner. As a claims examiner I was responsible in all 50 states, Canada, Mexico and Puerto Rico for flammable fabric claims and other commercial and personal claims issues. During my tenure as a claims examiner I was responsible for the claims handling of thousands of claims, all in litigation or pre-litigation, on issues of

liability, damages and coverage.

I was promoted and transferred to Liberty's New Bedford, Massachusetts office as claims manager. Under my management the office grew from one of Liberty's smaller offices to the thirtieth largest out of four hundred and sixty-five in the United States. I was responsible for homeowners, workers compensation, commercial first and third party claims and personal automobile. As manager of the New Bedford office I supervised several hundred maritime claims covering all forms of maritime exposure. I was a member of the Risk Management Team charged with evaluating risk and controlling potential losses.

After my employment with Liberty, I joined Trust Group Inc., who owned Trust Insurance Company (Trust). I remained with Trust from 1989 to 1999. During my tenure with Trust I established and wrote the Claims Manual for Uniform Claim Handling; established guidelines for the proper processing of new business; wrote underwriting processing procedure manuals and was responsible for underwriting operations. I established a training program for the training of over 1200 technicians wrote the training procedures manual on claims handling coverage evaluation and developed a Home Office Claim Department to oversee the day to day technical responsibilities of the company.

In 1992 I assumed the position of Senior Vice President. In that position I established the Audit Practices Group to monitor high exposure claims. I also established an agency audit program, which I personally led that reviewed the practices of independent agents In their writing of personal and commercial insurance policies for

2

Trust Insurance Company. I wrote the underwriting operations manual for the proper processing of new policies, I have taught more than 100 classes on commercial claims handling and insurance policy interpretation and the claims handling necessary for policies with coverage questions. I have made presentations before brokers and agents on how to underwrite contracts when a proposal is received and what they, as the broker, must review.

From 2000 to 2001, I was employed by Ladd Financial Group, Inc., who owned New England Fidelity Insurance Company. In the capacity as Vice President of Claims for New England Fidelity, I wrote the claims procedure manual, established a claims audit program for all claims coverage and established authority levels for paying and denying claims.

From 2001 to the present, I have been employed by Swift Brook Associates and myself as an Insurance consultant. In that capacity, I have represented Liberty Insurance Company at hearings before the Massachusetts Commissioner of Insurance; examined insurance companies for compliance of standards and procedures for the State of Vermont Insurance Department; testified at trials In state and federal court as to usual and customary accepted Insurance practices; provided Insight Into claims and Insurance policy issues for law firms; evaluated Insurance company procedures and provided guidance for proper claims handling. I been the responsible authority for hundreds of lawsuits involving commt have evaluated insurance issues occurring in Massachusetts and I was tt person for making the decision on company procedures when issues arose.

I have assisted and Instructed students concerning the process and procedures In

becoming insurance producers In Massachusetts. I am an instructor at the Insurance Library of Boston Massachusetts teaching CPCU and other insurance courses. I have conducted seminars as to proper agency practices.

**Qualifications**

- I am a Massachusetts Insurance Agent, licensed to sell personal and commercial lines of Insurance.

- I am a licensed Public Adjuster In Massachusetts,

- I have conducted seminars for insurance staff and attorneys on coverage and Insurance operational issues.

- I am a Chartered Property Casualty Underwriter (CPCU) earning my designation in 1980.

- I am an Instructor at the Massachusetts Insurance Library teaching Insurance Operations and CPCU courses on coverage, risk management, ethics and Insurance operational Issues.

- My titles within the Insurance Industry have Included claims adjuster, supervisor,

national examiner, claims manager, vice president and senior vice president of claims, senior vice president of operations and resident individual producer.

**Present Assignment**

I have been retained by the plaintiff AGA Fishing Corporation (AGA) to review the responsibilities of the defendant insurance agency and agent producer, with particular attention to the Protection and Indemnity (P&I) Insurance coverage

4

placed by the agent with an insurance company/underwriter, and the adequacy of this coverage from AGA's perspective.

I am being compensated at a rate of $200 per hour for this review, $300 per hour for deposition and trial testimony and have no financial interest in the outcome of the litigation.

I have been asked for my opinion regarding insurance industry practices relating to the solicitation and sale of insurance policies, the claims these policies Insure against and the obligations of those who write the policies for the interest of Its Insureds. My curriculum vitae regarding my education, training and experience, is incorporated herein. My opinions will be based on my employment, experience, education and training In the insurance industry based upon reasonable and prudent claims practices.

The primary issue I have been asked to address is the care service and responsibility to the policyholder, AGA fishing Corporation that was owed by the insurance agency Flagship Group Ltd. and its agents

**Parties:**

- AGA Fishing Corporation: A Massachusetts corporation owning the scallop fishing vessel GEORGIEJ.

- Flagship Group, Ltd: An Insurance agency specializing in marine insurance which was sold prior to 11/2003 to Brown and Brown Inc.

- Brown and Brown, Inc. A national insurance agency that bought Flagship Group, Ltd.

**In my review of the claim I have been provided with the following** material:

1. Deposition and exhibits of John S. Devnew.

5

2. Deposition and exhibits of Lisa Rawles

3. Deposition and exhibits of Steven Johnson

4. Deposition and exhibits of George Jones

5. Deposition and exhibits of Antonette Jones

6. Deposition and exhibits of Robert O'Sullivan

7. Deposition and exhibits of Chris Burns.

8. Deposition of Steven H. Bastoni

9. Deposition of Debra Fernandes

10. Information from the Massachusetts Insurance Commissioner's office, concerning Flagship Group Ltd.

**Background**

Sometime in the '90s Flagship, a marine Insurance broker located In Norfolk, VA, decided to solicit marine insurance coverage for commercial fishing vessel owners in MA. Before opening an office in New Bedford, MA, several producers/brokers from Flagship's Norfolk office solicited and sold to a number of commercial fishing vessel owners located in MA commercial marine insurance, including protection and indemnity coverages, for their vessels. In the late '90s, after administrative action had been taken against Flagship by the office of the Commissioner of Insurance for the Commonwealth of Massachusetts for soliciting and selling commercial insurance in Massachusetts without being properly licensed to do so, Flagship became a licensed insurance agency in the Commonwealth of Massachusetts and opened an office In New Bedford, Massachusetts and staffed it with a licensed broker/producer,

6

Ronald Walsh. Mr. Walsh had many years experience as an insurance broker/producer in the New Bedford, MA area,, specializing in commercial marine insurance, primarily for fishing vessels.

After several years Flagship decided to close the Massachusetts office and terminate Mr. Walsh. After Flagship's New Bedford office was closed at least three Flagship broker/producers continued to solicit and sell commercial marine insurance to fishing vessel owners in Massachusetts. These were Steven Johnson, the president of Flagship, Robert O'Sulllvan, another officer of Flagship and John Devnew, also an officer of Flagship. Many of the New Bedford accounts that Mr. Walsh had serviced were than reassigned to John Devnew, a Flagship broker/producer. In connection with soliciting and selling marine insurance Mr. Devnew never worked out of a licensed Insurance agency anywhere In Massachusetts but out of Flagship's Norfolk office. While it appears that Devnew may have been a licensed broker/producer in MA for various non-marine underwriters for at least a part of the time he solicited and sold commercial marine Insurance In MA, It does not appear that either Johnson or O'Sullivan were ever licensed to sell commercial marine Insurance In MA.

During the years that O'Sullivan and Johnson sold marine insurance to commercial fishing owners in MA virtually all of the vessels they serviced carried $5.000,000 of protection and Indemnity coverage. At no time did the FA/ GEORGIE J carry more than $1,000,000 in P&I coverage.

**AGA Fishing Corp. and the F/V GEORGIE J**

AGA owned a scallop fishing boat, known as the GEORGIE J.   The principal operator of AGA

7

was George Jones. Mr. Jones's wife Antonette was listed as the president of the company, but It was Mr. Jones, who ran the day-to-day operations of the organization.

As testified to by Mr. Devnew at his deposition Mr. Jones is described as "a simple unsophisticated man." (See Mr. Devnew's deposition page 38 lines 20 to 23). "Jones is a simple man in his 50s who has spent his life fishing." See Mr. Devnew's deposition, May 5, 2006.

In November of 2003 a serious accident to a seaman working aboard the GEORGIE J occurred under circumstances where the vessel owner was absolutely liable. The vessel owner was grossly underinsured for this loss (carrying only $1,000,000 P&I coverage) and the boat and its accompanying license were seized by the United States Marshall Service and sold at auction to pay for the damages caused by an accident. The vessel and scallop permit sold at auction for $1.7 million thus depriving AGA of its livelihood.

**Marine Insurance**

Marine Insurance, particularly protection and indemnity coverage, Is complex and very different from virtually any other liability insurance available in the United States. This Is because, unlike commercial liability insurance or, more traditionally workers compensation insurance for land-based employers, a seaman working aboard a vessel has the right to sus his employer in tort for a full measure of damages while working in one of the most hazardous occupations in the modern era. The level of proof necessary in order to hold a vessel owner legally responsible in the event of an injury to a seaman is remarkably low, while, at the same time, the potential exposure to the vessel owner is exceptionally large in the event of a serious, disabling injury to a young commercial fisherman. Accordingly,

It is Imperative that a vessel owner carry adequate coverage so that the vessel owner doesn't lose its vessel and perhaps its business in the event of a serious injury to a seaman working aboard Its vessel.

A marine insurance broker/producer who claims special knowledge about marine insurance and who holds himself out to possess particular skill and expertise in this type of insurance must be well-versed in the types of remedies available to a seaman and what is happening in the industry insofar as the potential earning capacity of a seaman. Only then can an insurance broker be in a position to ascertain whether a fishing vessel owner has adequate Insurance coverage and therefore properly assist and advise a vessel owner accordingly, so as to fully protect the owner's business and livelihood.

**Flagship Group Ltd.**

Flagship held Itself out to vessel owners in Massachusetts and elsewhere as having significant expertise in the field of marine insurance, including marine insurance for commercial fishing vessel owners. This has been testified to by all Flagship brokers/producers who sold marine Insurance, Including P&I Insurance, to various vessel owners in MA. All have acknowledged a responsibility to carry out the duties advertised on Flagship's website, I.e. to "systematically and comprehensively examine" a vessel owner's maritime exposures so as to make sure the vessel owner had enough insurance coverage so it would not lose its business in the event of a serious accident.

I am informed by the deposition of Mr. Walsh and other sources that a scallop fishing vessel owner's exposure to a fisherman who was injured while working

aboard its vessel significantly increased sometime in the early 2000's. This was because of two (2) primary reasons. The first was the limited number of scallop fishing permits made available in the area by the federal government, which limited the number of vessels that could fish for scallops; the second was the significantly higher earnings available to fisherman working in the scallop fisheries because of the higher earnings of the vessels. These two factors made it foolhardy for an owner of a scallop vessel to carry only $1,000,000 in P& I coverage. In the event of a serious injury to a scallop fisherman during this time-frame working in a very dangerous industry there was a substantial likelihood that the damages available to that seaman would exceed the P&I limits thus exposing the vessel owner to a loss of its boat and even its fishing permit. Thus in order to "systematically and comprehensively" evaluate a scallop fishing vessel's exposure in the event of an injury to one of its crewmembers it was Incumbent upon the broker/producer to be aware of this information so that he could properly assist and advise the vessel owner in purchasing adequate P&I coverage.

I am informed that the owners of AGA and the FA/ GEORGIE J were unsophisticated business people, knew little about their insurance needs and relied upon the insurance brokers/agents with whom they dealt to advise them on their insurance needs. This applied to the insurance needs for their vessel. In fact, I am informed that at all times after acquiring the vessel in the mid-late '80's AGA simply carried $1,000,000 P&I coverage on the vessel, the same coverage that the previous owner carried. While this amount of coverage might have been adequate until early In the 2000's, by the time of the Issuance of the subject P&I policies in May, 2003, this amount of P & I coverage, for the reasons I've already stated, was grossly

10

inadequate. As the broker/producer servicing AGA, Mr. Devnew knew or should have known this and so informed the owners of AGA so that he could properly advise AGA In assessing its insurance needs and obtaining, to the extent possible, the necessary/adequate layers of P&I coverage to achieve $5,000,000 in protection and indemnity coverage.

**Responsibilities of an Insurance Agency**

A Massachusetts insurance agent is not an "order taker" or someone who simply acts as a go-between an insured and an underwriter. The agent has the responsibility and duty to present facts to both sides and obtain recommendations, not only on the basis of what the policy holder tells them, but rather what their education and experience tells them how to fulfill the needs of a particular client. Massachusetts insurance producers are licensed professionals authorized by the Commonwealth of Massachusetts to advise the insurance clients on the products the agent to sells and how those products can protect the client. They are paid handsomely for their services and owe their clients the highest professional standards and products. Those products take the form of an insurance policy based on the needs of the client/insured.

A review of the depositions shows multiple other comparable insureds with limits of $5 million In P & I coverage and some with more.

One would not sell a commercial business automobile policy to an Insured In the fishing industry that needed P & I coverage. Likewise, a licensed insurance professional would not recommend an insurance policy with grossly inadequate coverage limits to an insured. An agent is required to be highly skilled in evaluating the needs of an Insured and securing the coverage to cover those needs.

An agent In Massachusetts, and the proper term is "producer", particularly in a specialized area of Insurance such as marine Insurance, has the responsibility to advise the insured what products the agent has available to him/her and make recommendations to the insured on what his needs are. If the agent cannot offer the Insured the needed coverage the agent must tell the insured that the agency can not supply the needed products.

An agent has the responsibility to properly, and professionally, advise an insurance client of their needs and further advise If the producer can meet those needs. A client can certainly reject an agent's recommendations, and It is often a done in the insurance market place. A client may wish to reject recommendations on the basis of price or other considerations. However, when a producer realizes that an insured needs a product, and the recommendation is rejected, good practice dictates that the producer must properly advise the client of the products he suggests, and Importantly, the producer should make those recommendations in writing, so there is no misunderstanding of what the producer believes the Insured requires for proper protection. If an agent producer cannot meet the needs of the insured because the producer does not have the product available to him who either directly or on a contract basis with another insurer, or available to them through surplus lines market, the producer has the responsibility to advise the insured of what the needs are and suggest to the client that he seek other markets for the products that are needed to meet the client's potential exposure.

**Opinion**

- It is my opinion that AGA was grossly underinsured for the exposures that were presented to them.   Operating the scallop boat Georgie J, with a crew of 5 or 6

persons, and only $1 million P & I coverage was grossly Inadequate. Based on the depositions of the Flagship staff, it is obvious that no recommendations were made to AGA to increase their P & I coverages to parallel the exposure that AGA could incur.

• Multiple similar fishing boats had policies sold by Flagship with limits of $5 million and more. Flagship should have advised AGA to secure comparable and adequate coverage.

• A "so you tell me what you need" philosophy (as testified to by Devnew) is a patently inadequate approach to satisfying a client's needs and it is just plain wrong for an insurance professional to use in evaluating the coverage required by a client.

• It is the agent's responsibility to evaluate the risks faced by an insured on a day-to-day basis. Flagship producers held themselves out to be professionals with specialized knowledge In the marine Insurance industry, possessing the necessary skill and capability to properly evaluate the risks that the insured faced, and having the commensurate ability to recommend an appropriate product, i.e. an Insurance policy, that would effectively offset those risks.

• If the Insured was presented with an option to increase the P & I coverage and declined, it would be the responsibility of the agent to advise the insured in writing of the agency's recommendations, the reasons for the recommendations, and note that the Insured had declined their recommendations.

• A review of the supplied material indicated Flagship did make recommendations on other coverage including hull and pollution limits.

• Insurance professionals who hold themselves out as possessing particular skill and

13

expertise in evaluating marine insurance risks should be held to a higher standard then a "you tell me what you need" philosophy as presented by the defendants in this situation.

• It Is my opinion that Flagship did not meet the standards of care by its failure to properly advise and recommend the proper/adequate coverage for AGA.

Summary

It is my opinion that Flagship had the responsibility to make recommendations and advise AGA on the basis of AGA's exposure to the liabilities that were known or should have been known by the defendants.

As a result of the inadequate coverage that the insured, AGA had, AGA sustained losses beyond its available coverage and resources. AGA's P&I coverage was grossly Inadequate and was not comparable to coverage carried by other fishing boats in the area and sold by the defendants. AGA should have been advised by Flagship of AGA's potential exposure In the event of a serious accident and injuries to a crewmember and Its Insurance needs so as to protect its business. Having failed to so advise, AGA Flagship breached its duty to AGA, which directly resulted In AGA losing its vessel, fishing permit and business.

June 7th, 2007

Paul Amoruso, CPCU

**Exhibit 11**

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF MASSACHUSETTS

3    CERTIFIED ORIGINAL

4

5    AGA FISHING CORP.,                    )

6                     Plaintiff,    )    CIVIL ACTION NO.

7        v.                         )        05-11396JLT

8    FLAGSHIP GROUP LIMITED          )

9    and                            )

10   BROWN & BROWN, INC.,            )

11                    Defendants.    )

12

13

14    DEPOSITION UPON ORAL EXAMINATION

15    OF LISA A. RAWLES

16    TAKEN ON BEHALF OF THE PLAINTIFF

17    Norfolk, Virginia

18    May 4th, 2006

19

20

21    - - - - - - - - - - - - - - - - - - - - - - - - - - - -

22    TAYLOE ASSOCIATES, INC.

23    Registered Professional Reporters

24    Telephone:  (757) 461-1984

25    Norfolk, Virginia

TAYLOE ASSOCIATES, INC.

1    Q.    Okay.  So, if I understand your testimony

2  correctly, at the time that Flagship first started

3  doing business in Massachusetts you were the account

4  manager not only for accounts generated in connection

5  with the Massachusetts activities, which were limited

6  to commercial fishing boats, but also you were

7  responsible for the commercial fishing boat activities

8  generated by Flagship for vessels working out of North

9  Carolina, Virginia, Maryland, and New Jersey.

10    A.    Not solely, but yes.

11    Q.    Okay.  There were other people in the

12  office that also --

13    A.    Correct.

14    Q.    -- let me -- this is one of the

15  instructions, which you know where I'm going with the

16  question, but just so it's clear on the record, and a

17  lot easier for the court reporter, wait until I get

18  the question all the way out.

19         So, if I understand your testimony, while

20  you were -- once Flagship started writing insurance

21  risks for vessels out of Massachusetts, your sole

22  activities as an account manager for Flagship at your

23  office in Norfolk was to deal with the commercial

24  fishing trade not only for the Massachusetts vessels

25  but also vessels out of North Carolina, Virginia,

```
 1    Maryland, and New Jersey.  Is that correct?

 2         A.      Not solely, but yes.

 3         Q.      Meaning you did other stuff, too?

 4         A.      Meaning I wasn't the only one in the

 5    department.

 6         Q.      Okay.  But your department -- your job

 7    activities were limited to dealing with commercial

 8    fishing vessels?

 9         A.      Yes.

10         Q.      Okay.  Who else in the department dealt

11    with commercial fishing vessels out of either --

12    strike that.

13               Was there anyone else that dealt with

14    commercial fishing vessels that were insured through

15    Flagship in Massachusetts other than you?

16         A.      Yes.

17         Q.      Who else?

18         A.      Jack Devnew.

19         Q.      Okay.

20         A.      Steve Johnsen.

21         Q.      Yep.

22         A.      Ron Walsh.

23         Q.      Okay.

24         A.      And Mary LaFleur.

25         Q.      Okay.
```

```
 1          A.      Joyce Styler, my immediate supervisor at
 2   the time.
 3          Q.      And you said that was S-T-Y-L-E-R?
 4          A.      Yes, sir.
 5          Q.      Okay.  Anybody else?
 6          A.      Bob O'Sullivan, on a limited basis.
 7          Q.      Anybody else that you can recall?
 8                  MR. STONE:  Good luck trying to read his
 9   handwriting.
10   BY MR. ABROMOVITZ:
11          Q.      Devnew, Johnsen, Walsh, LaFleur, Styler,
12   O'Sullivan.
13          A.      Myself.
14          Q.      Okay.  Of the people that you identified,
15   were you the only account manager?
16          A.      Joyce was also an account manager.  She
17   was at the senior level.
18          Q.      Okay.  And how about Mr. O'Sullivan?
19          A.      No, he was a vice president.
20          Q.      Okay.  And Mr. Devnew, what was his
21   position?
22          A.      Producer.
23          Q.      And Mr. Johnsen, what was his position?
24          A.      President.
25          Q.      And Mr. Walsh, what was his position?
```

4/28/06

#6

### NEW ENGLAND ACCOUNTS – RECAP

| EFF. DATE | CORPORATION | VESSEL | OWNER |
|---|---|---|---|
| 2/10 | FAIRHAVEN FISHING CORP.<br>5 STEPHEN ST., FAIRHAVEN, MA | "PAUL & MICHELLE"<br>$1 MIL. P&I LIMIT | FELICIO LOURENCO |
| 2/17 | BLANCA CASA FISHING CORP.<br>113 MACARTHUR DR., NEW BEDFORD, MA | "CASA BLANCA"<br>$500,000 P&I LIMIT | JOSE GARCIA |
| 3/18 | G&M FISHING CORP.<br>113 MACARTHUR DR., NEW BEDFORD, MA | "RIANDA"<br>$1 MIL. P&I LIMIT | JOHN GIROUARD |
| 3/27 | CAPABLE FISHING, INC.<br>84 FRONT ST., NEW BEDFORD, MA | "CAPABLE"<br>$500,000 P&I LIMIT | DAVIS CHAU |
| 4/11 | V&G SEA PRODUCTS, INC.<br>(W/SUNDERLAND)<br>30 EAGLE NEST TERR., WAKEFIELD, RI | "FIRST LIGHT"<br>$5 MIL. P&I LIMIT | GREG HUBA |
| 5/1 | J&G SCALLOPS, INC.<br>114 MACARTHUR DR., NEW BEDFORD, MA | "ANDREA JEAN"<br>$1 MIL. P&I LIMIT | SCOTT RAPOSA |
| 5/1 | G&J FISHERIES, INC.<br>114 MACARTHUR DR., NEW BEDFORD, MA | "GEORGES BANK"<br>$1 MIL. P&I LIMIT | SCOTT RAPOSA |
| 5/1 | AGA FISHING, INC.<br>14 GREEN DR., N. DARTMOUTH, MA | "VICTOR"<br>$1 MIL. P&I LIMIT | GEORGE JONES |
| 6/12 | GALLANT FISHERIES, INC.<br>114 MACARTHUR DR., NEW BEDFORD, MA | "CHRISTINE & JULIE"<br>$1 MIL. P&I LIMIT | WILLIAM GALLANT |
| 7/1 | FREEDOM FISHING CORP.<br>101 GREEN ST., FAIRHAVEN, MA | "COURAGEOUS"<br>$5 MIL. P&I LIMIT | RAY STARVISH |
| 7/1 | ENDEAVOR FISHING<br>113 MACARTHUR DR., NEW BEDFORD, MA | "ENDEAVOR'<br>$5 MIL. P&I LIMIT | RAY STARVISH/ERIC HANSEN |
| 7/1 | FLYIN' FISHERIES, INC.<br>35 BLOSSOM ST., FAIRHAVEN, MA | "DINAH JANE"<br>$500,000 P&I LIMIT | RONALD MONIZ |
| 7/1 | LOBSTERS, INC.<br>P.O. BOX 264, N. DARTMOUTH, MA | "INDEPENDENCE"<br>$3 MIL. P&I LIMIT | LARRY YACUBIAN |
| 7/1 | W.G. FISHERIES, INC.<br>114 MACARTHUR DR., NEW BEDFORD, MA | "JANICE & JULIE"<br>$1 MIL. P&I LIMIT | WILLIAM GALLANT |
| 7/1 | THE HOPE II., INC.<br>5 STEPHEN ST., FAIRHAVEN, MA | "LUZITANO"<br>$1 MIL. P&I LIMIT | FELICIO LOURENCO |
| 7/1 | MAJESTIC, INC.<br>114 MACARTHUR DR., NEW BEDFORD, MA | "MAJESTIC"<br>$1 MIL. P&I LIMIT | MIKE SMITH |
| 7/1 | K&R ENTERPRISES, INC.<br>84 FRONT ST., NEW BEDFORD, MA | "NORTHERN EDGE"<br>$1 MIL. P&I LIMIT | PETER KILSHAW |
| 9/3 | CFA FISHING CORP.<br>3 NINA ST., NEW BEDFORD, MA | "ROCK N ROLLER"<br>$1 MIL. P&I LIMIT | MARIA ANDRE' |
| 9/29 | FREEDOM FISHING CORP.<br>101 GREEN ST., FAIRHAVEN, MA | "ALPHA & OMEGA"<br>$5 MIL. P&I LIMIT | RAY STARVISH |


EXHIBIT
Rawles
#3
HJ 5/4/06

4/28/06

## MONOLINE NEW ENGLAND ACCOUNTS - RECAP

## LUMPERS AND/OR POLLUTION COVERAGE ONLY

| EFF. DATE | CORPORATION | VESSEL | OWNER |
|---|---|---|---|
| 1/8 | CFA FISHING CORP. – LUMPERS<br>3 NINA ST., NEW BEDFORD, MA | "ROCK N ROLLER" | MARIA ANDRE' |
| 2/1 | SANCHEZ BROTHERS, INC. – LUMPERS<br>113 MACARTHUR DR., NEW BEDFORD, MA | "COVERED WAGON" | JOSE GARCIA |
| 3/10 | V&G SEA PRODUCTS, INC. – LUMPERS<br>30 EAGLE NEST TERR., WAKEFIELD, RI | "FIRST LIGHT" | GREG HUBA |
| 3/13 | JACOBSEN FISHING – LUMPERS<br>113 MACARTHUR DR., NEW BEDFORD, MA | "ENDURANCE" | LARS SOVIK |
| 3/14 | FREEDOM FISHING CORP. – LUMPERS<br>101 GREEN ST., FAIRHAVEN, MA | "COURAGEOUS" | RAY STARVISH |
| 3/14 | K&R ENTERPRISES, INC. – LUMPERS<br>84 FRONT ST., NEW BEDFORD, MA | "NORTHERN EDGE" | LARRY YACUBIAN |
| 4/22 | PROSPECTOR FISHING – LUMPERS<br>3 STONEY HILL RD., MATTAPOISETT, MA | "PROSPECTOR" | KENNETH MISDAL |
| 5/1 | AGA FISHING, INC. – LUMPERS<br>14 GREEN DR., N. DARTMOUTH, MA | "VICTOR" | GEORGE JONES |
| 5/1 | MICHIGAN FISHING – POLLUTION<br>2 MIDDLE ST., FAIRHAVEN, MA | "CONCORDIA" | MALVIN KVILHAUG |
| 5/1 | J&M FISHING – POLLUTION<br>2 MIDDLE ST., FAIRHAVEN, MA | "SANDRA JANE" | MALVIN KVILHAUG |
| 5/5 | MICHIGAN FISHING – POLLUTION<br>2 MIDDLE ST., FAIRHAVEN, MA | "CONTENDER" | MALVIN KVILHAUG |
| 5/8 | FRANK, MANUEL & CARLOS, INC. –<br>LUMPERS<br>19 ANN AVE., DARTMOUTH, MA | "BUENOS AIRES" | |
| 7/28 | ENDEAVOR FISHING – LUMPERS<br>113 MACARTHUR DR., NEW BEDFORD, MA | "ENDEAVOR" | RAY STARVISH/ERIC HANSEN |
| 8/11 | MAJESTIC, INC. – LUMPERS<br>114 MACARTHUR DR., NEW BEDFORD, MA | "MAJESTIC" | MIKE SMITH |
| | | | |

AS OF 2/16/01

### NEW ENGLAND BUSINESS LOST

| EFFECTIVE DATE | CORPORATION | VESSEL | OWNER |
|---|---|---|---|
| | | | |
| 1/23 | SANCHEZ BROTHERS | "COVERED WAGON" | JOSE GARCIA |
| 1/26 | MICHIGAN FISHING, INC. | "CONCORDIA" | MALVIN KVILHAUG |
| 2/5 | J&M FISHING, INC. | "SANDRA JANE" | MALVIN KVILHAUG |
| 2/1 | MICHIGAN FISHING CORP. | "CONTENDER" | MALVIN KVILHAUG |
| 2/10 | FAIRHAVEN FISHING, INC. | "PAUL & MICHELLE" | FELICIO LOURENCO |
| 2/17 | BLANCA CASA FISHING | "CASA BLANCA" | JOSE GARCIA |
| | | | |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11396 JLT

```
************************************************
AGA FISHING CORP.                    *
                                     *
v.                                   *
                                     *
FLAGSHIP GROUP LIMITED and           *
BROWN & BROWN, INC.                  *
************************************************
```

**AFFIDAVIT OF GEORGE JONES**

I, George Jones, do attest and swear that the following is true and correct to the best of my knowledge, information and belief.

(1)    That I am a part owner of AGA Fishing Corporation.

(2)    I was born on December 17, 1946. I have lived in New Bedford my whole life.

(3)    I dropped out of school in sixth grade in order to go to work and help support my family. I made my first commercial fishing trip at the age of 15 and starting fishing for a living at age 21. I have fished my entire career aboard scallop boats.

(4)    Starting in the early 1980s I worked aboard the F/V VICTOR and became its Captain. In 1987 the former owner of the VICTOR decided he wanted to sell the vessel. The original plan was that he would keep 50% of the ownership of the vessel and my wife, Antonette and I, would purchase the other 50% of the vessel. That is how the name AGA (Axel, George and Antonette) came about.

(5)    Axel decided he did not want to continue to own the boat and so my wife and I decided to purchase the boat ourselves. We did this by taking out a bank loan, using

savings and Axel taking a mortgage.

(6)    I worked as Captain aboard the F/V VICTOR from 1987 to 1995 when I had a heart attack and had to stop fishing.   After that I would only take the vessel out occasionally as Captain.  My son, George, Jr. had fished the vessel as Captain for a couple years.  George was killed when he was ashore.  In his honor we changed the name of the vessel to the F/V GEORGIE J.

(7)    In all the years that I had worked as a commercial fisherman I had never been on a boat where there had been a serious injury or death.  I always understood that the P&I insurance would take care of a crewmember that was injured aboard the boat.  Before the Capaldi incident I never was aware that a claim for a commercial fisherman injured or killed aboard a boat could result in a cost of more than $1,000,000 or that the inured crewmember could recover more than the P&I insurance.  I never heard of such a thing. Nobody ever told me about it.

(8)    In all the years that I have purchased insurance either from my home, cars or my boat my wife and I always relied upon the insurance agents that we dealt with to tell us how much insurance coverage and the type of insurance we needed.  If they recommended that we have more or a different kinds of insurance we would always follow their recommendations.  When the insurance agent for my home recommended that we add earthquake coverage to our home we never questioned his judgment.  We simply did so.  While I would ask the insurance agents to shop around for better rates I never questioned any insurance agent about the amounts or types of insurance coverage that I should have.  I always viewed them as being the professionals and they

knew the insurance business and I did not.

(9)     When AGA Fishing Corp. purchased the F/V VICTOR (later the GEORGIE J) in 1987 Axel, whose last name I could never pronounce or spell, told me that he carried his insurance through Ron Walsh at Neptune Mutual. The insurance P&I coverage was $1,000,000. The bank loaning us the money to purchase the boat told us we needed insurance. So AGA simply carried over the same insurance that Axel had been carrying for the vessel after that time. I always assumed that if we did not have enough insurance coverage the insurance agent, who at that time was Ronald Walsh, would tell me we needed more coverage and we would purchase it.

(10)    In the 1990's I had a falling out with Neptune Mutual. I transferred the insurance coverage for the GEORGIE J to Bill Hart at Mariners Insurance. We simply continued the same $1,000,000 P&I insurance on the boat, figuring that if we needed more Bill Hart would tell me we needed more and we would purchase more. He never did.

(11)    In the late 90s I became aware that Ron Walsh had become employed by Flagship. As I always liked Ron Walsh and felt that he always properly advised us and assisted us we transferred the insurance back to Flagship. We still carried $1,000,000 P&I coverage. We assumed that this was enough insurance. We always believed that if it was not enough insurance coverage Ron Walsh would advise us to increase it and we would do so. He never did.

(12)    In the early 2000's Ron Walsh informed me that he was leaving Flagship and I questioned him about what I should do for insurance coverage for the GEORGIE J. He

told me that Steve Johnsen, the owner of Flagship, was a very honorable man and very knowledgeable in the field of insurance and that he felt we would be best served by staying with Flagship; that Flagship would take care of us. We did so.

(13)   Soon thereafter we learned that John "Jack" Devnew was the insurance agent from Flagship that would be handling our insurance needs for the F/V GEORGIE J. We were concerned because Mr. Devnew was based in Virginia. Mr. Devnew told us not to worry, that he would take care of us and was able by phone anytime we need to reach him. We believed him and relied upon him.

(14)   After Devenw took over the handling of the insurance needs for our vessel our P&I coverage limits were still $1,000,000. We assumed that if we needed more insurance Mr. Devnew would so inform us and we would purchase more insurance. He never did.

(15)   When I would receive the insurance renewal proposals from Flagship and they contained language "higher limits available upon request" I thought that meant that the insurance company could charge me more during a particular policy year. Mr. Devnew never told me anything different. I always believed that if I needed more insurance to protect my business that Mr. Devnew would tell me that I needed more insurance and I would have purchased it He never did.

(16)   After Mr. Devnew took over handling our insurance thru Flagship the scallop fishing vessels, including the GEORGIE J, were doing considerably better than they had done during the period of time that I insured my vessel through Ron Walsh at Flagship.

(17)   In November, 2003 a crewmember aboard the F/V GEORGIE J was seriously

injured. Prior to that time there had never been a claim aboard our vessel for an injury to a crewmember that exceeded $20,000. When Mr. Capaldi was injured we simply assumed that the insurance we had aboard the vessel would take care of his claim. We were shocked to learn that any claim could exceed the $1,000,000 limits and if it did so we could lose our business. Neither my wife nor I knew this.

(18)    After the Capaldi incident I learned that many of the vessel owners in New Bedford insured through Flagship were carrying $5,000,000 P&I coverage. I learned that the cost per man per year to increase from $1,000,000 P&I coverage to $5,000,000 P&I coverage would increase the insurance premiums in an amount less than $5,000 a year. Had I known that a claim could possibly exceed the $1,000,000 policy limits and that I could purchase up to $5,000,000 P&I limits for my entire crew for less than $5,000 a year I would have done so.

(19)    Prior to the incident with Mr. Capaldi in November 2003 I had no idea how an insurance company or the courts would determine an amount of money to be awarded to an injured seaman. That is something that I believe was up to the insurance agents that I dealt with to determine and advise me as to whether I had enough coverage.

Dated: June 7, 2007

George Jones
George Jones

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11396 JLT

```
************************************************
AGA FISHING CORP.                 *
                                  *
v.                                *
                                  *
FLAGSHIP GROUP LIMITED and        *
BROWN & BROWN, INC.               *
************************************************
```

**AFFIDAVIT OF ANTONETTE JONES**

I, Antonette Jones, do attest and swear that the following is true and correct to the best of my knowledge, information and belief.

(1)     That I have been married to George Jones for more than 40 years.

(2)     That I dropped out of high school when I was very young and did not get my GED until I was in my 40s.  I got it from New Bedford High.

(3)     When my husband and I through AGA Fishing Corp. bought the VICTOR (later the GEORGIE J) we did not have any business or legal advice.  We just went to the banks to arrange for the financing along with our savings.

(4)     My husband, George, would take care of everything related to the "fishing business."  Edie at Edie & Marie's would handle the boat settlements and distribute the monies generated by a fishing trip and pay the bills.  Occasionally I would write a check for supplies for the boat or repairs or things of that nature.

(5)     In connection with any insurance that we have ever purchased for our home, cars, or boats we always relied upon our insurance agents to tell us if we had enough

insurance and the type of insurance to purchase. If they told use we needed more insurance or different kinds of coverage we would just go with their recommendation. They are the professionals; neither my husband nor I really understood or knew much about insurance.

(6)    For many years we have insured our homes and cars through Steve Bastoni at Crowley & Weaver Insurance Agency in New Bedford. When Mr. Bastoni told us we needed more insurance on the cars or the house we wouldn't question his judgment. We would just purchase the insurance, including earthquake insurance that he recommended.

(7)    Prior to the accident with Victor Capaldi I had no idea what other fishing boats were carrying for insurance coverage. Nor did I have any idea what could happen if we did not have enough insurance. I was completely unaware of how insurance companies or courts determined an amount of money to award to somebody injured aboard a commercial fishing boat. I never F/V GEORGIE J.

(8)    When we did business with Ron Walsh we trusted him. We relied upon Mr. Walsh to tell us if we had enough insurance. If Mr. Walsh told us we did not have enough insurance we would have increased it. He is the professional and we relied upon him. When Ron Wlash left Flagship and recommended that we stay with Flagship for the boat insurance Jack Devnew assured us that he would "take care of us". We assumed he knew as much as Ron Walsh and would advise us properly.

Dated: June 7, 2007

Antonette Jones

5/1/06

P&I AND EXCESS P&I RATING IS DEPENDENT UPON SEVERAL FACTORS WHICH
INCLUDE, BUT ARE NOT LIMITED TO:

> OWERSHIP
> FLEET OR SINGLETON
> VESSEL INFORMATION/CONDITION
> CREW
> FISHERY
> NAVIGATION
> EXPERIENCE
> CLAIMS HISTORY

THERE WERE NO RATING SCALES IN PLACE FOR P&I AND EXCESS P&I COVERAGE FOR
THE YEARS 2000 THROUGH 2004. THE RATE PER MAN CHARGE FOR NEW ENGLAND
VESSELS DURING THE YEARS 2000 THROUGH 2004 RANGED AS FOLLOWS BASED ON
INDIVIDUAL RATING FACTORS AND SUBJECT TO UNDERWRITERS PROVISION
AND/OR APPROVAL:

SCALLOP VESSELS – $750,000 XS $250,000:        RATE PER MAN = $455 TO $1452

SCALLOP VESSELS – $2 MIL XS $1 MIL:        RATE PER MAN = $375 TO $1100

SCALLOP VESSELS – $4 MIL XS $1 MIL:        RATE PER MAN = $500 TO $750

THESE RATES WERE PULLED DIRECTLY FROM RANDOM SCALLOP VESSELS THAT
WERE IN THIS BOOK OF BUSINESS DURING THE YEARS 2000 THROUGH 2004 AND
INCLUDED THE "GEORGIE J". THIS PARTICULAR BOOK OF BUSINESS ALSO INCLUDED
VESSELS ENGAGED IN THE DRAGGING FISHERY WHICH WOULD HAVE RESULTED IN A
DIFFERENT RATING PHILOSOPHY BASED ON SIMILAR CRITERIA.

MSOFFICE/LISA/NE RATES.5-1-06

EXHIBIT
Rawles
#4
HJ 5/4/06
PENGAD 800-631-6989

## EXCESS PROTECTION & INDEMNITY - ALTERNATE

| | |
|---|---|
| **NAMED ASSURED:** | **MAJESTIC, INC. / MIKE SMITH AND DONALD CALNAN** |
| **TERM:** | **JULY 1, 2001 TO**                **12:00 Noon E.S.T.**<br>**JULY 1, 2002**                   **12:00 Noon E.S.T.** |
| **LIMIT OF LIABILITY:** | **$2,000,000 XS $1,000,000** |
| **SECURITY:** | **Underwriters At Lloyd's**<br>**London, England** |
| **TERMS & CONDITIONS:** | |

- **Excess of Primary Protection & Indemnity Policy Following Form**
- **AIMU Protection and Indemnity Clauses 6/2/83**
- **Fishing Vessel Clauses (P&I)**
- **Service of Suit Clause**
- **Excess Collision Extention**
- **Institute Radioactive Contamination Exclusion Clause 1/10/90**
- **Brokers Cancellation Clause**
- **Osprey Electronic Date Recognition Conformity Endorsement Clause**
- **Cancelling Returns Only**

| | |
|---|---|
| **CREW:** | **5-7 WA, CAPTAIN INCLUDED** |
| **TOTAL EXCESS P&I PREMIUM:** | **INCL.** |

## HIGHER LIMITS AVAILABLE UPON REQUEST

## EXCESS PROTECTION & INDEMNITY

| | |
|---|---|
| **NAMED ASSURED:** | **LOBSTERS, INC.** |
| | **LARRY YACUBIAN** |
| **TERM:** | **JULY 1, 2001 TO**     12:00 Noon E.S.T. |
| | **JULY 1, 2002**     12:00 Noon E.S.T. |
| **LIMIT OF LIABILITY:** | **$1,750,000 XS $250,000** |
| **SECURITY:** | **UNDERWRITERS AT LLOYD'S** |
| | **LONDON, ENGLAND** |

**TERMS & CONDITIONS:**
- ◆ **Excess of Primary Protection & Indemnity Policy Following Form**
- ◆ **AIMU Protection and Indemnity Clauses 6/2/83**
- ◆ **Fishing Vessel Clauses (P&I)**
- ◆ **Service of Suit Clause**
- ◆ **Excess Collision Extention**
- ◆ **Institute Radioactive Contamination Exclusion Clause 1/10/90**
- ◆ **Brokers Cancellation Clause**
- ◆ **Osprey Electronic Date Recognition Conformity Endorsement Clause**
- ◆ **Cancelling Returns Only**

| | |
|---|---|
| **CREW:** | **5-7, INCLUDING CAPTAIN** |
| **TOTAL EXCESS P&I PREMIUM:** | **INCL.** |

## HIGHER LIMITS AVAILABLE UPON REQUEST



## EXCESS PROTECTION & INDEMNITY

| | |
|---|---|
| **NAMED ASSURED:** | **ENDEAVOR FIGHING CORPORATION/ RAY STARVISH AND ERIC HANSEN** |
| **TERM:** | **JULY 1, 2001 TO**      **12:00 Noon E.S.T.** |
| | **JULY 1, 2002**      **12:00 Noon E.S.T.** |
| **LIMIT OF LIABILITY:** | **$4,750,000 XS $250,000** |
| **SECURITY:** | **UNDERWRITERS AT LLOYD'S LONDON, ENGLAND** |

**TERMS & CONDITIONS:**
- ◆ **Excess of Primary Protection & Indemnity Policy Following Form**
- ◆ **AIMU Protection and Indemnity Clauses 6/2/83**
- ◆ **Fishing Vessel Clauses (P&I)**
- ◆ **Service of Suit Clause**
- ◆ **Excess Collision Extention**
- ◆ **Institute Radioactive Contamination Exclusion Clause 1/10/90**
- ◆ **Brokers Cancellation Clause**
- ◆ **Osprey Electronic Date Recognition Conformity Endorsement Clause**
- ◆ **Cancelling Returns Only**
- ◆ **N.M.F.S. FORM 2-267 (B)**

| | |
|---|---|
| **CREW:** | **7, EXCLUDING CAPTAIN** |
| **TOTAL EXCESS P&I PREMIUM:** | **INCL.** |

## HIGHER LIMITS AVAILABLE UPON REQUEST



## EXCESS PROTECTION & INDEMNITY

**NAMED ASSURED:** FREEDOM FISHING CORPORATION /
RAY STARVISH

**TERM:** JULY 1, 2003 TO          12:00 Noon E.S.T.
JULY 1, 2004          12:00 Noon E.S.T.

**LIMIT OF LIABILITY:** $4,750,000 XS $250,000

**SECURITY:** UNDERWRITERS AT LLOYD'S
LONDON, ENGLAND

**TERMS & CONDITIONS:**
- Excess of Primary Protection & Indemnity Policy Following Form
- AIMU Protection and Indemnity Clauses 6/2/83
- Fishing Vessel Clauses (P&I)
- Service of Suit Clause
- Excess Collision Extention
- Institute Radioactive Contamination Exclusion Clause 1/10/90
- Brokers Cancellation Clause
- Osprey Electronic Date Recognition Conformity Endorsement Clause
- Cancelling Returns Only
- Terrorism Insurance Disclosure

**CREW:** 7, CAPTAIN INCLUDED

**TOTAL EXCESS P&I PREMIUM:**

## HIGHER LIMITS AVAILABLE UPON REQUEST



## EXCESS PROTECTION & INDEMNITY

| | |
|---|---|
| **NAMED ASSURED:** | **V & G SEA PRODUCTS, INC./GREGORY HUBA** |
| **TERM:** | **April 11, 2002 to**        **12:00 Noon E.S.T.**<br>**April 11, 2003**          **12:00 Noon E.S.T.** |
| **LIMIT OF LIABILITY:** | **$4,750,000.00 xs $250,000.00** |
| **SECURITY:** | **Underwriters at Lloyd's**<br>**London, England** |
| **TERMS & CONDITIONS:** | ♦ **Excess of Primary Protection & Indemnity Policy Following Form**<br>♦ **Canceling Returns Only** |
| **CREW:** | **3.5, including captain** |
| **TOTAL EXCESS P&I PREMIUM:** | **$** |

## HIGHER LIMITS AVAILABLE UPON REQUEST



# AGA Fishing, Corp.
## vs.
# Flagship Group Limited, et al.

# Debra Fernandes

## Volume 1

December 7, 2006
pp 1-106

Jones Reporting
COMPANY

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Debra Fernandes

Page 62

1  Q.  Did Mrs. Jones provide you with the
2  figures for the insurance requested?
3  A.  I tend to doubt it because like I said
4  before, it usually comes from a survey, and I
5  don't -- I don't know where the rest of this survey
6  is.  I would have to -- I mean, I don't recall.
7  Maybe they did just take out the -- I
8  don't recall.  I'd have to really call Seacoast
9  back and see if they have the full survey here, you
10  know, in their office or not because the whole
11  survey is not here.
12  Q.  Okay.  What about the liability portion
13  under insurance coverage requested, Section B; did
14  Mrs. Jones provide you with a $500,000 --
15  A.  I can't say that she did.  Again, I don't
16  know if that was the cap at the time, and we
17  discussed -- I had discussed it with the company.
18  And he said that was the max we could get.  I can't
19  recall.  I know right now, the maximum that I can
20  get is 250.
21  So if you look, I even handwrote the 500.
22  Because prior to this, I know it was capped at 250
23  also.  So I think -- I don't know if I just
24  stretched it to see if they'd do it or if he told

Page 63

1  me they could.  I can't recall how that came about.
2  But it was not part of their application.
3  Q.  P&I insurance capped at 250, is that just
4  through your brokerage or --
5  A.  No, no.
6  Q.  -- is that across the board?
7  A.  It depends -- it's company specific.  It
8  really is.  I mean, sometimes you can call a
9  company, and they'll say, you know, We're not going
10  to do -- it's -- I find it territorial.  I'm
11  working -- well, a small boat out of Gloucester.
12  And they don't seem to have a problem with half
13  million.  But as soon as I say New Bedford, they'll
14  only give 250 now.  So it's really area specific,
15  company specific.
16  And I'm assuming by looking at this
17  application that they did only probably offer 250
18  at the time.  And maybe after phone discussion,
19  they offered -- they allowed me to at least try the
20  half million and see what we got.  And luckily, we
21  were able to get it.
22  Q.  Do you have any understanding why it
23  would be capped at 250 in New Bedford?
24  A.  They just look at the whole area.  You

Page 64

1  can't even -- it's just tough to insure boats here
2  right now.
3  Q.  Has it always been that way?
4  A.  No.  It wasn't back when I used to do
5  boats.  It was like writing car insurance.  It was
6  a dime a dozen.  Now, it's just really tough.
7  Q.  What do you attribute that to?
8  MR. ABROMOVITZ:  Objection.
9  A.  I have no idea.  I guess there's just a
10  lot of factors these companies look at.
11  Q.  What discussions did you have with either
12  Mrs. Jones or Mr. Jones about the $500,000 for P&I
13  coverage?
14  A.  I have no recollection of that.
15  Q.  Do you have -- well, strike that.
16  Tell me about any conversations you had
17  with them, in general, about P&I coverage.
18  A.  I -- I can't recall.  I don't know.  I
19  see that I indicated here half a million, which was
20  not on the application.  And I'm assuming that's
21  what we talked about, and that's what I quoted.  I
22  don't know what the conversations were.
23  Q.  Did the Joneses say anything to you about
24  why they hadn't brought the Kelly Jean to Flagship

Page 65

1  for a quote?
2  A.  No.
3  Q.  Did you have any discussions with the
4  Joneses about the permit value on the Kelly Jean?
5  A.  No.
6  Q.  Did the Joneses appear knowledgeable to
7  you about marine insurance?
8  MR. ABROMOVITZ:  Objection.
9  A.  Yeah.  They knew what they -- they just
10  came in.  They, obviously, knew I needed a survey,
11  yeah.  I'd say they had some experience in insuring
12  boats.
13  Q.  Did they seem to know what hull insurance
14  covered?
15  A.  Sure.
16  Q.  Did they seem to know what P&I coverage
17  was for?
18  A.  Yes.
19  MR. ABROMOVITZ:  Objection.
20  Q.  Do you recall any questions that they
21  asked you about hull insurance?
22  A.  I don't know.  I don't recall.
23  Q.  Do you recall any questions that they had
24  for you about P&I insurance?

17 (Pages 62 to 65)

Debra Fernandes

Page 94

1   adequate insurance coverage?
2      A.   Yeah.  I mean, again, we -- you know, we
3   had a lot of discussions before we even bound this,
4   you know.  I just don't recall them, you know.
5      Q.   The policy that you actually wrote on the
6   application form through the company in New York,
7   that policy actually had a limit of $250,000 P&I,
8   the actual piece of paper?
9      A.   Half a million, wasn't it?
10     Q.   Well, what I want to see is -- I want to
11  know what the form --
12     A.   Oh, on their form.
13     Q.   On their form.
14     A.   Yes.  It had a 250 limit on their form.
15     Q.   Okay.  Let's just identify the document
16  on the record.
17     A.   Yeah.  I know what you're talking about.
18         Right here.  DF23.
19     Q.   Okay.
20     A.   24 actually.
21     Q.   DF24?
22     A.   Yeah.
23     Q.   And under the section entitled,
24  "Insurance Coverage Requested," this is a printed

Page 95

1   form.  Subsection B is P&I liability.  There's a
2   space for $100,000, $200,000, $250,000 --
3      A.   Correct.
4      Q.   -- correct?  And that was part of the
5   printed form you were provided?
6      A.   Right.  And as you can see right here, it
7   was faxed to me from them.
8      Q.   Okay.  This was faxed to you from the
9   company through whom you placed the coverage?
10     A.   Right.  Right here.
11     Q.   Okay.  Just stay with me on the
12  questions, and you're one of these people who
13  speaks very fast.  And I'm surprised -- the
14  reporter is doing a great job of keeping up with
15  you.  But let me just get the questions out first.
16  Okay?
17         The handwritten $500,000, that's your
18  handwriting?
19     A.   Yes.
20     Q.   And so the Joneses requested, after a
21  consultation with you, $500,000 in coverage;
22  correct?
23         MS. PASTORI:  Objection.
24     A.   I don't recall.  They could have

Page 96

1   requested a million.  I don't -- they might have
2   been all I could get, you know.  I don't recall the
3   whole situation.
4      Q.   Okay.  You got whatever insurance you get
5   from them?
6      A.   Exactly.
7      Q.   And you got the insurance that you
8   thought to be adequate for their needs?
9      A.   Exactly.
10     Q.   Now, let me go back on two other things.
11  Let's go to the same application and go to DF23.
12  And on very line 1, there's a space for owner;
13  correct?
14     A.   Yes.
15     Q.   And who is listed as the owner?
16     A.   Antoinette Jones.
17     Q.   Does George Jones appear -- his name
18  appear as owner?
19     A.   No, not there.
20     Q.   And let's go to the issue of the amount
21  of coverage that was bound.  Take a look, if you
22  would, please, on Exhibit 4 on this Sheet, if you
23  have Exhibit 4 in front of you.  It's the second
24  page of the vessel application form.

Page 97

1      A.   What's the front of that one look like?
2   Oh, it's this one.
3      Q.   The fax.
4      A.   Yup.  Page 4?
5      Q.   No.  Page -- it's Page 2 --
6      A.   Oh, Page 2.
7      Q.   -- of the actual application.
8      A.   Okay.
9      Q.   All right.  Do you remember the
10  questioning earlier today about whether you could
11  find the survey and how the figure of $60,000 was
12  arrived at?
13     A.   Right, yes.
14     Q.   Okay.  And under the section described,
15  "Amount of hull insurance requested," do you see
16  that?
17     A.   Yes.
18     Q.   All right.  There's a figure of 70,000.
19  Do you see that?
20     A.   Yes.
21     Q.   And then there's -- somebody wrote in, in
22  handwriting, "Survey 2/02 says 50 to 58 - I can go
23  60K."  Do you see that?
24     A.   Yes.

**Exhibit 17**

13. Please list any losses you may have had with this or any other vessel within the last five (5) years.

(If none, please write "None".)

| Date | Description of loss  _Zelinski_ | Amount of loss |
|------|------------------------------|----------------|
| _2/22/00_ | _Injury broken-thumb_ | _7,719_ |
| _4/11/00_ | _Injured finger - Lynch_ | _(RT)_ |
| _6/6/01_ | _Rivera possible seizure_ | _- No known payner_ |

14. Present Insurer: _new purehase_

Date Coverage Expires_____/_____/_____

15. Has insurance ever been denied or cancelled for this vessel? Yes_____ No _X_

If Yes: Why?_____

16. Mortgage Amount_ _none._ _    Name and Address of Lender

_____

_____

_____

### Insurance Coverage Requested

(a) Hull and Machinery Insurance $ _60,000_

(b) P&I (Liability)    100,000_____ 200,000_____ 250,000_____ _$500,000_

to include _2_ crew member (s) (Excluding Owners)

(c) War Risk, Pollution, Excess Collision and Twelve (12) Month Navigation are included where applicable.

Statement:

I believe that the above information, given by me, is correct and complete.

_Antonette J. Jones_                                    _3-15-02_

Signature of Applicant                                    Date

**Island Wide Marine Agency**
Division of WBM Agency, Inc.
5771 Nesconset Hwy.
Suite 212
South Setauket, NY 11720

DF24

# MARITIME BULLETIN

### News and Information from the Port of Hampton Roads

**Volume 69, No 4, April, 2005**

This months Maritime Bulletin is Sponsored by:

## Flagship Group Ltd.

# Hampton Roads Premier Maritime Events:

## 85th Annual Banquet

HRMA will host its 85th Annual Dinner Meeting on May 12th. Congresswoman Thelma Drake will be this year's keynote speaker.



On November 2, 2004, Thelma Drake was elected as the representative of Virginia's Second Congressional District in the U.S. House of Representatives. This District encompasses all of Virginia Beach, parts of the cities of Norfolk and Hampton, and Accomack and Northampton Counties on Virginia's Eastern Shore.

Shortly after being sworn in, Thelma Drake was appointed to serve on the Committee of Armed Services, the Committee on Resources and the Committee on Education and the Workforce.

In addition to her seats on these key committees, Representative Drake will be a member of the House Republican Policy Committee, which plays an integral role in shaping the House Republican position on major policy initiatives.

## International Trade Symposium 2005

On May 12, 2005, the Hampton Roads Maritime Association will offer the International Trade Symposium for the second consecutive year. The Symposium is offered to raise awareness of the ever changing issues related to international trade.

The opening session will have comments from J. J. Keever, Deputy Executive Director of Virginia Port Authority (VPA) and Joseph Dorto, General Manager of Virginia International Terminals (VIT) on "Capacity - Acting Today, Meeting the Needs of the Future."

Mr. William L. Ralph, Senior Advisor of R.K. Johns & Associates will mediate the second session, a panel discussing "Asia Phenomenon - What does it mean to East Coast Ports?" Panel participants include Mr. Michael DiVirgilio, representing NYK Line; Mr. Jeffrey S. Heller, representing Norfolk Southern Corporation; Chris Von Kannewurff, representing "K" Line America, Inc. and; Rodolfo Sabonge, representing Panama Canal Authority.

The Symposium will conclude with a luncheon presentation by Mr. J. Russell Bruner, President and CEO of Maersk, Inc. who will discuss APM Terminals Virginia.

Published by the Hampton Roads Maritime Association, Norfolk, Virginia
email: hrma@portofhamptonroads.com -- web site: www.portofhamptonroads.com

1

# SPONSOR SPOTLIGHT





## HAMPTON ROADS
## MARITIME ASSOCIATION

*Officers*
**Chairman of the Board**
Charles E. Brinley

**President**
Meade G. Stone, Jr.

**Vice Presidents**
Robert P. Armbruster
Joseph A. Dorto
Kip Hinkle

**Executive Vice President
& Secretary**
Arthur W. Moye, Jr.

**Treasurer**
Judy M. Barrett

**Assistant Treasurer**
Stephen M. Carmel

*Staff*
**Administrator**
David C. White

**Administrative Assistant
to Executive Vice President**
Jodie M. Love

**Accounting**
Kristie A. Acors
Christina M. Martin

**Shipdesk Clerk**
Lynne H. Stonum

**Membership Desk/Editor**
Susan N. Wisniewski

*MARITIME BULLETIN* is published
12 times a year by Hampton Roads
Maritime Association.
Subscriptions are available through
membership in the Association.
Membership rate is $200 annually.



Recipient of Presidential "E" and
"E Star" Awards for Excellence in
Export Service
Recipient of ASAE Communication
Excellence & Honorable Mention Awards

The Flagship Group has been providing commercial insurance to the local, regional, and national maritime community since 1977.

The focus of the company is ship repairers, terminals, tug and barge operators, and commercial fishing vessel exposures. These industries have difficult exposures and concerns. These may include drydocks, railways, or sea trials of vessels being repaired. A misunderstood coverage often needed, is for "action over claims", whether a down river repairer or yard owner. Terminal operators have stevedore, wharfinger, and care custody and control exposures. Vessel operators need Hull and P&I coverage for Jones Act crew claims, as well as damages arising out of allisions and collisions. Insurance for United States Longshore & Harbor Workers exposure is a complex coverage that the agency deals with on a daily basis. Assistance is given in determining whether employees are covered by a state act or federal act. Many clients have activities that expose employees to three jurisdictions, State Act, USL&H, and Jones Act.

As professional brokers the objective is to assist clients with an understanding of their exposures, and evaluating the proper way to transfer risk at a fair price. This is accomplished through experience, technical knowledge, risk evaluation, and relationships in the insurance market. A comprehensive review of insurance exposures is performed and coverage recommendations are made. The employees of Flagship Group average in excess of 15 years in the industry. Several of the staff have spent time as underwriters.

While recognized for their expertise in the marine insurance field, Flagship Group has a large book of non-marine clients. The agency writes traditional property and casualty business as well as employee benefits.

Perhaps the most important function Flagship performs is as your advocate in the event of a claim. A principal responsibility of a broker is to ensure that losses are handled in a timely and efficient manner. The Flagship Group is dedicated to assisting with every facet of the claims process and settlement.

In 2000, The Flagship Group, Ltd. was purchased by Brown & Brown, Inc., one of the leading independent insurance intermediaries in the United States. Their decentralized structure allows Flagship Group access to the national resources provided by Brown & Brown, while allowing Flagship Group to focus on its core specialty of providing maritime insurance to its clients worldwide.

For more information, contact their offices at 757-625-0938 or visit their web site at www.flagshipgroup.com.

### IN THIS ISSUE

| | |
|---|---|
| 1. Cover Page | 5. News Briefs & Announcement |
| 2. Sponsor Spotlight | 6. HRMA Highlights |
| 3. Maritime News | 7. Membership News |
| 4. Port Statistics | 8. Club Contacts/Upcoming Events |