UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11396 JLT

***********************************************
AGA FISHING CORP.                    *
                                     *
v.                                   *
                                     *
FLAGSHIP GROUP LIMITED and           *
BROWN & BROWN, INC.                  *
***********************************************

### AGA FISHING CORP.'S OPPOSITION TO FLAGSHIP GROUP LIMITED AND BROWN & BROWN, INC.'S, MOTION TO STRIKE AFFIDAVIT OF RONALD WALSH

Now comes the Plaintiff, AGA Fishing Corp., ("AGA") and opposes the Defendants, Flagship Group Limited and Brown & Brown's Inc., ("Defendants") Motion to Strike Affidavit of Ronald Walsh as follows.

I.   Ronald Walsh's Affidavit does not contradict his deposition testimony.

The Defendants contend that Ron Walsh's affidavit contradicts his deposition testimony but the Defendants do not cite to any portion of Mr. Walsh's deposition testimony showing a contradiction. Although Mr. Walsh did state in paragraph two of his affidavit: "When I testified at my deposition that I didn't remember whether the Jones' relied upon me for advice concerning insurance coverages that was inaccurate", Mr. Walsh had in fact testified at his deposition that the Jones relied upon him for advice concerning insurance coverage. (Walsh Depo., pp. 123-124, Exhibit A).

It appears that Mr. Walsh thought he needed to clarify an answer he gave

at the end of his deposition: Q. Did the Joneses ever say anything to you that indicated that they were relying upon you for advice in terms of coverage? A. I don't recall. (Walsh Depo page 130, line 6-9, Exhibit A). In any event, the Jones specific direction for coverage advice is not required to show reliance on Flagship Limited Group. Compare, <u>Construction Planners, Inc. v. Dobax Ins. Agency, Inc.</u>, 583 N.E.2d 255, 31 Mass. App. Ct. 672 (1991) (when an insurance broker who holds himself out as knowledgeable in the field of construction industry insurance fails to advise his construction company client that, in the absence of specific direction, he was not going to renew a builder's risk policy even though he knew that the client construction company had yet to complete the project, the broker is liable for the loss of insurance coverage that arose when the policy was not renewed.)

II.     Ronald Walsh is a fact witness.

The Defendants attempt to characterize Mr. Walsh as an undisclosed expert witness "as to the duties of brokers and the adequacy of coverage." (Defendant's Motion at p. 3.) This statement is inaccurate. Mr. Walsh, who was a Flagship broker/producer running Flagship's New Bedford office during all times relevant hereto, is expected to testify about the duties of Flagship Group Limited's insurance broker/producers which included reviewing the adequacy of insurance coverage carried by ship owners. (Walsh Depo., pp. 70-71 and pp. 131-132, Exhibit A). Mr. Walsh is allowed to provide testimony based on his particular knowledge that he has by virtue of his position as an insurance

producer with Flagship Group Limited.[1]  See, <u>USA v. Munoz-Franco</u>, 2007 U.S. App. First Circuit, Lexis 11972, ["Under (Fed. R. Evid 701), courts have allowed lay witnesses to express opinions about a business based on the witness's own perceptions and knowledge and participation in the day-to-day affairs of the business." (internal quotation marks and citations omitted)]

III.   Paragraphs 5 and 6 of Ron Walsh's Affidavit are not based on speculation or conjecture.

The Defendants assert that Ron Walsh's statement in his affidavit as to what he would have advised AGA about insurance coverage is based on speculation or conjecture.  However, Mr. Walsh's statements in his affidavit are factually supported, e.g.: "In or about 2001 there had been a major increase in the revenues being generated by commercial scallop fishing vessels out of New Bedford[2] and the value of fishing permits."  (Walsh's Affidavit ¶5, Exhibit B); "Need to increase their P&I coverage to at least $5,000,000 because of their potential exposure in the event of a serious injury occurring aboard a vessel, much of which is impacted by the earnings of crewmembers aboard the vessels." (Walsh's Affidavit ¶5, Exhibit B); and "The cost of increasing P&I coverage from $1,000,000 to $5,000,000 was relatively minimal." (Walsh's Affidavit ¶6, Exhibit B).

IV.   Conclusion

For all the reasons addressed, the Defendants 'Motion to strike should be denied.

---

[1] As noted in Mr. Walsh's deposition, he had previously testified at trial 20 to 25 times but never as an expert witness. (Walsh Depo., p. 9 and page 127, Exhibit A).
[2] See also Affidavit of Edie Mikina, Exh. C.

3

Dated: July 11, 2007                The Plaintiff, AGA FISHING CORP.
                                    By its attorney,
                                    JOSEPH G. ABROMOVITZ, P.C.


                                    s/Joseph G. Abromovitz
                                    _____
                                    Joseph G. Abromovitz
                                    BBO No. 011420
                                    858 Washington Street
                                    Third Floor
                                    Dedham, MA 02026
                                    Phone: (781) 329-1080

CERTIFICATE OF SERVICE

I, Joseph G. Abromovitz, counsel for the plaintiff, hereby certify that on the 11th day of July, 2007 I served a copy of the within document via postage prepaid mail to:

Michael J. Stone
Peabody & Arnold, LLP
30 Rowes Wharf
Boston, MA 02110

                                    s/Joseph G. Abromovitz
                                    _____
                                    Joseph G. Abromovitz

Ronald J. Walsh

|  |  |
|---|---|
| 1 | Volume: I |
| 2 | Pages: 1-138 |
| 3 | Exhibits: 1-17 |

4        UNITED STATES DISTRICT COURT

5        DISTRICT OF MASSACHUSETTS

6                  C.A. No. 05-11396 JLT

7

8  ------------------------------------

9  AGA FISHING CORP.,

10                  Plaintiff,

11     v.

12  FLAGSHIP GROUP LIMITED and

13  BROWN & BROWN, INC.,

14                  Defendants.

15 ------------------------------------

16

17        DEPOSITION of RONALD J. WALSH

18  Wednesday, November 29, 2006, 10 a.m. to 1:52 p.m.

19           PEABODY & ARNOLD, LLP

20             30 Rowes Wharf

21           Boston, Massachusetts

22

23  Court Reporter:  Paulette Cook, RPR/RMR

24

JONES REPORTING COMPANY
617-451-8900

Ronald J. Walsh

9

```
1      Q.  And golf season will be over by then?
2      A.  That's more important.  That's more
3  important.
4           MR. ABROMOVITZ:  Bite your tongue golf
5  season over.  Played last weekend.
6      Q.  By any chance, have you spoken with any
7  experts hired on behalf of the Joneses?
8      A.  Only this morning I talked to Mr. Abromovitz
9  whom I have not seen in many years -- a decade or
10 more.
11     Q.  You've been deposed before, correct?
12     A.  Yes, I have.
13     Q.  About roughly how many times?
14     A.  Thirty to 50.
15     Q.  And that was in connection with your job as
16 a -- as an insurance agent, broker?
17     A.  Yes, only as an insurance agent working with
18 international marine services and with the Flagship
19 Group entity in New Bedford.
20     Q.  Have you ever testified at trial?
21     A.  Yes.
22     Q.  And about how many times?
23     A.  I would say at least 20, 25 times.
24     Q.  Have you ever been a party in a lawsuit?
```

70

1  answered your question but --
2      Q.  You did.  Were you -- strike that.
3          Did you provide your clients with
4  consultation and advice as to exactly what type of
5  insurance that they should have?
6      A.  I would give them my opinion based upon the
7  industry factors that existed at the time of
8  quotations, and those factors were numerous.
9      Q.  Such as what?
10     A.  Ongoing litigation -- what the court
11 decisions were coming down in terms of awards, what
12 men were making in the industry as fishermen, what
13 the potential was for their loss of income at that
14 time due to a result of a disability that incurred
15 while at sea and under the coverage of their
16 policies, the values of the vessels at the time.
17 These different factors.
18         The amount of soliciting, plaintiff
19 counsel that were moving into the area.  All of
20 these factors you'd say, okay, here's what we've
21 got, and here's what I think you should do.
22     Q.  Did you go over these factors with the
23 Joneses' situation with the boat, the Victor?
24     A.  I think probably not specifically as we're

Ronald J. Walsh

71

1  doing now, but I may have said to them, look, here's
2  what I think you should have to protect yourself
3  based on how things are going.  What they -- what
4  people like the Joneses could understand is what
5  were the cost of claims, what were claims costing on
6  an average, what were the awards coming down out of
7  the federal court system for different types of
8  injuries.
9          Those are things that they understood,
10 and these are things, you know, that I would have
11 addressed with them.
12     Q.  Do you have any recollection though?
13     A.  No, I don't.
14     Q.  So your answer is based upon your general
15 practice?
16     A.  Yes.
17     Q.  Did you ever tell the --
18         MS. PASTORI:  Off the record.
19         (Off the record.)
20 BY MS. PASTORI:
21     Q.  Did the Joneses ever ask you to increase
22 their insurance limits for P & I?
23     A.  Not to my knowledge.  I can't recall.
24     Q.  Did the Joneses provide you copies of their

Ronald J. Walsh

123

1   over the phone, I may have seen Mrs. Jones at a
2   cocktail party for the sheriff on reelection but,
3   heck, that was well over a year ago.
4           MS. PASTORI:  Why don't we go off the
5   record for a minute?
6           (Off the record.)
7   BY MS. PASTORI:
8       Q.  I just have a few followup questions that
9   I'd like to ask you, and then I'll turn you over.
10          In terms of your relationship as a
11  broker with the Joneses, was your relationship with
12  them pretty standard, pretty typical of what you had
13  with all your other clients?
14      A.  No.  More so with them, I spent more time
15  with them, and how I know it is because even the
16  paperwork here -- and an extraordinary amount of
17  paperwork was back and forth, back and forth, and
18  the Joneses were good fishermen, but, without
19  insulting them, they just didn't understand the
20  fishing industry, the intricate part.  They didn't
21  understand insurance.
22          They relied upon everyone, their
23  bookkeepers, their insurance man, their oil men to
24  put in the oil, what should I do.  I found whenever

124

1  they conceived there was a big problem, they'd be at
2  my office together. More often than no, I'd have to
3  hold their hand, and they just didn't understand,
4  and they needed more guidance than anyone -- the
5  hundreds of people that I ever dealt with, they
6  stick out in my mind as probably being the most
7  naive.
8       Q.  Give me some examples. You mentioned they'd
9  show up at your office if there was a problem or
10 something. So could you give me some examples of
11 what you're talking about?
12      A.  You asked me specifically about the hull
13 insurance. They may have come to me, you know, I'm
14 underinsured, or they may say my insurance should be
15 higher. I don't know. If there was a minor claim,
16 which they did have a crew member that may have been
17 on -- you know, on their boat when they insured with
18 us, and they would panic. You know, are we supposed
19 to get involved. I'm only surmising this now --
20      Q.  You don't have any memory?
21      A.  I don't have any great memory of it. I can
22 remember she had a terrible time when she lost her
23 son, and she was looking for, you know, consolation
24 and -- I mean if I happened to be on the waterfront,

Ronald J. Walsh

127

1 what they're just insuring but try to bring it off
2 the professional level to a personal level, how's
3 the family, going through a bad time.  They have a
4 daughter -- tried to do this with everyone, tried to
5 get them at ease to talk about things, be it at golf
6 or the family.  They had some tragedies in their
7 life, and ultimately they'd come up, and they would
8 feel -- the death of their son and a daughter who
9 either -- another son that had cerebral palsy that
10 was committed to an institute somewhere.
11        So I always held their hand knowing it
12 was not easy for them just raising their own
13 families and surviving with the tragedy that's
14 occurred to their family.  So with -- oh, my father
15 -- things we'd talk beyond business.  But nothing
16 more than that.
17    Q.  Is it your opinion that you fulfilled any
18 duties that you may have had to the Joneses and AGA?
19    A.  I feel that I did whatever I should have
20 done as an insurance agent.
21    Q.  Have you ever testified as an expert before?
22 I know you've testified a whole bunch of times
23 but --
24    A.  No, never as an expert.  No.

130

1  get the record all mucked up.  Other than that one
2  piece of advice, as you sit here today you have no
3  recollection of any other advice that you gave the
4  Joneses?
5      A.  I have no other recollection.
6      Q.  Did the Joneses ever say anything to you
7  that indicated that they were relying upon you for
8  advice in terms of coverage?
9      A.  I don't recall.
10     Q.  That's all I have for now.
11         MR. ABROMOVITZ:  I have a few questions.
12 CROSS-EXAMINATION BY MR. ABROMOVITZ:
13     Q.  Mr. Walsh, you testified earlier that of all
14 the boat owners that you serviced over the years the
15 Joneses tended to need more information than most?
16 Is that fair to say?
17     A.  Yes.
18     Q.  They were unsophisticated in the field of
19 insurance?
20     A.  Yes, more so Mr. Jones.
21     Q.  Okay.  And when the issue would come up as
22 to renewal of coverage and specifically with
23 reference to the protection and indemnity coverage
24 limits that they had and when an application was

Ronald J. Walsh

131

1  filed, I think you said you wouldn't put your name
2  on the application unless you felt comfortable that
3  the coverage that was being sought was adequate?
4      A.  That's correct.
5      Q.  Okay.  And how would you go about
6  determining if that coverage was adequate?
7      A.  There are several factors as -- in answer to
8  one of the questions.  One of the things certainly
9  was what the judgments were coming down from the
10 juries in the court and the federal courts and not
11 just the district or federal court but also Maine
12 and elsewhere, what claims were being paid out --
13 the cost of claims being paid within the industry in
14 the New Bedford area by all these other agents that
15 were my competitors, the values of the stocks, the
16 values of the vessels -- all of these came into
17 play.
18     Q.  When you say the values of the stocks, do
19 you mean how much was being generated by the catches
20 that the boats were making?
21     A.  Yes.
22     Q.  Why would that be important?
23     A.  Well, more often than not, when a man was
24 injured on a fishing boat he spent a lot of time

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11396 JLT

****************************************************
AGA FISHING CORP.                    *
                                     *
v.                                   *
                                     *
FLAGSHIP GROUP LIMITED and           *
BROWN & BROWN, INC.                  *
****************************************************

**AFFIDAVIT OF RONALD J. WALSH**

I, Ronald J. Walsh, do attest and swear that the following is true and correct to the best of my knowledge, information and belief.

(1)    That when I first met George and Antoinette Jones in a professional capacity as a broker of marine insurance in the 1980's it became clear to me that they were very unsophisticated in the field of marine insurance. As I testified at my deposition they just did not understand insurance coverage. This was true up to and including my last dealings with them prior to the termination of my employment with Flagship Group, Limited.

(2)    When I testified at my deposition that I didn't remember whether the Jones' relied upon me for advice concerning insurance coverage that was inaccurate. The question was asked of me several hours into the course of my deposition and I was tired. I do remember that, in fact, they did rely upon me for advice, more-so than most if not all of the other clients that I serviced. I did not make this change to my deposition transcript for the simple reason that when the transcript was received by me to review I

was in Florida and more than thirty days passed and I understood that I could not correct the transcript more than 30 days after I received it.

(3) During the period of time that I was placing marine insurance coverage for AGA both with Neptune Mutual and later with Flagship, because of the factors addressed in my deposition, it was my opinion, certainly up to and including the last policy that I placed for them thru Flagship, that $1,000,000 P&I coverage was adequate. If I had not believed $1,000,000 P&I coverage to have been adequate I would have advised the Jones (and all of my other clients) to increase their coverages. I thought that to have been part of my job as a marine insurance broker/producer.

(4) When I testified at my deposition that went forward on or about November 29, 2006, that I had not spoken with Attorney Abromovitz, the attorney for AGA Fishing Corporation, prior to the deposition I had forgotten that he and I did speak at length in early 2005. We spoke at length concerning my relationship with the Mr. & Mrs. Jones, and the factors that I would consider when seeking to place coverage for them and the other vessel owners that I serviced. I told Attorney Abromovitz the same things to which I testified at my deposition concerning the Jones', their knowledge of insurance, and the factors that were considered by me and other competent marine insurance brokers/producers when a broker/producer of marine insurance was assessing the adequacy of insurance coverage and advising clients, all about which I testified at my deposition.

(5) Having lived in New Bedford most of my life, worked in the fishing industry and knowledgeable about what was happening with the scallop fishing industry over

the years it was clear to me that by 2001 there had been a major upswing in the profitability to a commercial scallop fishing vessel owner, and the captains and crews working those boats. While I was no longer in the marine insurance industry I was aware that starting in or about 2001 there had been a major increase in the revenues being generated by commercial scallop fishing vessels out of New Bedford and the value of fishing permits. Had I still been in the industry selling marine insurance I would have advised commercial scallop fishing vessel owners, such as AGA Fishing Corporation, of the need to increase their P&I coverage to at least $5,000,000 because of their potential exposure in the event of a serious injury occurring aboard a vessel, much of which is impacted by the earnings of crewmembers aboard the vessels.

(6)   I was well aware during the period of time that I was selling marine insurance that the cost of increasing P&I coverage from $1,000,000 to $5,000,000 was relatively minimal. There is no doubt in my mind, based upon my relationship with George and Antoinette Jones, that had I informed AGA Fishing Corporation that they should carry at least $5,000,000 P&I coverage for their fishing vessel the GEORGIE J that they would have followed my recommendation.

Dated: June 7, 2007

_____
Ronald Walsh

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11396 JLT

*********************************************
AGA FISHING CORP.                    *
                                     *
v.                                   *
                                     *
FLAGSHIP GROUP LIMITED and           *
BROWN & BROWN, INC.                  *
*********************************************

### AFFIDAVIT OF EDIE MIKINA

I, Edie Mikina, do attest and swear that the following is true and correct to the best of my knowledge, information and belief.

(1) That I am part owner of Edie & Marie Boat Settlements, 113 McArthur Drive, New Bedford, MA 02740 and have been since 1985.

(2) Edie & Marie's is a boat settlement house. What this means is that when a commercial fishing vessel that we worked with landed and offloaded its stock at a commercial fish enterprise, typically what would happen is that the revenues generated from the boat's catch would be reported to Edie & Marie's. We would then pay the vessel's bills associated with the fishing trip, pay the crew, and distribute the remaining funds to the vessel owner. As part of this process I became familiar with the volume of the gross landings, the monies generated and the earnings of crewmembers from 1985 thru the present.

(3) In the timeframe of roughly 2001 through 2003 Edie & Marie's did the boat

settlements for roughly 40 scallop commercial fishing vessels fishing out of the ports of New Bedford and Fairhaven. It was quite evident that during this timeframe the gross landings and dollars generated from the landings were increasing significantly over prior years. This meant that the earnings of the crewmembers on these commercial scallop vessels were increasing tremendously over the prior years; also the profits of the scallop fishing vessel owners were too, increasingly over this period of time.

(4)   Starting in the early 2000's a crewmember working steady aboard a scallop fishing vessel could earn annually in excess of $100,000.

Dated: June , 2007

_____
Edie Mikina